# EXHIBIT 2

Ruby Green

*vs.*

Howard Finkelstein

Deposition of:

RENEE DADOWSKI

May 07, 2021

Vol 01

# PHIPPS REPORTING

*Raising the Bar!*

Renee Dadowski
May 07, 2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 20-CV-62160-BLOOM/Valle

RUBY GREEN,

      Plaintiff,

vs.

HOWARD FINKELSTEIN, Individually, in his
Capacity as Public Defender for Broward
County, and the Office of the Public
Defender for Broward County,

      Defendant.

_____/

ZOOM DEPOSITION OF

RENEE DADOWSKI, ESQ.

Friday, May 7, 2021
1:58 p.m. - 4:30 p.m.

Location:  Via Zoom

Stenographically Reported By:
Cindy Hart, Court Stenographer

Job No.:  187232

Renee Dadowski
May 07, 2021

Page 2

```
 1   APPEARANCES VIA ZOOM:
 2   On behalf of Plaintiff:
 3       FRANK & RICE, P.A.
         325 West Park Avenue
 4       Tallahassee, Florida 32301
         (850)629-4168
 5       BY:  Patrick R. Frank, Esq.
         lawatf@aol.com
 6
 7   On behalf of Defendant:
 8       LAUFER & LAUFER, P.A.
         7251 West Palmetto Park Road
 9       Boca Raton, Florida 33433
         (561)300-5150
10       BY:  Cory Laufer, Esq.
         claufer@lauferlawyers.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                I N D E X
 2
 3   Witness                                Page
 4   Testimony of Renee Dadowski, Esq.
 5       Direct Examination by Mr. Frank      4
         Cross Examination by Mr. Laufer     111
 6   Certificate of Oath                     114
     Certificate of Reporter                 115
 7   Read and Sign Letter                    116
     Errata Sheet                            117
 8
 9
10             E X H I B I T S
11   EXHIBIT          DESCRIPTION          PAGE
12   No. 1  9/18/20 e-mail                   105
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   Thereupon,
 2   the following proceedings began at 1:58 p.m.:
 3           STENOGRAPHIC REPORTER:  Raise your right
 4       hand, please.
 5           Do you swear that the testimony you are
 6       about to give will be the truth, the whole
 7       truth, and nothing but the truth, so help you
 8       God?
 9           THE WITNESS:  I do.
10   Thereupon,
11           RENEE DADOWSKI, ESQ.
12   having first been duly sworn, testifies as follows:
13               DIRECT EXAMINATION
14   BY MR. FRANK:
15       Q.   Good afternoon, Ms. Dadowski.  How are
16   you?
17       A.   Good.  How are you?  Thank you.
18       Q.   Good, good.  My name is Patrick Frank.
19   I'm an attorney with the law firm of Frank & Rice up
20   in Tallahassee.  We represent Ruby Green who is a
21   plaintiff in the lawsuit that's been filed against
22   Howard Finkelstein and the Broward County Public
23   Defender's Office.
24           Have you ever been deposed before?
25       A.   A long, long time ago.
```

Page 5

```
 1       Q.   What was the --
 2       A.   I was a public defender and I had to
 3   testify in like federal court on something.
 4       Q.   Okay.  Would that have been the only
 5   instance in which you've testified in a deposition
 6   before?
 7       A.   I believe so.  And now I'm thinking, did I
 8   even testify in a deposition or was it just in court?
 9   I don't know if I've ever been deposed.  I couldn't
10   tell you now that I think about it.
11       Q.   Okay.  That's fine.  I appreciate that.
12           Well, just in the interest of facilitating
13   an efficient deposition, I'm just going to give you a
14   few basic ground rules about what we're going to do
15   today.  You're an attorney, so I'm sure it's probably
16   not lost on you on how these things function.
17       A.   Right.  I did give a statement to the
18   State Attorney's Office once 'cause one of our
19   lawyers got involved in a DUI accident and I did -- I
20   was like listed as a witness, I guess, for the
21   investigation, so I had to give a statement.
22       Q.   Oh, okay.
23       A.   But I don't know if that counts for your
24   purposes, but as far as a deposition, I don't believe
25   I have.
```

Renee Dadowski
May 07, 2021

Page 6

1   Q.   I appreciate that.
2        So for purposes of today, I don't think
3   it's going to be particularly long.  I anticipate
4   maybe about an hour or so at most, but if you for any
5   reason you need to take a break, it's not an
6   endurance contest, so please feel free to let me know
7   if you need to do so, okay?
8   A.   Will do.  Thanks.
9   Q.   And I don't always ask questions as
10  artfully as I would aspire to, so in the event that I
11  ask you something that doesn't make a whole lot of
12  sense, which is certainly possible at times, I would
13  invite you to ask me to rephrase the question or just
14  let me know that you don't understand so that I can
15  make sure that every question I'm asking you today is
16  something that's clear; is that fair?
17  A.   Yes, it is.
18  Q.   Sometimes there's a tendency to
19  gesticulate or say uh-huh or huh-uh in lieu of giving
20  an articulable answer such as a yes or no.  We all do
21  it.  We're all reminded of it at times.  I may at
22  some point in time, if you do that, I may say, Is
23  that a yes or is that a no?  I'm not doing it to be
24  glib or funny.  I'm just doing it to make sure that
25  we have a clean record, okay?

Page 7

1   A.   I taught for 25 years at defender college
2   and that was one of the big pet peeves that I had
3   with the lawyers that we were training, to make sure
4   that they're aware of their record and then know that
5   you can't say uh-huh and huh-huh.  So I will try to
6   make sure I don't do that, but feel free to let me
7   know if I do.  I have no problem with you telling me
8   that I did it.
9   Q.   That's a phenomenon you seem to be very
10  familiar with it.  Okay.  Good.
11       Today you're represented by Cory Laufer
12  who's your attorney who's representing the Public
13  Defender's Office.  He may or may not, hopefully not
14  too many times, but he may object today to some of my
15  questions.
16       In the event that he does, he's doing so
17  for the record so you know.  Unless he explicitly
18  tells you not to answer a question, I'd request that
19  you, after we've gotten our objections on the record
20  to preserve them, that you would answer the question,
21  okay?
22  A.   Sure.
23  Q.   And that is -- oh, and you understand that
24  even though we're not in court today, you're still
25  full force and effect of being under oath, correct?

Page 8

1   A.   Yes.
2   Q.   Okay.  Terrific.
3        This is going to be the only time that I'm
4   going to get to talk to you prior to a trial, so I'm
5   going to ask you just some general questions if I may
6   about your background.
7   A.   Somebody is trying to connect to audio.
8   It says Staff 5.  I don't know who that is.  And
9   somebody actually it looks like they did successfully
10  connect to audio.  So I know you were asking who was
11  on the call.  There's somebody that's listed as Staff
12  5.
13  Q.   Okay.  I don't -- yeah, I don't know who
14  that is, if they want to be on the call or identify
15  themselves.  Are they on now?
16  A.   Yes, they're on and they're muted.
17  Q.   Okay.  Do we know who that is?
18       MR. LAUFER:  I don't know who that is.
19  A.   I'm sure the host could kick them off if
20  they don't want to identify themselves and we don't
21  know who they are.
22       They're gone.  I guess we scared them with
23  that.
24  BY MR. FRANK:
25  Q.   Okay.  So if you would, could you tell me

Page 9

1   a little bit about your educational background.
2   A.   From college or law school?
3   Q.   College on, please.
4   A.   Okay.  I graduated in 1985 from Indiana
5   University of Pennsylvania, which is in Indiana,
6   Pennsylvania.  I got a B.S. in accounting and a minor
7   in pre-law.  I graduated magna cum laude.
8        And then when I graduated from college, I
9   moved to South Florida.  I thought I was just going
10  to go to law school down there and then once I
11  graduated from law school, I would come back to
12  Pennsylvania.  And I got my degree, my J.D., at Nova
13  University Center for the Study of Law is what it was
14  called at the time, in 1988.
15       I did an internship in the Public
16  Defender's Office my last semester and I got hired
17  after my internship.
18  Q.   Okay.
19  A.   Indiana University of Pennsylvania is in
20  Indiana, Pennsylvania.  That's why they call -- it's
21  not affiliated with IU at all.  People always ask if
22  it's a branch campus of Indiana University and it is
23  not.  It's its own separate state university in
24  Pennsylvania.
25  Q.   Okay.  I've not heard of that university

Renee Dadowski
May 07, 2021

Page 10

1  before.
2      A.  Jimmy Stewart is from Indiana,
3  Pennsylvania and it used to be the Christmas tree
4  capital of the world, just for some knowledge.  If it
5  still is, I don't know.
6      Q.  Good to know.
7          What precipitated you going to Nova as
8  opposed to someplace locally?
9      A.  Well, my parents had a place in Boca Raton
10 at the time and two of my best friends from college,
11 two of my sorority sisters moved down a year ahead of
12 me because one of them, their parents had a place in
13 Boca Raton, so I was gonna move down, live with them,
14 and then I got accepted to UM and Nova.
15         UM was a little bit too far for me to
16 drive from Boca where I was planning to live.  And
17 also when I went and toured Nova, I really liked the
18 smallness of the campus and I really liked the
19 professors that I met during my tour.
20     Q.  I see.  Now, you had indicated you had
21 done an externship or I don't know what the proper --
22     A.  It was a CLI, certified legal internship.
23     Q.  Okay.  With the Public Defender's Office
24 in Broward?
25     A.  Correct, in January of 1988.  Last minute

Page 11

1  decision.  I had never intended to do criminal
2  defense work.  It just happened.
3      Q.  I see.  And then after you did that, you
4  went to work for them full time?
5      A.  Yes, I got hired June 1st of 1988 and I
6  stayed there until January of this year, 2021.
7      Q.  Okay.  When you initially were hired, who
8  was the head of the office at that point in time?
9      A.  It was -- Alan Schreiber was the public
10 defender and Bob Wills was the chief assistant public
11 defender.
12     Q.  I see.  And Mr. Schreiber was the
13 immediate predecessor, I guess, to Mr. Finkelstein,
14 correct?
15     A.  Correct.  He was the elected public
16 defender prior to Howard Finkelstein getting elected.
17     Q.  When you were initially hired on, what was
18 your first position with the office?
19     A.  I was assigned to county court, so Judge
20 Kate Kearney, Kathleen Kearney, was my first division
21 judge.  And then I had Judge Paul Backman at the same
22 time as Judge Kate Kearney, and then I split Judge
23 June Johnson besides having Judge Kate Kearney and
24 Judge Backman.
25     Q.  I see.

Page 12

1      A.  And I was a CLI at the time.  I was an
2  attorney.  That was before we realized that CLIs were
3  not supposed to be in court by themselves.
4      Q.  Oh, okay.  And after you did the initial
5  stint in county court, what position did you go to
6  next after that?
7      A.  Then I was promoted to felony in like the
8  fall of '89 because I didn't pass The Bar -- we
9  didn't get Bar results then until September of 1988.
10 So I think it was like sometime in the fall, I can't
11 remember exactly when, in '89, I got promoted to
12 felony and I was assigned to Judge Moe's, Leroy Moe's
13 division.
14     Q.  Okay.  And how long were you in that
15 position for?
16     A.  As Judge Moe's attorney or in felony?
17     Q.  In felony.
18     A.  I was there until -- and I can't tell you
19 when 'cause I do not have access to any of my public
20 defender records.  So I was in Judge Moe's division
21 and felony basically until I was promoted to, I
22 believe it was called a senior attorney position.
23         And I had been through various divisions.
24 I was the first public defender assigned to the
25 Domestic Violence Unit when they created DV court in

Page 13

1  Broward.  And then I had some, you know, a bunch of
2  other judges.
3          And then I became a senior attorney, which
4  was kind of like a supervising attorney, but I
5  couldn't tell you what year that was, sorry.
6      Q.  Oh, no.  Would it have been -- and I
7  understand we're going back to 1989, 1990.
8      A.  No, no, this would have been in the '90s.
9  Probably --
10     Q.  In the '90s?
11     A.  -- '92 maybe.  I don't know.  '90 -- I'm
12 not sure.  I don't know how long it was before I
13 became a senior attorney.
14     Q.  Okay.  When you became a senior attorney,
15 did you still, whatever time that may have been, were
16 you still -- I know you were serving in a supervisory
17 capacity, but were you still trying cases at that
18 time?
19     A.  Yes, I still had a case load.  I think I
20 had maybe 20 to 25 cases.  And I believe -- I might
21 have even had more, but I had like more of the
22 serious cases, like the capital sexual batteries, the
23 attempted first degree murders, murder twos, armed
24 robberies, traffickings.
25         And I think at that time I was like

Renee Dadowski
May 07, 2021

---

Page 14

```
 1   bringing some of the younger lawyers as co-counsel
 2   with me.  I can't remember if that was part of my
 3   responsibilities then, but I, for some reason, think
 4   that one of the things they wanted us to do was to
 5   bring the younger lawyers along with you as
 6   co-counsel.
 7       Q.   Typically at that time when you had some
 8   of the supervisory responsibilities, how many, on
 9   average, lawyers would have under you that you
10   would supervise or oversee their activities?
11       A.   Well, there was -- I was kind of -- we had
12   chief assistant public defenders and then each chief
13   assistant public defender had three or four senior
14   attorneys, so then the senior attorneys were
15   responsible for the direct supervision of probably
16   three or four judges.  So I want to say anywhere
17   from -- 'cause some divisions had two, some divisions
18   had three and very rarely at that time did any
19   divisions have four attorneys.  So I would say
20   anywhere from 6 to 10 attorneys I was probably
21   directly responsible for at that time.
22       Q.   Okay.
23       A.   Again, you know, I don't know for sure 100
24   percent because it's going back awhile.
25       Q.   Oh, absolutely.  And I'm not going to hold
```

Page 15

```
 1   you to it.  I realize we're going back some years,
 2   and when I ask you these questions, I'm just asking
 3   for general ballpark.
 4       A.   Okay.
 5       Q.   So I certainly understand with that
 6   caveat.
 7            This particular position that you talked
 8   about that you think you were doing maybe in '92, how
 9   long did you hold that specific position?
10       A.   I want to say I held that position
11   until -- so it actually may have been later than '92
12   now that I'm thinking about it.  I really don't
13   remember.  But I believe I held that position as like
14   a senior attorney until Howard Finkelstein was
15   elected and started.  And I believe he was elected in
16   2006 and his term started in 2007.
17            So once 2007, or whenever Howard
18   Finkelstein's first term started, I became the
19   director of the Early Representation Unit.  So I
20   created the actual Early Representation Unit.
21       Q.   Okay.  What is that?
22       A.   Basically the law requires that when
23   someone's entitled to counsel and a public
24   defender, they're supposed to get them early.  We had
25   a tendency under the previous-elected public defender
```

Page 16

```
 1   that we would not get appointed sometimes until 21,
 2   30, 40 days after somebody was arrested.  We were not
 3   appointed at first appearance, other than for limited
 4   purposes of first appearance.  And the rules of
 5   criminal procedure provide that we're supposed to be
 6   appointed either when, you know, somebody's taken
 7   into custody when there's custodial interrogation,
 8   and first appearance, and things like that.
 9            So Howard decided that he wanted to start
10   following the law and having the public defenders
11   receive the same type of representation as private
12   attorney clients because, you know, obviously our
13   clients were at a disadvantage if they didn't have
14   counsel and we couldn't get them released from
15   custody, they would basically be held in jail and
16   they would lose their jobs and their families and
17   their houses and apartments and everything else.
18            So Howard said, you know, we're gonna
19   treat our clients the way private attorneys handle
20   clients because private attorneys obviously get
21   involved right away.
22       Q.   Right.  Now, when Mr. Finkelstein became
23   public defender, did you support his campaign?  Did
24   you support his becoming public defender?
25       A.   Yes, I did.  There was nobody else that
```

Page 17

```
 1   ran against him.  There was really nobody else to
 2   support, but I would have supported Howard
 3   regardless.
 4       Q.   Was Mr. Schreiber retiring at that time?
 5       A.   He was retiring, and actually, Howard was
 6   Alan Schreiber's anointed public defender, for lack
 7   of a better word.  He supported Howard and that was
 8   who he felt would be the best person to take over for
 9   him and his administration.
10       Q.   I see.  At the time immediately prior to
11   Mr. Finkelstein being elected, what was his position
12   in the Public Defender's Office?
13       A.   He was a chief assistant public defender
14   and he was in charge of training.  I can't remember
15   when Howard got elected.
16            I became a chief assistant in 2007, so I
17   don't remember now -- in April of 2007.  So it might
18   have been 2004 was the election.  Let me go back in
19   my math.  Let's see.  It might have been 2004 and so
20   he started in 2005.  So I became the director of the
21   Early Representation Unit in 2005 I think now,
22   January of 2005.  I'm sorry.  I'm just trying to go
23   back in my years.
24       Q.   Not at all.  Not at all.  I appreciate
25   that.
```

Renee Dadowski
May 07, 2021

Page 18

```
 1           So your initial position under
 2  Mr. Finkelstein's tenure was with the Department of
 3  Early -- I'm sorry, what was that?
 4      A.   Representation.  Early Representation
 5  Unit, yes.
 6      Q.   And then you've indicated that in April of
 7  2007 you became chief assistant?
 8      A.   Correct, I became the chief assistant in
 9  charge of the Early Representation Unit.  So I was
10  basically -- Bob Wills was the chief of the Early
11  Representation Unit when Howard got elected.
12           I basically created the whole unit.  I
13  went down to Miami-Dade before Howard was actually
14  sworn in, I created the training manual, I created
15  the procedures, I devised the whole unit with
16  Howard's support.
17           And so then, they decided, I guess, to
18  move Bob to a different position and so they
19  promoted me to the chief of the Early Representation
20  Unit in April of 2007.
21      Q.   Okay.  Were you, at the time with the
22  Early Representation Unit, were you trying cases at
23  that point when you were head of that unit, director
24  of that unit?
25      A.   I believe so because I think at that point
```

Page 19

```
 1  they still wanted -- it was either before, during, or
 2  soon after I became the chief because they wanted all
 3  of the chiefs to start trying some cases.  So once
 4  again, I had about 20 cases.  And I brought some of
 5  the younger lawyers on with me to try cases.  And I
 6  believe it might have been when Howard first took
 7  office and I became the director and continued.
 8           There may have been a time where we
 9  stopped handling cases.  And then, as I recall, he
10  wanted us to start handling cases again.  So at some
11  point as the chief of the Early Representation Unit,
12  I did, in fact, I believe, handle some cases.
13      Q.   When you refer to he, you're referring to
14  Mr. Finkelstein?
15      A.   Correct.
16           And then when I became a felony chief,
17  there was a time where I also handled -- I had some
18  cases that I handled in my division that I
19  supervised.
20      Q.   When did you become felony chief?
21      A.   Once again, I couldn't probably tell you
22  that, but I can tell you that it was maybe -- well, I
23  can tell you.  Whenever Nadine Girault became the
24  chief of the Early Representation Unit, I became a
25  felony chief, and at that point I handled --
```

Page 20

```
 1  actually, before that -- let me back up.
 2           While I was still the chief of the Early
 3  Representation Unit, I ended up getting two
 4  divisions.  I handled -- well, actually the ROC court
 5  division had two judges.  So I had Judge Backman and
 6  Judge Bidwill were the judges and I had, I believe,
 7  two lawyers in each of those divisions.  And then I
 8  also had Judge Imperato and that had three lawyers in
 9  it.  And I had Judge -- I think it was Judge
10  Rothschild.  I cannot remember.
11      Q.   Now, this would have been subsequent to
12  you being the chief of the Early Representation Unit,
13  correct?
14      A.   This would have been at the same time
15  because --
16      Q.   Same time?
17      A.   Yeah.  So there was a time where they gave
18  me more responsibilities.  So I was the chief -- I
19  believe I was the chief still of the Early
20  Representation Unit and then they gave me four other
21  divisions, one division plus two other judges.  So
22  ROC court, or repeat offender court, and it was Judge
23  Imperato and I -- oh, I know who it was.  It was
24  Judge Siegel, I apologize.  It was Judge Siegel.  And
25  I had three lawyers in that division as well.
```

Page 21

```
 1      Q.   I see.
 2      A.   And then I went straight to -- when Nadine
 3  Girault became the chief of the Early Representation
 4  Unit, I just handled felony trial divisions.
 5      Q.   Okay.  Do you have sort of a ballpark
 6  figure of when you went back to just handling the
 7  felony?
 8      A.   Maybe 2009, 2010.
 9      Q.   And you would have been chief assistant of
10  the felony division?
11      A.   Well, there were a couple of us.  It
12  was -- Frank De La Torre was a chief of felony; Steve
13  Michaelson was a chief of felony; I believe Susan
14  Porter was a chief of felony; and I had some
15  divisions.  You know, I really don't remember.  I'm
16  sorry.
17      Q.   Well, there's a lot of people and a lot of
18  years, so I certainly understand.
19      A.   Yeah.  If I had my public defender
20  records, I could tell you for sure, but I -- now my
21  mind might not be accurate as to the dates, I'm
22  sorry.
23      Q.   No, I understand.
24           When you were over the felony division
25  around about this time, were you still trying cases?
```

Renee Dadowski
May 07, 2021

1    A.   At that point, I believe so.  I think
2  Howard still wanted us to have some cases.
3         And then it got to a point where we moved
4  Susan Porter from the felony trial divisions back to
5  the training director 'cause she was the chief of
6  training.  And then we had some reorganization and we
7  stopped having trainers, and so Sue became a chief of
8  one of the felony units; Frank was a chief of felony
9  units; Steve was the chief of some felony.  And then
10 I don't think -- and then I believe I had like --
11 that's when I had a couple.  I was still in ERU.
12        Then they decided to move Sue back to
13 training as the training director, and that's when I
14 believe I got like full felony divisions as opposed
15 to any of the ERU division, or as opposed to
16 handling the ERU division as well.
17        And then when Steve Michaelson retired,
18 just Frank De La Torre and I supervised the felony
19 divisions.  And I think at that point I may not have
20 handled any cases or trials anymore, but I believe
21 before that I had some.
22    Q.   Okay.  What was the next position that you
23 had that you remember after you went from -- if you
24 went from felony, head of those felony divisions that
25 you were just talking about?

1    A.   When Catherine Keuthan retired in 2007,
2  then I became an executive chief assistant public
3  defender in -- I want to say it was September of
4  2000 -- excuse me, 2017, when she retired in 2017; I
5  became an executive chief assistant public defender
6  in 2017.
7    Q.   And at that point in time were you trying
8  cases when you took that role?
9    A.   No, no, I was not.
10   Q.   What was your -- generally, what were your
11 responsibilities associated with that position?
12   A.   Basically there were three of us that were
13 executive chief assistant public defenders at that
14 time.  Prior to that, when Howard first took over, it
15 was Diane Cuddihy and Catherine Keuthan were the
16 executive chief assistant public defenders.
17        And then when Cathy left, Gordon Weekes
18 and I became executive chief assistant public
19 defenders, and my main responsibilities were
20 supervising the staff.  There was some secretaries or
21 administrative assistants that were directly
22 responsible for the staff, but I oversaw all of the
23 staff.  I was responsible for the ultimate hiring of
24 all the staff.
25        I directly oversaw our IT department and

1  the staff in that department.  I helped make the
2  decisions regarding the office and the procedures and
3  I helped draft the office manual or updated the
4  office manual that had been there.
5         And I was also mainly in charge or
6  supposed to be in charge of the budget and the
7  finances.  And I think that's kind of, you know,
8  like -- I kind of directly oversaw the lawyers, too.
9  We oversaw the chief assistants, too.  We basically
10 reported to Howard.  Howard was our boss.
11   Q.   I see.
12   A.   And everybody else reported to us so to
13 speak.
14   Q.   You mentioned that you were involved in
15 hiring decisions.  Were you involved in termination
16 or disciplinary decisions at that point in time, too?
17   A.   Yes.
18   Q.   What was the nature of the involvement
19 that you had with regard to discipline or
20 termination?
21   A.   Well, even when I was a chief assistant, I
22 was involved in disciplinarian -- disciplinary issues
23 and termination issues.  So when I was the chief of
24 the Early Representation Unit, I had to -- you know,
25 it's not ever pleasant, but sometimes we had to let

1  some of the attorneys that weren't quite making it,
2  'cause usually by the time they came to my Early
3  Representation Unit, they had been through juvenile
4  and county court and so, you know, that was kind of
5  like their last chance to see if we could get them to
6  get up to speed.  Because it takes a lot of time to
7  train a lawyer, we don't like to get rid of people
8  lightly.
9         So I was involved in -- I didn't make the
10 ultimate decision, but I would give my
11 recommendations and information to Cathy, Diane, and
12 Howard and they would give me the okay, whether it
13 was okay to, you know, cut our losses at that point.
14        And then when I became an executive chief
15 assistant public defender, it was once again, you
16 know, we would discuss with the chief if they came in
17 and said that someone's not gonna quite make it,
18 sometimes I was involved in those decisions and
19 sometimes I wasn't.
20   Q.   I see.  Typically when you would be
21 involved in the decisions regarding making a
22 recommendation about a lawyer that they should be let
23 go, would Diane and Cathy and Mr. Finkelstein
24 typically follow your recommendations?
25   A.   Yes.

Renee Dadowski
May 07, 2021

Page 26

1    Q.   Can you remember any instances in which
2  they might have vetoed or disagreed with your
3  recommendation?
4    A.   There may have been some times, but
5  unfortunately, you know, it's going back to 2009
6  probably, so I don't think I can remember.
7    Q.   Sure.  With regard to letting --
8  potentially letting an attorney go, what you had said
9  before seemed to relate more to issues of not being
10 up to snuff as it were as far as performance goes.
11         Were there ever any instances that you can
12 recall during your tenure that you made any
13 recommendations to terminate attorneys for behavioral
14 issues?
15   A.   Well, during this pandemic, we terminated
16 two attorneys, not including Ruby Green.  One
17 attorney because he was having some stress issues it
18 seemed and another attorney because she made some
19 inappropriate remarks on a group chat and also she
20 had been practicing civil law and some criminal law
21 and you're not entitled to do that.  And after we
22 requested her to stop doing that, I believe she
23 stopped, but then she had another issue where she was
24 involved in a group text with the prosecutor and said
25 something related to Hitler that the prosecutor took

Page 27

1  great offense at and so the decision was made to
2  terminate her.
3    Q.   Who was that particular person?
4    A.   Natalie Lopez.
5    Q.   And as far as the gentleman who you
6  referenced who had stress issues, who was that?
7    A.   Jonathan Miceli.
8         And I'm pretty sure Ruby was actually
9  involved in some of the text chains involving
10 Jonathan.  She was, I think, concerned about his
11 behavior and some of the comments that he had been
12 making is my recollection.
13   Q.   There was a gentleman -- I'll represent to
14 you there was a gentleman I read in a paper account
15 that said -- used a four letter epithet during a Zoom
16 call with a judge to another prosecutor.  Does that
17 ring a bell?
18   A.   Yeah, that was Dale Miller and he still
19 works in the office.  He thought he was I guess -- he
20 thought his screen was off and he was muted, and he
21 didn't realize that he was still on a live mic.
22   Q.   I see.  Yeah, that seems to be a hazard
23 these days.
24   A.   I believe he made the comment directed at
25 the prosecutor.  He called him a something idiot.

Page 28

1    Q.   Yeah.  I saw that.
2    A.   Something like that.
3    Q.   Going back for a moment, when
4  Mr. Schreiber was head of the office, did he try
5  cases?
6    A.   No, never.  Never that I was aware of.  He
7  might have tried them before I got hired, but from
8  June 1st of 1988 until he left, he never tried a case
9  that I'm aware of.
10   Q.   Okay.  As far as you mentioned at some
11 point in time there was a training -- efforts to
12 train PDs stopped.  Did I hear you correctly?
13   A.   Correct.
14   Q.   When did that stop?
15   A.   It stopped because I believe there was a
16 need to move the resources to some other areas and I
17 think we needed more attorneys as opposed to the
18 training attorneys, so -- I can't recall when.
19         And it's not that so much that we stopped
20 training them, we just stopped formally training
21 them.  So, you know, basically that would have been
22 like the training would have fallen to some of the
23 supervising attorneys.  I believe we had at some
24 point kind of like four supervisors, so they were
25 responsible -- someone was responsible for the fourth

Page 29

1  floor, someone was responsible for the fifth floor,
2  and someone was responsible for the sixth floor and
3  the seventh floor.  So those supervisors would have
4  been the ones that kind of like took over the role of
5  training.
6    Q.   Okay.  When formal training was being
7  done, what would that actually entail and how would
8  that be differentiated from I guess the informal
9  training you're referencing?
10   A.   They would have organized meetings where
11 they would be in the mock courtroom.  Susan Porter
12 was amazing.  She was an awesome trainer.  She had a
13 lot of experience.  She tried a lot of cases in her
14 day.  She had a lot of -- the trainers that worked
15 with her were very highly experienced trial
16 attorneys.  They did a great job.  One was Dorothy
17 Ferraro, one was Donald Caneratsi (phonetic).  I
18 think there was Joanna Nagy was a trainer at some
19 point under Susan Porter.
20         I can't remember who else but there were a
21 bunch of them, and they would take the younger
22 lawyers under their wings and have formal, like, how
23 do you take a depo?  How do you cross examine a
24 witness?  How do you impeach a witness?  How do you,
25 you know, prepare for court?  How do you prepare your

Renee Dadowski
May 07, 2021

Page 30

1  trials?  How do you research?  Those kind of things.
2        So when Susan Porter was the director of
3  training, we had a very, very quality training
4  department.  And then she retired unfortunately and
5  it kind of went downhill after that.
6     Q.   I see.  How come no efforts to kind of
7  revive it after Ms. Porter left?
8     MR. LAUFER:  Objection.
9     A.   Well, they did revive it, but the person
10 that was the trainer, Susan Porter basically advised
11 against that person becoming the training director,
12 but because it was Gordon's friend, we were told that
13 she was gonna get the position.  And most people did
14 not feel she was the best choice or qualified for it.
15        Before Susan left, she was actually one of
16 her trainers.  Her and Adam Goldberg I believe were
17 the two trainers that Susan had under -- that she
18 supervised before she retired in 2007 -- or 2017,
19 excuse me.
20 BY MR. FRANK:
21    Q.   Who was the person who was Gordon's
22 friend?
23    A.   Lorena Mastrarrigo.
24    Q.   You mentioned that in 2017 you became
25 chief assistant and Gordon was also a chief

Page 31

1  assistant; is that correct?
2     A.   We became executive chief assistants in
3  2017.  We both became chief assistants in 2007.
4     Q.   Oh, okay.  I see.
5        When you became executive chief assistants
6  in 2017 under Mr. Finkelstein, what you've
7  described your duties.  What were Mr. Weekes' duties,
8  if you know?
9     A.   I think he was more directly responsible
10 for, I really don't know, the lawyers.  'Cause, you
11 know, Diane Cuddihy was the chief of appeals as well
12 and she -- you know, we all kind of -- when there was
13 an issue that came up, we all kind of talked about
14 it, but I'm not exactly sure what -- I mean, we all
15 kind of talked about how to run things.  So maybe he
16 was -- it was anticipated that he would be the one
17 kind of more running the office, but I really
18 couldn't tell you what he did.
19    Q.   How do you -- well, let me ask you this:
20 How do you know what your duties were?  Were they
21 reduced to writing somewhere or --
22    A.   No, they were not reduced to writing.
23 Catherine Keuthan, Cathy Keuthan before she left
24 basically told me that, you know, I would be in
25 charge of the support staff, I would be in charge of

Page 32

1  the budget, I would be in charge of like, you know,
2  the administrative staff.  I basically did all of our
3  bombs, which was like the personnel stuff as far as
4  time sheets, who was there, who was not there.  I was
5  responsible for sending the reports to the Florida
6  Public Defender's Association as far as, you know,
7  the number of cases and that sort of stuff.
8        You know, Gordon and I were, along with
9  Diane, we would get on the Florida Public Defender
10 Association calls with Howard.  But you know, I just
11 don't know specifically what Gordon was told his
12 duties were --
13    Q.   Do you know from --
14    A.   -- other than possibly running the office,
15 you know, with the rest of us.
16    Q.   Okay.  As far as those positions that you
17 held with executive chief assistant, would it be
18 accurate to say that it was, in terms of the
19 delegation of authority, it would be -- from 2017 on,
20 it would have been Mr. Finkelstein head of the
21 office, and then you yourself and Mr. Weekes would
22 have been his deputies or chief executive assistants?
23    A.   Yeah, actually Diane Cuddihy kind of like
24 had the most experience 'cause she was an executive
25 chief from when Howard first took over.  So it was

Page 33

1  Diane Cuddihy, and then Gordon and I also became
2  executive chiefs, and we basically replaced Catherine
3  Keuthan.  So there were three of us.  And then Diane
4  Cuddihy retired in May of 2020 and then it was just
5  Gordon and myself.
6     Q.   I see.  After -- well, May of 2020, that
7  would have been during I guess --
8     A.   Pandemic.
9     Q.   -- COVID.  Yeah.
10    A.   Correct.
11    Q.   And at that time during the pandemic, the
12 office would have been not occupied, correct?  People
13 were telecommuting?
14    A.   Right.  I mean, you could go into the
15 office if there was a need, but most people did not.
16 We allowed certain of the chief assistants if they
17 had to be in the office.
18        There was a point in time when I was
19 directly responsible for okaying whoever needed to go
20 into the office and I would keep a list of who wanted
21 to go in, where their offices were located just to
22 make sure that other people weren't gonna be around
23 when someone was in the office, that we kept
24 everybody kind of distanced.
25    Q.   I see.  As far as Ms. Green is the

Renee Dadowski
May 07, 2021

Page 34

1  plaintiff in this case, when did you first get to
2  know her or come into her orbit?
3      A.  She was an attorney that got promoted to
4  felony and so Frank De La Torre was her direct
5  supervisor.  And I remember Frank saying good things
6  about her as an attorney, she was a real fighter.
7  And I think I became aware of her when I was a chief
8  assistant and she and Lorena Mastrarrigo, who was a
9  trainer, had some issues.  It was Metty Ros, Ruby
10 Green, Jenn Edgley, and they had a problem with
11 Lorena Mastrarrigo.
12      So I remember Cathy Keuthan, Diane
13 Cuddihy, I believe Susan Porter was there, and I, we
14 all kind of had a meeting because Ruby and Metty and
15 Jenn had some issues with something that Lorena had
16 done.  I believe she was like undermining something
17 that was going on in court.  And she was a trainer,
18 so I'm pretty sure Susan would have been involved in
19 that.
20      And I remember that the outcome was that
21 everybody felt that Lorena Mastrarrigo was being
22 untruthful about whatever occurred.  So Ruby might be
23 able to tell you better what happened, but this was
24 really my first involvement with her.  She was a
25 division attorney and there were some issue -- or was

Page 35

1  she a supervisor in county court?  I think she was a
2  felony division attorney, and I think Ruby and Jenn
3  were trial partners.  And I'm not sure why Metty was
4  involved in that, but I think Metty was involved in
5  that.  Or it might have been something that Metty
6  became involved in with, like, kind of, like, some
7  issues with them after where Ruby and Jenn having
8  issues with Lorena.
9      Q.  Lorena Mastrarrigo was the trainer,
10 correct?
11      A.  She was a trainer.  She was not the
12 training director at that time.  She was just one of
13 the trainers.
14      Q.  I see.  And she was the friend of
15 Mr. Weekes?
16      A.  Correct.
17      Q.  As you sit here today, do you have any
18 recollection specifically of what the issue they had
19 was?  I know you've indicated she was untruthful or
20 something of that nature.
21      A.  It was something happened in court and it
22 was -- I believe it was Judge Bailey's courtroom,
23 Dennis Bailey, and I don't know if Lorena went side
24 bar and kind of was like joking around with Judge
25 Bailey, inappropriately the lawyers felt, because the

Page 36

1  lawyers apparently were having an issue with Judge
2  Bailey and some of his rulings, and so they kind of
3  felt like it was inappropriate for one of our
4  attorneys to kind of go side bar and yuck it up with
5  the judge in front of the clients.
6      Q.  Right.
7      A.  Like I said, you're gonna have to ask
8  Ruby.  She would know more so than I what the actual
9  reason was.
10      I just remember that the outcome was that
11 Diane, Cathy, Susan, and I got the impression that
12 Lorena was not being truthful or accurate with
13 whatever her account of what happened was.
14      Q.  I see.  Do you have any recollection after
15 that of what your -- any subsequent interactions with
16 Ms. Green?
17      A.  Yes.  I believe I was one of the ones that
18 actually recommended that she become a chief
19 assistant in the -- for the county court division
20 because -- I'm trying to remember.
21      I believe Lynn DeSanti was the chief of
22 county court and I don't remember if Ruby was one of
23 her supervisors.  She may not have been.  Then when
24 Metty Ros took over 'cause Lynn DeSanti resigned and
25 went into private practice, so when Lynn DeSanti

Page 37

1  resigned, Metty Ros became the chief of county court
2  and she wanted to have I believe it was Jenn Edgley
3  and Ruby Green as her supervisors, and then I believe
4  she also had Jeremy Michaelson.  I don't remember if
5  they were all at the same time or if some of them
6  came later, but I remember then Metty Ros was being
7  promoted to felony chief and so there was a question
8  as to who would take Metty Ros' spot.
9      And I believe, you know, Frank De La Torre
10 had good things to say about Ruby.  Metty had some
11 good things to say about Ruby.  I had known nothing
12 but good things about Ruby at that point, so I
13 believe, you know, she was somebody that I
14 recommended as well to Howard to put her in the
15 felony chief position -- I mean, excuse me, the
16 misdemeanor chief position.
17      Q.  When you recommended Ms. Green to Howard
18 or Mr. Finkelstein, was he familiar with Ms. Green at
19 that point?  Did he know her?
20      A.  Yes, yes, I believe he was.
21      Q.  When did you first become aware of
22 Mr. Weekes throwing his hat in the ring to run for
23 public defender?
24      A.  He officially did it -- well, I mean, I
25 think he had talked about it because before -- well,

Renee Dadowski
May 07, 2021

Page 38

1  Cathy was still here. He and Howard would have
2  once-a-week lunch sessions where Howard was basically
3  mentoring him and telling him I guess the ways of the
4  office and I guess getting him prepared to be the
5  elected public defender.
6       Now, whether he had officially put his hat
7  in the ring at that point, I don't recall. I know
8  nobody at that point had put their hat in the ring.
9  When, you know, when Gordon actually did, he was the
10 first one. So I can't remember if those training
11 sessions -- I guess you could check the filing date
12 because Cathy Keuthan was still here, so it would had
13 to have been before November of 2017. So if he filed
14 after November of 2017, then obviously it was --
15 these training sessions occurred well before that.
16      So they would have lunch in Howard's
17 little side office and, you know, Howard was, I
18 guess, kind of helping him navigate the political
19 world and how to become the elected public defender.
20      And I know at one point we all left the
21 office and went to another attorney's office. I want
22 to say it was Alan Levine's office. And we all had
23 like kind of like an organizational meeting at
24 lunchtime on how to support Gordon. We were all
25 given lists of who we should be contacting to try to

Page 39

1  get donations to his campaign.
2       And then there was another meeting that
3  they had at Owen McNamee's house, which I did not go
4  to because I don't like animals, I don't like dogs,
5  big dogs, and he had like a big dog and I'm afraid of
6  them really. I'm allergic to animals. So I did not
7  go, and so I couldn't tell you when that was. But
8  that was at some other point.
9       Q.  Mr. Levine, was he affiliated with
10 Mr. Weeke's campaign?
11      A.  He was -- he used to work in the Public
12 Defender's Office. He was best friends or very good
13 friends with Owen McNamee who was one of the chief
14 assistants, and he's actually the husband of Judge
15 Olga Levine, but he was really tight with Owen
16 McNamee and so I think that's how we got his space in
17 his office 'cause he was down the street, 'cause, you
18 know, we're not supposed to campaign in the
19 courthouse.
20      Q.  Right. Was this, as far as the logistics
21 of this particular meeting, was this done during work
22 hours?
23      A.  It was done during lunchtime.
24      Q.  Okay. And was it -- how did -- was it a
25 voluntary thing for people to go there and

Page 40

1  participate in this meeting?
2       A.  Well, I guess it was voluntary, but it was
3  kind of expected that you would participate because
4  at that point he was the only one that we knew of
5  that was planning on running for the public defender.
6  He was the only one from inside the office that was
7  running for public defender, and I guess the hope was
8  that he would not make too many changes and rock the
9  boat too much if he became the elected public
10 defender.
11      So I think it was kind of like, you know,
12 strongly encouraged that you would support Gordon and
13 participate in his campaign without being outright
14 told to.
15      Q.  How did you become aware of this
16 particular meeting? Was it circulated via e-mail
17 or --
18      A.  I believe we got an e-mail. It would have
19 probably been to our private e-mails because we all
20 gave Frank De La Torre -- I think he was maybe
21 organizing it because Frank De La Torre I believe we
22 gave and Owen McNamee -- I don't remember. I believe
23 Frank De La Torre might have been the one that
24 organized it, but I think Owen McNamee got the space
25 or Steve Michaelson also 'cause Steve Michaelson was

Page 41

1  still working there.
2       I remember he was in the office and he
3  was -- I don't know if he ended up being Gordon's
4  treasurer, but he started out as being Gordon's
5  treasurer, and he was a former executive chief
6  assistant -- I mean, excuse me, former chief
7  assistant public defender, not executive. He was a
8  former chief assistant public defender before he
9  retired, and he basically was the treasurer of
10 Howard's campaign.
11      So I know he was Gordon's treasurer
12 initially. Like I said, whether he was his final
13 treasurer, I don't know, so -- could have been Steve
14 sending out the e-mails about it. But we used to get
15 e-mails as to, like, here's your list of who you need
16 to contact to get donations.
17      Q.  Do you still have copies of those lists?
18      A.  I do not believe so. I believe I
19 deleted -- I deleted a lot of public defender stuff
20 once I no longer worked for the Public Defender's
21 Office, and those would have been personal e-mails
22 anyway. I mean, I can look and see, but I -- no, I
23 don't -- well, unless they're just not -- I don't
24 recall I have them, no.
25      Q.  Okay. As far as making calls to raise

Renee Dadowski
May 07, 2021

Page 42

1   money, did you do that?

2       A.   Yes.

3       Q.   Do you remember who you called to raise

4   money?

5       A.   Yes, but most people that I called to

6   raise money were not gonna -- I believe they didn't

7   want to support Gordon.

8       Q.   Did you personally support Gordon in the

9   election?

10      A.   At that point I did, yes, 'cause nobody

11  else was running against him.  I had worked with him

12  as an executive -- I mean as a chief assistant since

13  2007 and I became an executive chief with him at the

14  same time and I didn't have any issues with him up

15  until that point, so yes, I did.

16      Q.   You had referred to Mr. Finkelstein within

17  the context of him taking over for Mr. Schreiber

18  as --

19      A.   Yes.

20      Q.   -- as the anointed one earlier.  Would you

21  put that same destination on Gordon Weekes as it

22  relates to taking over for Mr. Finkelstein?

23      A.   Yes.  That was definitely Howard's chosen

24  person to be the elected public defender when Howard

25  retired.

Page 43

1       Q.   What were your -- you mentioned up until

2   that point.  And that point are you referencing when

3   Mr. Weekes got into the race?

4       A.   Yes.  At that point I actually gave him

5   the maximum that we could give him as a donation.  I

6   gave him, you know, $1,000.  I gave him $500 at one

7   point and then I gave him another $500 at another

8   point, and once again, that was before anybody else

9   had been in the race.

10           So he was the only one in the race.  He

11  was the only one that I thought was gonna be in the

12  race, especially from our office, and so at that

13  point, yes, I gave him donations.

14      Q.   Was there ever a time when your opinion

15  changed or you started to have issues with

16  Mr. Weekes?

17      A.   Yes.

18      Q.   When did that start?

19      A.   It actually started soon after I became

20  the -- an executive chief.

21      Q.   And I think that was in 2017?

22      A.   Yes.  And right around the time I was

23  becoming an executive chief, there was an issue about

24  some people felt that I maybe treated them not the

25  way they should have been treated and these were

Page 44

1   people that I considered friends.  So I, you know,

2   had some concerns and I wanted to like address it and

3   clear it up.  And then it seemed like kind of like

4   Gordon and Diane and Howard were not allowing me to

5   kind of deal with those issues and make my -- clear

6   things up with the people.

7           And then eventually when I did, I was told

8   by the same people that they didn't say what people

9   said that I had said and they didn't feel the way

10  people said that I was told how they felt.  So it was

11  just like I couldn't understand where it was coming

12  from.

13          And then when the Cruz case came along, I

14  kind of had some difference of opinions as to how

15  that case and a lot of the other homicide death

16  penalty cases that we had in the office at the time

17  should have been handled, and so I kind of started

18  seeing some things that I didn't think were in the

19  best interest of our clients.  And that was mainly my

20  concern all through my 32-and-a-half years that I

21  worked in the Public Defender's Office was clients

22  were always first.

23      Q.   I see.  What were the -- if you could

24  elaborate on who was -- who led you to believe that

25  other people had some kind of adverse opinion about

Page 45

1   you or bad vibes or whatever it was?

2       A.   Catherine Keuthan before she left and

3   Diane -- well, actually, it wasn't Diane Cuddihy

4   because when I finally was able to talk to Diane

5   Cuddihy about it, she told me that she never heard

6   what Catherine Keuthan said she heard.  So it was

7   just very bizarre.  I don't know.  I can't explain

8   it.

9       Q.   Okay.  What did Ms. Keuthan contend that

10  she had heard about you?

11      A.   That when we were at a seminar, that I was

12  basically being bossy and they wanted to do -- some

13  of the staff that I was with didn't want to leave

14  Disney Village, and I didn't have a car 'cause I flew

15  in and that they felt like they had to leave Disney

16  Village because -- it was just, like I said, it was

17  just kind of like, what are we even talking about?

18  You know, like this is just, like, craziness.

19          And then, you know, like there was a point

20  in time where I made somebody uncomfortable.  Because

21  we had three parking spaces and they were only for

22  Howard and the two executive chiefs.  And apparently

23  I made a comment that staff should not be parking in

24  those parking spaces and they felt offended by it is

25  what I was told.  It's like, I mean, really just kind

Renee Dadowski
May 07, 2021

Page 46

1   of ridiculous stuff.
2      Q.   Right.  How does that tie back to you
3   indicated that you started to take issue with
4   Mr. Weekes?  What is the connection?
5      A.   Well, because I think that at that point,
6   they were kind of like thinking that I had some
7   issues with people that I never did.  And I don't
8   know, you know, before -- I don't really know how to
9   say some of these things and whether I should say
10  some of these things, so.
11     Q.   I understand.
12          What were the issues with the -- what is
13  the Cruz case?  Was that a death penalty case?
14     A.   Yes.  That's the Parkland case.
15     Q.   Oh, the Parkland case, sure.
16     A.   Yeah.
17     Q.   What was it about it or -- you seem to
18  suggest that there were some ideological differences
19  internally about how to handle that.
20     A.   Yes.  The lawyer that was the lead
21  attorney on that case, she previously had -- prior to
22  the Cruz case, she probably had pending six or seven,
23  maybe even more, homicide cases, some of them death
24  penalty cases, and some of them that she had worked
25  on for years, some as much as like six years.  In

Page 47

1   fact, a couple of them were ready for trial within a
2   few months from the Cruz case happening, which
3   happened on Valentine's Day, February 14th of 2018.
4   And the office's position, which I disagreed with,
5   was that they allowed her to transfer all of her
6   cases to other attorneys.  And like I said, one of
7   them I believe the lawyers tried within like a couple
8   of months and I thought that that was not the correct
9   way to handle the cases.  I believed that because she
10  had had a relationship with the clients, that she
11  should still have to try the case.
12          I mean, the Cruz case obviously was a big
13  press case and there was gonna be a lot of work to be
14  done on it, but I didn't think that her other clients
15  should be treated second class just because the Cruz
16  case occurred, and I felt that our black clients were
17  not getting the same treatment as far as the
18  resources that our young white kid, Nikolas Cruz, was
19  getting.
20          And I voiced my opinion on that because I
21  thought it was kind of hypocritical for people to say
22  that, you know, everyone should be treated equally
23  and that our black clients and our other clients were
24  treated not the same because they weren't a press
25  case.

Page 48

1      Q.   Right.  Were these concerns that you
2   expressed to Mr. Finkelstein?
3      A.   Initially these were concerns that I
4   expressed to Gordon and Diane, and they were of the
5   opinion that Melisa McNeill, who was the attorney,
6   should be able to dump her cases.  And I kind of felt
7   they were being dumped and I didn't think it was
8   appropriate.  And I couldn't understand why our other
9   death penalty clients were less than and didn't
10  deserve the same amount of representation.  If
11  they're saying that Melisa McNeill was the best
12  attorney that we had in the office, then she should
13  be representing -- the best capital crimes attorney I
14  should say at that point, death penalty lawyer that
15  we had in the office, then why should she be able to
16  not handle her other cases?
17          Especially, you know, I can understand
18  like there was a lot of work, but this was like a
19  brand new case at that point and she had a client
20  that was ready to go to trial.
21          And we also at that point had a young
22  black man who was in a similar situation as far as
23  kind of age, but he only allegedly murdered one
24  person, and I didn't think that the resources were
25  going to that kid the same as they were to Nikolas

Page 49

1   Cruz.  So that's kind of where I started having
2   issues.
3          But you know, once Howard and Diane and
4   Gordon told me that that's the way it is, then I
5   accepted it until I would speak to them privately
6   about other concerns, but as far as the office was
7   concerned, you know, that was the decision that
8   Howard made, so publicly I stood by it.
9      Q.   I see.  Do you remember the name of the
10  young man that you just referenced, the young
11  African-American man?
12     A.   Yes.  Do you want the name?
13     Q.   Yes, please.
14     A.   Okay.
15     Q.   I'm sorry.
16     A.   Karari Ritchie.
17     Q.   I'm sorry, what was his first name?
18     A.   Karari, K-a-r-a-r-i, and I believe it is
19  R-i-t-c-h-i-e.
20          He eventually did get the resources once
21  we started giving the resources to Nick Cruz, but it
22  was, you know, he had been through a bunch of
23  lawyers.
24          Now, the one case that they tried, it was
25  not Karari Ritchie.  The one that Melisa McNeill was

able to basically get off of and that two other lawyers tried, that was not Karari Ritchie. That was another client. I don't know that name. I can't recall that name.

**Q. I see. As far as you expressing your concerns, was this done to Mr. Weekes and Mr. Finkelstein verbally or did you ever commit any of this to writing?**

A. Just -- actually, I remember sitting in Diane Cuddihy's office and we discussed it. So it was me and Diane and Gordon first, and then I believe Howard came in and backed them up.

**Q. Did Mr. Weekes or Mr. Finkelstein, or Ms. Cuddihy even, did they give you any insight into their rationale for how they were allocating resources and why they were doing what they were doing?**

A. I mean, Nikolas Cruz was a very serious case. He allegedly shot and killed 14 Parkland students and allegedly shot 14 others and they felt that it was -- obviously it was a press case and that they wanted to make sure that the world I guess seeing our representation would see effective representation.

**Q. I see. Apart from that particular issue**

**or the issues you've described with Mr. Weekes, and that sounds like it happened, the Parkland issue obviously unfolded after February of 2018, any other issues you had with him after that?**

A. Yes. I mean, I can't remember specifics, but I know that, you know, my whole career has been clients first always and my whole -- one of my whole management styles has been that if a lawyer has had a client and the client has been through a couple of lawyers, you know, once they get through two attorneys, then it's not good for the clients to have changing representation.

So I felt that after a lawyer -- I mean, excuse me, after a client had had one or two lawyers, then it should go to one of what we used to consider floaters or major crimes attorneys because they usually were people that were not planning to leave the office and that would give some stability to the clients.

Sometimes we had lawyers that complained that their judge was too tough or that their whatever, and so in one particular case, Lorena Mastrarrigo wanted to move one of the lawyers that had only been in a division in a couple of weeks or a couple of months, excuse me, because the judge was

too tough and he wasn't learning anything, and my position was, well, it's gonna be the same problem for another attorney and why are we going to reward this attorney because he can't figure out how to stand up to a judge?

And so, I think eventually Gordon agreed with me, but it was not an easy agreement. And to me, it should really be a no brainer that the clients should come first and that we don't assign and re-assign cases just because the lawyers are having issues.

I mean, I'm aware now even after the fact of some lawyers that told me that they're being moved because the supervising attorney can't supervise another lawyer because of personal issues, and so rather than looking at the clients -- so that's basically continuing in this new administration of Gordon's that rather than looking at what's in the best interest of the clients, they're kind of looking at other issues that I don't think should be the main focus of representation.

**Q. I see. As far as the -- when Ms. Green got into the election, threw her hat in the ring to run for public defender, did it change the dynamics or did anything change in the office?**

MR. LAUFER: Object to form.

A. Yes.

I'm sorry. Cory, did you object?

MR. LAUFER: That was an objection to form.

A. Okay. Can I answer it?

MR. LAUFER: You may.

BY MR. FRANK:

**Q. Yes.**

A. Okay. I'm not used to the civil objections, so. We don't object to form in the criminal arena.

Yes, it did.

**Q. Could you explain how?**

A. Well, the office was very divided. There were a lot of people that did not support Gordon Weekes. There were a lot of people that supported Ruby Green.

I think a lot of people didn't want to support Gordon Weekes because of who he was going to have as his top people or who everybody had anticipated, which actually turned out to be the case, of his top people.

And you know, a lot of people had issues with those attorneys, so -- and I think Ruby just had

Renee Dadowski
May 07, 2021

Page 54

1  general support for, you know, from a lot of the
2  attorneys in the office and staff.
3      Q.   Did you, when Ms. Green got in, did you
4  have a preference for her?  Did your support for
5  Gordon change at that point?
6      A.   Well, unfortunately, I had mentioned to
7  Gordon a couple of times that I didn't believe I
8  could support him.  I never told anybody else.  I
9  told Gordon.  Diane knew that and Howard was advised
10 of that at some point because he was not happy with
11 me saying that I wasn't gonna support Gordon.  And I
12 can't remember why that was, but there was, I
13 believe, one or two times where I specifically told
14 Gordon that I didn't think I could support him
15 anymore.
16      And I can't remember what happened as to
17 what caused that, but I never publicly did anything
18 about it.  I kept that between, you know, me and
19 Gordon or me and the executive chiefs and Howard.  I
20 never vocalized it to any, you know, publicly
21 throughout the office I should say that I was not
22 supporting Gordon.
23      Q.   When you told Mr. Weekes that, what was
24 his response, if any?
25      A.   I mean, I don't think he was happy.  I

Page 55

1  mean, I think he was happy that I kept it basically
2  to myself and didn't share that with the rest of the
3  office.
4      Then, you know, we kind of got over things
5  and I thought we had kind of patched things up
6  because -- I believe the last time I told him I
7  didn't think I was gonna be able to support him was
8  in like the beginning of 2020, prior to the pandemic,
9  and I can't even remember what happened as to why I
10 felt strongly that, you know, I couldn't support him.
11      And then we kind of talked about it and I
12 think I told him that I would be willing to still
13 support him.  And then he actually asked me to go to
14 a campaign event for him, with him, that I did go to,
15 the one that whatever the democratic club is that's
16 out west maybe in Plantation where they pass out the
17 ice cream at the end.  So I did go to that campaign
18 event with him.
19      And then during the pandemic, I
20 actually -- he asked me to get on a Zoom fundraiser
21 that Anthony Narula hosted and so I did that.
22 Because, you know, we kind of, I thought, had patched
23 things up in some respects, but I guess not.  He must
24 not have ever forgotten the fact that I told him that
25 I couldn't support him.

Page 56

1      Q.   What, if anything, did Mr. Finkelstein do
2  to communicate to you that he wasn't happy that you
3  weren't supporting Gordon?
4      A.   He told me.
5      Q.   Okay.  You told him that you weren't going
6  to support Gordon and he said -- what did he actually
7  say?
8      A.   Well, we had -- I think there was another
9  kind of like issue that occurred about handling maybe
10 even the Cruz case again because it kind of seemed
11 like it always kind of went back to that 'cause I was
12 still of the belief that other cases deserved the
13 resources.
14      And so I just remember that there was at
15 least -- there was a -- I was in Diane's office or
16 Diane and Gordon were in my office and then Diane
17 went and -- I said something to Diane that I couldn't
18 wait for her to retire because I kind of figured that
19 maybe things would get better for me once there were
20 only like two people.  You know how there's always
21 like -- when there's three friends, there's always
22 like two against one?
23      Q.   Right.
24      A.   So I kind of felt like maybe with Diane
25 going, Gordon and I just being working together, that

Page 57

1  it wouldn't be quite so contentious, and so I think I
2  made a comment to Diane about like, you know, I can't
3  wait for you to retire, and she took offense at that
4  and went and told Howard.
5      And then, you know, Howard called us all
6  into his little side office and was not happy with
7  the fact that I told Diane that and that I had said
8  that I didn't think I could support Gordon.
9      Q.   As far as when Ms. Green entered the race
10 subsequent to that, did you ever have any discussions
11 with Mr. Weekes or Mr. Finkelstein specifically about
12 Ms. Green's campaign?
13      A.   I don't believe so about the campaign.  I
14 mean, we might have talked about the campaign just
15 like if there was like an event that they had both
16 been at and if, you know, there was something that
17 was reported that she had said out on the campaign
18 trail, we might have had some conversations, but I
19 couldn't give you dates and times.
20      Q.   Did you ever attend, either in person or
21 by Zoom, any of Ms. Green's campaign events?
22      A.   Just that one that I went to in the
23 democratic club that I went to that was in the
24 beginning of 2020 where they passed out the ice
25 cream.  Judge Lynch was there, Ruby was there, and

Renee Dadowski
May 07, 2021

Page 58

1  Gordon was there, so yes.
2      Q.   Mr. Weekes had asked you to go to that
3  one, correct?
4      A.   Yes.  I think I asked him if he wanted me
5  to go because he was going to it and he said yes.  I
6  can't remember if he asked me or if I volunteered
7  because I think at that point I was trying to, you
8  know, make nice with Gordon.
9      Q.   Who were the deputies of the people that
10 he was bringing in that you indicated that some
11 people were concerned about?
12     A.   Lorena Mastrarrigo and Nadine Girault.
13     Q.   And you've referenced Lorraine previously.
14     A.   Lorena.
15     Q.   Lorena.
16          What about Ms. Girault, what was it about
17 her that, to your understanding, was a cause of
18 concern?
19     A.   I don't really know as much about Nadine.
20 I mean, Nadine was an Early Representation Unit
21 chief, as I told you, and then Howard demoded her.
22 So I don't know if people had some run-ins with her
23 when she was a chief or not.
24          I really -- I mean, Nadine and I had some
25 issues because when she was a chief of Early

Page 59

1  Representation Unit, she took over for me and
2  obviously that was my baby.  I created the unit; I
3  started it; I did everything.
4          And I know how Howard is.  Howard is very
5  demanding and, you know, he wants to know when a
6  press case comes in or a case that's gonna be an
7  issue perhaps, someone with severe mental illness or
8  some case that people are gonna know about, he wanted
9  us to kind of be on it.  So, you know, she wasn't as
10 prepared a lot of times on cases.  And so Lynn
11 DeSanti, who was the chief of county court, and me,
12 who was then a chief of felony, we tried to help her
13 and kind of tell her, like, Listen, you need to be
14 prepared, you need to know what's going on in the
15 Early Representation Unit.
16          And you know, she never had a piece of
17 paper on her desk.  And when I was a chief of the
18 Early Representation Unit, I had like, you know,
19 follow-up mental health cases and follow-up serious
20 cases, and you know, I couldn't understand how she
21 didn't have -- like her desk was pretty much cleared
22 out all the time, like where's the follow-up?
23          So -- and I know then Howard kind of
24 became unhappy with the way she was handling herself
25 in the Early Representation Unit, so he ended up

Page 60

1  removing her.
2      Q.   I see.  As far as the issues that you've
3  discussed with Mister -- that you had with
4  Mr. Weekes, other than what you've described with the
5  Cruz case and allocation of resources, were there
6  ever any other disputes or points of contention that
7  you had with Mr. Weekes prior to your separation from
8  the office?
9      A.   I mean, I think it was just mainly like
10 how to run the office, you know, like just things
11 that I thought were priorities that, you know -- he
12 kind of wanted it -- while he was running, he wanted
13 to kind of keep things happy and everybody happy and
14 content.  He didn't want to make any waves.  And
15 sometimes, you know, some people, you need to kind of
16 steer more in the right direction, you know.
17          So he didn't want to -- you know, he
18 always was kind of like, you know, don't say anything
19 or don't bring it up and -- you know, people that
20 might have been problematic, he was kind of brushing
21 things aside, like people that I thought -- I can't
22 give you specific examples at this point, but I just
23 know that there were some times where he would tell
24 me, like, you know, Let's not say anything, Let's
25 just let it go.

Page 61

1          I'm like, Okay.
2      Q.   What happened ultimately?  What were the
3  circumstances of your separating from the office?
4      A.   December 29th I was on vacation and I was
5  in Pennsylvania and we had a text chain going for
6  chief assistants and administration because we had
7  daily Zoom meetings for the most part during the
8  pandemic.
9          You know, I started -- before the
10 pandemic, I organized all of our staff -- well, first
11 of all, I organized most of our -- some of our staff
12 to get computers so that we could kind of conduct an
13 office remotely and then it morphed into the fact
14 that we were able to get all of the staff computers
15 so we could conduct everything remotely.  You know, I
16 kind of spearheaded that, along with our IT people
17 and our two administrators that were in charge of the
18 support staff.  And then -- so then, after awhile
19 everybody -- we would have a daily chief Zoom meeting
20 once we got all of our technological stuff set up.
21          And during the holidays we were told that
22 we were maybe gonna have once a week, so we got a
23 text message from Gordon 'cause we had a text chain
24 going.  In lieu of having the daily Zoom meetings in
25 case anything important came out, we were supposed to

Renee Dadowski
May 07, 2021

Page 62

1  kind of like just communicate with that.
2        So the 29th of December -- or actually,
3  the 27th of December we got like a text message from
4  Gordon saying we're gonna have a chief meeting at 11
5  o'clock on Wednesday, so.  I wasn't even gonna log on
6  because I was on vacation.  And I was like, Oh, all
7  right.  I guess I'll get on 'cause I kind of do
8  what's expected.
9        So I logged on and when I logged on, I
10 didn't have my video showing 'cause I was -- I didn't
11 have the -- I think whatever screen I was using, it
12 wasn't like video capable.  I can't remember.  And I
13 logged on and I believe Ella was on first, Ella
14 Phillips, and then Nadine Girault may have gotten on
15 or Dacia Riley got on.  I was kind of surprised to
16 see her 'cause she wasn't an employee of the office.
17 And then Gordon got on.
18     Q.   Who is Dacia Riley?
19     A.   Well, apparently now she's the general
20 counsel, but she was not an employee of the office at
21 that time.  So I just figured that Gordon was hiring
22 her.  So she got on.
23        And then Gordon said something to me like,
24 Oh, I wish I could see you.
25        And I said, You know, well, sorry.

Page 63

1        And then nobody else got on.  And then he
2  told me that he did not have a future for me in his
3  administration or his office or he did not see a
4  future for me in his administration or his office and
5  that he was going to be terminating me effective
6  immediately, which would have been December 29th.
7        So he told me that I needed to deal with
8  Ella Phillips or anything from now on and that they
9  would be sending me, I guess, a separation agreement
10 that they were gonna require me to sign.  And then he
11 blacked out his screen, but he was still on there.
12        And so they started like kind of telling
13 me that they're gonna be sending me some separation
14 agreement, that I'm to deal only with Ella.  And I
15 think I had some questions 'cause I was kind of like
16 obviously not expecting it because the week before, I
17 was on a hiring call with Nadine, Ella, Lorena, and
18 Gordon, and you know, I was kind of surprised that
19 the Monday before Christmas that he would have me on
20 a hiring call with him and then two days before the
21 new year, he's telling me that I'm no longer gonna be
22 a part of his office.  Not only just not a part of
23 his administration, I think he said not a part of his
24 office either.  I can't remember exactly what he
25 said.

Page 64

1        So I said to them, Well, is Howard
2  terminating me?  Because Howard is still the elected
3  public defender.  So unless Howard Finkelstein is
4  terminating me, I'm still an employee of the Public
5  Defender's Office.  I'm like, Howard is my boss and
6  he is currently the elected public defender.
7        And they really didn't answer that
8  question.  They kept just telling me about how to
9  expect some separation agreement that they were gonna
10 be sending me and -- you know, I can't remember what
11 else 'cause I was like, Well, can I resign instead of
12 be fired or be terminated?  You know, I said, I need
13 to deal with obviously -- I was in DROP, which is, I
14 don't know if you're familiar with the Deferred
15 Retirement Option Plan.
16     Q.   Sure, sure.
17     A.   I started DROP July 1st of 2020.  And so I
18 was like telling them that I needed to try to check
19 and look into that ramifications that would have for
20 me if I retired 'cause I didn't know if I was gonna
21 retire as opposed to a termination, if I needed to
22 resign as opposed to a termination.  Like, I didn't
23 know how that would affect my DROP.  So I asked them,
24 you know, to let me look into that.
25        And also obviously I -- once again, you

Page 65

1  know, I stressed to them, like, Is Howard firing me?
2  Because if Howard is not firing me, you have no
3  authority.  You know, I'm technically your bosses
4  still.  I didn't say that to him, but that's what I
5  was thinking.
6        I'm like, you know, Howard is the elected
7  public defender.  Gordon and I are the executive
8  chiefs, which are equals in the office.  Even though
9  he was the public defender elect at that point, he
10 was not the public defender and I still worked for
11 Howard.  So I was like, if Howard wasn't firing me, I
12 didn't know what authority they had to fire me.
13        So eventually I think I hung up with them
14 and I texted Howard and I said, Gordon just fired me.
15 And then I called Howard and he told me that he's not
16 firing me, that he's not terminating me under his
17 watch I think was the words that he used, or while he
18 was still the elected.
19        So, you know, I was still kind of like
20 surprised by the whole thing, like I said, because I
21 had just been on a hiring call the Monday before and
22 I had been -- you know, when Gordon was first
23 elected, he had me and Nadine meet with every single
24 secretary, attorney, investigator division in the
25 office, which, you know, I kind of -- I wasn't

Renee Dadowski
May 07, 2021

Page 66

1  expecting to stay as one of his administrators, you
2  know, in his administration, but you know, then he
3  had me on those calls in August and I was like, well,
4  that's odd.  And then he had me continue on the
5  Public Defender Association calls.
6          And I asked him if he wanted me at some
7  point to like share a lot of the stuff with Nadine,
8  and he said, No.  And then -- Nadine is now his
9  executive chief assistant.  She's I guess -- I don't
10 know if she's his number two or number three because
11 I think Elia Phillips may be the number two.
12         And then he had me, you know, like I said,
13 on the hiring calls 'cause I was surprised that he
14 included me on -- that was just the hiring call on
15 the Monday before Christmas, but I had been on other
16 second-round hiring decisions, which, you know, I
17 thought, well, okay, if he's having me still continue
18 to do that, so perhaps he just wanted me to be on the
19 call so I could train Lorena and Nadine and Ella how
20 to do it.  I'm not sure.  You'd have to ask him.
21         But yeah, I mean, the Monday before he,
22 like I said, didn't seem to indicate anything.  And I
23 was -- I mean, he commented about how my hair looked
24 gray, but that was about it, but he didn't say
25 anything as far as, you know, don't get on this call

Page 67

1  or I changed my mind.  I'm still on there.
2          And then -- so then, like I said, I hung
3  up with them on the Zoom call and I called Howard,
4  and Howard said no.
5          And then I called Diane Cuddihy 'cause she
6  was the other executive chief when I -- 'cause we had
7  kind of like patched things up after she retired, and
8  even before that we kind of patched things up.  And
9  she was like surprised.  She didn't know.
10         So then I called FRS and I asked them
11 like, Does it make a difference whether I'm fired or
12 whether I resign or what?  And they basically told me
13 that I had 30 days to find another FRS job or else I
14 would be forced to retire and I still had
15 four-and-a-half years left that I could do DROP.  And
16 obviously, you know, that's a lot of money leaving on
17 the table.  And my friends always, you know, told me
18 you need to find another job 'cause you need to --
19 you worked 32-and-a-half years for that, you need to
20 collect that money.
21     Q.    I see.  To clarify, Mr. Finkelstein, did
22 you text him or did you call him?
23     A.    At first I texted him.  I texted him I
24 think as soon as I got off the call and said, Gordon
25 just fired me.

Page 68

1          And then, you know, I wasn't sure if he
2  was checking text messages or not because I mean,
3  obviously he only had two days left before he was
4  completely retired.  And then I called him and spoke
5  to him.
6      Q.    I see.  Do you still have those text
7  messages with Mr. Finkelstein?
8      A.    I don't think so.  I can look, but I don't
9  believe I do.
10     Q.    As far as what ultimately
11 Mr. Finkelstein -- it sounds like Mr. Finkelstein
12 said, I'm not firing you --
13     A.    Correct.
14     Q.    -- there are only two days left anyway.
15     A.    Well, he didn't say that, but that's
16 what -- he just said he's not firing me under his --
17 while he's the public defender or under his watch
18 or --
19     Q.    So what ultimately happened; did you file
20 a resignation letter or --
21     A.    No.  What happened was I believe Ella
22 tried to call me later on.  Oh, I think -- well, what
23 happened was also once I finished speaking to Howard,
24 I called my IT people because I knew that I was in
25 Pennsylvania and all of my motions and anything that

Page 69

1  I had done over the 32-and-a-half years -- we usually
2  allow the attorneys, you know, if they were leaving
3  the office, they would make a copy of their F-drive
4  or their computers and so they would have their
5  motion for writing samples and letters that they
6  wrote and any recommendation letters and whatever
7  else they had on their computers, you know, they
8  would make a copy of them.
9          So like usually when somebody would retire
10 from the office, Elizabeth or Ralph, who were IT
11 people, would make copies of the, you know, and put
12 them on a disk or a flash drive, disk back in the day
13 when we had disks, now flash drives, and give them
14 copies of, you know, anything they felt was
15 important.
16         So I remember I called Elizabeth and asked
17 her if she would do that for me, and she basically
18 was concerned 'cause I told her that Gordon fired me,
19 so obviously she didn't want to be next, even though,
20 like I said, Gordon really didn't have the authority
21 to fire me at that point.  And so she said she wanted
22 to check with Gordon.
23         And I said, Well, you know, let's just
24 kind of wait and see what happens.
25         And so -- and at that point I still didn't

Renee Dadowski
May 07, 2021

Page 70

1 know why I was the only one on that call.  Like I
2 found out later that Gordon had sent a separate text
3 to all the chief assistants and told them to get on
4 at noon and he excluded me from that.  So he had this
5 like deceptive little like plot to get me on the Zoom
6 call without anybody else on there instead of just
7 kind of calling me directly and being up front and
8 saying, Hey, we need to have a conversation, you
9 know.  So kind of showed me the kind of character
10 that this guy has.
11          But anyway, so then apparently later on
12 the 12 o'clock Zoom call that he changed the time to,
13 he told everybody that I was no longer gonna be
14 working in the office.  I don't know whether he told
15 them he fired me, 'cause obviously I wasn't on the
16 call, or whether -- I don't know what he said 'cause
17 at that point they hadn't -- my resignation hadn't
18 even been an issue.  They were basically telling me
19 that you're terminated effective immediately, so
20 there was no concern or anything.
21      Q.   To be clear, Mr. Weekes, during the call
22 you had with him, specifically used the word
23 terminated, correct?
24      A.   Yes, yes.  He told me, You're terminated
25 effective immediately.

Page 71

1      Q.   I see.  And ultimately, when you were
2 sorting out the paperwork related to this decision
3 that was made, did you sign a resignation letter?
4      A.   Well, this is what happened.  So after I
5 finished speaking to FRS and they said it really
6 doesn't matter, you know, that happens a lot based
7 on, you know, when there's new elected officials, a
8 lot of people get terminated, it's very common.  So
9 being fired, terminated, separated, resigning,
10 they're all kind of the same thing, it's all
11 considered a separation from employment and it's not
12 a big deal.
13          So, you know -- and I knew that you could
14 get fired or you could resign and still collect
15 unemployment.  I mean, I wasn't gonna do that anyway,
16 but I knew that it really didn't make a difference
17 from that perspective, so -- but it just, you know,
18 as far as like an ego thing at that point, I kind of
19 didn't want to be fired.  I'd never been fired from
20 anything in my life, so I wasn't sure how I wanted to
21 handle it or if at that point I even wanted to just
22 retire.
23          You know, I talked to FRS to kind of see
24 where my funds were and what I was gonna give up if I
25 retired or if I continued to do DROP.  So obviously I

Page 72

1 was caught off guard.  I wasn't really prepared for
2 that.
3          So then I believe Ella tried to call me
4 later on that day and I didn't answer the call 'cause
5 I was talking to some other people.  And then like at
6 that point I had kind of gone into -- after I talked
7 to FRS and they told me I had 30 days to find a job,
8 I had reached out to some friends that I knew that
9 worked for some other agencies that were State of
10 Florida agencies to see if they had any job openings.
11          And then the next day I believe I spoke to
12 Ella, and I think I asked her at that point because
13 of the fact that -- first of all, I said, You can't
14 fire me until January 4th, or whatever day Gordon
15 takes over, so you can't do it on the 29th.  But I
16 was very concerned that they were gonna try to push
17 my paperwork through to claim that I was terminated
18 in December.
19          So I was -- I think at that point I asked
20 her -- I can't remember if it was that day or the
21 next day when I spoke to her.  So it was either like
22 30th or the 31st.  And she had told me to put it in
23 writing, like an e-mail.  Because I had asked if they
24 would be willing to allow me to instead of getting my
25 termination on January 4th, if they would allow me --

Page 73

1 I can't remember when I did that, if they would allow
2 me to use my two weeks that I had as vacation that
3 was gonna roll over and if they would allow me to
4 have an official separation date being January 19th,
5 which was Martin Luther King's holiday, so therefore,
6 I would have 30 days from that date to try to find a
7 state job instead of 30 days from January 4th or
8 whatever it was.
9          In the meantime I had already gotten
10 another job.  So after I had sent that to Ella, I had
11 reached out to my current employer and I asked if,
12 you know, they had a job opening and he said he
13 needed to discuss it with his number two because
14 obviously, you know, hiring someone that only can
15 work for four-and-a-half years is kind of, you know,
16 a disadvantage.  You kind of want to hire someone
17 that's gonna be long term.
18          And the cases that I'm doing now are death
19 penalty cases so they take a long time.  So he wanted
20 to just make sure that his number two, his chief
21 assistant, would be okay with it, but I didn't know
22 for sure.  I kind of expected that I would be hired.
23 And I had some other feelers out that I kind of
24 expected I would get another job, but you never know.
25 It was the middle of pandemic and so I wasn't really

Renee Dadowski
May 07, 2021

Page 74

1   sure.
2         So at that point I think I asked them if
3   they would be willing to be gracious enough to allow
4   me to use my two weeks of vacation and then have my
5   official termination date on the 19th.  And I asked
6   at that point if I could resign in lieu of a
7   termination.
8         And then I know when I got my separation
9   agreement on whatever that Monday was, I think it was
10  January 4th, they never acknowledged -- it was
11  basically Dacia said she would be sending me a
12  separation agreement on the December 29th phone call,
13  and on January 4th it still was called a separation
14  agreement, and they never acknowledged whether they
15  accepted my resignation.  So I pretty much treated it
16  as I was being terminated.
17        The first separation agreement they sent
18  to me that they wanted me to sign, besides the fact
19  that it was a mess with all kind of grammatical and
20  typographical errors, it was embarrassing, but I red
21  penned it back and sent it back to them.  They had in
22  there that they wanted me to be -- have a termination
23  or separation date of December 29th and they wanted
24  me to have the -- oh, 'cause they turned off my
25  computer access.  I forgot to say that.

Page 75

1         Back in December 29th, like within like a
2   half an hour or an hour of me being told that I was
3   gonna be terminated, they actually cut off my access
4   to the computer in the system, so I couldn't get
5   anything.  I was basically locked out.  So I told
6   them that they had no authority to cut off my access
7   to the computer because I was still an employee of
8   the office.
9         And in fact, on December 31st when I
10  talked to Ella, I once again said, Ella, I'm still an
11  employee of the office, you know, please turn on my
12  access to the computer.  There are things that I need
13  to get off of my computer.
14        And she said, No, we've already turned it
15  off and we're not gonna do that.  We're not gonna be
16  able to do that.
17   Q.   Were you able to get your documents off
18  the computer?
19   A.   Nope.  In fact, I have repeatedly asked
20  them for -- you know, like as an attorney, you need a
21  writing sample when you're trying to get a new job.
22  I have asked them for -- to provide me with my
23  writing samples and they're refusing and they
24  consider -- Dacia sent me an e-mail saying she
25  considers the matter closed I believe, something like

Page 76

1   that.  So no, I don't have my writing sample.  I was
2   not able to get it.
3    Q.   What was the effective date of the
4   separation to your understanding?
5    A.   It was -- well, with some back and forth
6   because the first one they sent to me said,
7   Termination December 29th and access to the computer
8   December 29th.
9         And so I sent them back like a counter and
10  said, Well, first of all, I repeatedly told you that
11  you can't terminate me December 29th and, you know,
12  and your computer access to cut me off the computer
13  on December 29th was not okay either.
14        And so then they agreed to send me -- they
15  sent me another one back and said that your
16  separation will be January 19th in lieu of the
17  previously scheduled termination of January 4th
18  instead of December 29th.
19   Q.   Right.
20   A.   So like I said, they never used the term
21  resignation.  The whole language in there was
22  separation.  So if they think that by calling it a
23  separation, that was a resignation from me, I mean,
24  that was not my impression.
25        I was always under the impression that

Page 77

1   even though it said separation on January 19th in
2   lieu of termination on January 4th, I still -- they
3   never acknowledged and said, We're gonna allow you to
4   resign.
5         I don't know whether they thought that
6   they allowed me to resign, but I never felt that way
7   and still don't feel that way, but it was a
8   resignation it seems because separation is the term
9   that's used for the State of Florida when somebody
10  leaves employment whether -- whatever it is, for
11  whatever reason.
12   Q.   Did you ultimately sign some manner of
13  separation agreement?
14   A.   Yes.  I made some corrections.  It was
15  pretty one sided.  They basically told me that I
16  can't sue now, in the future, in the past for
17  anything I know, anything I may come to know or
18  whatever.  I mean, I knew it wasn't a valid -- they
19  can't force somebody to waive an E.E.O.C. claim.
20  Whether their legal counsel thinks that they can is
21  kind of scary, but you know, I know that they can't
22  force that.
23        So I made some changes to it and said, you
24  know, like if you violate the terms of your agreement
25  on your side, then I'm gonna change the language in

Renee Dadowski
May 07, 2021

Page 78

1  that to say, you know, like all bets are off and that
2  I can sue.  And I cut off the language about things
3  that I may not know about.  I mean, how can you give
4  up a right to something that you may not even know
5  about right now?  But regardless, they refused to
6  allow any of my changes.
7          We went back and forth.  And I said,
8  Listen, you know -- it was -- my birthday was January
9  13th.  I said, I'm going away a few days for my
10  birthday.  'Cause I got a deadline.  Like it has to
11  be signed by January 15th by 4:00 p.m. or January
12  14th -- I think it was 15th by 4:00 p.m. or we're
13  gonna consider that you're not going to sign it and
14  we're gonna go back to the January 4th termination
15  date.
16          So, you know, and at that point I kind of
17  knew I had a job and I really didn't want to sign it,
18  but then I knew how vindictive they had been, so I
19  was afraid that if I didn't sign it, they wouldn't
20  give me my final payout or they would do something
21  with my final paycheck or they would backdate the
22  separation and claim that I was terminated on
23  December 29th, so I signed it.
24          And they basically told me, You can't make
25  any corrections and you sign it as is or that's it,

Page 79

1  so I signed it.
2      Q.   I see.  Where are you working now?
3      A.   I work for the Capital Collateral Regional
4  Counsel South.
5      Q.   Now, have you been furnished with a
6  copy of -- it's an e-mail that I believe that you
7  wrote.  Do you have that?
8      A.   I mean, I wrote a bunch of e-mails.
9  You're gonna have to kind of give me a little bit of
10  more --
11      Q.   Well, in anticipation of today's
12  deposition, I asked counsel's office to provide you
13  with a copy of the e-mail that you wrote to Howard
14  regarding the Ruby Green's podcast.
15      A.   Oh, yes, I do have that.
16      Q.   Do you have that in front of you?
17      A.   Let's see.  I can pull it up.  Let me see.
18  Where is it?  Let's see.
19      Q.   No one forwarded you a --
20      A.   They did.
21      Q.   Okay.
22      A.   They did, but I just got to find it.
23  Okay.  Where is it?  Okay.  Yes, they forwarded it to
24  me on Wednesday.  It says the e-mails.
25      Q.   Right, right.  And I just wanted to ask

Page 80

1  you a couple questions about that.
2      A.   Okay.
3      Q.   Prior to last summer I guess when the
4  podcast giving rise to this lawsuit took place, had
5  you had any discussions with Mr. Weekes or
6  Mr. Finkelstein about concerns either one of them had
7  about things that Ms. Green was saying on the
8  campaign trail?
9      A.   Yes.
10      Q.   Can you tell me -- elaborate on that?
11      A.   I know Gordon would come back and report
12  things that Ruby was saying criticizing the training,
13  criticizing the chiefs not having cases, criticizing
14  the way the office was run basically.
15          So there would be times when, you know, I
16  wasn't directly involved in the conversations, but I
17  may have been in Howard's office or somebody's office
18  and they would be talking about some of the things
19  that Ruby had said on the campaign.
20      Q.   This was prior -- would this have been
21  prior to the August 2020 podcast?
22      A.   Yes.  In fact, there was a couple -- there
23  was one other podcast or some other recorded
24  interview that she gave that we all listened to.  And
25  I can't remember when it was, but I think at that

Page 81

1  point there was a discussion of whether she should be
2  terminated or fired.
3      Q.   And that's what I wanted to talk to you a
4  little bit about, but I just wanted to make sure that
5  there was -- you've said the one where you discussed
6  whether she should be terminated or fired, that would
7  have been the last one that you listened to, correct,
8  or that would have been the last --
9      A.   Well, there was another one before that.
10      Q.   Okay.
11      A.   There was -- I mean, there had been some
12  discussions prior to that where there was a question
13  as to whether or not she should be fired.
14          And you know, Gordon kind of said no,
15  'cause he didn't want to give her that extra
16  ammunition I guess if she had been fired.  So he
17  was -- he basically said he did not want Howard to
18  fire her.  And that was like before this Adams
19  Brothers podcast 'cause I think it was referenced in
20  one of my e-mails.
21      Q.   Did Mr. Finkelstein want to fire Ruby
22  prior to the Adams Brother podcast?
23          MR. LAUFER:  Object to the form.
24  BY MR. FRANK:
25      Q.   You can go ahead.

Renee Dadowski
May 07, 2021

Page 82

1      A.  I believe so.

2      Q.  Okay.  Was it your understanding based on

3 your discussions with Mister -- or your interactions

4 with Mr. Weekes and Mr. Finkelstein that the talk

5 regarding firing Ms. Green was related to statements

6 she had made on the campaign trail?

7      MR. LAUFER:  Object to form.

8      A.  Yes.  I mean, Diane Cuddihy would have

9 been there for those conversations 'cause those all

10 happened before she retired.  So it would have been

11 not just Howard and Gordon and I.  It would have been

12 Howard, Gordon, Diane, and I.

13 BY MR. FRANK:

14      Q.  Okay.  And the discussion was whether to

15 fire her based on her statements on the campaign

16 trail?

17      A.  I mean, I couldn't tell you whether it was

18 specifically regarding statements on the campaign

19 trail or if it was statements that she made

20 criticizing, you know, the training and the way the

21 office was run.  I mean, I don't believe she made

22 those comments in the office.

23      Are you asking me if they were comments

24 made while she was at like a democratic club event or

25 something?

Page 83

1      Q.  Yes.  I'm asking the context.

2      Was it your understanding that the

3 discussion with regard to the prospect of terminating

4 her related to things that Ms. Green said critiquing

5 the office?

6      A.  Yes.

7      Q.  Was there any other -- other than the

8 things that she had said critiquing the office, was

9 there any other behavior or other statements that

10 served as a basis, to your knowledge, for the

11 discussions about prospectively terminating her?

12      MR. LAUFER:  Object to form.

13      A.  Not that I'm aware of.

14 BY MR. FRANK:

15      Q.  Okay.  So it would have been exclusively

16 based on statements that Ms. Green made?

17      A.  Yes.  I mean, she was trying cases and she

18 was in court where she was supposed to be, so it

19 would have been nothing regarding her performance.

20      Q.  Okay.  As far as this Adams Brother

21 podcast, how did that come about that you became

22 aware of it?

23      A.  That Sunday night, I don't know if it was

24 the day after the podcast or the same day as the

25 podcast, Howard sent me an e-mail and said, Did she

Page 84

1 say that?  I believe is what the context of the e-mail

2 was.  Let me look and see if I can find it.

3      MR. FRANK:  Why don't we take a

4      five-minute break.

5      (Thereupon, a recess was taken from 3:45

6      p.m. until 3:50 p.m., after which the following

7      proceedings were held:).

8 BY MR. LAUFER:

9      Q.  Ms. Dadowski, were you able to locate that

10 e-mail?

11      A.  Yes.  Actually, the first one that he sent

12 to me was on Sunday, August 9, 2020 at 7:55 p.m.  And

13 he said, Can you listen and see if she stepped over

14 the line?  Just came from someone who was anonymous

15 but said we are on opposite sides of the PD race.

16 She is being unfair to you.  And he sent me a YouTube

17 link.

18      So like I said, it was Sunday at eight

19 o'clock at night almost.  I don't know if I listened

20 to it that night.  I believe I did, but I wasn't

21 gonna respond to Howard at that point because it was

22 kind of late.  And I think, you know, it was like a

23 45-minute podcast or something like that, and so I

24 just waited until the next day.

25      And then obviously before I could respond

Page 85

1 to him -- I may have responded to him and said, Will

2 do, because I usually had a habit of when I got an

3 e-mail from Howard, I would at least acknowledge it

4 because if you didn't, he would get impatient and

5 sometimes he would get -- like he would send us a

6 response that said, It's been two minutes.  It's been

7 five minutes.  It's been 10 minutes.  So we kind of

8 got in the habit like, you know, when Howard sends

9 you something, you need to make sure that you at

10 least acknowledge it.

11      So I don't have that as far as anything

12 that I sent to him, but that is at Sunday, August 9th

13 at 7:55 p.m.

14      And then the next e-mail that I have

15 regarding it is he sent a copy of a J.A.A.B. blog.

16 That was like the courthouse blog.  I guess somebody

17 must have posted something on J.A.A.B. blog.  And he

18 said, Did she say that?

19      And so, it says, Ruby calls Howard a fraud

20 on Adams Brother podcast.

21      And then there's a note.  It says -- I

22 guess it's August 9, 2020 at 9:26 p.m. and it says,

23 Questions his commitment to the black community and

24 says he doesn't care about them.  Says he golf every

25 day and doesn't show up to work.  Say what you want

Renee Dadowski
May 07, 2021

Page 86

1　but no one who works there ever said what she said
2　publicly.  The Howard myth is penetrated.  And then
3　it had a link to the same Adams Brother podcast.
4　　　　So I must have listened to it again
5　because at that point I responded at 8:34 a.m. on
6　August 10, 2020 and said, I just re-listened again
7　and took notes.
8　　　　And then at 8:47 he said, I listened to
9　the first 28 minutes.  Your thoughts.
10　　　Q.　And when you said you took notes, did you
11　take handwritten notes or typed notes?
12　　　A.　I took handwritten notes and I
13　basically -- they really weren't impression, like
14　mental impression notes.  They were just line and
15　page, like you would do a depo.
16　　　Q.　Right.
17　　　A.　All I did was I went through the podcast
18　and wrote what Ruby's words were and put it on a
19　piece of paper and I put the timestamp next to the
20　words so in case there was a particular statement or
21　comment that we needed to go to and find out where
22　she said something, I would just be able to go
23　straight to the time.
24　　　　So I basically just summarized as far as
25　like an index of her statements.  I didn't make any

Page 87

1　notes on what I thought.
2　　　Q.　And that would have been on that Sunday,
3　the 10th?
4　　　A.　No.  I did that on the morning of -- ~~whatever~~
5　Sunday was the 9th.  I did that on the morning of the
6　10th, correct.
7　　　Q.　Okay.  And did you --
8　　　A.　Because I knew that Howard was gonna be
9　requesting it, so I just went ahead and started going
10　it just because I know him, and so, that's why I
11　started taking notes.  I think I got up early that
12　day and started just listening to it and taking the
13　notes.
14　　　Q.　Okay.
15　　　A.　The first time I just listened to it.
16　　　Q.　And as far as those handwritten notes are,
17　where are those notes now?
18　　　A.　I threw them away.  When I came back from
19　my Christmas vacation from Pittsburgh, I had a bunch
20　of public defender stuff that were -- my dining room
21　table was basically my makeshift desk for the Public
22　Defender's Office.
23　　　　And so any notes or any reference to
24　public defender work, I basically threw away 'cause I
25　knew I wouldn't need it anymore.  I really didn't

Page 88

1　think about this context.  So I just kind of like
2　pitched everything 'cause I was basically getting
3　ready to -- whatever property I had left for the
4　Public Defender's Office, I needed to return to them.
5　So anything that was my, you know, notes, legal pads,
6　anything that was -- had anything to do with like my
7　list of the people that wanted to be -- have access
8　to the Public Defender's Office that I was
9　coordinating, the chiefs that were on leave or
10　administration that was on leave and when they were
11　gonna be off, I kept those lists and would let Gordon
12　know when we had our daily chief meetings who was
13　gonna present and who was gonna be absent, and so I
14　just kind of like, you know, threw it all away.
15　　　Q.　As far as the handwritten notes that you
16　took, what did you do about -- or what, if any,
17　action did you take to communicate with
18　Mr. Finkelstein about the notes you had taken?
19　　　A.　At that point I just told him that I took
20　notes and he didn't ask me for what they were.  I
21　think maybe if we had a phone conversation, I might
22　have told him that my notes were basically going
23　through the audio and putting word for word what she
24　said and what the timestamp was for things that I
25　felt were critical probably of the office.

Page 89

1　　　　So I don't think I did every single
2　comment.  I didn't do anything I believe that the
3　host made except for the one comment that he made
4　about the O.J. trial.  I think I wrote that one down.
5　But as far as anything else is concerned, I didn't --
6　I didn't do anything with that.
7　　　　And then I think at some point after he
8　fired her, I knew that he was gonna need to have some
9　written response for the press or whoever else would
10　be asking him for it, so I started making notes as
11　far as the important points in the Adams Brother
12　podcast and I sent him an e-mail with those notes.
13　　　Q.　Okay.
14　　　A.　Did you get those?  Because I think I just
15　got those sent to me the other day.
16　　　Q.　I have those.
17　　　A.　Okay.
18　　　Q.　I do and that's what I'm looking at.
19　　　　And I believe, for the record, that's an
20　e-mail that you sent August 19th at 9:47 a.m. and
21　it's got a list.  It says, Ruby's podcast, and it's
22　got bullet points.
23　　　A.　Correct.
24　　　Q.　As far as prior to that, was there a time
25　when you had a telephone call, after you had had the

Renee Dadowski
May 07, 2021

Page 90

1  opportunity to review the podcast one or two times
2  and took handwritten notes, did you ever have a
3  telephone call with Mr. Finkelstein?
4       A.   I'm sure I did.
5       Q.   Okay.  Do you remember generally what the
6  exchange was after you had a chance to look at it and
7  discuss it with him?
8       A.   Probably he was very upset.  I think he
9  was very upset that she called him a racist because
10 obviously that is something that he felt that he
11 fought for all of his life was to make, you know,
12 races or equality for black clients and black people
13 and he was very strong advocate for civil rights, and
14 you know, I think the racism comment or implication
15 really hurt him and, you know, he was very upset by
16 that.
17            And I obviously don't believe that Howard
18 Finkelstein is a racist either, but I think that was
19 something that was really just hurtful to him.
20      Q.   Hurtful to him personally?
21      A.   Personally, yeah.  Well, I mean, I think
22 even professionally as a public defender, as an
23 elected public defender where most of our clients are
24 blacks or browns or, you know, minorities, whether
25 they're a minority-majority or majority-minority at

Page 91

1  this point.  You know, a lot of people that are in
2  the boxes are black clients and so obviously if you
3  have a racist public defender, that would probably be
4  problematic.
5       Q.   Did you personally have an issue or take
6  issue with anything that Ms. Green said in her
7  podcast -- in the podcast?
8            MR. LAUFER:  Object to form.
9       A.   Other than calling Howard or implying that
10 Howard was a racist, I mean, as far as the comments
11 where she made about -- I mean, let me go back to
12 that e-mail and see what notes I made as far as
13 the --
14 BY MR. FRANK:
15      Q.   And for the record, you're looking at the
16 August 19th e-mail with the bullet points?
17      A.   Yeah, that's what I'm looking at right
18 now.  So let me just see here.
19            I mean, obviously I couldn't comment on,
20 Black face in a high place doesn't always advance the
21 race.  I'm not really sure if I have any input or
22 insight into that comment.  That's obviously how she
23 felt, so.  You know, as a white person, I don't know
24 that I could tell her whether that was legitimate or
25 not.  I mean, I didn't see it, but obviously I'm not

Page 92

1  her, so I don't know how she felt.
2            Told as supervisor and chief not to go to
3  the courtrooms and not to train the attorneys.  I
4  wasn't privy to that.  I believe that might have
5  happened, if it did at all, with Cathy Keuthan and
6  Diane Cuddihy, but from what Diane Cuddihy told me
7  about that is that that was never relayed to her, but
8  you know, I don't know where she got that from.
9            Reasons that made her want to run.  Told
10 not to train attorneys.  Referred to as public
11 pretenders.  I mean, we've been called public
12 pretenders since, you know, before my time, so I
13 don't think that's anything that's new.  We're always
14 gonna be called public pretenders and I'm sure people
15 are gonna be called public pretenders long after, you
16 know, I'm no longer practicing law, so.  And you
17 know, as far as that's the reasons made her want to
18 run, I can't comment on that.
19            Why would admin when George Floyd happened
20 tell the office not to march in solidarity with Black
21 Lives Matter?  Well, the reason I can tell you as to
22 why we felt that way is because we were in the middle
23 of a pandemic and obviously Howard was not having any
24 of the attorneys or staff come into the office and he
25 felt that that would send a poor message if we had

Page 93

1  attorneys walking or protesting for George Floyd and
2  on one hand saying it's not safe to come to the
3  office, but on the other hand saying that it's safe
4  to protest.  I think that was the reason why, you
5  know, the office was basically told not to march as
6  an office.
7            Why would admin not want to hire people
8  who looked like the people filling the boxes?  I can
9  assure you that there was never any systemic reason
10 that we didn't hire -- we hired whoever the best
11 qualified person was, whether they were black or
12 white, so that I didn't ever feel that to be an issue
13 because I believed that we hired a lot of black
14 attorneys whenever I was involved in the hiring
15 process, and so we would hire them if they were
16 qualified whether they were black or white.
17      Q.   Did you think that Ms. Green's comments
18 with regard to training and allocation of resources
19 were legitimate concerns?
20      A.   I mean, yes.  I thought, along with other
21 people, that our training director at that time,
22 Lorena Mastrarrigo, was a mistake and even before she
23 became a training director.  Like I said, I believe
24 Susan Porter conveyed her concerns to Howard and
25 Cathy and Diane that Lorena was not qualified or

Renee Dadowski
May 07, 2021

Page 94

1  should not be the training director.
2          And in fact, I actually voiced my concern,
3  and I was told by Cathy that it was a done deal, that
4  that's who Gordon wanted and Howard was gonna give
5  Gordon who he wanted.
6          You know, just from personal experiences
7  with Lorena's training, I was the -- we used to have
8  a public defender college that was held anywhere from
9  two to three times a year, and I started teaching at
10  defender college probably in the mid '90s.  And you
11  know, like I said, it would be at least twice a year,
12  sometimes three times, sometimes we had advanced.
13  And for years I had one partner, Bill Laswell, and
14  then he retired and so, I would basically be asked
15  and invited back to defender colleges and I would
16  bring somebody else with me for every defender
17  college, and I never had a problem.  I always had
18  very good partners.
19          And prior to me being told that I needed
20  to bring Lorena with me, I had had attorneys
21  basically telling me that she had given them
22  incorrect legal advice, that she really didn't know
23  the law, that she was, you know, it was a problem.
24  So like a lot of times lawyers would go to her
25  office, ask her for things because they kind of knew

Page 95

1  with Gordon possibly being the elected that if they
2  didn't kind of go and follow that procedure that
3  there could be problems for them in the future, or
4  they felt that there could be problems for them in
5  the future.  So, you know, they would go ask her, she
6  would give them incorrect or wrong advice, and then
7  they would come down and ask me or some other
8  attorneys what the correct law was.
9          I know that one of the trainers with her
10  before she became the director like had to actually
11  call her out on a couple of times for things that she
12  didn't know, but anyway, so back to defender college.
13          You know, like I said, for 25 years I had
14  been teaching at defender college and had various
15  people come and teach with me, and the only time that
16  I was ever told not to bring somebody back was when I
17  had Lorena Mastrarrigo as my partner.  And the person
18  who was in charge of the defender college for that
19  time basically pulled me aside and said, She was
20  awful and don't ever bring her back again, so.
21      Q.   And for the record, this was the training
22  director under --
23      A.   Yeah, this was the training director.
24  Like, I didn't want to bring her because like I knew
25  she really was not very good, but at one point I was

Page 96

1  told by Howard that I needed to bring Lorena because
2  she was the training director, and Gordon had been
3  pushing for me to bring her as a training director.
4          I might have told Gordon that there were
5  some problems and concerns, but he was -- they were
6  adamant that I needed to bring Lorena with me.  So
7  the one time that I did bring her, it was really
8  embarrassing because, like I said, we're teaching the
9  young public defenders throughout the state and I had
10  never ever been told not to bring somebody back.
11          So then after we came back the following
12  defender college, she wanted to come with me like as
13  my partner, and I kind of made an excuse as to why
14  she couldn't come or what was going on, Like I think
15  it would be best if I bring somebody else with me,
16  you know, to give them the experience of learning.  I
17  think it was another one of her trainers I brought
18  with me to give them the experience.
19          And then, finally I admitted to her the
20  reason, 'cause she was still putting, like, pressure
21  on me, like she really wanted to go because we had
22  some concern issues where she thought that I was, you
23  know, not treating her well, and it was all
24  professional obviously as to why.  And so, I finally
25  had to tell her, like, the reason that I'm not

Page 97

1  bringing you is because -- it's not because I don't
2  like you.  It's because I was told not to bring you
3  back.  And I think she was very taken aback by that
4  and not appreciative of it.
5          So as far as Ruby's comments as far as the
6  training were concerned, I think myself and a lot of
7  other attorneys in the office kind of believed that
8  as well.
9      Q.   I see.
10      A.   And like I said, Susan Porter kind of felt
11  that way before she was even given that position when
12  Susan retired.
13      Q.   I see.  As far as your discussions or
14  exchanges with Mr. Finkelstein about the podcast, did
15  he solicit your opinion about what he should do with
16  regard to Ms. Green?
17      A.   I believe he asked me if he should fire
18  her.  I think that would have been on the other
19  e-mails.
20      Q.   Okay.  I haven't been furnished those
21  e-mails.
22          What was your opinion or what did you
23  recommend?
24      A.   Well, obviously I was very concerned
25  because he -- you didn't get those e-mails from

Renee Dadowski
May 07, 2021

Page 98

1  like --
2      Q.   I did not.
3      A.   Because those were -- let me see.  Those
4  were dated in August.
5      Q.   It's okay for now.  I just want to know
6  what advice or what your opinion was that you gave to
7  him.
8      A.   Well, I was put in a very difficult
9  position that I thought because he asked me I think
10 whenever he was gonna fire her, I think the
11 suggestion was, should it come from him or Gordon or
12 me?  And I remember when he made the suggestion that
13 it came from me, I was obviously very concerned
14 because I, you know, listen, if Ruby was under the
15 impression that I supported Gordon, I expected that
16 she would terminate me, but obviously there was some
17 hope that I was in DROP and that she might see my
18 value as being an attorney in the office for
19 32-and-a-half years, really the only one that has any
20 historical knowledge that's for the most part left so
21 that she might see some value in keeping me around.
22          And clearly, if she won the election and I
23 was the one that fired her, there was absolutely no
24 way that she was gonna keep me around.
25          So I remember I called Diane Cuddihy in

Page 99

1  kind of like a panic and said, you know, like --
2  'cause I think he sent a text at -- yeah, 'cause he
3  sent the text on August 10th at 7:23 a.m. and said, I
4  am firing her today.
5          And then later on at that same day, August
6  10th at 8:02 a.m., he said, Unless I hear something
7  from you guys, I plan to fire her today.  She
8  attacked me professionally and personally, the office
9  and fellow PDs, the language has the ability -- I
10 don't know where it went.  Let's see.  I kind of like
11 hit something.
12     Q.   Those I actually have seen, but it sounds
13 like there was some kind of discussion about whether
14 you should do it or not.
15     A.   Right, yeah.  Yeah, so I'm trying to
16 figure out when that was, if that was -- like that's
17 why I was trying to look at those e-mails to see if
18 those were around that time or if that was --
19     Q.   You had a discussion with Ms. Cuddihy and
20 what was her take on the whole thing?
21     A.   She was gonna talk to Howard, and then she
22 never did get a chance to talk to him because he
23 changed his mind and decided to wait.  So whatever
24 day that was, I think 'cause -- I think the question
25 was should I fire her or -- should I fire her or

Page 100

1  Gordon fire her or, Renee, should you fire her?  And
2  that's when I was kind of like, oh.
3      Q.   Other than saying or taking the position
4  that he wanted Mr. Finkelstein to wait until after
5  the election, did Mr. Weekes have an opinion one way
6  or another about Ms. Green being fired?
7          MR. LAUFER:  Object to form.
8      A.   Well, he said in the Sun Sentinel
9  interview that he was gonna fire her, so he, I think,
10 made it very clear that she was gonna be fired when
11 he took over if he was the elected public defender.
12 BY MR. FRANK:
13     Q.   Was that before or after to your knowledge
14 of this podcast issue?
15     A.   Before.
16     Q.   Okay.  So your understanding was he was
17 going to do it anyway?
18     A.   Correct.  He basically said he was gonna
19 fire her if he won.
20     Q.   What was your understanding as to why he
21 would have fired, just because she was running
22 against him?
23     A.   I believe so.
24          MR. LAUFER:  Object to form.
25

Page 101

1  BY MR. FRANK:
2      Q.   Okay.  You personally, did Mr. Finkelstein
3  ask you or solicit your opinion about whether Ms.
4  Green should be fired or not?
5      A.   I think he did, and I think I told him
6  that he probably should wait and let Gordon weigh in
7  because I believe Gordon was out campaigning at the
8  time.  He had taken I think some time off for --
9  'cause it was I think the week before the election.
10 So I can't remember if he was off or not but --
11 'cause initially Howard only sent it to me.
12          And I said, you know, before you make that
13 decision whether you want to fire her, I think you
14 need to run it by Gordon.  Because in the past Gordon
15 had said he did not want her to be fired during the
16 campaign because he felt that that might give her
17 some extra ammunition and people might feel more
18 sympathetic to her if she got fired, and I think he
19 thought it might negatively affect his campaign I
20 believe.
21     Q.   Apart from the timing considerations, did
22 you believe that Mr. Finkelstein should have fired
23 Ms. Green?
24     A.   I did not think he should fire her, but
25 you know, that was obviously -- I wasn't Howard, you

Renee Dadowski
May 07, 2021

Page 102

1    know, and I'm sure maybe if somebody attacked me and
2    called me a racist or criticized my office, I might
3    feel differently, but you know, obviously I thought
4    she was doing a good job for the clients, but I knew
5    obviously that Gordon was gonna fire her if he won.
6         Obviously if she did win, I didn't think
7    he should fire her because I think that would have
8    just been kind of like not productive to fire
9    somebody if she won the election, so I did not think
10   that he should fire her at that point.
11        Q.    Did you share that opinion, your opinion
12   with Mr. Finkelstein?
13        A.    No.  I think I shared it with Diane
14   Cuddihy instead.
15        Q.    During your exchanges with Mr. Finkelstein
16   regarding this podcast, other than you've indicated
17   that he was upset, did he communicate any concerns
18   about how, if at all, these statements made by Ms.
19   Green would affect the office?
20        A.    Yeah, I think he actually specifically
21   says it, too, in his e-mail, and I think that's
22   really consistent as to how he felt.  Let me -- and I
23   think he might have even said it when he was replying
24   on a news article as to why he felt that was
25   counterproductive to the mission of the office.  I

Page 103

1    would have to look to see specifically what he said.
2         Q.    Do you know if -- obviously it affected
3    Ms. Green because she was terminated, but do you know
4    if Ms. Green's statements affected the office in any
5    way after she was terminated?
6         MR. LAUFER:  Object to form.
7         A.    Well, I think she had a lot of people that
8    agreed with her statements that were in the office as
9    far as, you know, the training and stuff like that.
10   I mean, I think a lot of people also agreed with the
11   Tallahassee comments and not going up to Tallahassee
12   for funding, but the lawyers really don't quite
13   understand how funding works.  So I think that, you
14   know, they don't understand you don't just go up to
15   Tallahassee and ask for money, and, you know, like
16   the fact that they thought that people in other
17   public defender agencies were getting money that we
18   weren't, you know, there's a Florida Public Defender
19   Association, so everybody kind of worked together and
20   then divided the pot.
21        So a lot of the young lawyers, and even
22   some of the older lawyers, don't quite understand how
23   that works.  So I think they probably agreed with her
24   as far as those statements were concerned, but they
25   were not really knowledgeable about how the

Page 104

1    legislative budget works and the process works.
2         But as far as the training was concerned,
3    I think they agreed with her on that and I think
4    that's, you know, there were a lot of people that --
5    BY MR. FRANK:
6         Q.    Do you know if the statements made by Ms.
7    Green had any impact one way or another on the actual
8    operation of the office?
9         A.    No, I don't believe so.
10        Q.    Do you know if the statements made by Ms.
11   Green in the podcast undermined or hurt
12   Mr. Finkelstein's relationship with any of the
13   attorneys in the office?
14        MR. LAUFER:  Object to form.
15        A.    No, I don't think so.
16   BY MR. FRANK:
17        Q.    Okay.
18        A.    I don't think anybody changed their mind
19   based on what Ruby said in the podcast, if that's
20   what you're asking.
21        Q.    That's what I'm asking.
22        A.    Okay.
23        MR. FRANK:  Madam Court Reporter, I'm
24   going to attach the September 18th e-mail that
25   was sent to you as Exhibit 1.

Page 105

1         (Thereupon, 9/18/20 e-mail was marked as
2    Defense Exhibit No. 1.)
3    BY MR. FRANK:
4         Q.    I'm looking at the e-mail also, Ms.
5    Dadowski, and it says that you forwarded it at some
6    point, like a month later, to someone named -- let me
7    get this right for the court reporter.
8         A.    Michelle Grzybowski?
9         Q.    Yes.
10        A.    She was the administrative assistant and
11   she was basically Howard's secretary and Gordon's
12   secretary.  He didn't really have a secretary, but
13   she kind of acted in that way.  She would handle all
14   the public records request that we had to send out.
15        The reason I sent it to her was we got a
16   public records request from a woman named Rita Lipof,
17   and she asked for any correspondence that we had
18   regarding Ruby's termination I believe, whatever the
19   e-mail public record request was.
20        Q.    Okay.  When Mr. Finkelstein gave you this
21   communication that led to you looking at the podcast,
22   did you view that as an unusual request from
23   Mr. Finkelstein for you to do that?
24        A.    No.
25        MR. LAUFER:  Object to form.

Renee Dadowski
May 07, 2021

Page 106

1  BY MR. FRANK:
2      Q.   Why wasn't it unusual?
3      A.   Because any time that somebody would say
4  something negative about him or, you know, like on
5  the blog especially or mainly on the blog, if any
6  time somebody would say something, he would forward
7  it to, I guess before my time, Cathy and Diane, and
8  then after Kathy retired, he would forward it to me,
9  Gordon, and Diane and, you know, just let us be aware
10 of what was going on.
11     Q.   When you refer to the blog, is that that
12 J.A.V.L. blog?
13     A.   J.A.A.B. blog.
14     Q.   And when he would forward stuff, was there
15 usually, from that blog, were there usually
16 directives that came with it or --
17     A.   Not usually.  You know, obviously if there
18 was a link to something that somebody said something
19 on the record or -- I can't remember, you know,
20 whatever, but he would have us listen to things if
21 somebody critiqued him that was able to be, you know,
22 documented other than somebody's written words, he
23 would have us listen to it and get our opinions.
24          And like I said, there was another one
25 that somebody must have sent to him or sent to us

Page 107

1  that Ruby had said something that he found offensive
2  or whatever because he had us listen to another one
3  at some other point before the pandemic.
4      Q.   I see.  Before the pandemic?
5      A.   Correct.  Before the pandemic because we
6  were all in the office and I remember --
7      Q.   So that would -- go ahead.  I'm sorry.
8      A.   I was gonna say I just remember that we
9  were in Diane's office, me, Gordon, and Diane, and
10 then we, I think, went into Howard's office and
11 talked about it.  And I think that was the first time
12 or another time that Gordon had said, you know, don't
13 fire her.
14     Q.   And it's my understanding that that
15 initial time was precipitated by something he heard
16 or saw and he forwarded it to you by e-mail?
17     A.   Yeah.  Well, probably -- I can't 100
18 percent say, but usually, like, I didn't really give
19 much credence to anonymous postings, but Howard, you
20 know, looked at that a lot, and so I'm guessing at
21 some point somebody must have sent him something or
22 forwarded him something, and you know, whether he
23 forwarded it to all of us or we were all in the same
24 spot and one of us got it and we listened to it, but
25 I do remember listening to something at some point

Page 108

1  and that's why I made reference in my reply to him,
2  like, I don't think it's anything different than what
3  she said before other than the Black Lives Matter
4  stuff and implying that Howard was a racist.
5      Q.   And for the record, if it happened before
6  the pandemic, my understanding is that your office
7  went into telecommuting mode sometime in March of
8  2020; is that accurate?
9      A.   Yeah, we went in -- I think March 13th was
10 a Friday.  We kind of were preparing for it.  And so
11 I had meetings with some of the staff and said, you
12 know, we have five or six -- or I think we had 10 or
13 12 secretaries that we were giving laptops to and
14 they were gonna be responsible for, you know, like
15 trying to keep the office going.
16          And then we had a chief meeting in the
17 office on Monday, March 16th.  And then the office
18 was kind of -- I think Judge Tuter shut down the
19 courthouse then.  He might have shut -- I can't
20 remember if he shut it down the Friday before or that
21 Monday.  And then, so that was the last time that we
22 were all physically expected to be in the office as
23 an office was Friday, and the chiefs were not
24 expected to be in the office as an office after -- or
25 March 16th.  And then I think on March 17th is

Page 109

1  officially when the pandemic really started.
2      Q.   And it's your recollection that this first
3  instance of Mr. Finkelstein being upset about Ms.
4  Green's statements came before that March 16th date,
5  2020?
6      A.   Definitely, because we were all in the
7  office when we talked about it.
8      Q.   And as far as you've indicated that
9  Mr. Finkelstein would talk to you about anonymous
10 posts on this blog, was it your experience that
11 Mr. Finkelstein was particularly sensitive to things
12 that were said about him or the office?
13          MR. LAUFER:  Object to form.
14 BY MR. FRANK:
15     Q.   You can go ahead.
16     A.   Yes.
17     Q.   How often -- well, let me back up.
18          Would you say that he was unusually
19 sensitive to it?
20          MR. LAUFER:  Object to form.
21 BY MR. FRANK:
22     Q.   You can answer.
23     A.   I mean, I don't know whether the word
24 unusually -- I mean, I think he was sensitive.  I
25 think that things that a lot of people would just

Renee Dadowski
May 07, 2021

Page 110

1  ignore because they were coming from anonymous
2  posters he gave, you know, credence to and it hurt
3  him.
4           You know, there was some things that were
5  said about Gordon on the blog anonymously, and I
6  think those were, you know, obviously not appreciated
7  either.
8       Q.   Right.  Okay.  How often would he raise
9  the issue, just ballpark estimate, how often would he
10  raise the issue about the blog with you?
11      A.   Well, there was a time when it was more
12  frequently, but then I think he kind of calmed down a
13  little bit as far as looking at the blog.  And then,
14  you know, every time somebody would probably point
15  something out to him, he would kind of let us know.
16  I mean, I really couldn't tell you.
17  Sometimes it would be, you know, couple times a week;
18  sometimes it would be couple times a month, so;
19  sometimes it would be, you know, couple months in
20  between before we had to deal with the blog issue.
21  So like when it first started, I think it was more
22  frequently.
23           MR. FRANK:  Ms. Dadowski, I think that's
24      all I have for you.  I certainly appreciate
25      your time and patience today on a Friday

Page 111

1  afternoon.
2           Your counsel may have some questions for
3  you.
4           MR. LAUFER:  You know what?  Can you just
5      give -- can we take two minutes?  I've got a
6      lot of notes.  I'm just going to look through
7      my notes and we'll come back.  And if I have
8      anything at all, it's going to be very brief.
9           MR. FRANK:  Absolutely.
10          (Thereupon, a recess was taken from 4:26
11      p.m. until 4:27 p.m., after which the following
12      proceedings were held:)
13               CROSS EXAMINATION
14  BY MR. LAUFER:
15      Q.   Ms. Dadowski, I just have one follow up.
16  I want to make sure I understood you correctly.
17           Do you recall being asked on direct
18  examination about a time that you listened to a prior
19  recording involving statements made by the plaintiff?
20      A.   Yes.
21      Q.   When I say prior, I mean prior to the
22  Adams Brothers podcast.
23      A.   Correct.
24      Q.   I had written down that you had said we
25  all listened to it.  My question to you, ma'am, is:

Page 112

1  Do you have a distinct recollection of
2  Mr. Finkelstein being in that group of people who
3  listened to the recording at that time?
4      A.   No.  I don't believe -- whether he
5  listened to it on his own, I couldn't tell you, but I
6  believe we listened to it and then we went and kind
7  of told -- 'cause usually what would happen is Howard
8  didn't want to listen to a very lengthy anything or
9  read a very lengthy anything.  So he would send it to
10  us and we would read it or listen to it and then give
11  what we thought or our impressions or he would --
12  sometimes it seemed like he actually listened to it
13  but he didn't tell us he listened to it because then
14  he would start talking about it and he would have
15  these, like, comments that were made.  So it's like,
16  well, clearly he listened to it, but he didn't let us
17  know that he listened to it or something, so.
18           But yeah, I don't believe he was there
19  when we listened to it.  I think we were in Diane's
20  office.
21           MR. LAUFER:  That's the only question I
22      had, ma'am.  Thank you very much.
23           MR. FRANK:  Ms. Dadowski, I'm sure I know
24      what your counsel is going to say, but I need
25      to ask you anyway for the record.  You have the

Page 113

1  opportunity to read or waive.
2           THE WITNESS:  Read.
3           MR. FRANK:  Okay.  We just wanted to
4  chronical that.
5           And Madam Court Reporter, I am requesting
6  a copy.
7           MR. LAUFER:  I imagine you're ordering,
8  counsel, right?
9           MR. FRANK:  Yes, I'm ordering a copy.
10          MR. LAUFER:  Well, assuming counsel is
11  ordering, I will take a copy as well.
12          (Thereupon, the proceedings concluded at
13  4:30 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Renee Dadowski
May 07, 2021

---

Page 114

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF DADE

          I, the undersigned authority, certify that
RENEE DADOWSKI, ESQ. appeared before me via Zoom and
was duly sworn on the 7th day of May, 2021.
Signed this 21st day of May, 2021.

*Cindy Hart*

CINDY HART, Stenographer
Notary Public, State of Florida
My Commission No. GG 328946
Expires: 6/23/23

---

Page 115

CERTIFICATE OF STENOGRAPHER

STATE OF FLORIDA
COUNTY OF DADE

          I, CINDY HART, Stenographer, do hereby
certify that I was authorized to and did
stenographically report the foregoing Zoom Deposition
of RENEE DADOWSKI, ESQ.; Pages 1 through 113; that a
review of the transcript was requested; and that the
transcript is a true record of my stenographic notes.
          I FURTHER CERTIFY that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the
parties' attorneys or counsel connected with the
action, nor am I financially interested in the
action.
          Dated this 21st day of May, 2021.

*Cindy Hart*

CINDY HART, Stenographer
Notary Public, State of Florida
My Commission No. GG 328946
Expires: 6/23/23

---

Page 116

May 24, 2021
Renee Dadowski, Esq.
c/o Cory Laufer, Esq.
Laufer & Laufer, P.A.
claufer@lauferlawyers.com

IN Re:  Green vs. Finkelstein
Case No.:  20-CV-62160

Please take notice that on May 7, 2021, you gave your
deposition in the above cause.  At that time, you did
not waive your signature.

The above-addressed attorney has ordered a copy of
this transcript and will make arrangements with you
to read their copy.  Please execute the Errata Sheet,
which can be found at the back of the transcript, and
have it returned to us for distribution to all
parties.
If you do not read and sign the deposition within a
reasonable time, the original, which has already been
forwarded to the ordering attorney, may be filed with
the Clerk of the Court.

If you wish to waive your signature now, please sign
your name in the blank at the bottom of this letter
and return to the address listed below.
Very truly yours,

*Cindy Hart*

CINDY HART, Stenographer
Phipps Reporting, Inc.
1551 Forum Place, Suite 200-E
West Palm Beach, Florida 33401

I do hereby waive my signature.

_____
Renee Dadowski, Esq.

Job No.: 187232

---

Page 117

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
IN RE:  Green vs. Finkelstein
CASE NO. 20-CV-62160
WITNESS: Renee Dadowski, Esq.
TAKEN: 5/7/2021

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| | | | |

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts stated
in it are true.

_____          _____
Date                     Renee Dadowski, Esq.

Job No.: 187232

Renee Dadowski
May 07, 2021

1

**Exhibits**

**DFT Exhibit 001
Dadowski**
   3:12  104:25
   105:2

**$**

**$1,000**
   43:6

**$500**
   43:6,7

**1**

**1**
   104:25  105:2
**10**
   14:20  85:7
   86:6  108:12
**100**
   14:23  107:17
**10th**
   87:3,6  99:3,6
**11**
   62:4
**12**
   70:12  108:13
**13th**
   78:9  108:9
**14**
   50:19,20
**14th**
   47:3  78:12
**15th**
   78:11,12
**16th**
   108:17,25
   109:4

**17th**
   108:25
**18th**
   104:24
**1985**
   9:4
**1988**
   9:14  10:25
   11:5  12:9  28:8
**1989**
   13:7
**1990**
   13:7
**19th**
   73:4  74:5
   76:16  77:1
   89:20  91:16
**1:58**
   4:2
**1st**
   11:5  28:8
   64:17

**2**

**20**
   13:20  19:4
**2000**
   23:4
**2004**
   17:18,19
**2005**
   17:20,21,22
**2006**
   15:16
**2007**
   15:16,17
   17:16,17  18:7,
   20  23:1  30:18
   31:3  42:13

**2009**
   21:8  26:5
**2010**
   21:8
**2017**
   23:4,6  30:18,
   24  31:3,6
   32:19  38:13,14
   43:21
**2018**
   47:3  51:3
**2020**
   33:4,6  55:8
   57:24  64:17
   80:21  84:12
   85:22  86:6
   108:8  109:5
**2021**
   11:6
**21**
   16:1
**25**
   7:1  13:20
   95:13
**27th**
   62:3
**28**
   86:9
**29th**
   61:4  62:2  63:6
   72:15  74:12,23
   75:1  76:7,8,
   11,13,18  78:23

**3**

**30**
   16:2  67:13
   72:7  73:6,7
**30th**
   72:22

**31st**
   72:22  75:9
**32-and-a-half**
   44:20  67:19
   69:1  98:19
**3:45**
   84:5
**3:50**
   84:6

**4**

**40**
   16:2
**45-minute**
   84:23
**4:00**
   78:11,12
**4:26**
   111:10
**4:27**
   111:11
**4th**
   72:14,25  73:7
   74:10,13  76:17
   77:2  78:14

**5**

**5**
   8:8,12

**6**

**6**
   14:20

**7**

**7:23**
   99:3
**7:55**

Renee Dadowski
May 07, 2021

2

84:12 85:13

**8**

**89**
  12:8,11
**8:02**
  99:6
**8:34**
  86:5
**8:47**
  86:8

**9**

**9**
  84:12 85:22
**9/18/20**
  105:1
**90**
  13:11
**90s**
  13:8,10 94:10
**92**
  13:11 15:8,11
**9:26**
  85:22
**9:47**
  89:20
**9th**
  85:12 87:5

**A**

**a.m.**
  86:5 89:20
  99:3,6
**aback**
  97:3
**ability**
  99:9

**able**
  34:23 45:4
  48:6,15 50:1
  55:7 61:14
  75:16,17 76:2
  84:9 86:22
  106:21
**absent**
  88:13
**absolutely**
  14:25 98:23
  111:9
**accepted**
  10:14 49:5
  74:15
**access**
  12:19 74:25
  75:3,6,12
  76:7,12 88:7
**accident**
  5:19
**account**
  27:14 36:13
**accounting**
  9:6
**accurate**
  21:21 32:18
  36:12 108:8
**acknowledge**
  85:3,10
**acknowledged**
  74:10,14 77:3
**acted**
  105:13
**action**
  88:17
**activities**
  14:10
**actual**
  15:20 36:8
  104:7

**Adam**
  30:16
**adamant**
  96:6
**Adams**
  81:18,22 83:20
  85:20 86:3
  89:11 111:22
**address**
  44:2
**admin**
  92:19 93:7
**administration**
  17:9 52:17
  61:6 63:3,4,23
  66:2 88:10
**administrative**
  23:21 32:2
  105:10
**administrators**
  61:17 66:1
**admitted**
  96:19
**advance**
  91:20
**advanced**
  94:12
**adverse**
  44:25
**advice**
  94:22 95:6
  98:6
**advised**
  30:10 54:9
**advocate**
  90:13
**affect**
  64:23 101:19
  102:19
**affiliated**

**9:21 39:9**
**afraid**
  39:5 78:19
**African-american**
  49:11
**afternoon**
  4:15 111:1
**age**
  48:23
**agencies**
  72:9,10 103:17
**agreed**
  52:6 76:14
  103:8,10,23
  104:3
**agreement**
  52:7 63:9,14
  64:9 74:9,12,
  14,17 77:13,24
**ahead**
  10:11 81:25
  87:9 107:7
  109:15
**Alan**
  11:9 17:6
  38:22
**allegedly**
  48:23 50:19,20
**allergic**
  39:6
**allocating**
  50:15
**allocation**
  60:5 93:18
**allow**
  69:2 72:24,25
  73:1,3 74:3
  77:3 78:6
**allowed**
  33:16 47:5

Renee Dadowski
May 07, 2021
3

77:6

**allowing**
44:4

**amazing**
29:12

**ammunition**
81:16 101:17

**amount**
48:10

**animals**
39:4,6

**anointed**
17:6 42:20

**anonymous**
84:14 107:19
109:9 110:1

**anonymously**
110:5

**Anthony**
55:21

**anticipate**
6:3

**anticipated**
31:16 53:22

**anticipation**
79:11

**Apart**
50:25 101:21

**apartments**
16:17

**apologize**
20:24

**apparently**
36:1 45:22
62:19 70:11

**appeals**
31:11

**appearance**
16:3,4,8

**appointed**
16:1,3,6

**appreciated**
110:6

**appreciative**
97:4

**appropriate**
48:8

**April**
17:17 18:6,20

**areas**
28:16

**arena**
53:12

**armed**
13:23

**arrested**
16:2

**artfully**
6:10

**article**
102:24

**articulable**
6:20

**aside**
60:21 95:19

**aspire**
6:10

**assign**
52:9

**assigned**
11:19 12:12,24

**assistant**
11:10 14:12,13
17:13,16 18:7,
8 21:9 23:2,5,
13,16,18 24:21
25:15 30:25
31:1 32:17
34:8 36:19

41:6,7,8 42:12
66:9 73:21
105:10

**assistants**
23:21 24:9
31:2,3,5 32:22
33:16 39:14
61:6 70:3

**associated**
23:11

**Association**
32:6,10 66:5
103:19

**assure**
93:9

**attach**
104:24

**attacked**
99:8 102:1

**attempted**
13:23

**attend**
57:20

**attorney**
4:19 5:15 7:12
12:2,16,22
13:3,4,13,14
15:14 16:12
26:8,17,18
34:3,6,25 35:2
46:21 48:5,12,
13 52:3,4,14
65:24 75:20
98:18

**attorney's**
5:18 38:21

**attorneys**
14:14,19,20
16:19,20 25:1
26:13,16
28:17,18,23

29:16 36:4
47:6 51:11,16
53:25 54:2
69:2 92:3,10,
24 93:1,14
94:20 95:8
97:7 104:13

**audio**
8:7,10 88:23

**August**
66:3 80:21
84:12 85:12,22
86:6 89:20
91:16 98:4
99:3,5

**authority**
32:19 65:3,12
69:20 75:6

**average**
14:9

**aware**
7:4 28:6,9
34:7 37:21
40:15 52:12
83:13,22 106:9

**awesome**
29:12

**awful**
95:20

---

**B**

**B.S.**
9:6

**baby**
59:2

**backdate**
78:21

**backed**
50:12

**background**

Renee Dadowski
May 07, 2021                                                                    4

8:6 9:1

**Backman**
  11:21,24 20:5

**bad**
  45:1

**Bailey**
  35:23,25 36:2

**Bailey's**
  35:22

**ballpark**
  15:3 21:5
  110:9

**bar**
  12:8,9 35:24
  36:4

**basic**
  5:14

**basis**
  83:10

**batteries**
  13:22

**becoming**
  16:24 30:11
  43:23

**beginning**
  55:8 57:24

**behavior**
  27:11 83:9

**behavioral**
  26:13

**belief**
  56:12

**believed**
  47:9 93:13
  97:7

**bell**
  27:17

**bets**
  78:1

**better**
  17:7 34:23
  56:19

**Bidwill**
  20:6

**big**
  7:2 39:5 47:12
  71:12

**Bill**
  94:13

**birthday**
  78:8,10

**bizarre**
  45:7

**black**
  47:16,23 48:22
  85:23 90:12
  91:2,20 92:20
  93:11,13,16
  108:3

**blacked**
  63:11

**blacks**
  90:24

**blog**
  85:15,16,17
  106:5,11,12,
  13,15 109:10
  110:5,10,13,20

**boat**
  40:9

**Bob**
  11:10 18:10,18

**Boca**
  10:9,13,16

**bombs**
  32:3

**boss**
  24:10 64:5

**bosses**

65:3

**bossy**
  45:12

**boxes**
  91:2 93:8

**brainer**
  52:8

**branch**
  9:22

**brand**
  48:19

**break**
  6:5 84:4

**brief**
  111:8

**bring**
  14:5 60:19
  94:16,20
  95:16,20,24
  96:1,3,6,7,10,
  15 97:2

**Brother**
  81:22 83:20
  85:20 86:3
  89:11

**Brothers**
  81:19 111:22

**Broward**
  4:22 10:24
  13:1

**browns**
  90:24

**brushing**
  60:20

**budget**
  24:6 32:1
  104:1

**bullet**
  89:22 91:16

**bunch**

13:1 29:21
49:22 79:8
87:19

---

**C**

**calling**
  70:7 76:22
  91:9

**calls**
  32:10 41:25
  66:3,5,13
  85:19

**calmed**
  110:12

**campaign**
  16:23 39:1,10,
  18 40:13 41:10
  55:14,17
  57:12,13,14,
  17,21 80:8,19
  82:6,15,18
  101:16,19

**campaigning**
  101:7

**campus**
  9:22 10:18

**Caneratsi**
  29:17

**capable**
  62:12

**capacity**
  13:17

**capital**
  10:4 13:22
  48:13 79:3

**car**
  45:14

**care**
  85:24

**career**

Renee Dadowski
May 07, 2021

5

51:6

**Catherine**
23:1,15 31:23
33:2 45:2,6

**Cathy**
23:17 25:11,23
31:23 34:12
36:11 38:1,12
92:5 93:25
94:3 106:7

**caveat**
15:6

**Center**
9:13

**certified**
10:22

**chain**
61:5,23

**chains**
27:9

**chance**
25:5 90:6
99:22

**changes**
40:8 77:23
78:6

**changing**
51:12

**character**
70:9

**charge**
17:14 18:9
24:5,6 31:25
32:1 61:17
95:18

**chat**
26:19

**check**
38:11 64:18
69:22

**checking**
68:2

**chief**
11:10 14:12
17:13,16 18:7,
8,10,18,19
19:2,11,16,20,
24,25 20:2,12,
18,19 21:3,9,
12,13,14 22:5,
7,8,9 23:2,5,
13,16,18 24:9,
21,23 25:14,16
30:25 31:2,3,
5,11 32:17,22,
25 33:16 34:7
36:18,21 37:1,
7,15,16 39:13
41:5,6,8
42:12,13
43:20,23
58:21,23,25
59:11,12,17
61:6,19 62:4
66:9 67:6 70:3
73:20 88:12
92:2 108:16

**chiefs**
19:3 33:2
45:22 54:19
65:8 80:13
88:9 108:23

**choice**
30:14

**chosen**
42:23

**Christmas**
10:3 63:19
66:15 87:19

**circulated**
40:16

**circumstances**

61:3

**civil**
26:20 53:10
90:13

**claim**
72:17 77:19
78:22

**clarify**
67:21

**class**
47:15

**clean**
6:25

**cleared**
59:21

**CLI**
10:22 12:1

**client**
48:19 50:3
51:9,14

**clients**
16:12,13,19,20
36:5 44:19,21
47:10,14,16,23
48:9 51:7,11,
19 52:8,16,19
90:12,23 91:2
102:4

**CLIS**
12:2

**club**
55:15 57:23
82:24

**co-counsel**
14:1,6

**Collateral**
79:3

**collect**
67:20 71:14

**college**

7:1 9:2,3,8
10:10 94:8,10,
17 95:12,14,18
96:12

**colleges**
94:15

**comment**
27:24 45:23
57:2 86:21
89:2,3 90:14
91:19,22 92:18

**commented**
66:23

**comments**
27:11 82:22,23
91:10 93:17
97:5 103:11

**commit**
50:7

**commitment**
85:23

**common**
71:8

**communicate**
56:2 62:1
88:17 102:17

**communication**
105:21

**community**
85:23

**complained**
51:20

**completely**
68:4

**computer**
74:25 75:4,7,
12,13,18 76:7,
12

**computers**
61:12,14 69:4,
7

Renee Dadowski
May 07, 2021

6

concern
  44:20 58:18
  70:20 94:2
  96:22
concerned
  27:10 49:7
  58:11 69:18
  72:16 89:5
  97:6,24 98:13
  103:24 104:2
concerns
  44:2 48:1,3
  49:6 50:6 80:6
  93:19,24 96:5
  102:17
conduct
  61:12,15
connect
  8:7,10
connection
  46:4
consider
  51:15 75:24
  78:13
considerations
  101:21
considered
  44:1 71:11
considers
  75:25
consistent
  102:22
contacting
  38:25
contend
  45:9
content
  60:14
contention
  60:6

contentious
  57:1
contest
  6:6
context
  42:17 83:1
  84:1 88:1
continued
  19:7 71:25
conversation
  70:8 88:21
conversations
  57:18 80:16
  82:9
conveyed
  93:24
coordinating
  88:9
copies
  41:17 69:11,14
corrections
  77:14 78:25
correctly
  28:12 111:16
correspondence
  105:17
Cory
  7:11 53:3
counsel's
  79:12
counter
  76:9
counterproductiv
  e
  102:25
counts
  5:23
county
  4:22 11:19
  12:5 25:4 35:1

  36:19,22 37:1
  59:11
courthouse
  39:19 85:16
  108:19
courtroom
  29:11 35:22
courtrooms
  92:3
COVID
  33:9
craziness
  45:18
cream
  55:17 57:25
created
  12:25 15:20
  18:12,14 59:2
credence
  107:19 110:2
crimes
  48:13 51:16
criminal
  11:1 16:5
  26:20 53:12
critical
  88:25
criticized
  102:2
criticizing
  80:12,13 82:20
critiqued
  106:21
critiquing
  83:4,8
cross
  29:23 111:13
Cruz
  44:13 46:13,22
  47:2,12,15,18

  49:1,21 50:18
  56:10 60:5
Cuddihy
  23:15 31:11
  32:23 33:1,4
  34:13 45:3,5
  50:14 67:5
  82:8 92:6
  98:25 99:19
  102:14
Cuddihy's
  50:10
cum
  9:7
current
  73:11
currently
  64:6
custodial
  16:7
custody
  16:7,15
cut
  25:13 75:3,6
  76:12 78:2

---

                D

Dacia
  62:15,18 74:11
  75:24
Dadowski
  4:11,15 84:9
  105:5 110:23
  111:15
daily
  61:7,19,24
  88:12
Dale
  27:18
dated

Renee Dadowski
May 07, 2021                                                                    7

98:4

**dates**
  21:21 57:19

**days**
  16:2 27:23
  63:20 67:13
  68:3,14 72:7
  73:6,7 78:9

**De**
  21:12 22:18
  34:4 37:9
  40:20,21,23

**deadline**
  78:10

**deal**
  44:5 63:7,14
  64:13 71:12
  94:3 110:20

**death**
  44:15 46:13,23
  48:9,14 73:18

**December**
  61:4 62:2,3
  63:6 72:18
  74:12,23 75:1,
  9 76:7,8,11,
  13,18 78:23

**deceptive**
  70:5

**decided**
  16:9 18:17
  22:12 99:23

**decision**
  11:1 25:10
  27:1 49:7 71:2
  101:13

**decisions**
  24:2,15,16
  25:18,21 66:16

**defender**
  5:2 7:1 11:10,

11,16 12:20,24
14:13 15:24,25
16:23,24 17:6,
13 21:19 23:3,
5 25:15 32:9
37:23 38:5,19
40:5,7,10
41:7,8,19
42:24 52:24
64:3,6 65:7,9,
10 66:5 68:17
87:20,24
90:22,23 91:3
94:8,10,15,16
95:12,14,18
96:12 100:11
103:17,18

**Defender's**
  4:23 7:13 9:16
  10:23 17:12
  32:6 39:12
  41:20 44:21
  64:5 87:22
  88:4,8

**defenders**
  14:12 16:10
  23:13,16,19
  96:9

**defense**
  11:2 105:2

**Deferred**
  64:14

**definitely**
  42:23 109:6

**degree**
  9:12 13:23

**delegation**
  32:19

**deleted**
  41:19

**demanding**
  59:5

**democratic**
  55:15 57:23
  82:24

**demoded**
  58:21

**Dennis**
  35:23

**department**
  18:2 23:25
  24:1 30:4

**depo**
  29:23 86:15

**deposed**
  4:24 5:9

**deposition**
  5:5,8,13,24
  79:12

**deputies**
  32:22 58:9

**Desanti**
  36:21,24,25
  59:11

**described**
  31:7 51:1 60:4

**deserve**
  48:10

**deserved**
  56:12

**desk**
  59:17,21 87:21

**destination**
  42:21

**devised**
  18:15

**Diane**
  23:15 25:11,23
  31:11 32:9,23
  33:1,3 34:12
  36:11 44:4
  45:3,4 48:4

49:3 50:10,11
54:9 56:16,17,
24 57:2,7 67:5
82:8,12 92:6
93:25 98:25
102:13 106:7,9
107:9

**Diane's**
  56:15 107:9

**difference**
  44:14 67:11
  71:16

**differences**
  46:18

**differentiated**
  29:8

**differently**
  102:3

**difficult**
  98:8

**dining**
  87:20

**direct**
  4:13 14:15
  34:4 111:17

**directed**
  27:24

**direction**
  60:16

**directives**
  106:16

**directly**
  14:21 23:21,25
  24:8 31:9
  33:19 70:7
  80:16

**director**
  15:19 17:20
  18:23 19:7
  22:5,13 30:2,
  11 35:12

Renee Dadowski
May 07, 2021                                                                8

93:21,23 94:1
95:10,22,23
96:2,3
**disadvantage**
16:13 73:16
**disagreed**
26:2 47:4
**disciplinarian**
24:22
**disciplinary**
24:16,22
**discipline**
24:19
**discuss**
25:16 73:13
90:7
**discussion**
81:1 82:14
83:3 99:13,19
**discussions**
57:10 80:5
81:12 82:3
83:11 97:13
**disk**
69:12
**disks**
69:13
**Disney**
45:14,15
**disputes**
60:6
**distanced**
33:24
**divided**
53:15 103:20
**division**
11:20 12:13,20
19:18 20:5,21,
25 21:10,24
22:16 34:25

35:2 36:19
51:24 65:24
**divisions**
12:23 14:17,19
20:4,7,21
21:4,15 22:4,
14,15,19,24
**documented**
106:22
**documents**
75:17
**dog**
39:5
**dogs**
39:4,5
**Domestic**
12:25
**Donald**
29:17
**donation**
43:5
**donations**
39:1 41:16
43:13
**Dorothy**
29:16
**downhill**
30:5
**draft**
24:3
**drive**
10:16 69:12
**drives**
69:13
**DROP**
64:13,17,23
67:15 71:25
98:17
**DUI**
5:19

**duly**
4:12
**dump**
48:6
**dumped**
48:7
**duties**
31:7,20 32:12
**DV**
12:25
**dynamics**
52:24

**E**

**e-mail**
40:16,18 72:23
75:24 79:6,13
83:25 84:1,10
85:3,14 89:12,
20 91:12,16
102:21 104:24
105:1,4,19
107:16
**e-mails**
40:19 41:14,
15,21 79:8,24
81:20 97:19,
21,25 99:17
**E.E.O.C.**
77:19
**Edgley**
34:10 37:2
**educational**
9:1
**effect**
7:25
**effective**
50:23 63:5
70:19,25 76:3
**efficient**

5:13
**efforts**
28:11 30:6
**ego**
71:18
**eight**
84:18
**elaborate**
44:24 80:10
**elect**
65:9
**elected**
11:15,16 15:15
17:11,15 18:11
38:5,19 40:9
42:24 64:2,6
65:6,18,23
71:7 90:23
95:1 100:11
**election**
17:18 42:9
52:23 98:22
100:5 101:9
102:9
**Elizabeth**
69:10,16
**Ella**
62:13 63:8,14,
17 66:11,19
68:21 72:3,12
73:10 75:10
**embarrassing**
74:20 96:8
**employee**
62:16,20 64:4
75:7,11
**employer**
73:11
**employment**
71:11 77:10

Renee Dadowski
May 07, 2021

9

encouraged
40:12
ended
20:3 41:3
59:25
endurance
6:6
entail
29:7
entered
57:9
entitled
15:23 26:21
epithet
27:15
equality
90:12
equally
47:22
equals
65:8
errors
74:20
ERU
22:11,15,16
especially
43:12 48:17
106:5
ESQ
4:11
estimate
110:9
event
6:10 7:16
55:14,18 57:15
82:24
events
57:21
eventually
44:7 49:20

52:6 65:13
everybody
24:12 33:24
34:21 53:21
60:13 61:19
70:13 103:19
exactly
12:11 31:14
63:24
examination
4:13 111:13,18
examine
29:23
examples
60:22
exchange
90:6
exchanges
97:14 102:15
excluded
70:4
exclusively
83:15
excuse
23:4 30:19
37:15 41:6
51:14,25 96:13
executive
23:2,5,13,16,
18 25:14 31:2,
5 32:17,22,24
33:2 41:5,7
42:12,13
43:20,23 45:22
54:19 65:7
66:9 67:6
Exhibit
104:25 105:2
expect
64:9

expected
40:3 62:8
73:22,24 98:15
108:22,24
expecting
63:16 66:1
experience
29:13 32:24
96:16,18
109:10
experienced
29:15
experiences
94:6
explain
45:7 53:14
explicitly
7:17
expressed
48:2,4
expressing
50:5
externship
10:21
extra
81:15 101:17

**F**

F-DRIVE
69:3
face
91:20
facilitating
5:12
fact
19:12 47:1
52:12 55:24
57:7 61:13
72:13 74:18
75:9,19 80:22

94:2 103:16
fall
12:8,10
fallen
28:22
familiar
7:10 37:18
64:14
families
16:16
far
5:24 10:15
26:10 27:5
28:10 32:3,6,
16 33:25 39:20
41:25 47:17
48:22 49:6
50:5 52:22
57:9 60:2
66:25 68:10
71:18 83:20
85:11 86:24
87:16 88:15
89:5,11,24
91:10,12 92:17
97:5,13 103:9,
24 104:2 109:8
110:13
February
47:3 51:3
federal
5:3
feel
6:6 7:6 30:14
44:9 77:7
93:12 101:17
102:3
feelers
73:23
fellow
99:9

Renee Dadowski
May 07, 2021                                                                    10

felony
    12:7,12,16,17,
    21 19:16,20,25
    21:4,7,10,12,
    13,14,24 22:4,
    8,9,14,18,24
    34:4 35:2
    37:7,15 59:12
felt
    17:8 34:21
    35:25 36:3
    43:24 44:10
    45:15,24 47:16
    48:6 50:20
    51:13 55:10
    56:24 69:14
    77:6 88:25
    90:10 91:23
    92:1,22,25
    95:4 97:10
    101:16 102:22,
    24
Ferraro
    29:17
fifth
    29:1
fighter
    34:6
figure
    21:6 52:4
    99:16
figured
    56:18 62:21
file
    68:19
filed
    4:21 38:13
filing
    38:11
filling
    93:8

final
    41:12 78:20,21
finally
    45:4 96:19,24
finances
    24:7
finished
    68:23 71:5
Finkelstein
    4:22 11:13,16
    15:14 16:22
    17:11 19:14
    25:23 31:6
    32:20 37:18
    42:16,22 48:2
    50:7,13 56:1
    57:11 64:3
    67:21 68:7,11
    80:6 81:21
    82:4 88:18
    90:3,18 97:14
    100:4 101:2,22
    102:12,15
    105:20,23
    109:3,9,11
Finkelstein's
    15:18 18:2
    104:12
fire
    65:12 69:21
    72:14 81:18,21
    82:15 97:17
    98:10 99:7,25
    100:1,9,19
    101:13,24
    102:5,7,8,10
    107:13
fired
    64:12 65:14
    67:11,25 69:18
    70:15 71:9,14,
    19 81:2,6,13,

16 89:8 98:23
100:6,10,21
101:4,15,18,22
firing
    65:1,2,11,16
    68:12,16 82:5
    99:4
firm
    4:19
first
    4:12 11:18,20
    12:24 13:23
    15:18 16:3,4,8
    19:6 23:14
    32:25 34:1,24
    37:21 38:10
    44:22 49:17
    50:11 51:7
    52:9 61:10
    62:13 65:22
    67:23 72:13
    74:17 76:6,10
    84:11 86:9
    87:15 107:11
    109:2 110:21
five
    85:7 108:12
five-minute
    84:4
flash
    69:12,13
flew
    45:14
floaters
    51:16
floor
    29:1,2,3
Florida
    9:9 32:5,9
    72:10 77:9
    103:18

Floyd
    92:19 93:1
focus
    52:21
follow
    25:24 95:2
    111:15
follow-up
    59:19,22
following
    4:2 16:10 84:6
    96:11 111:11
follows
    4:12
force
    7:25 77:19,22
forced
    67:14
forgot
    74:25
forgotten
    55:24
formal
    29:6,22
formally
    28:20
former
    41:5,6,8
forth
    76:5 78:7
forwarded
    79:19,23 105:5
    107:16,22,23
fought
    90:11
found
    70:2 107:1
four
    14:13,16,19
    20:20 27:15

Renee Dadowski
May 07, 2021                                                                                            11

28:24

**four-and-a-half**
67:15  73:15

**fourth**
28:25

**Frank**
4:14,18,19
8:24  21:12
22:8,18  30:20
34:4,5  37:9
40:20,21,23
53:8  81:24
82:13  83:14
84:3  91:14
100:12  101:1
104:5,16,23
105:3  106:1
109:14,21
110:23  111:9

**fraud**
85:19

**free**
6:6  7:6

**frequently**
110:12,22

**Friday**
108:10,20,23
110:25

**friend**
30:12,22  35:14

**friends**
10:10  39:12,13
44:1  56:21
67:17  72:8

**front**
36:5  70:7
79:16

**FRS**
67:10,13  71:5,
23  72:7

**full**

7:25  11:4
22:14

**function**
5:16

**funding**
103:12,13

**fundraiser**
55:20

**funds**
71:24

**funny**
6:24

**furnished**
79:5  97:20

**future**
63:2,4  77:16
95:3,5

---

**G**

**generally**
23:10  90:5

**gentleman**
27:5,13,14

**George**
92:19  93:1

**gesticulate**
6:19

**get all**
61:14

**Girault**
19:23  21:3
58:12,16  62:14

**giving**
6:19  49:21
80:4  108:13

**glib**
6:24

**God**
4:8

**goes**
26:10

**Goldberg**
30:16

**golf**
85:24

**gonna**
10:13  16:18
25:17  30:13
33:22  36:7
42:6  43:11
47:13  52:2
54:11  55:7
59:6,8  61:22
62:4,5  63:10,
13,21  64:9,20
70:13  71:15,24
72:16  73:3,17
75:3,15  77:3,
25  78:13,14
79:9  84:21
87:8  88:11,13
89:8  92:14,15
94:4  98:10,24
99:21  100:9,
10,18  102:5
107:8  108:14

**Gordon**
23:17  30:25
32:8,11  33:1,5
38:9,24  40:12
42:7,8,21  44:4
48:4  49:4
50:11  52:6
53:16,20  54:5,
7,9,11,14,19,
22  56:3,6,16,
25  57:8  58:1,8
61:23  62:4,17,
21,23  63:18
65:7,14,22
67:24  69:18,
20,22  70:2

**goes**
26:10

72:14  80:11
81:14  82:11,12
88:11  94:4,5
95:1  96:2,4
98:11,15  100:1
101:6,7,14
102:5  106:9
107:9,12  110:5

**Gordon's**
30:12,21  41:3,
4,11  52:18
105:11

**gotten**
7:19  62:14
73:9

**gracious**
74:3

**graduated**
9:4,7,8,11

**grammatical**
74:19

**gray**
66:24

**Green**
4:20  26:16
33:25  34:10
36:16  37:3,17,
18  52:22  53:18
54:3  57:9  80:7
82:5  83:4,16
91:6  97:16
100:6  101:4,23
102:19  103:3
104:7,11

**Green's**
57:12,21  79:14
93:17  103:4
109:4

**ground**
5:14

**group**
26:19,24

Renee Dadowski
May 07, 2021

12

**Grzybowski**
  105:8

**guard**
  72:1

**guessing**
  107:20

---

**H**

**habit**
  85:2,8

**hair**
  66:23

**half**
  75:2

**hand**
  4:4  93:2,3

**handle**
  16:19  19:12
  46:19  47:9
  48:16  71:21
  105:13

**handled**
  19:17,18,25
  20:4  21:4
  22:20  44:17

**handling**
  19:9,10  21:6
  22:16  56:9
  59:24

**handwritten**
  86:11,12  87:16
  88:15  90:2

**happens**
  69:24  71:6

**happy**
  54:10,25  55:1
  56:2  57:6
  60:13

**hat**
  37:22  38:6,8

  52:23

**hazard**
  27:22

**head**
  11:8  18:23
  22:24  28:4
  32:20

**health**
  59:19

**hear**
  28:12  99:6

**help**
  4:7  59:12

**helped**
  24:1,3

**helping**
  38:18

**Hey**
  70:8

**high**
  91:20

**highly**
  29:15

**hire**
  73:16  93:7,10,
  15

**hired**
  9:16  11:5,7,17
  28:7  73:22
  93:10,13

**hiring**
  23:23  24:15
  62:21  63:17,20
  65:21  66:13,
  14,16  73:14
  93:14

**historical**
  98:20

**hit**
  99:11

**Hitler**
  26:25

**holiday**
  73:5

**holidays**
  61:21

**homicide**
  44:15  46:23

**hope**
  40:7  98:17

**hopefully**
  7:13

**host**
  8:19  89:3

**hosted**
  55:21

**hour**
  6:4  75:2

**hours**
  39:22

**house**
  39:3

**houses**
  16:17

**Howard**
  4:22  11:16
  15:14,17  16:9,
  18  17:2,5,7,15
  18:11,13  19:6
  22:2  23:14
  24:10  25:12
  32:10,25
  37:14,17  38:1,
  2,17  42:24
  44:4  45:22
  49:3,8  50:12
  54:9,19  57:4,5
  58:21  59:4,23
  64:1,2,3,5
  65:1,2,6,11,
  14,15  67:3,4

  68:23  79:13
  81:17  82:11,12
  83:25  84:21
  85:3,8,19  86:2
  87:8  90:17
  91:9,10  92:23
  93:24  94:4
  96:1  99:21
  101:11,25
  107:19  108:4

**Howard's**
  18:16  38:16
  41:10  42:23
  80:17  105:11
  107:10

**huh-huh**
  7:5

**huh-uh**
  6:19

**hung**
  65:13  67:2

**hurt**
  90:15  104:11
  110:2

**hurtful**
  90:19,20

**husband**
  39:14

**hypocritical**
  47:21

---

**I**

**ice**
  55:17  57:24

**identify**
  8:14,20

**ideological**
  46:18

**idiot**
  27:25

Renee Dadowski
May 07, 2021

13

ignore
  110:1

illness
  59:7

immediate
  11:13

immediately
  17:10 63:6
  70:19,25

impact
  104:7

impatient
  85:4

impeach
  29:24

Imperato
  20:8,23

implication
  90:14

implying
  91:9 108:4

important
  61:25 69:15
  89:11

impression
  36:11 76:24,25
  86:13,14 98:15

inappropriate
  26:19 36:3

inappropriately
  35:25

including
  26:16

incorrect
  94:22 95:6

index
  86:25

Indiana
  9:4,5,19,20,22
  10:2

indicate
  66:22

indicated
  10:20 18:6
  35:19 46:3
  58:10 102:16
  109:8

informal
  29:8

initial
  12:4 18:1
  107:15

initially
  11:7,17 41:12
  48:3 101:11

input
  91:21

inside
  40:6

insight
  50:14 91:22

instance
  5:5 109:3

instances
  26:1,11

intended
  11:1

interactions
  36:15 82:3

interest
  5:12 44:19
  52:19

internally
  46:19

internship
  9:15,17 10:22

interrogation
  16:7

interview
  80:24 100:9

investigation
  5:21

investigator
  65:24

invite
  6:13

invited
  94:15

involved
  5:19 16:21
  24:14,15,22
  25:9,18,21
  26:24 27:9
  34:18 35:4,6
  80:16 93:14

involvement
  24:18 34:24

involving
  27:9 111:19

issue
  26:23 31:13
  34:25 35:18
  36:1 43:23
  46:3 50:25
  51:2 56:9 59:7
  70:18 91:5,6
  93:12 100:14
  110:9,10,20

issues
  24:22,23 26:9,
  14,17 27:6
  34:9,15 35:7,8
  42:14 43:15
  44:5 46:7,12
  49:2 51:1,4
  52:11,15,20
  53:24 58:25
  60:2 96:22

IU
  9:21

J

J.A.A.B.
  85:15,17
  106:13

J.A.V.L.
  106:12

J.D.
  9:12

jail
  16:15

January
  10:25 11:6
  17:22 72:14,25
  73:4,7 74:10,
  13 76:16,17
  77:1,2 78:8,
  11,14

Jenn
  34:10,15 35:2,
  7 37:2

Jeremy
  37:4

Jimmy
  10:2

Joanna
  29:18

job
  29:16 67:13,18
  72:7,10 73:7,
  10,12,24 75:21
  78:17 102:4

jobs
  16:16

Johnson
  11:23

joking
  35:24

Jonathan
  27:7,10

Renee Dadowski
May 07, 2021

14

**judge**
  11:19,21,22,
  23,24 12:12,
  16,20 20:5,6,
  8,9,22,24
  27:16 35:22,24
  36:1,5 39:14
  51:21,25 52:5
  57:25 108:18
**judges**
  13:2 14:16
  20:5,6,21
**July**
  64:17
**June**
  11:5,23 28:8
**juvenile**
  25:3

---

**K**

---

**K-A-R-A-R-I**
  49:18
**Karari**
  49:16,18,25
  50:2
**Kate**
  11:20,22,23
**Kathleen**
  11:20
**Kathy**
  106:8
**Kearney**
  11:20,22,23
**keeping**
  98:21
**kept**
  33:23 54:18
  55:1 64:8
  88:11
**Keuthan**

  23:1,15 31:23
  33:3 34:12
  38:12 45:2,6,9
  92:5
**kick**
  8:19
**kid**
  47:18 48:25
**killed**
  50:19
**King's**
  73:5
**knowledgeable**
  103:25
**known**
  37:11

---

**L**

---

**La**
  21:12 22:18
  34:4 37:9
  40:20,21,23
**lack**
  17:6
**language**
  76:21 77:25
  78:2 99:9
**laptops**
  108:13
**Laswell**
  94:13
**late**
  84:22
**laude**
  9:7
**Laufer**
  7:11 8:18 30:8
  53:1,4,7 81:23
  82:7 83:12
  84:8 91:8

  100:7,24 103:6
  104:14 105:25
  109:13,20
  111:4,14
**law**
  4:19 9:2,10,
  11,13 15:22
  16:10 26:20
  92:16 94:23
  95:8
**lawsuit**
  4:21 80:4
**lawyer**
  25:7,22 46:20
  48:14 51:8,13
  52:15
**lawyers**
  5:19 7:3 14:1,
  5,9 19:5 20:7,
  8,25 24:8
  29:22 31:10
  35:25 36:1
  47:7 49:23
  50:2 51:10,14,
  20,23 52:10,13
  94:24 103:12,
  21,22
**lead**
  46:20
**learning**
  52:1 96:16
**leave**
  45:13,15 51:17
  88:9,10
**leaves**
  77:10
**leaving**
  67:16 69:2
**led**
  44:24 105:21
**left**

  23:17 28:8
  30:7,15 31:23
  38:20 45:2
  67:15 68:3,14
  88:3 98:20
**legal**
  10:22 77:20
  88:5 94:22
**legislative**
  104:1
**legitimate**
  91:24 93:19
**Leroy**
  12:12
**letter**
  27:15 68:20
  71:3
**letters**
  69:5,6
**Levine**
  39:9,15
**Levine's**
  38:22
**lieu**
  6:19 61:24
  74:6 76:16
  77:2
**life**
  71:20 90:11
**lightly**
  25:8
**liked**
  10:17,18
**limited**
  16:3
**line**
  84:14 86:14
**link**
  84:17 86:3
  106:18

Renee Dadowski
May 07, 2021                                                                                    15

Lipof
  105:16
list
  33:20 41:15
  88:7 89:21
listed
  5:20 8:11
listen
  59:13 78:8
  84:13 98:14
  106:20,23
  107:2
listened
  80:24 81:7
  84:19 86:4,8
  87:15 107:24
  111:18,25
listening
  87:12 107:25
lists
  38:25 41:17
  88:11
live
  10:13,16 27:21
Lives
  92:21 108:3
load
  13:19
locally
  10:8
locate
  84:9
located
  33:21
locked
  75:5
log
  62:5
logged
  62:9,13

logistics
  39:20
long
  4:25 6:3 12:14
  13:12 15:9
  73:17,19 92:15
longer
  41:20 63:21
  70:13 92:16
looked
  66:23 93:8
  107:20
Lopez
  27:4
Lorena
  30:23 34:8,11,
  15,21 35:8,9,
  23 36:12 51:22
  58:12,14,15
  63:17 66:19
  93:22,25 94:20
  95:17 96:1,6
Lorena's
  94:7
Lorraine
  58:13
lose
  16:16
losses
  25:13
lost
  5:16
lot
  6:11 21:17
  25:6 29:13,14
  41:19 44:15
  47:13 48:18
  53:16,17,19,24
  54:1 59:10
  66:7 67:16
  71:6,8 91:1

93:13 94:24
97:6 103:7,10,
21 104:4
107:20 109:25
111:6
lunch
  38:2,16
lunchtime
  38:24 39:23
Luther
  73:5
Lynch
  57:25
Lynn
  36:21,24,25
  59:10

———————————

M

ma'am
  111:25
Madam
  104:23
magna
  9:7
major
  51:16
majority-
minority
  90:25
makeshift
  87:21
man
  48:22 49:10,11
management
  51:8
manner
  77:12
manual
  18:14 24:3,4

march
  92:20 93:5
  108:7,9,17,25
  109:4
marked
  105:1
Martin
  73:5
Mastrarrigo
  30:23 34:8,11,
  21 35:9 51:23
  58:12 93:22
  95:17
math
  17:19
maximum
  43:5
Mcnamee
  39:13,16
  40:22,24
Mcnamee's
  39:3
Mcneill
  48:5,11 49:25
meet
  65:23
meeting
  34:14 38:23
  39:2,21 40:1,
  16 61:19 62:4
  108:16
meetings
  29:10 61:7,24
  88:12 108:11
Melisa
  48:5,11 49:25
mental
  59:7,19 86:14
mentioned
  24:14 28:10
  30:24 43:1

54:6

**mentoring**
38:3

**mess**
74:19

**message**
61:23 62:3
92:25

**messages**
68:2,7

**met**
10:19

**Metty**
34:9,14 35:3,
4,5 36:24
37:1,6,8,10

**Miami-dade**
18:13

**mic**
27:21

**Miceli**
27:7

**Michaelson**
21:13 22:17
37:4 40:25

**Michelle**
105:8

**mid**
94:10

**middle**
73:25 92:22

**Miller**
27:18

**mind**
21:21 67:1
99:23 104:18

**minor**
9:6

**minorities**
90:24

**minority-
majority**
90:25

**minute**
10:25

**minutes**
85:6,7 86:9
111:5

**misdemeanor**
37:16

**mission**
102:25

**mistake**
93:22

**Mister**
60:3 82:3

**mock**
29:11

**mode**
108:7

**Moe's**
12:12,16,20

**moment**
28:3

**Monday**
63:19 65:21
66:15,21 74:9
108:17,21

**money**
42:1,4,6
67:16,20
103:15,17

**month**
105:6 110:18

**months**
47:2,8 51:25
110:19

**morning**
87:4,5

**morphed**

61:13

**motion**
69:5

**motions**
68:25

**moved**
9:9 10:11 22:3
52:13

**murder**
13:23

**murdered**
48:23

**murders**
13:23

**muted**
8:16 27:20

**myth**
86:2

---

**N**

**Nadine**
19:23 21:2
58:12,19,20,24
62:14 63:17
65:23 66:7,8,
19

**Nagy**
29:18

**named**
105:6,16

**Narula**
55:21

**Natalie**
27:4

**nature**
24:18 35:20

**navigate**
38:18

**negative**

106:4

**negatively**
101:19

**new**
48:19 52:17
63:21 71:7
75:21 92:13

**news**
102:24

**nice**
58:8

**Nick**
49:21

**night**
83:23 84:19,20

**Nikolas**
47:18 48:25
50:18

**noon**
70:4

**Nope**
75:19

**note**
85:21

**notes**
86:7,10,11,12,
14 87:1,11,13,
16,17,23 88:5,
15,18,20,22
89:10,12 90:2
91:12 111:6,7

**Nova**
9:12 10:7,14,
17

**November**
38:13,14

**number**
32:7 66:10,11
73:13,20

Renee Dadowski
May 07, 2021                                                                          17

## O

o'clock
62:5 70:12
84:19

O.J.
89:4

oath
7:25

object
7:14 53:1,3,11
81:23 82:7
83:12 91:8
100:7,24 103:6
104:14 105:25
109:13,20

objection
30:8 53:4

objections
7:19 53:11

occupied
33:12

occurred
34:22 38:15
47:16 56:9

odd
66:4

offended
45:24

offender
20:22

offense
27:1 57:3

offensive
107:1

office's
47:4

official
73:4 74:5

officially
37:24 38:6
109:1

officials
71:7

okaying
33:19

older
103:22

Olga
39:15

once
5:18 9:10
15:17 19:3,21
25:15 41:20
43:8 49:3,20
51:10 56:19
61:20,22 64:25
68:23 75:10

once-a-week
38:2

ones
29:4 36:17

opening
73:12

openings
72:10

operation
104:8

opinion
43:14 44:25
47:20 48:5
97:15,22 98:6
100:5 101:3
102:11

opinions
44:14 106:23

opportunity
90:1

opposed
10:8 22:14,15

28:17 64:21,22

opposite
84:15

Option
64:15

orbit
34:2

organizational
38:23

organized
29:10 40:24
61:10,11

organizing
40:21

outcome
34:20 36:10

outright
40:13

oversaw
23:22,25 24:8,
9

oversee
14:10

Owen
39:3,13,15
40:22,24

## P

p.m.
4:2 78:11,12
84:6,12 85:13,
22 111:11

pads
88:5

page
86:15

pandemic
26:15 33:8,11
55:8,19 61:8,
10 73:25 92:23

107:3,4,5
108:6 109:1

panic
99:1

paper
27:14 59:17
86:19

paperwork
71:2 72:17

parents
10:9,12

parking
45:21,23,24

Parkland
46:14,15 50:19
51:2

part
14:2 61:7
63:22,23 98:20

participate
40:1,3,13

particular
15:7 27:3
39:21 40:16
50:25 51:22
86:20

particularly
6:3 109:11

partner
94:13 95:17
96:13

partners
35:3 94:18

pass
12:8 55:16

passed
57:24

patched
55:5,22 67:7,8

patience

Renee Dadowski
May 07, 2021

18

110:25
**Patrick**
4:18
**Paul**
11:21
**paycheck**
78:21
**payout**
78:20
**PD**
84:15
**PDS**
28:12 99:9
**peeves**
7:2
**penalty**
44:16 46:13,24
48:9,14 73:19
**pending**
46:22
**penetrated**
86:2
**penned**
74:21
**Pennsylvania**
9:5,6,12,19,
20,24 10:3
61:5 68:25
**percent**
14:24 107:18
**performance**
26:10 83:19
**person**
17:8 27:3
30:9,11,21
42:24 48:24
57:20 91:23
93:11 95:17
**personal**
41:21 52:15

94:6
**personally**
42:8 90:20,21
91:5 99:8
101:2
**personnel**
32:3
**perspective**
71:17
**pet**
7:2
**phenomenon**
7:9
**Phillips**
62:14 63:8
66:11
**phone**
74:12 88:21
**phonetic**
29:17
**physically**
108:22
**piece**
59:16 86:19
**pitched**
88:2
**Pittsburgh**
87:19
**place**
10:9,12 80:4
91:20
**plaintiff**
4:21 34:1
111:19
**plan**
64:15 99:7
**planning**
10:16 40:5
51:17

**Plantation**
55:16
**pleasant**
24:25
**please**
4:4 6:6 9:3
49:13 75:11
**plot**
70:5
**plus**
20:21
**podcast**
79:14 80:4,21,
23 81:19,22
83:21,24,25
84:23 85:20
86:3,17 89:12,
21 90:1 91:7
97:14 100:14
102:16 104:11,
19 105:21
111:22
**points**
60:6 89:11,22
91:16
**political**
38:18
**poor**
92:25
**Porter**
21:14 22:4
29:11,19 30:2,
7,10 34:13
93:24 97:10
**position**
11:18 12:5,15,
22 15:7,9,10,
13 17:11 18:1,
18 22:22 23:11
30:13 37:15,16
47:4 52:2
97:11 98:9

100:3
**positions**
32:16
**possible**
6:12
**possibly**
32:14 95:1
**posted**
85:17
**posters**
110:2
**postings**
107:19
**posts**
109:10
**pot**
103:20
**potentially**
26:8
**practice**
36:25
**practicing**
26:20 92:16
**pre-law**
9:7
**precipitated**
10:7 107:15
**predecessor**
11:13
**preference**
54:4
**prepare**
29:25
**prepared**
38:4 59:10,14
72:1
**preparing**
108:10
**present**

88:13

**preserve**
7:20

**press**
47:13,24 50:21
59:6 89:9

**pressure**
96:20

**pretenders**
92:11,12,14,15

**pretty**
27:8 34:18
59:21 74:15
77:15

**previous-elected**
15:25

**previously**
46:21 58:13
76:17

**prior**
8:4 11:16
17:10 23:14
46:21 55:8
60:7 80:3,20,
21 81:12,22
89:24 94:19
111:18,21

**priorities**
60:11

**private**
16:11,19,20
36:25 40:19

**privately**
49:5

**privy**
92:4

**probably**
5:15 13:9
14:15,20 19:21
26:6 40:19
46:22 88:25

90:8 91:3
94:10 101:6
103:23 107:17
110:14

**problem**
7:7 34:10 52:2
94:17,23

**problematic**
60:20 91:4

**problems**
95:3,4 96:5

**procedure**
16:5 95:2

**procedures**
18:15 24:2

**proceedings**
4:2 84:7
111:12

**process**
93:15 104:1

**productive**
102:8

**professional**
96:24

**professionally**
90:22 99:8

**professors**
10:19

**promoted**
12:7,11,21
18:19 34:3
37:7

**proper**
10:21

**property**
88:3

**prosecutor**
26:24,25
27:16,25

**prospect**

83:3

**prospectively**
83:11

**protest**
93:4

**protesting**
93:1

**provide**
16:5 75:22
79:12

**public**
4:22 5:2 7:12
9:15 10:23
11:9,10,15
12:19,24
14:12,13
15:23,25
16:10,23,24
17:6,12,13
21:19 23:2,5,
13,16,18 25:15
32:6,9 37:23
38:5,19 39:11
40:5,7,9 41:7,
8,19,20 42:24
44:21 52:24
64:3,4,6 65:7,
9,10 66:5
68:17 87:20,
21,24 88:4,8
90:22,23 91:3
92:10,11,14,15
94:8 96:9
100:11 103:17,
18 105:14,16,
19

**publicly**
49:8 54:17,20
86:2

**pull**
79:17

**pulled**
95:19

**purposes**
5:24 6:2 16:4

**push**
72:16

**pushing**
96:3

**put**
37:14 38:6,8
42:21 69:11
72:22 86:18,19
98:8

**putting**
88:23 96:20

---

**Q**

**qualified**
30:14 93:11,
16,25

**quality**
30:3

**quite**
25:1,17 57:1
103:12,22

---

**R**

**R-I-T-C-H-I-E**
49:19

**race**
43:3,9,10,12
57:9 84:15
91:21

**races**
90:12

**racism**
90:14

**racist**
90:9,18 91:3,
10 102:2 108:4

Renee Dadowski
May 07, 2021

20

raise
  4:3 41:25
  42:3,6 110:8,
  10
Ralph
  69:10
ramifications
  64:19
ran
  17:1
rarely
  14:18
rationale
  50:15
Raton
  10:9,13
re-assign
  52:10
re-listened
  86:6
reached
  72:8 73:11
realize
  15:1 27:21
realized
  12:2
reasons
  92:9,17
receive
  16:11
recess
  84:5 111:10
recollection
  27:12 35:18
  36:14 109:2
recommend
  97:23
recommendation
  25:22 26:3
  69:6

recommendations
  25:11,24 26:13
recommended
  36:18 37:14,17
record
  6:25 7:4,17,19
  89:19 91:15
  95:21 105:19
  106:19 108:5
recorded
  80:23
recording
  111:19
records
  12:20 21:20
  105:14,16
red
  74:20
reduced
  31:21,22
refer
  19:13 106:11
reference
  87:23 108:1
referenced
  27:6 49:10
  58:13 81:19
referencing
  29:9 43:2
referred
  42:16 92:10
referring
  19:13
refused
  78:5
refusing
  75:23
regard
  24:19 26:7
  83:3 93:18

97:16
regarding
  24:2 25:21
  79:14 82:5,18
  83:19 85:15
  102:16 105:18
regardless
  17:3 78:5
Regional
  79:3
relate
  26:9
related
  26:25 71:2
  82:5 83:4
relates
  42:22
relationship
  47:10 104:12
relayed
  92:7
released
  16:14
remarks
  26:19
reminded
  6:21
remotely
  61:13,15
removing
  60:1
Renee
  4:11 100:1
reorganization
  22:6
repeat
  20:22
repeatedly
  75:19 76:10

rephrase
  6:13
replaced
  33:2
reply
  108:1
replying
  102:23
report
  80:11
reported
  24:10,12 57:17
reports
  32:5
represent
  4:20 27:13
representation
  15:19,20 16:11
  17:21 18:4,9,
  11,19,22
  19:11,24 20:3,
  12,20 21:3
  24:24 25:3
  48:10 50:23,24
  51:12 52:21
  58:20 59:1,15,
  18,25
represented
  7:11
representing
  7:12 48:13
request
  7:18 105:14,
  16,19,22
requested
  26:22
requesting
  87:9
require
  63:10

Renee Dadowski
May 07, 2021

**requires**
15:22

**research**
30:1

**resign**
64:11,22 67:12
71:14 74:6
77:4,6

**resignation**
68:20 70:17
71:3 74:15
76:21,23 77:8

**resigned**
36:24 37:1

**resigning**
71:9

**resources**
28:16 47:18
48:24 49:20,21
50:16 56:13
60:5 93:18

**respects**
55:23

**respond**
84:21,25

**responded**
85:1 86:5

**response**
54:24 85:6
89:9

**responsibilities**
14:3,8 20:18
23:11,19

**responsible**
14:15,21
23:22,23 28:25
29:1,2 31:9
32:5 33:19
108:14

**rest**
32:15 55:2

**results**
12:9

**retire**
56:18 57:3
64:21 67:14
69:9 71:22

**retired**
22:17 23:1,4
30:4,18 33:4
41:9 42:25
64:20 67:7
68:4 71:25
82:10 94:14
97:12 106:8

**Retirement**
64:15

**retiring**
17:4,5

**return**
88:4

**review**
90:1

**revive**
30:7,9

**reward**
52:3

**Rice**
4:19

**rid**
25:7

**ridiculous**
46:1

**rights**
90:13

**Riley**
62:15,18

**ring**
27:17 37:22
38:7,8 52:23

**rise**

80:4

**Rita**
105:16

**Ritchie**
49:16,25 50:2

**robberies**
13:24

**ROC**
20:4,22

**rock**
40:8

**role**
23:8 29:4

**roll**
73:3

**room**
87:20

**Ros**
34:9 36:24
37:1,6

**Ros'**
37:8

**Rothschild**
20:10

**Ruby**
4:20 26:16
27:8 34:9,14,
22 35:2,7
36:8,22 37:3,
10,11,12
53:18,25 57:25
79:14 80:12,19
81:21 85:19
98:14 104:19
107:1

**Ruby's**
86:18 89:21
97:5 105:18

**rules**
5:14 16:4

**rulings**
36:2

**run**
31:15 37:22
52:24 60:10
80:14 82:21
92:9,18 101:14

**run-ins**
58:22

**running**
31:17 32:14
40:5,7 42:11
60:12 100:21

---

**S**

**safe**
93:2,3

**sample**
75:21 76:1

**samples**
69:5 75:23

**scared**
8:22

**scary**
77:21

**scheduled**
76:17

**school**
9:2,10,11

**Schreiber**
11:9,12 17:4
28:4 42:17

**Schreiber's**
17:6

**screen**
27:20 62:11
63:11

**second**
47:15

Renee Dadowski
May 07, 2021                                                                    22

second-round
66:16
secretaries
23:20 108:13
secretary
65:24 105:11,
12
semester
9:16
seminar
45:11
send
76:14 85:5
92:25 105:14
sending
32:5 41:14
63:9,13 64:10
74:11
sends
85:8
senior
12:22 13:3,13,
14 14:13,14
15:14
sense
6:12
sensitive
109:11,19,24
Sentinel
100:8
separate
9:23 70:2
separated
71:9
separating
61:3
separation
60:7 63:9,13
64:9 71:11
73:4 74:8,12,

13,17,23 76:4,
16,22,23 77:1,
8,13 78:22
September
12:9 23:3
104:24
serious
13:22 50:18
59:19
served
83:10
serving
13:16
sessions
38:2,11,15
seven
46:22
seventh
29:3
severe
59:7
sexual
13:22
share
55:2 66:7
102:11
shared
102:13
sheets
32:4
shot
50:19,20
showed
70:9
showing
62:10
shut
108:18,19,20
side
35:23 36:4

38:17 57:6
77:25
sided
77:15
sides
84:15
Siegel
20:24
sign
63:10 71:3
74:18 77:12
78:13,17,19,25
signed
78:11,23 79:1
similar
48:22
single
65:23 89:1
sisters
10:11
sit
35:17
sitting
50:9
situation
48:22
six
46:22,25
108:12
sixth
29:2
smallness
10:18
snuff
26:10
solicit
97:15 101:3
solidarity
92:20

somebody
8:7,9,11 16:2
37:13 45:20
69:9 77:9,19
85:16 94:16
95:16 96:10,15
102:1,9 106:3,
6,18,21,25
107:21 110:14
somebody's
16:6 80:17
106:22
someone's
15:23 25:17
someplace
10:8
sorority
10:11
sort
21:5 32:7
sorting
71:2
sounds
51:2 68:11
99:12
South
9:9 79:4
space
39:16 40:24
spaces
45:21,24
speak
24:13 49:5
speaking
68:23 71:5
spearheaded
61:16
specific
15:9 60:22
specifically

32:11 35:18
54:13 57:11
70:22 82:18
102:20 103:1

**specifics**
51:5

**speed**
25:6

**split**
11:22

**spoke**
68:4 72:11,21

**spot**
37:8 107:24

**stability**
51:18

**staff**
8:8,11 23:20,
22,23,24 24:1
31:25 32:2
45:13,23 54:2
61:10,11,14,18
92:24 108:11

**stand**
52:5

**start**
16:9 19:3,10
43:18

**started**
15:15,16,18
17:20 41:4
43:15,19 44:17
46:3 49:1,21
59:3 61:9
63:12 64:17
87:9,11,12
89:10 94:9
109:1 110:21

**state**
5:18 9:23 72:9
73:7 77:9 96:9

**statement**
5:17,21 86:20

**statements**
82:5,15,18,19
83:9,16 86:25
102:18 103:4,
8,24 104:6,10
109:4 111:19

**stayed**
11:6

**steer**
60:16

**STENOGRAPHIC**
4:3

**stepped**
84:13

**Steve**
21:12 22:9,17
40:25 41:13

**Stewart**
10:2

**stint**
12:5

**stood**
49:8

**stop**
26:22 28:14

**stopped**
19:9 22:7
26:23 28:12,
15,19,20

**straight**
21:2 86:23

**street**
39:17

**stress**
26:17 27:6

**stressed**
65:1

**strong**

90:13

**strongly**
40:12 55:10

**students**
50:20

**Study**
9:13

**stuff**
32:3,7 41:19
46:1 61:20
66:7 87:20
103:9 106:14
108:4

**styles**
51:8

**subsequent**
20:11 36:15
57:10

**successfully**
8:9

**sue**
22:7,12 77:16
78:2

**suggest**
46:18

**suggestion**
98:11,12

**summarized**
86:24

**summer**
80:3

**Sun**
100:8

**Sunday**
83:23 84:12,18
85:12 87:2,5

**supervise**
14:10 52:14

**supervised**
19:19 22:18

30:18

**supervising**
13:4 23:20
28:23 52:14

**supervision**
14:15

**supervisor**
34:5 35:1 92:2

**supervisors**
28:24 29:3
36:23 37:3

**supervisory**
13:16 14:8

**support**
16:23,24 17:2
18:16 31:25
38:24 40:12
42:7,8 53:16,
20 54:1,4,8,
11,14 55:7,10,
13,25 56:6
57:8 61:18

**supported**
17:2,7 53:17
98:15

**supporting**
54:22 56:3

**supposed**
12:3 15:24
16:5 24:6
39:18 61:25
83:18

**surprised**
62:15 63:18
65:20 66:13
67:9

**Susan**
21:13 22:4
29:11,19 30:2,
10,15,17
34:13,18 36:11

Renee Dadowski
May 07, 2021

24

93:24 97:10,12

**swear**
4:5

**sworn**
4:12 18:14

**sympathetic**
101:18

**system**
75:4

**systemic**
93:9

---

**T**

**table**
67:17 87:21

**takes**
25:6 72:15

**Tallahassee**
4:20 103:11,15

**taught**
7:1

**teach**
95:15

**teaching**
94:9 95:14
96:8

**technically**
65:3

**technological**
61:20

**telecommuting**
33:13 108:7

**telephone**
89:25 90:3

**telling**
7:7 38:3
63:12,21 64:8,
18 70:18 94:21

**tells**

7:18

**tendency**
6:18 15:25

**tenure**
18:2 26:12

**term**
15:16,18 73:17
76:20 77:8

**terminate**
26:13 27:2
76:11 98:16

**terminated**
26:15 64:12
70:19,23,24
71:8,9 72:17
74:16 75:3
78:22 81:2,6
103:3,5

**terminating**
63:5 64:2,4
65:16 83:3,11

**termination**
24:15,20,23
64:21,22 72:25
74:5,7,22
76:7,17 77:2
78:14 105:18

**terms**
32:18 77:24

**Terrific**
8:2

**testified**
5:5

**testifies**
4:12

**testify**
5:3,8

**testimony**
4:5

**text**
26:24 27:9

61:5,23 62:3
67:22 68:2,6
70:2 99:2,3

**texted**
65:14 67:23

**Thanks**
6:8

**thing**
39:25 65:20
71:10,18 99:20

**thinks**
77:20

**thoughts**
86:9

**three**
14:13,16,18
20:8,25 23:12
33:3 45:21
56:21 66:10
94:9,12

**threw**
52:23 87:18,24
88:14

**throwing**
37:22

**tie**
46:2

**tight**
39:15

**times**
6:12,21 7:14
26:4 54:7,13
57:19 59:10
60:23 80:15
90:1 94:9,12,
24 95:11
110:17,18

**timestamp**
86:19 88:24

**timing**
101:21

**today's**
79:11

**top**
53:21,23

**Torre**
21:12 22:18
34:4 37:9
40:20,21,23

**tough**
51:21 52:1

**tour**
10:19

**toured**
10:17

**traffickings**
13:24

**trail**
57:18 80:8
82:6,16,19

**train**
25:7 28:12
66:19 92:3,10

**trainer**
29:12,18 30:10
34:9,17 35:9,
11

**trainers**
22:7 29:14
30:16,17 35:13
95:9 96:17

**training**
7:3 17:14
18:14 22:5,6,
13 28:11,18,
20,22 29:5,6,9
30:3,11 35:12
38:10,15 80:12
82:20 93:18,
21,23 94:1,7
95:21,23 96:2,
3 97:6 103:9

Renee Dadowski
May 07, 2021

25

transfer
47:5

treasurer
41:4,5,9,11,13

treat
16:19

treated
43:24,25
47:15,22,24
74:15

treating
96:23

treatment
47:17

tree
10:3

trial
8:4 21:4 22:4
29:15 35:3
47:1 48:20
89:4

trials
22:20 30:1

truth
4:6,7

truthful
36:12

turn
75:11

turned
53:22 74:24
75:14

Tuter
108:18

twice
94:11

two
10:10,11 14:17
20:3,5,7,21

104:2

26:16 30:17
45:22 50:1
51:10,14 54:13
56:20,22 61:17
63:20 66:10,11
68:3,14 73:2,
13,20 74:4
85:6 90:1 94:9
111:5

twos
13:23

type
16:11

typed
86:11

typically
14:7 25:20,24

typographical
74:20

**U**

ultimate
23:23 25:10

ultimately
61:2 68:10,19
71:1 77:12

UM
10:14,15

uncomfortable
45:20

undermined
104:11

undermining
34:16

unemployment
71:15

unfair
84:16

unfolded
51:3

unfortunately
26:5 30:4 54:6

unhappy
59:24

unit
12:25 15:19,20
17:21 18:5,9,
11,12,15,20,
22,23,24
19:11,24 20:3,
12,20 21:4
24:24 25:3
58:20 59:1,2,
15,18,25

units
22:8,9

university
9:5,13,19,22,
23,25

untruthful
34:22 35:19

unusual
105:22 106:2

unusually
109:18,24

updated
24:3

upset
90:8,9,15
102:17 109:3

**V**

vacation
61:4 62:6 73:2
74:4 87:19

Valentine's
47:3

valid
77:18

value

98:18,21

various
12:23 95:14

verbally
50:7

vetoed
26:2

vibes
45:1

video
62:10,12

view
105:22

Village
45:14,16

vindictive
78:18

violate
77:24

Violence
12:25

vocalized
54:20

voiced
47:20 94:2

voluntary
39:25 40:2

volunteered
58:6

**W**

wait
56:18 57:3
69:24 99:23
100:4 101:6

waited
84:24

waive
77:19

Renee Dadowski
May 07, 2021

26

**walking**
93:1

**watch**
65:17 68:17

**waves**
60:14

**ways**
38:3

**Wednesday**
62:5 79:24

**week**
61:22 63:16
101:9 110:17

**Weeke's**
39:10

**Weekes**
23:17 32:21
35:15 37:22
42:21 43:3,16
46:4 50:6,13
51:1 53:17,20
54:23 57:11
58:2 60:4,7
70:21 80:5
82:4 100:5

**Weekes'**
31:7

**weeks**
51:24 73:2
74:4

**weigh**
101:6

**west**
55:16

**white**
47:18 91:23
93:12,16

**willing**
55:12 72:24
74:3

**Wills**
11:10 18:10

**win**
102:6

**wings**
29:22

**wish**
62:24

**witness**
4:9 5:20 29:24

**woman**
105:16

**won**
98:22 100:19
102:5,9

**word**
17:7 70:22
88:23 109:23

**words**
65:17 86:18,20
106:22

**worked**
29:14 41:20
42:11 44:21
46:24 65:10
67:19 72:9
103:19

**working**
41:1 56:25
70:14 79:2

**works**
27:19 86:1
103:13,23
104:1

**world**
10:4 38:19
50:22

**writing**
31:21,22 50:8
69:5 72:23
75:21,23 76:1

**written**
89:9 106:22
111:24

**wrong**
95:6

**wrote**
69:6 79:7,8,13
86:18 89:4

**Y**

**young**
47:18 48:21
49:10 96:9
103:21

**younger**
14:1,5 19:5
29:21

**Youtube**
84:16

**yuck**
36:4

**Z**

**Zoom**
27:15 55:20
57:21 61:7,19,
24 67:3 70:5,
12

**Renee Dadowski**

| | |
|---|---|
| **From:** | Howard Finkelstein |
| **Sent:** | Saturday, August 15, 2020 4:57 PM |
| **To:** | Gordon Weekes; Renee Dadowski |

I am thinking we send email and text to ruby cell at exactly 7pM and then immediately shut off her office email and access card. Here is text and email I propose

Thank you for your service. Your services are no longer requested. Your termination is immediate. Please call Chief Investigator mark Forman who will facilitate the return of any Personal possessions in your office and receive from you your access card, Laptop etc.


We should probably  notify chiefs After it's done. We can send them the link of the radio show but my guess is they have already heard it. Her disrespect for me personally and for the office and it's lawyers prevents her from being part of our office. It Inhibits us in Our ability to do our job. It brings disrepute down on us and our clients. Her lack of truthfulness should prevent her from being a lawyer As well but that is another issue for others
Sent from my iPad

1