# EXHIBIT 4

RUBY GREEN

*vs.*

HOWARD FINKELSTEIN

Deposition of:

HOWARD FINKELSTEIN

April 09, 2021

Vol 01

# PHIPPS REPORTING

*Raising the Bar!*

Howard Finkelstein
April 09, 2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.:   20-CV-62160-BLOOM/Valle

RUBY GREEN,

                 Plaintiff,

vs.

HOWARD FINKELSTEIN,
Individually, in his Capacity
as Public Defender for Broward
County, and the Office of the
Public Defender for Broward County,

                 Defendant.
_____/

ZOOM DEPOSITION OF

HOWARD FINKELSTEIN

Friday, April 9, 2021
10:00 a.m. - 12:40 p.m.

Via Zoom

Stenographically Reported By:
Estelle Pregen
Stenographer

Job No.:   183373

Howard Finkelstein
April 09, 2021

Page 2

```
 1    APPEARANCES:   (All Present Via Zoom)
 2
      On behalf of Plaintiff:
 3
          FRANK & RICE, P.A.
 4        325 West Park Avenue
          Tallahassee, Florida 32301
 5        (850) 629-4168
          BY:  PATRICK R. FRANK, ESQ.
 6        lawatf@aol.com
 7
      On behalf of Defendant:
 8
          LAUFER & LAUFER, P.A.
 9        7251 W. Palmetto Park Road, Suite 305
          Boca Raton, Florida 33433-3187
10        (561) 300-5150
          BY:  ALICIA LYONS LAUFER, ESQ.
11        alaufer@lauferlawyers.com
12
          GENERAL COUNSEL
13        LAW OFFICE OF THE PUBLIC DEFENDER
          17th Judicial Circuit
14        201 SE 6th Street, #3872
          Fort Lauderdale, Florida 33301
15        (954) 831-6119
          BY:  DACIA RILEY-TAYLOR, ESQ.
16        driley-taylor@browarddefender.org
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    I N D E X
 2
      Examination                            Page
 3
      Direct       By Mr. Frank
 4
 5
 6
 7    Certificate of Oath                     103
      Certificate of Reporter                 104
 8    Read and Sign Letter                    105
      Errata Sheet                            106
 9
10
11                   E X H I B I T S
12                 No Exhibits Marked
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1    Thereupon,
 2    the following proceedings began at 10:00 a.m.:
 3             THE STENOGRAPHER:  Would you please raise
 4    your right hand.
 5             Do you solemnly swear the testimony you are
 6    about to give will be the truth, the whole truth and
 7    nothing but the truth, so help you God?
 8             THE WITNESS:  I do.
 9    Thereupon:
10                  HOWARD FINKELSTEIN
11    was called as a witness by the Plaintiff, and being
12    first duly sworn, was examined and testified on his
13    oath as follows:
14                  DIRECT EXAMINATION
15    BY MR. FRANK:
16        Q.   Could you state your name for the record,
17    sir?
18        A.   Howard Finkelstein.
19        Q.   Good morning, Mr. Finkelstein.
20             My name is Patrick Frank.  I'm an attorney.
21    I represent Ruby Green in the case that we're here on
22    today.
23             Have you ever been deposed before?
24        A.   Yes.
25        Q.   Okay.  What was the context of you
```

Page 5

```
 1    previously being deposed?
 2        A.   I believe in the Michael Brannon lawsuit.  I
 3    think there was years ago a personal injury lawsuit
 4    where I was a witness.  I think that's it.
 5        Q.   Okay.  With respect to the Michael Brannon
 6    lawsuit, that is a lawsuit that was filed against you
 7    individually in your office; is that correct, or your
 8    former office, the Public Defender's Office?
 9        A.   Yes, sir.
10        Q.   And the nature of the cause in that action
11    was that was a first amendment retaliation claim?
12        A.   I think amongst other things.  It was a
13    pretty big lawsuit that resulted in myself and the
14    office prevailing.
15        Q.   Well, it sounds like you've had some
16    experience with being deposed before.
17             Just for the purpose of the record so we can
18    have a clear record today, I'm just going to give you
19    a few baseline rules.
20             You're an attorney so I'm sure you're
21    familiar with this.  But I don't think it's going to
22    be particularly long today but certainly I appreciate
23    you attending and being here.
24             If for whatever reason you need to take a
25    break, please let me know.  It's not an endurance
```

Howard Finkelstein
April 09, 2021

Page 6

1   contest.  Again, I don't think it's going to be
2   particularly long but if something does come up,
3   please let me know.
4           I don't always tend to ask questions as
5   artfully as I would aspire to, so if I ask you
6   something that you don't understand, please feel free
7   to let me know and I'll be more than happy to rephrase
8   it.
9           Occasionally, your lawyer -- your attorney
10  is going to make some objections today related to some
11  of the questions, I hope not too many, but obviously
12  she's doing that for the record, to preserve the
13  record.
14          So in the event that -- she'll put it on the
15  record but in the event that unless she expressly
16  tells you not to answer the question or directs you
17  not to, I'm going to ask that you answer the question.
18  Is that fair?
19      A.  Yes, sir.
20      Q.  Okay.  Terrific.
21          Occasionally, we have -- the other thing and
22  it's a little more difficult today probably a little
23  more problematic from the standpoint of using the
24  technology, but we have a tendency to say uh-huh or
25  nuh-huh in lieu of saying yes or no sometimes.  We all

Page 7

1   do it.  You may do it today.  If I say something to
2   the effect that, you know, is that a yes or is that a
3   no, I'm not trying to be flip or funny, I'm just
4   trying to make sure that we have a clean record of
5   what was actually said in the proceedings; okay?
6       A.  Yes, sir.
7       Q.  Thank you very much.
8           Notwithstanding any communications you might
9   have had with counsel, in terms of preparing for
10  today, have you spoken with anyone else about your
11  deposition today?
12      A.  No.
13      Q.  So apart from possibly counsel, you wouldn't
14  have spoken with Gordon Weekes or anyone else at the
15  Public Defender's Office?
16      A.  No, sir.
17      Q.  Again, with the caveat not to reference
18  anything, any materials prepared for you by counsel,
19  have you reviewed any documents in anticipation of
20  this deposition today?
21      A.  I believe what you sent and provided, a
22  transcript of a pod cast and some emails.
23      Q.  The pod cast itself, did you actually listen
24  to the whole pod cast in contemplation of today?
25      A.  No.

Page 8

1       Q.  Okay.  But did you listen to portions of it?
2       A.  No.  I listened to it once back when it was
3   sent to me.
4       Q.  Okay.  And for the purposes of the record,
5   you're referring to an August of 2020 pod cast that
6   the plaintiff participated in?
7       A.  I guess so.  I believe that's what it was.
8       Q.  Okay.  Terrific.  Thank you.
9           This is going to be the only opportunity I
10  get to talk to you before trial in this matter,
11  Mr. Finkelstein, so I'm going to ask you some
12  questions about your background.
13          If you would, could you tell me a little bit
14  about your educational background?
15      A.  College, University of South Florida; law
16  school, University of Miami.
17      Q.  What year did you get your degree at the
18  University of South Florida?
19      A.  1975.
20      Q.  What kind of degree was it?
21      A.  My major was Political Science.
22      Q.  What year did you get your J.D. from
23  University of Miami?
24      A.  I want to say '77, '78.  Seventy-eight
25  probably.

Page 9

1       Q.  Apart from what you just told me regarding
2   University of South Florida and University of Miami,
3   have you attended any other educational institutions?
4       A.  No.
5       Q.  Have you obtained any other type of
6   certifications or academic credentials other than
7   those degrees?
8       A.  None that I can think of, no.
9       Q.  If you would, I'm not going to ask for you
10  to be too specific but if you could give me sort of a
11  thumbnail sketch of what you did for work or where you
12  worked after you got your law degree?
13      A.  I started working for the Public Defender's
14  Office in Broward County the year before I graduated
15  law school.
16          I was hired at that time to work part time.
17  I stayed with the office upon graduation, I want to
18  say until about 19 -- late 1980 or early 1981, went
19  into private practice for about seven years.
20          Then came back to the Public Defender's
21  Office in 1988, and worked there as a major crimes
22  homicide attorney.
23          Eventually became a chief assistant in
24  charge of training and interns and then eventually the
25  elected Public Defender.

Howard Finkelstein
April 09, 2021

Page 10

1    Q.   When you indicated that up until about 1988
2    when you worked in private practice, what kind of work
3    did you do there?
4    A.   Criminal defense.
5    Q.   Is it a still existing firm or was it a firm
6    that you opened up?
7    A.   It was a firm that I opened up and both of
8    my partners have since died.
9    Q.   What was the name of that firm?
10   A.   Finkelstein, Brackey and Dallas.
11   Q.   What prompted you after being in private
12   practice for that period of time to go back to working
13   in the Public Defender's Office?
14   A.   Two major things.  One was I was never
15   comfortable in private practice.  I was never
16   comfortable with the money aspects of the practice of
17   law.  It culminated in personal problems, resulting in
18   addiction to drugs, my arrest, and when I got sober, I
19   decided to change my life and remove from it the money
20   based practice of law.
21   Q.   I see.
22        What year did you ultimately determine to
23   run for Public Defender?
24   A.   Oh, gosh.  Four terms, 16 years -- I want to
25   say in 2004.  My math could be off a little.

Page 11

1    Q.   Okay.  Who was your predecessor that you
2    took over for?
3    A.   His name was Allen Schreiber.
4    Q.   Was he sort of a mentor to you or --
5    A.   No, he was not a mentor.  He was my boss.
6    He hired me, gave me my first job as a lawyer.
7    Q.   So it looks like you went back in 1988.  You
8    worked there about 16 more years before you decided to
9    run for office?
10   A.   Okay.  I'll take your word on the math, but
11   yes, okay.
12   Q.   Right, and you kind of worked your way up
13   through the ranks, I guess.
14        When you ultimately ran for Public Defender
15   in 2004, what were your -- one, what were your duties
16   as far as your day-to-day overseeing the office?
17   A.   Before I was elected or after?  I'm not sure
18   I understood.
19   Q.   When you took office.
20   A.   When I took office my duties were to run a
21   constitutional office, to provide effective
22   representation to any and all indigent people charged
23   with a crime.
24        The day that I took office, there was a
25   massive change in government funding called Article V.

Page 12

1    And so the first few years were spent, one, trying to
2    change the culture in the office.  The office had
3    become very political, in fact, many articles about
4    it, how it was a political machine to the detriment of
5    the clients.
6        So my first four years were really spent
7    trying to change the culture and make it client
8    centric.  But my duties were to make sure that I kept
9    hiring lawyers, that we trained lawyers, that we
10   provided effective representation to everyone
11   appointed.
12        The year that I took over we had -- I want
13   to say 65 to 67,000 new cases a year.  So, it was
14   quite a job.
15   Q.   What about the office when you refer to it
16   as having been political before you came in?  What was
17   political about it?  Can you expound on that?
18   A.   Yes.  At the time, the way you rose through
19   the ranks was by supporting the candidates that the
20   Public Defender wanted, supported.  It involved
21   contributing to his campaigns and to other campaigns.
22   It included dropping literature at condominiums at
23   night, all for the benefit of the political benefit
24   of whoever my predecessor chose.
25   Q.   When you're talking about offices, are you

Page 13

1    talking about offices that your predecessor -- other
2    than his office, people who were running for other
3    offices?
4    A.   His office and other offices.
5    Q.   So basically it sounds like you're saying is
6    that your predecessor had basically dispatched public
7    defenders to perform political acts under the umbrella
8    of the office to help campaigns?
9    A.   Yes.
10   Q.   And you came in and you wanted to change
11   that?
12   A.   Yes.
13   Q.   You mentioned something about Article V, the
14   funding scenario.
15        Did that play into the political environment
16   that you described?
17   A.   It didn't play into the political
18   environment of my predecessor.  What it played into
19   was the political environment of the county versus the
20   state.
21        Article V shifted -- before Article V was
22   passed, there was a shared responsibility.  The state
23   would fund the office and the counties would
24   supplement.
25        Article V, I believe, was an amendment that

Howard Finkelstein
April 09, 2021

Page 14

1  was a voter approved amendment and it shifted the
2  funding all to the state and it took the county out of
3  it. That then created a new way in which both Public
4  Defenders and the State Attorney's offices would be
5  funded, and because all, almost all offices are
6  chronically underfunded, it's created a new mechanism
7  where when one office ran out of funds, money would be
8  taken from other offices.
9       So, a whole new method and attitude about
10 how government agencies got funded came into being.
11      Q.   I see.
12           As far as when you took the helm, you said
13 part of the duties -- not duties, but efforts that you
14 undertook was to depoliticize the office.
15           How did you actually go about effectuating
16 that?
17      A.   Actually had an office meeting where I told
18 people that that was done, it was over, that anybody
19 that worked there could be involved or not involved in
20 any candidate or no candidate, any issue or no issue,
21 that the deal would be that as long as they were
22 working and providing representation and giving our
23 clients everything that they were entitled to, I would
24 never ask them to support a political candidate or
25 issue that they didn't want to.

Page 15

1      Q.   I see.
2           Did you implement or have them place any
3  type of resign to run policy for anybody who had
4  political aspirations?
5      A.   No, I didn't.
6      Q.   Was there any problem with anyone in the
7  office, when you were running it, endorsing a
8  candidate?
9      A.   I don't even know if anybody did, but no.
10 No. I don't even think that issue ever came up.
11      Q.   Okay.
12      A.   Go ahead.
13      Q.   No, go ahead. I'm sorry. What were you
14 going to say?
15      A.   Mostly because most candidates running for
16 office are not going to seek out endorsements of an
17 Assistant Public Defender or an Assistant State
18 Attorney.
19           Most of them are going to seek out either
20 the elected official, assuming that's a, you know,
21 it's a race not for State Attorney or Public Defender.
22 I don't know.
23           I don't think that issue ever came up, to my
24 knowledge.
25      Q.   I see. How many public defenders on average

Page 16

1  did you have working under you?
2      A.   Between 135 and 150.
3      Q.   And were they all from a logistic
4  standpoint? Were they all at one location or were
5  there several locations for the offices?
6      A.   It depended what years. Are we talking
7  about just during my term now or before my term?
8      Q.   During your term.
9      A.   During my term, no. When I started out we
10 had, one, two, three -- I want to say three out parcel
11 offices. Two across the street, I want to say one in
12 the west satellite courthouse.
13           We had the main office in the courthouse.
14 Then we got an expanded office in the courthouse.
15           Eventually near the end the out parcels were
16 canceled and so now we're all in the courthouse but
17 not in the same office.
18      Q.   I see.
19           As far as one of the things you mentioned
20 that was your responsibilities as Public Defender was
21 to train ADAs. Is that something that you did
22 personally?
23      A.   Well, not as the elected -- let me back up.
24           I was the chief of training for many years
25 and when I was the chief of training, I did the

Page 17

1  training personally.
2      Q.   I see.
3      A.   As the elected Public Defender, no. During
4  my time as elected Public Defender, the training was
5  done by Susan Porter and when she retired Lorraina
6  took over, and in both cases I would often come in and
7  lecture or give a speech on either a topic or on
8  introductory matters.
9           But I had some contact with the interns and
10 a lot of that was just so that I could get a sense
11 because I would be seeing them upon graduation when
12 they applied for a job.
13           So it was an opportunity for me to kind of
14 get a first look before I had to take a more serious
15 look.
16      Q.   I see. Would it be accurate to say that you
17 had complete hiring authority for the office while you
18 were head of the office?
19      A.   Yes.
20      Q.   During your tenure, did anyone else
21 participate or did you have committees or anything
22 like that to interview candidates?
23      A.   No.
24      Q.   Or was it just you?
25      A.   Yes. It was -- eventually it evolved into

Howard Finkelstein
April 09, 2021

Page 18

1     it.

2           There was always a process before they got

3     to me but it eventually became a larger committee of

4     several of the chiefs.  Three, four and sometimes even

5     five chiefs would do the initial interviews and weed

6     out the people that they didn't think would fit and

7     then the ultimate choice was made in the initial years

8     by me, Diane and Katherine, and then in the end by me,

9     Gordon and Renee.

10       Q.  When you refer to Diane, are you referring

11     to Diane Cuddihy?

12       A.  Yes, sir.

13       Q.  And what was Ms. Cuddihy's formal position

14     with the office?

15       A.  Executive Chief Assistant.

16       Q.  Was Ms. Cuddihy an attorney?

17       A.  Yes.

18       Q.  As far as you referenced Renee, is that

19     Renee Dadowski?

20       A.  Yes, sir.

21       Q.  And did Ms. Dadowski take over Ms. Cuddihy's

22     role after she left?

23       A.  No.

24       Q.  What was Ms. Dadowski's role?

25       A.  Ms. Dadowski's role was, after Diane left,

Page 19

1     was as a second eye on budgetary matters.  Also in

2     charge of personnel and other administrative matters

3     because at that point we were months away from me

4     departing and whoever was going to be elected coming

5     in.

6           So we were trying or I was trying to make

7     sure that we could serve all of our clients through

8     the remainder of my term because we had no idea who

9     the next Public Defender would be.

10       Q.  I see.

11           To your knowledge, is Ms. Dadowski still

12     employed by the Public Defender's Office?

13       A.  No, she's not.

14       Q.  Do you know what the circumstances are --

15     were of her separation?

16       A.  I just know she was terminated but I don't

17     know anything else.

18       Q.  Do you know when she was terminated?

19       A.  No.

20       Q.  How do you know that she was terminated?

21       A.  She called me and told me.

22       Q.  But she didn't share with you the reasons

23     why?

24       A.  I don't even -- no, she didn't.  She didn't.

25     I knew that there was some bad blood.

Page 20

1       Q.  When you're saying bad blood, would that

2     have been between Mr. Weekes, the current Public

3     Defender and Ms. Dadowski?

4       A.  Yes.

5       Q.  Did Mr. Weekes ever discuss it with you,

6     that situation?

7       A.  No.

8       Q.  So as you sit here today you don't

9     understand the basis of the bad blood between the two?

10       A.  No, no.  No, I understand that the

11     tension -- they had tension.  They were not getting

12     along for certain periods, so I knew that.  But I

13     don't know the basis and the reasons for the

14     termination, that I don't know.

15       Q.  Do you know what precipitated the tension?

16       A.  No, I don't.  I can't recall if there was

17     any trigger event that comes to mind, but no, there

18     was just -- from my perspective, there was tension and

19     I just can't tell you exactly why.

20       Q.  Okay.  How long did Ms. Dadowski work for

21     you before you departed?

22       A.  Oh, she was there the whole time I was

23     there.

24       Q.  Okay.  So --

25       A.  I mean as the elected.  She was there, you

Page 21

1     know, we were both Assistant Public Defenders before I

2     was elected.

3           I don't know when she started.  I mean, a

4     long time ago, like 30 years ago, 25, a long time ago.

5       Q.  You said that she had handled personnel.

6     Would she be sort of the equivalent or analog to a

7     Human Resources person in doing that with that office?

8       A.  I'm not quiet sure what Human Resources do

9     so I don't know if that would be fair or not.

10           Renee helped me administrate, the

11     administrative part of the office as well as

12     implementing, you know, any procedures or policies

13     that we might have had to do.

14           So again, I don't know what a Human Resource

15     officer necessarily does.

16       Q.  That's absolutely a fair point.  And when I

17     use the word human resources, let me be clear about

18     what I'm talking about.  Someone who maintains

19     personnel files, administers leave policies,

20     employment insurance, those sort of administrative

21     tasks, gives advice.

22       A.  She wouldn't do that.  That would be -- that

23     would probably be Liz, Michelle or Barbara.

24       Q.  And for the record, could you tell me what

25     their last names are respectively?  You said Liz,

Howard Finkelstein
April 09, 2021

Page 22

1  Michelle and Barbara?
2      A.  Liz McCue (phonetic), Michelle Grabowski and
3  Barbara Jackson.
4      Q.  You gave me some broad strokes with regard
5  to what you did when you were the Public Defender.
6  You didn't train people directly; you said you came in
7  and would lecture sometimes.
8          What was sort of the day-to-day
9  responsibilities that you did?  You know, you come to
10 the office on any given day and what were the tasks
11 that you would perform on a typical day?
12     A.  Generally speaking, on any given day the
13 tasks I had set out for the day were not the tasks
14 that I did.
15         My day was largely controlled by what
16 happened.  You know every morning I'm sure you're
17 aware of, you know, courts open at nine o'clock.  And
18 so we had twenty, over thirty criminal courtrooms that
19 open up with, you know, one hundred cases in each one
20 with all of the issues that permeate any case times
21 all of those cases.
22         And on top of that whether witnesses show,
23 whether the prosecutor shows, the public defender
24 shows, the judge is late, whatever it might be was
25 largely what my day centered on as well as, you know,

Page 23

1  continuing.
2          There was always a constant process of
3  interviewing people for internships, for hiring.
4  There was always a process going on of people's work
5  that we were looking at with eyes to promote, to move.
6          On a day-to-day basis that office could be
7  experiencing any type of problem that exists in the
8  world of criminal law.
9      Q.  I see.
10         During your tenure as the Public Defender,
11 did you try any cases?
12     A.  No, sir.
13     Q.  Did your predecessor that you referenced,
14 did he try cases while he was the Public Defender?
15     A.  He did once or twice, and then never did it
16 again.
17     Q.  I see.
18         You could speak to this probably better than
19 I can, is it typical for a public defender to, at
20 least in Florida to -- who's head of the Public
21 Defender's Office, to not try cases?
22     A.  That's the more typical model for your State
23 Attorneys and Public Defenders for a lot of the
24 reasons that I've shared with you.
25         Just the nature of the job and all of the

Page 24

1  problems that most of the electeds believe that if
2  they find themselves in a trial and all this stuff
3  happens, somebody is going to lose.  Either they're
4  not going to be able to pay attention to all the other
5  clients who are having issues or they're not going to
6  pay attention to the client that they're in trial
7  with.
8          It's just very difficult to do both and I
9  think that's why most don't.  Some do, though.
10         Carrie Hewitt in Palm Beach I know handles
11 cases and I know Mike Satz, the State Attorney handles
12 mostly cases where police officers have been killed.
13 But the lion's share of elected Public Defenders and
14 State Attorney's would not.
15     Q.  I see.  I understand that you indicated that
16 you didn't try cases but did you ever go in just on
17 select appearances and argue motions or participate in
18 any aspect of any case directly?
19     A.  Yes.
20     Q.  What would occasion that?
21     A.  In one case that comes to mind, a very high
22 profile case with extreme public interest presented a
23 unique situation where a defendant had life insurance
24 policies in excess of half a million dollars that
25 might or might not have been accessible.  And we were

Page 25

1  on this case where at first blush it would appear the
2  defendant had more money then all of his defense
3  counsels combined.
4          But on the other hand, whether or not it was
5  accessible and the victims could freeze it, could have
6  posed a problem that the case could be two years into
7  its process and we could have been removed or not,
8  which could have threatened the integrity of the whole
9  process.
10         That's the only one that jumps to mind.  I'm
11 sure there are others but that one just jumps to mind.
12     Q.  So basically the person was found to be --
13 have financial resources, then they wouldn't qualify
14 for your office's representation?
15     A.  Correct.  But this one was so off the grid
16 as compared to others in that how much money was
17 involved, whether it could be accessed, and what would
18 happen if the defense was interrupted.  The issues
19 were huge because the case was the biggest case
20 probably in Broward's history.
21     Q.  I see.
22     A.  So my role was to basically go in.  I was
23 speaking to the Court having to do with money,
24 funding, how this case could be effected if we were
25 removed from the case and the jeopardy it could place

Howard Finkelstein
April 09, 2021

Page 26

1  on the integrity of the process.
2       Q.  I see.  I see.  I'm going to go a little bit
3  off topic for a moment.
4            In researching to prepare for the deposition
5  and in the context of case, I notice that you -- it
6  sounds like you had a television show.  Do I have that
7  correct?
8       A.  Yes, sir.  I mean --
9       Q.  It was called Help Me Howard?
10      A.  Yes.  It's not my TV show, you know what I
11  mean?  I admit it's the TV station's show.
12      Q.  What TV station is that for?
13      A.  Channel seven, WSVN.
14      Q.  And the show, can you kind of give me a
15  thumbnail sketch of what it is?  I haven't seen it.
16      A.  It's a like two-and-a-half to three-minute
17  piece where somebody is suffering some kind of legal
18  problem.  It could be anything from leaky faucets the
19  landlord won't fix to needing a liver transplant.  We
20  tell their story.  I pop-up once or twice to tell
21  people what the law is and we try to help people.
22      Q.  I see.  How long have you done that?  Well,
23  are you still doing it now?
24      A.  Yes, sir.
25      Q.  How long have you done that for?

Page 27

1       A.  I think we're in our 23rd year.
2       Q.  Okay.  So you were doing that even before
3  you were the Public Defender?
4       A.  Yes, sir.
5       Q.  So getting back, if you could tell me about
6  your first recollection of meeting with and having
7  Ruby Green, the plaintiff, in this case come to work
8  for your office?
9       A.  She was just another one of, you know,
10  bright eyed, bushy tailed, young people that were
11  filled with energy and couldn't wait to put their
12  legal education to work.
13           You know, it's kind of a magical time for
14  young lawyers, you know, the first time I meet them
15  they're either -- and I can't remember if I met Ruby
16  as an intern or when she first applied.  It was awhile
17  ago but I remember her.
18      Q.  I see.  She started to work for your office
19  as an ADA?
20      A.  APD, Assistant Public Defender.
21      Q.  APD, I'm sorry.  That's correct.  I got my
22  terminology wrong.
23           You hired her, correct?
24      A.  Yes, I think so, yes.
25      Q.  You would have had the authority to do so?

Page 28

1       A.  Yes.  Just when you asked me, I've been
2  there for so long.
3       Q.  No --
4       A.  Forty years, and it's like okay.  And I have
5  to stop for a second because I also did the hiring
6  with my predecessor to a large degree so, but yes, it
7  was during my term.
8       Q.  I believe, I'll represent to you that I
9  think Ruby came in, Ms. Green came in around 2012.
10      A.  Okay.
11      Q.  As far as bringing her into the office, do
12  you know who she worked for first, who her immediate
13  supervisor was?
14      A.  In the office?
15      Q.  Yes.
16      A.  I can't remember if it would have been Doug
17  Brawley or whether he was gone and it was Linda Sante.
18  I would think Linda Sante.
19      Q.  Typically I don't expect you to remember the
20  specific career trajectory of Ms. Green.  But
21  typically when a new Public Defender comes in, what
22  kind of work are they assigned to start?
23      A.  They're placed in one of two places.
24  They're either going to be placed in county court
25  which is misdemeanors or in juvenile which is a high

Page 29

1  bred but there's no jury trials.
2           What we try to do is fit where the lawyer is
3  at and their desires.  So for instance, some people
4  come in and they have a burning desire they want to
5  help kids, but they may be not so eager to go into
6  jury trials.  Juvenile is a good thing, fit.
7           Others may come in and all they want to do
8  is become the next Perry Mason and, you know, jury
9  trials are what they want so it will be county court.
10  But that would be where the two, where you would start
11  as a new lawyer, one of those two places.
12      Q.  I see.
13           And as you sit here today do you have a
14  recollection as to what Ms. Green wanted to do?  Did
15  she want to be the next Perry Mason or -- if you
16  remember?
17      A.  No, I don't.
18      Q.  As far as advancing in the office under your
19  tenure, did your office typically do personnel
20  performance evaluations for the lawyers?
21      A.  I'm trying to remember.
22           We do them periodically, the chief
23  assistants would.  It was more, I think -- the
24  evaluations were more of a monitoring to make sure,
25  especially with the young lawyers, that they were

Howard Finkelstein
April 09, 2021

Page 30

1  developing in all spheres.
2       As you know being a lawyer, there's a lot.
3  It's not just -- you don't just walk into court and
4  give closing arguments.
5       A lot of the young lawyers have no
6  organizational skills whatsoever.  So that's a
7  starting point.  They don't know how to use
8  investigators, depositions, pretrial motion practice,
9  as well as jail visits.
10       So we try to come up with a bunch of
11  categories that we could look at that would give us an
12  insight so that we would, one, know if people were
13  doing the job, and two, how well they were doing it,
14  how well they were progressing because when you are in
15  the front end of the office, the nature of a public
16  defender office and turnover rates, you're going to be
17  promoting these people in about a year to felonies and
18  you don't have that much time to make sure that they
19  have the fundamentals down.
20       Q.  Okay.  As far as the metrics for
21  performance, did you actually have a formal template
22  for performance evaluation or to establish or keep the
23  progress of the lawyers?
24       A.  You know, there was a template that was -- I
25  don't want to use the word formal because my

Page 31

1  recollection is different chiefs would use different
2  ones.  It wasn't a highly formalized process.  A lot
3  of it is because there's a lot of art form to being a
4  lawyer, and all of the categories together can shine a
5  light, but rarely give you the answer.
6       Q.  I see.
7       As far as if and when evaluations were done
8  or any reports chronicling the PD's progress, would
9  that be something that you would periodically have
10  evaluated?
11       A.  I would look at them.  When it would come to
12  my attention, usually when it was done is, it would be
13  if, let's say people had left -- some people left the
14  office and there were positions that's were opening
15  up, higher up, let's say major crimes, specialized
16  unit, homicide, we would look at those, any
17  evaluations that were done, as well as other factors
18  to see who would be a good fit for that.
19       Also they would utilize whenever we would
20  receive funding and we knew that there would be money
21  that we could utilize for raises, we would use
22  evaluations as a basis to determine who would get
23  raises and how large the raises were.
24       But don't let me mislead you.  When I say
25  how large the raises are, usually we're talking about

Page 32

1  whether you can get nothing or up to $3,000.
2       Q.  I understand.
3       A.  You know, these were very small numbers.
4  But when you're a young APD, that $2,000 is a big
5  deal.
6       Q.  Absolutely.  Absolutely.
7       Would it have been under your purview to
8  make the final determination as to whether someone got
9  a raise or a promotion?
10       A.  Yes.
11       Q.  I guess you would have done that at least in
12  some small part based on their immediate supervisor's
13  recommendation?
14       A.  That would always come into play for sure,
15  whether I accepted it or not, like we discussed
16  before, a lot of times just because you look at a
17  bunch of categories it doesn't necessarily tell you
18  the whole story.
19       I would usually also meet with that person
20  because I wanted to see if I could discern those
21  things that make lawyers good, that don't necessarily
22  get reflected in data.
23       Q.  I see.
24       Do you have any recollection as you sit here
25  today as to how Ms. Green performed in the first

Page 33

1  several years at your office?
2       A.  She did a good job.
3       Q.  And did she receive regular promotions?
4       A.  Yes.  I can't tell you at what point but I
5  mean, I made her chief assistant pretty quick, so,
6  yes, I would think so.
7       Q.  How was she as far as during her beginning
8  and middle tenure, I guess, how was she as far as
9  getting along with other people in the office?
10       A.  You know, I've heard different things.  I
11  know that she had some issues with some people.  I
12  can't even recall now who they were with.  I wish I
13  could tell you that it stands out but it doesn't.
14       Its pretty typical when you have 200 people
15  and the majority of them are young people, and with
16  that comes all of the things that come with twenty-
17  something year olds and personality conflicts, dating
18  conflicts, jealousies, all of that other stuff, so --
19       Q.  Aside from those things, are you aware of
20  any type of performance issues or anything that would
21  have effected Ms. Green's performance?
22       A.  No, no.  No, I think she did a good job.
23       Q.  When did Mr. Weekes, Gordon Weekes start
24  working for the office?
25       A.  He worked, my memory is he worked in the

Howard Finkelstein
April 09, 2021

Page 34

1  office and then at some point I think he left, and
2  then I remember him coming back.  That was, I think,
3  before my tenure he came back.  And then, yes, that's
4  my memory.
5      Q.   How was he as working under you, how was his
6  performance generally speaking?
7      A.   Very good.
8      Q.   And you were Public Defender for what, four
9  terms?
10     A.   Yes, sir.
11     Q.   Prior to the last term that you were in
12 office, did Mr. Weekes ever express to you any type of
13 political ambitions to run for your office?
14     A.   I believe prior to the last term.  You
15 mean -- do you mean like before the last four-year
16 term?
17     Q.   Well, yes.  Exactly prior to you, when he
18 became aware that you weren't going to run, that you
19 weren't going to run for another term, was there a
20 time where he approached you about him potentially
21 running for your office?
22     A.   Yes, yes.
23     Q.   Do you remember when that was?  When did you
24 decide -- I guess, first of all, when did you decide
25 that you weren't going to run for another term?

Page 35

1      A.   Really soon after I was elected for the last
2  time.  I could see the changes coming.  And I believe
3  that while I was the right person to run the office,
4  starting in 2004 or five, I could see that the world
5  was changing and that I wasn't going to be the right
6  person to lead the office going forward, that
7  technology issues were becoming -- this is even before
8  the pandemic, were becoming huge, that the practice of
9  law was going to be changing and that I was becoming a
10 dinosaur.
11     Q.   I see.  How long into your fourth term was
12 it before you actually made it clear to outsiders or
13 third parties that you weren't going to run again?
14     A.   Pretty soon.  I don't have a specific
15 recollection but it appeared within the newspaper.
16          Some reporter -- I don't even remember how
17 it came into play.  It was like an off-the-cuff type
18 thing.
19          A reporter called me, I think heard that I
20 was running for Congress or some crazy thing and I
21 said no, I'm not running for congress and I'm not
22 running for Public Defender again either.  Something
23 like that.  I don't remember how it came up.
24          But I was also -- look, I'm 67 now.  And at
25 that time I was what, 63 years of age, and I could see

Page 36

1  that the office was and has always been an office of
2  primarily young people.  Young, passionate people and
3  that while I was a good role model and later in my
4  time, I could see that my frames of references were
5  not the same as the new generation, that their
6  experience and my life experience were very different.
7  And it's not a matter that one was right or wrong.
8  It's just I could see it was time.
9      Q.   I see.
10          Did Mr. Weekes ever come to you before he
11 actually announced and picked your brains or try to
12 get some feedback from you about what you thought
13 about him running?
14     A.   He asked me my opinion -- I don't remember
15 if he asked me my opinion or just said he was going to
16 do it.  I don't recall.
17     Q.   Did Mr. Weekes at any time ever ask for your
18 endorsement?
19     A.   Yes.
20     Q.   And did you give it to him?
21     A.   I did.
22     Q.   How did you -- do you remember when you gave
23 him the endorsement?
24     A.   It was right in the very beginning.  He
25 declares that he's going to run and he's the only one

Page 37

1  running at that time.  My wife and I gave him a check
2  and I endorsed him, and that was really my entire role
3  in the entire campaign other than I did go to one
4  event to meet his mom.
5      Q.   Meet Mr. Weekes' mother?
6      A.   Yes.
7      Q.   Okay.
8      A.   Just because that's what a good boy does.
9      Q.   Right.  No, I understand.
10          Relative to when Mr. Weekes made his
11 intentions known, when did Ms. Green throw her hat
12 into the ring?  When did you become aware of that?
13     A.   There's a period of time there, and I just
14 can't now in retrospect, I can't tell you if it's
15 three months or eight months.  It's just not clear.
16 But it should be out there somewhere in some
17 documentation of some sort when she did.  I just don't
18 recall.
19     Q.   Did the campaign event and the check that
20 you wrote, did those predate Ms. Green's entry into
21 the race?
22     A.   Yes.
23     Q.   I see.  I'll represent to you that in
24 discovery in this case I was provided some emails and
25 you actually don't have a copy of the email in front

Howard Finkelstein
April 09, 2021

Page 38

1  of you, but I was just going to reference it and see
2  if you remember it.
3          It looks like it's dated November 27th,
4  2018, and it's an email that you wrote to both
5  Mr. Weekes and Ms. Green, where you talk about setting
6  out some ground rules?
7      A.  Yes.
8      Q.  To avoid --
9      A.  Yes, I remember.
10     Q.  And I guess some of the stuff that you
11  talked about, I guess that email derived from your
12  concern about the politics of the office when you
13  first came in?
14     A.  Yes.  Yes, sir.
15     Q.  And you reference ground rules going forward
16  and basically suggest that politicking won't be
17  tolerated.
18          Was there ever any issue about either
19  Ms. Green or Mr. Weekes asking fellow colleagues to
20  vote for them, not necessarily asking them to help
21  with the campaign, but soliciting their votes?
22     A.  Not to my knowledge.
23     Q.  And at this point in time when you wrote
24  that, when you wrote the email I guess because
25  Ms. Green was already in the race at that point, you

Page 39

1  had already endorsed Mr. Weekes; correct?
2      A.  Yes.
3      Q.  Okay.  Prior to Ms. Green getting into the
4  race, did she come to talk to you about her entering
5  the race?
6      A.  No.
7      Q.  Okay.  So were you surprised when she got
8  involved and made herself a candidate?
9      A.  Yes.
10     Q.  And what aspect of it surprised you?
11     A.  Just because I didn't know, that surprised
12  me.  I hadn't heard anything about it.
13          And then the other part was one of the rules
14  in the office is before you run for any position, the
15  rules require that you come and seek permission.
16  While I did not have a resign to run, there were
17  certain rules.  Most of the people running before this
18  race, before Ruby and Gordon were running for judges.
19  I needed to have some rules in place in that regard
20  because I couldn't have young assistant public
21  defenders declare against a judge and the next thing
22  you know I've got an angry judge taking it out on
23  10,000 of my clients.  So I had to have certain rules
24  about if you're going to run again sitting judges, it
25  can't be sitting criminal judges, et cetera.

Page 40

1          When Ruby declared, she -- the rules
2  required her to come and say and ask permission.  She
3  never did.  That said, I would have given her
4  permission.
5          So, you know, I'm not a formal guy, but no
6  she didn't do it right.  She should have come and
7  asked.  I would have given her the permission.  That
8  said, she declared herself a candidate, and that's
9  what prompted me sending both the email to Ruby and
10  Gordon and also one to the office because like I told
11  you, I've been around a long time, and I watched two
12  other offices get ripped apart, Miami's office and
13  Palm Beach's office.  The Miami Beach -- the Miami
14  office I think had two people from within running and
15  it ended up in a federal lawsuit that went on for
16  years and years and years.
17          Something similar happened in Palm Beach and
18  they even charged the Public Defender with a crime up
19  there.
20          So, I had seen what can happen to a public
21  defender office when it becomes an internal battle and
22  I was most concerned, not most, equally concerned for
23  the staff because I have 60 people that come to work
24  and they make so little money and they have to feed
25  their families, their children with the little money

Page 41

1  that I give them, I did not want them to live in a
2  stress filled environment where they felt they had to
3  back one candidate or the other and if they backed the
4  wrong person they wouldn't be able to keep their job
5  and pay their mortgage.  No, I was very concerned that
6  the race not affect the people doing the important
7  work in the office and that's why I sent those emails.
8      Q.  As far as the rule that you referenced, is
9  that -- was that codified anywhere, the rule that you
10  referenced about needing to seek permission prior to
11  running?
12     A.  Yes.  I think it's in the -- what do you
13  call that thing -- the book, in the rules and policies
14  of the office, and it was sent out in an email back --
15  right after I took office.
16          No other Public Defender had ever allowed
17  their people to run, and it was all about how
18  political power was maintained.  If the elected
19  officials didn't let their people run against judges,
20  the elected officials and the judges were pals and
21  laughing all together, and all to the detriment of the
22  clients.
23          And because we had had a judicial nominating
24  commission that hadn't put a Public Defender on the
25  bench in 20 years, we were having a judiciary that I

Howard Finkelstein
April 09, 2021

Page 42

1  perceived as one not reflective of community standards
2  and attitudes, and the best thing that I was able to
3  do was to tell my people, as long as you've reached a
4  certain point in your career and you have mastered
5  this job, you can run for a judgeship and about six of
6  my people got elected.  And that changed the judiciary
7  for the benefit of our clients.
8      Q.   I see.
9           As far as adhering to the rule, what does
10  that, to your understanding what does that actually
11  contemplate?  They come to you and verbally request
12  permission?
13      A.   Correct.
14      Q.   And is that something that you have ever,
15  ever withheld from anyone?
16      A.   Yes.
17      Q.   You've withheld permission to run for the
18  office?
19      A.   To run for -- somebody withheld -- it was, I
20  want to say -- maybe a nuisance board and I was
21  concerned that a conflict would be created.
22      Q.   I see.  In that context did the person
23  resign to run or they just didn't run?
24      A.   They didn't run.
25      Q.   As far as qualifications, did you believe

Page 43

1  that Ms. Green was qualified to, if she won the
2  election, to serve as the Public Defender?
3      A.   No.
4      Q.   And why did you believe she wasn't
5  qualified?
6      A.   She doesn't have the experience necessary
7  yet, in my opinion.  For whatever it's worth, it's
8  just my opinion.
9           It takes awhile to not only understand the
10  job, and the job is a many layered thing, dealing with
11  everything from moral to budgeting to administration,
12  to getting lightbulbs and yellow pads.  And it's more
13  than just trying cases.  It requires life experience.
14  But it also requires a tempering of attitudes and
15  maturity because to keep 200 people moving in the same
16  direction, just requires an understanding and an
17  insight into the human condition, into institutions,
18  into government machinery to make it run as smoothly
19  as possible.
20           And me personally, I didn't think that Ruby
21  had that experience at that time.  She was younger,
22  you know.  I mean I didn't have that experience when I
23  was her age either.
24      Q.   How old is Mr. Weekes?
25      A.   I don't know.  Let's see I'm -- probably

Page 44

1  50 -- 50s, I think.  I don't know.
2      Q.   At the time he was running for Public
3  Defender, what position did Mr. Weekes hold in your
4  office?
5      A.   Executive Chief Assistant.
6      Q.   And what were the duties of that position?
7      A.   To do everything that I needed done and to
8  make sure that I knew everything I needed to know, and
9  in many ways kind of like -- what was it in Star Trek,
10  Captain Picard, "Make it so."
11      Q.   Right.
12      A.   You know, I mean I could sit in the office
13  and say, "We're going to change this policy here that
14  we're not going to have competency evaluations done
15  unless the lawyer is present."  Okay.  Well, now I've
16  got to make it so, and I've got to make sure that 200
17  people know it's so, and then the procedures and the
18  processes and the depositions and all the stuff.
19           Just like today, you know, what it took you
20  to get all of us here takes stuff, you know, it takes
21  work.
22      Q.   So it sounds like basically, sounds like a
23  chief of staff position, kind of carrying out your
24  directives; is that a fair characterization?
25      A.   Yes, I think so.  I think that's fair.

Page 45

1      Q.   Was Mr. Weekes actually actively trying
2  cases as well when he was your assistant?
3      A.   No, he was not.
4      Q.   How long did he serve as your assistant?
5      MS. LAUFER:  I'm going to object to the form
6  of the question.  If you could rephrase that?
7      MR. FRANK:  Sure.  Sure.
8  BY MR. FRANK:
9      Q.   You just described that the position he held
10  was executive assistant prior to taking -- prior to
11  him taking -- being elected.
12           How long did he serve in the capacity of
13  your executive assistant?
14      MS. LAUFER:  I'm just going to object.  He
15  did not testify that he was an executive assistant.
16      MR. FRANK:  I thought he did.
17  BY MR. FRANK:
18      Q.   What was the name of his position prior to
19  being elected?
20      A.   Executive Chief Assistant, and that was when
21  he was like a chief of staff type of thing.  Before
22  that he was Chief Assistant in charge of juvenile and
23  during that time I believe he handled and tried cases.
24      Q.   Okay.  How long was he Executive Chief
25  Assistant?

4

Howard Finkelstein
April 09, 2021

**Page 46**

1    A.   At least a couple of years, three years.
2    Two, three years.  Three years.
3    Q.   Okay.
4    A.   Maybe four.  Between two and four.
5    Q.   With respect to the email that we were just
6    discussing that you sent out to Mr. Weekes and
7    Ms. Green, did you get any feedback from either one of
8    them responsive to that email about staying away from
9    politics in the office?
10   A.   Mr. Weekes told me and promised me that he
11   would do so.
12   Q.   Did you have any discussions with Ms. Green
13   about that?
14   A.   I do not have any recollection.
15   Q.   And as the campaign unfolded I guess after
16   this email that you had sent out and they're both in
17   the race, did you observe or did you have any
18   knowledge of any of Ms. Green's campaign events or
19   activities or her message?
20   A.   No.
21   Q.   So you didn't monitor it or watch any type
22   of coverage of the events?
23   A.   No.  I really stayed out of it.  I didn't go
24   to any events for either side.
25        I guess I remember showing up at one event,

**Page 47**

1    I didn't even speak, for Gordon, one, and I don't even
2    remember when that was.
3         But other than that, no, I didn't monitor
4    it, was not aware and hadn't heard anything.
5    Q.   I see.
6         Did anyone report to you, report back to you
7    or give you information about Ms. Green's campaign or
8    express concerns about it to you?
9    A.   No.
10   Q.   Okay.
11   A.   I don't know if anybody was really talking
12   to me.  By that point, you know, I assumed that people
13   who were supporting Ruby and then there were people
14   supporting Gordon, but nobody was really talking to me
15   about anything in the campaign.
16   Q.   At the time they were running, did you have
17   any understanding as to what their respective
18   platforms were?
19   A.   No, not specifically.
20   Q.   Were there any things that Mr. Weekes either
21   shared with you directly or you heard that he wanted
22   to do to change how you ran the office?
23   A.   General stuff, but nothing that really stood
24   out.  You know, I assume both of them were going to
25   want to change stuff just like I changed stuff.  So

**Page 48**

1    nothing, you know, it kind of like I knew it was
2    going, there was a campaign going on out there, and I
3    was just trying to keep the ship floating and not
4    hitting the rocks.
5         And as I'm preparing to leave, I don't know
6    what's coming in, you know what I mean.  It was -- for
7    me it was, I was very tuned in to making sure that our
8    clients didn't get lost during this time.
9    Q.   I see.  How would you say the COVID pandemic
10   affected the operations of the office last year?
11   A.   Oh, my God.  Oh, God.  Let's see.
12        Everything that was up is now down, and
13   everything that was down is up.  And I didn't mean to
14   be glib.
15   Q.   No, not at all.
16   A.   When it happened, okay, I -- thank God I had
17   Gordon.  I am, like I said I was becoming a dinosaur.
18   I knew how to email and I know how to text.  But all
19   of a sudden we were faced with morphing an office that
20   had been running a certain way for 50 some odd years,
21   into a remote office.  That was beyond my ability to
22   foresee.
23        And so the pandemic caused us to shut
24   down -- I want to say March 11th, March 13th, we had
25   to create systems of communication with clients where

**Page 49**

1    clients could call their lawyers but we couldn't have
2    the lawyers cell phone numbers appearing so that the
3    clients were getting it.
4         We had to figure out how we could interview
5    people remotely, how we could set up at least an
6    emergency basis of bond reduction or release hearings
7    for people that were caught in jail because we knew
8    the virus was going to spread through the jail.
9         It required us to have all of the chief
10   assistants met everyday of the pandemic starting at
11   11:00 o'clock, and it usually went up to two hours.
12   Every day just dealing with the stuff that happened
13   that morning and how we were going to deal with it,
14   all of this is taking place at the same time the
15   judges are trying to figure out how to be judges and
16   prosecutors.  So, yes, it was huge.
17   Q.   At some point in time all the Public
18   Defenders were working from home or remotely; correct?
19   A.   Correct.
20   Q.   When did that commence?
21   A.   March 11th or March 13th, one of those two
22   days.
23   Q.   And how long did that work from home
24   protocol stay in place?
25   A.   I think it's still in place.  Unless they've

Howard Finkelstein
April 09, 2021

Page 50

1  reopened recently, I don't know.
2      Q.   So basically everyone would work remotely,
3  via computer, is that how it worked out?
4      A.   Yes, sir.
5      Q.   Did you actually physically work out of the
6  office at that time or did you work from home as well?
7      A.   From home as well.  We did not want anybody
8  in the office.
9          Gordon would go in occasionally and I think
10  Michelle.  At that time, nobody knew what the virus
11  was, nobody knew how it spread.
12         There were massive efforts to, I think they
13  used to call it super clean -- I don't know what
14  means, super clean the offices.  They didn't want
15  people coming into the courthouse but at the same time
16  we had to keep the emergency functions of government
17  operating which includes your Baker Acts, your release
18  hearings, your children in endangered hearings.
19         So it was, when I tell you massive, I've
20  been around 44 years, I've never seen anything like
21  that.
22      Q.   No, I definitely can agree with that.
23         Did your office ever have any joint meetings
24  with everyone, telephone conferences or anything of
25  that nature?

Page 51

1      A.   Yes.
2      Q.   When would those occur, typically?
3      A.   We have a few.  I assume -- I'm sure Renee
4  or Gordon could tell you.  We would -- those were
5  done, if there was general information to share which
6  there always was since the virus was spreading, but we
7  were also trying to maintain a connectiveness.
8          I was very, very concerned because I had
9  very young lawyers and many of them lived alone in
10  apartments and I was very concerned with young lawyers
11  who were just learning how to be lawyers who had all
12  these clients that they were now having to learn a
13  whole different way to practice and then being
14  isolated and locked up -- and you probably can
15  remember your first year of practice in law, it's
16  nerve wracking.  And I was very, very worried.  So we
17  would periodically have a whole office-wide meeting
18  just so everybody could see each other's face.
19         Also they started a -- I don't remember,
20  they called it some kind of barbecue or something,
21  after 5:00 o'clock I want to say on Fridays, kind of
22  like a happy hour without booze type thing, but, yes,
23  there were some meetings and it was just an effort to
24  maintain connectiveness, mental health, moving
25  forward.  These were big, big challenges.

Page 52

1      Q.   Obviously we're here today related to -- you
2  referenced it a little while ago about the pod cast in
3  August of 2020.
4          When did you become aware of or start to
5  have concerns about things that Ms. Green was saying
6  in connection with her campaign?
7      A.   When the podcast was sent to me.
8      Q.   So prior to August of 2020 when you received
9  the podcast, you didn't have any concerns about things
10  that Ms. Green had said in connection with her
11  campaign?
12      A.   I hadn't heard anything, no.
13      Q.   Now, you indicated that the first
14  inclination you had or inkling rather of this
15  situation was when you -- a podcast was sent to you;
16  is that correct?
17      A.   Yes, sir.
18      Q.   And who sent you the podcast?
19      A.   I got two sent to me by two different
20  people.  The first one came in, I didn't know the
21  phone number, and all it said was, "We're on opposite
22  sides of the race but what she said is outrageous and
23  unfair and wrong", and there was a link.
24          I later learned that that phone number was
25  from Michael Ahern who is a lawyer and I guess he was

Page 53

1  running the Tom Lynch campaign.  And then after that,
2  shortly after that I got another text from Buddy
3  Nevins who runs a political blog, that says, "You need
4  to see this.  It's really wrong and outrageous."
5      Q.   Okay.  Michael Ahern, did he ever work for
6  the Public Defender's Office?
7      A.   I don't think so.
8      Q.   What was your understanding as to why he
9  would say, if you understand, why he would say you're
10  on opposite sides?  Wasn't that a different race he
11  was working on?
12      A.   I don't think so.  I'm assuming that he was
13  referring to him working on the Tom Lynch campaign.
14  Tom Lynch was the other candidate for Public Defender.
15      Q.   Okay.
16      A.   There were three candidates.
17      Q.   I see.  And then you indicated that -- did
18  you respond to Mr. Ahern?
19      A.   No.
20      Q.   When Mr. Ahern sent it to you, did you
21  immediately watch the podcast?
22      A.   No.
23      Q.   Okay.  You didn't know who it was initially?
24      A.   I didn't know who it was initially and I
25  really -- I didn't want to get involved in campaign

Howard Finkelstein
April 09, 2021

Page 54

1  stuff and I believe I sent it to Renee and said,
2  "Watch it and let me know if she has gone over the
3  line." And then I think she didn't respond. I don't
4  know if she was out or something, my wife and I sat
5  down and watched it.
6      Q.   Okay. I'm sorry, for the record, what is
7  your wife's name?
8      A.   Donna.
9      Q.   I'm sorry, say that again?
10     A.   Donna, D-O-N-N-A.
11     Q.   Did you watch the whole thing?
12     A.   No. I couldn't get through it I was so
13  upset.
14     Q.   And if you could, can you tell me about --
15  let me back up.
16          You watched it after you received it from
17  Mr. Nevins, correct?
18     A.   Yes. I think. I think. I think.
19     Q.   Did you have a prior relationship or
20  friendship with Mr. Nevins?
21     A.   Yes.
22     Q.   So he had sent you that. And what was it
23  about that you saw in the podcast that upset you?
24     A.   What she said about me, me as a person, me
25  professionally, what she said about the office and the

Page 55

1  way she said it, and a reckless disregard for the
2  truth.
3      Q.   You indicated you've seen it recently. Can
4  you give me some specific examples of what you're
5  referencing?
6      A.   I haven't seen it recently. I only watched
7  it that night. I have reviewed -- I guess you sent or
8  somehow I got a transcript of the show and I had
9  looked at it this morning.
10          I can tell -- I can take you through some of
11  the things. She made a comment that as administration
12  we don't hire people that look like her.
13          That's outrageous. I hired her and the
14  racial demographics of the office in my administration
15  skyrocketed. It was one of the major points of my
16  agenda was to make the office look like the community,
17  and we did.
18     Q.   I was going to ask you a question about that
19  before you went on.
20          As far as when she said they don't -- that
21  the office doesn't hire people who look like her, you
22  interpreted that to mean that -- your understanding
23  was that she was saying they don't hire
24  African-American people; is that accurate?
25     A.   I assume. Yes, that's how I took it.

Page 56

1      Q.   Okay. Anything else?
2      A.   Oh, yes. Yes, we're going to go through a
3  bunch of them. How about I never come to work? It's
4  outrageous.
5      Q.   Okay. When you say that's outrageous, are
6  you saying that that's false?
7      A.   Yes.
8      Q.   Okay. All right.
9      A.   Let's see. That I don't know people's
10  names. No. That's false, that's a lie.
11          Does that mean on any given day I might not
12  know a new secretary out of 200 people that's in pod
13  E? Yes, that's possible.
14     Q.   Okay. And with regard to coming into the
15  office, did you keep during your tenure as a Public
16  Defender, do you actually keep a day-to-day calendar
17  of what your appointments were?
18     A.   No. No. I mean, I would keep on my phone,
19  you know, if particular speeches I had to give or if
20  it was a particular function, but some things would be
21  in my calendar.
22          But it's not like -- if you looked at my
23  calendar you wouldn't know what I did that day. You
24  would know a couple of things I did.
25     Q.   Okay. How -- and I apologize, I'm not

Page 57

1  trying to be glib by asking this, but for purposes of
2  tracking the veracity of this issue that you're
3  contesting, how would one know without a calendar,
4  other than your testimony, is there anything else out
5  there that would allow for someone to go back and
6  figure out what you did on any given day in the last
7  two years of your office?
8      A.   I don't know. I don't know how you would do
9  this.
10     Q.   Right. And so what appointments? Who you
11  met with? Where you went? What you did?
12          Is there anything that we can look to that
13  would -- that you can demonstrate that would refute
14  this contention that you weren't at the office, to
15  demonstrate that you were at the office and were
16  working?
17     A.   I don't know how you go through with this
18  for that. I'm not aware of anybody ever trying to
19  reach me that couldn't, ever. Whether it's a client,
20  whether it's one of my lawyers, whether it's a
21  prosecutor, whether it's the media. I'm one of the
22  easiest people to reach.
23     Q.   I see.
24     A.   The inmates have my phone number, my cell
25  phone number.

Howard Finkelstein
April 09, 2021

Page 58

1      Q.   Did you work from home before the pandemic?
2   Did you work from home a lot or telecommute?
3      A.   Yes.
4      Q.   Okay.  How often would you say that you
5   would work from home in lieu of going in, physically
6   going into the office prior to the pandemic?
7      A.   It depends what years, okay.  The first four
8   years when I started I was there almost all the time
9   including Saturdays and Sundays during the time when
10  I'm trying to change the culture.
11     Q.   Sure.
12     A.   As my administrative staff became better and
13  better, there was less need for me to be as hands on.
14  There were different points where different things
15  were going on and I would employ different
16  administrative approaches.
17          What I tried to do by and large was come
18  into the office at least between three and five
19  mornings a week, and by that I mean from like nine to
20  1:30 so that I could deal with any issues that would
21  happen in court.
22          If I was needed, any issues with the public
23  that needed to speak to me or any other issues that
24  required my presence.  I then would usually use the
25  latter part of the day for my more in-depth emails, my

Page 59

1   conversations which required attention and focus.  And
2   by that I mean, when I sit in the office and I make a
3   phone call, the office door does not stop with people
4   walking in, the phone ringing, faxes going off, and
5   when you're talking to someone about their child who's
6   facing going to prison, it's just not okay to say,
7   "Excuse me, I've got to do this; excuse me, I've got
8   to do this."
9           So over the years I developed a way in which
10  I felt I could best handle what I needed to handle at
11  the office and at the same time give the attention to
12  the people that needed it when they needed it.  So, at
13  least three mornings a week, usually five mornings a
14  week from probably nine to one, sometimes two, then I
15  would usually stop on my way home, get a piece of
16  pizza off the street, come home, begin the emails,
17  begin my phone calls.  That would usually go to six.
18  Then the media frenzy starts before their deadline.
19  Then the phone calls from the lawyers who are seeking
20  out about what's going to happen the following morning
21  and then I go to bed.
22     Q.   I see.
23          So for clarification purposes, and I
24  appreciate all that, how often would you work from
25  home, actually work from home?  How many days prior to

Page 60

1   the COVID, the last two years?
2      A.   I worked from home seven days a week.  It's
3   hard to explain.  Over 16 years my phone never
4   stopped.  Never stopped.
5      Q.   Right.
6      A.   So, I work nights, I work Saturdays, I work
7   Sundays.  I don't have a 9:00 to 5:00 job.  And if
8   there is a lull, it is much appreciated.
9           But the nature of my job is not to be in any
10  particular place, but to be accessible to everybody
11  who needs me.
12     Q.   I see.
13          As far as physically going into the office,
14  you had a parking spot in a garage; correct?
15     A.   Yes.
16     Q.   Is there some way to track when you actually
17  went to the office that way?
18     A.   I have no idea.
19     Q.   You don't know?
20     A.   I don't know.
21     Q.   Go ahead, if you would.  We have gone
22  through the issue about being away from the office and
23  not knowing people.  What else did you take issue
24  with?
25     A.   She said, "So if you're arrested for a crime

Page 61

1   you could be facing life in prison, you have an
2   attorney who's never tried a felony case before."
3   That's not true.
4           Nobody goes from county court or juvenile
5   and handles major crimes where people are looking at
6   life in prison.  Doesn't happen.
7      Q.   Okay.
8      A.   She got into this discussion with the
9   moderator about me and the O.J. case and how I said
10  things and it was this weird agreement, and it
11  appeared that they were talking about me being racist.
12  It's very weird because neither one of them know what
13  comments they're referring to.  I don't even know if
14  Ruby was born yet when I was covering O.J.  I just
15  found that was just -- it was unprofessional.  It left
16  an impression that shouldn't have been left.  And
17  she's a trial lawyer.  She knows exactly how to leave
18  an impression or not.  Let's see.
19          Then she talked about how I told people that
20  they could not march in the Black Lives Matter.
21  Absolutely false.  Absolutely false.
22          What Gordon and I did do was we had closed
23  the office either March 11th or March 13th.  We closed
24  the office telling the public it is not safe for our
25  staff to come to work.  I could not in good faith then

Howard Finkelstein
April 09, 2021

Page 62

1  tell my office that we were going out as an office.
2  It wasn't safe to go to work, but we could go and
3  gather in a large group on the street. I could not do
4  that. But every lawyer was allowed to do whatever
5  they wanted.
6          There was no rules to prevent them from
7  marching, there were no sanctions, there was no
8  nothing. I started my career demonstrating on the
9  streets. It's just absurd that I would punish people
10  for doing it.
11      Q.  Okay. Anything else?
12      A.  Oh, yes. Hold on.
13          Then she goes after me for not doing
14  anything, just sending letters. Well, I want you to
15  know that was the biggest attack on me is these
16  missives that I'd send to the state attorney and to
17  the sheriff, all about the fact that there's a double
18  standard of justice, one for black, one for white;
19  that the arrest protocols and the choices of what
20  charges to prosecute and how large the sentence is
21  differs based upon whether you're black or you're
22  white. And then she then says, "No, I need to go bust
23  down some doors." That's not how lawyers talk.
24      Q.  Okay. When you talk about letters, are
25  these actual correspondence she is referring to about

Page 63

1  you sending things, taking issue? Is this an ongoing
2  stream of letters or correspondence or is this a
3  specific event where you wrote some kind of letters of
4  this nature?
5      A.  I'm not sure what she's referring to. I can
6  tell you I have written many letters to many people
7  from the chiefs of police, individually, collectively,
8  to the state attorney, legislative delegation, Broward
9  County Commission, all on issues affecting poor people
10  and with the focus on poor people of color and the
11  disparities in the system.
12      Q.  Okay. Go on.
13      A.  Then she attacks me after I created the
14  Mental Health Court for them trying to stop it and she
15  goes into this whole talk about, hey, well, you know,
16  they need it. And then she starts referencing me as a
17  drug addict with cocaine on my nose. Yes, I was
18  addicted to cocaine in 1987. And I have been sober
19  from cocaine, any of those things, for however many
20  years that is. But then she talks about how wrong it
21  is that I'm trying to close down the Felony Mental
22  Health Court. She doesn't know what she's talking
23  about. She doesn't know about
24  Joshua Meyers' death. She doesn't know why we were
25  trying to change it, and as a direct result of those

Page 64

1  efforts, the mental health court got a new mental
2  health court judge who takes care of mentally ill
3  people rather than hurting them.
4          So she was reckless in what she was doing
5  because she didn't know what she was talking about.
6      Q.  Okay.
7      A.  Then she --
8      Q.  Do you know if Ms. Green had any interaction
9  or personal experience dealing with the mental health
10  court?
11      A.  I'm sure she's had some dealings with it.
12      Q.  Okay.
13      A.  I can't point to anything, any particular
14  case but I'm sure she would have.
15      Q.  Okay. What else?
16      A.  Okay. I don't even handle jail calls. I
17  told you before, people, inmates have my cell phone
18  number. I'm probably the only elected Public Defender
19  that takes direct calls from the jail.
20          I can't say that for sure. I don't know
21  whether all nineteen others do or don't. It's just
22  not true.
23          And then she goes on, "So it's just your day
24  to go home and play golf". That's wrong. That's not
25  true.

Page 65

1      Q.  Okay.
2      A.  That's probably the majority of them that I
3  can recall from the podcast.
4      Q.  Okay. As far as watching this, after you
5  watched the podcast, what, if anything, did you do?
6      A.  I believe I had already sent it, I think, to
7  Renee, to Gordon and maybe to Diane, for their
8  thoughts on it.
9      Q.  Okay.
10      A.  I had already decided what I was going to
11  do.
12      Q.  Okay. And what had you decided?
13      A.  She was going to be terminated because the
14  way and what she said about me as a person was
15  outrageous, was wrong, it was untruthful, and I was
16  really hurt. I was really hurt personally.
17          My wife watched it. We didn't know whether
18  to cry or not at the state of politics that just so
19  someone could get elected they would feel free to
20  trash another human being this way.
21          I was hurt. And I was hurt because I did a
22  lot for Ruby. That doesn't matter. I've never hurt
23  her. And why she would do that was really hurtful.
24  I'm not running. I'm not even involved.
25      Q.  Okay. You made the determination already

Howard Finkelstein
April 09, 2021

Page 66

1 and then you sent it to Ms. Dadowski possibly and
2 Mr. Weekes.  What were you anticipating or hoping that
3 they would do?
4      A.   Nothing.  I had no anticipation or no hope.
5 I wanted them to see it because I now knew that I had
6 a problem I had to deal with.
7           It wasn't even, you know, just rumors.  This
8 was a major political blogster who sought a political
9 consultant.  It was seen by people in my office.  This
10 was going to affect my ability to recruit, it was
11 going to affect my ability to talk to my own lawyers,
12 it was going to affect my ability in talking whether
13 it was to legislatures or people in the community.  It
14 held me up to disrepute.  It held the office up as one
15 that shouldn't be believed, that isn't committed, that
16 doesn't care.  It affected my ability and our ability
17 to do our job.
18      Q.   Okay.  When you say that you're referring to
19 the blogger, you're referring to Mr. Nevins?
20      A.   Yes, sir.
21      Q.   And you indicated that you thought some
22 other people had heard it as well.
23           Who to your knowledge other than people you
24 sent it to, who heard it and communicated to you that
25 they had heard it?

Page 67

1      A.   Rob Jacobowitz.
2      Q.   Who is that?
3      A.   He was a long time public defender.  He
4 called Frank de la Torre who was a chief assistant
5 that had retired and said, "You are not going to
6 believe the insubordination and the awful things that
7 Ruby said."
8      Q.   So this gentleman called a former public
9 defender.  How did you find out that these two other
10 people had that communication?
11      A.   Because the person he called told me.
12      Q.   And who was that again, the person he
13 called?
14      A.   Frank de la Torre.
15      Q.   And he was the one who was the former Public
16 Defender?
17      A.   No, he was a former Chief Assistant Public
18 Defender.
19      Q.   Okay.  So Mr. de la Torre called you or
20 emailed you or something and said this other gentleman
21 called you?
22      A.   Yes.
23      Q.   Called him?
24      A.   Yes.
25      Q.   Okay.  Apart from those two gentlemen, did

Page 68

1 anyone else communicate to you that they had seen the
2 podcast?
3      A.   A couple other people, and I can't recall
4 who they were now.
5           If I think of it I'll let Alicia know and
6 she can let you know.
7      Q.   Okay.
8      A.   I just can't.  That's not coming to me.
9      Q.   Other than Mr. Weekes and Ms. Dadowski, was
10 there anyone else in the office, in your office who
11 reached out to you and said that they had seen the
12 podcast?
13      A.   Inside the office.  I believe so but I
14 can't -- I can't say with any clarity.
15      Q.   Okay.  So if I understand correctly, you've
16 testified that Gordon Weekes and Ms. Dadowski, you
17 sent it to them, and they told the gentleman, Frank de
18 la Torre and had spoken with -- he was the former
19 chief assistant, he spoke to the other gentleman, they
20 had seen it or de la Torre received a call about it.
21 And anyone else?
22      A.   Yes.  I do -- there were other people and I
23 just can't recall their names.
24           Oh, and also Diane Cuddihy I sent it to.
25      Q.   Okay.

Page 69

1      A.   And I believe Katherine Keuthan as well.
2      Q.   Who is Katherine Keuthan?
3      A.   She was my executive chief assistant along
4 with Diane Cuddihy before they both retired.
5      Q.   Okay.  Apart from the people in your office
6 that you actually sent it to, did anyone independently
7 reach out to you and say, "Hey, I saw this and I'm
8 concerned about," it or reach out -- let me back up --
9 reach out to you at all and indicate that they had
10 seen it?
11      A.   I believe Owen Mackami.
12      Q.   Who is that?
13      A.   There's a few, and I can't recall who they
14 were.
15           You know, Public Defender's Office is not,
16 you know, like high school.  Once somebody sees a
17 video, it just goes through, you know, "Oh did you see
18 this?" and it gets passed.  But I don't have any
19 specific memories other than the general ones.  But
20 some people had seen it.
21      Q.   Okay.  And the reason why I'm asking
22 Mr. Finkelstein is that one of -- and I'll refer
23 you -- let me back up and refer you.
24           One of the documents that I've given to you
25 is the Answer and Affirmative Defenses that you've

Howard Finkelstein
April 09, 2021

Page 70

1  raised on your behalf in the case.
2  Are you familiar with that document?  It's an eight
3  page document.
4       A.   Yes.
5       Q.   Could you look at that just briefly and flip
6  to page six?
7       A.   Hold on.  Okay.
8       Q.   And it says for the fourth affirmative
9  defense, it says, "Plaintiff's claim for first amended
10 retaliation is barred in that plaintiff's protective
11 speech substantially interfered with the operation of
12 the office of the Public Defender for Broward County
13 and completely undermined the effective working
14 relationship with coworkers, i.e. other assistant
15 public defenders or her superiors warranting and
16 justifying her termination".
17      Do you agree with that affirmative defense?
18      A.   Yes.
19      Q.   Before I just read it to you and after you
20 looked at it, had you ever seen that affirmative
21 defense before?
22      A.   Yes.
23      Q.   Okay.  If you would, it specifically says
24 that, "Her statement undermined the effective working
25 relationship with coworkers including assistant public

Page 71

1  defenders and superiors warranting, justifying her
2  termination".
3       Whose relationships in the office were
4  undermined?
5       A.   Many people.
6       Q.   Okay.
7       A.   This created a split in the office.  It left
8  a bad taste in the mouths of people who were not
9  African-American as well.  It was almost like unless
10 you're African-American, you can't do this job.  You
11 aren't here for the right reasons.
12      Our office is really diverse racially,
13 ethnically, religiously, politically.  This had an
14 effect.  It had an effect on how people viewed me, how
15 they viewed my executive chief assistant, Gordon.  How
16 they viewed what I said and why I said it.  And
17 whether or not they were committed, it affected a lot
18 of different things.
19      The comment about white privilege was
20 hurtful.  It was shocking.  This is a Public
21 Defender's Office that we have committed -- it's not
22 just that we're committed to a democratic or a liberal
23 agenda.  The people that I have served with have
24 dedicated our entire life to fighting for racial
25 equality in the criminal justice system.

Page 72

1       Q.   I see.  And if you would, could you identify
2  the specific assistant public defenders whose
3  relationships were undermined?
4       A.   Oh, I can't.  There is no way.  It was a lot
5  of conversation.
6       If you're asking me did anybody walk up to
7  me and say, "I will never talk to you again Howard
8  because of what I heard Ruby say," no.  But you could
9  feel an energy change.
10      You could see that lawyers were avoiding
11 administration not because they wanted to avoid us,
12 but they wanted to avoid getting pulled into this
13 political fight that was now going to possibly spread
14 within the office.  The exact thing that I did not
15 want to happen, which is why I sent the email to
16 Gordon and to Renee.
17      It wasn't that you can't attack what we're
18 doing.  Do we need more money?  Yes.  Do we need more
19 training?  Yes.  Do we need more lawyers?  Yes.  All
20 of those things.
21      This was a personal attack that went to my
22 very character, my morality and everything I dedicated
23 my life for.  And it was fortuitous because I wasn't
24 running.
25      Q.   Okay.  So if I understand correctly, you

Page 73

1  can't cite a specific instance of an assistant public
2  defender coming to you and saying that Ms. Green's
3  comments undermines relationships in the office?
4       A.   No, not the way you phrased the question.
5  Nobody walked up to me and said, "Because of what Ruby
6  Green did, I won't talk to you or I won't do this."
7  Because you know that's not how human beings interact.
8       All of a sudden there was less receptivity,
9  there was less good vibrations, there was less, "Oh,
10 I'll do it for the team."
11      It was a shift that was occurring.  This is
12 why I wanted to keep it out of the office.  Because
13 whether Gordon, Ruby, or Tom Lynch got elected was way
14 beyond my control of any kind.  But the 34,000 people
15 that we were representing at the present time should
16 not have to carry Ruby or Gordon's water.
17      Q.   Okay.  As far as the sense that there was a
18 shift or there was a divide, is there anyone that you
19 can identify who you believe could testify to that
20 phenomenon that you're speaking to?
21      A.   No.  Just remember, I'm the guy, I'm the
22 boss.  They're not going to come and tell me this.
23      Q.   So, this idea that relationships were
24 undermined in the office was based on your perception;
25 is that fair?

Howard Finkelstein
April 09, 2021

Page 74

1    A.   It's based upon my perception and how I
2  observed others acting.
3    Q.   Okay.  And if you would, could you tell me
4  specifically, give me specific instances in which you
5  saw people acting in a certain way that suggested to
6  you that Ms. Green's comments had undermined
7  relationships or the functioning of the office.  What
8  did you observe?
9    A.   People voiding administration, avoiding
10  maybe me.  I can't speak for Gordon.  Probably.  But
11  it was based upon my observance, my perception, the
12  same thing I've used in every other decision that I've
13  made as a Public Defender.
14        You know, I had my eyes, I had my ears, I
15  had my intuitiveness, and that's how I made my
16  decisions.
17    Q.   As far as the people that you observed or
18  perceived to avoid you, can you identify who those
19  people are?
20    A.   No, no.  It wasn't a specific thing where
21  person A looked at me and said, "Oh, you're
22  disgusting."  No.  Lawyers don't act that way.
23    Q.   Okay.  So I if I understand and I'm not
24  trying to be persnickety about this, I'm just trying
25  to make sure I understand whether or not you can cite

Page 75

1  any specific instance or episode or person that would
2  substantiate this affirmative defense?
3    A.   I can't recall anybody specifically at this
4  moment.  But it was a general perception, an
5  observation.
6        And then there's the other part.  I'm her
7  boss.  I'm her boss.
8    Q.   Okay.  How much of the decision to terminate
9  her would you attribute to you being personally
10  offended by the comments and taking umbrage with them
11  as opposed to undermining relationships in the office?
12    A.   I can't break that into percentages.  They
13  are part and parcel of the same thing.  Who I am for
14  lack of a better word, my brand, if you will, is how
15  I'm able to get things done.  I'm able to shift things
16  in the criminal justice system because of either the
17  respect that I've earned, the experience I have, how I
18  approach things and how they perceive whether people
19  in the community support me.  So, this hurt me,
20  insulted me, defamed me, but it also affected my
21  ability to do what I do.
22    Q.   Can you describe a specific instance in
23  which you experienced some kind of obstruction of your
24  ability to do your job based on this podcast?
25    A.   You can't prove a negative.  Any trial

Page 76

1  lawyer will tell you that.  I can't prove the
2  negative.  I can only tell you what I felt, what I
3  discerned and how I observed the coming, going and
4  movements.  Remember this is based for me on 44 years
5  of being in that office.
6    Q.   And at the time this podcast occurred in
7  August of 2020, as it is now, the office was
8  actually -- everyone was still telecommuting; correct?
9    A.   Correct.  I would say, you said -- yes, yes.
10    Q.   How much actual interaction did you, other
11  than possibly Mr. Weekes and possibly Ms. Dadowski,
12  who you sent the podcast to, how much interaction did
13  you actually have with other employees between
14  August and the end of your term?
15    A.   Significant, you know, phone calls.  Most of
16  my job was -- retirement has been a Godsend in that
17  for the first time in 16 years I don't have that phone
18  glued to my ears.
19    Q.   Right.  Did you ever actually physically --
20  would it be fair to say that most of your interactions
21  were either on, were via telephone calls or emails?
22    A.   Telephone, emails, zoom, text, yes.  Yes, we
23  weren't meeting in the office, if that's what you're
24  asking me.
25    Q.   Yes.

Page 77

1    A.   No, there was --
2    Q.   Face to face with the staff?
3    A.   No, no.  Only on zoom after March 11th.
4    Q.   It looks like Ms. Dadowski reviewed the
5  podcast at your request and she said that she was
6  taking notes on it.  Do you recall that?
7    A.   Kind of, vaguely.  I remember her --
8  something like that, yes.
9    Q.   Did she ever share those notes with you?
10    A.   No.
11    Q.   Do you know what she did with those notes?
12    A.   I have no idea.  I haven't seen Renee in,
13  oh, God, a year.  I don't know how long were you --
14  where are we at now?  How many months -- almost a
15  year, I don't think I've seen her.
16    Q.   Okay.
17    A.   Other than on zoom.
18    Q.   Right.  Right.  Okay.  As far as -- so I
19  want to make sure that I cover all this.  So we talked
20  about all these people.
21        Has anyone else reached out to you other
22  than the people that we've discussed, saying,
23  indicating that they have seen the podcast?
24    A.   I know a couple, I think a couple of my
25  friends, my wife's friends may have seen it.  It was

Howard Finkelstein
April 09, 2021

Page 78

1  posted somewhere.  I'm not a social media person.  I
2  don't even have a Facebook page so I can't tell you
3  how many people have seen it.
4            Reporters have seen it.  I've been called by
5  reporters.
6       Q.  In terms of your decision to, decision to
7  terminate Ms. Green, it looks like you or you
8  testified that you coordinated or discussed a little
9  bit with Mr. Weekes and Ms. Dadowski.  Did they
10  have -- agree with you or have a similar opinion?
11            MS. LAUFER:  I'm just going to object to
12  form.  Go ahead and answer.
13  BY MR. FRANK:
14       Q.  If you know.
15       A.  Yes, they agreed.
16       Q.  And it looks like you wanted to terminate
17  her immediately?
18       A.  Yes, I did.
19       Q.  My understanding is, and correct me if I'm
20  wrong, but you waited on that for a little bit?
21       A.  Yes, I did.
22       Q.  And can you explain why you did that?
23       A.  Yes, I can.  For better or for worse, I
24  struggled with this.  I wanted to fire her right away.
25  I was -- for all the reasons I told you, I was hurt, I

Page 79

1  was insulted, I was outraged, her dishonesty, her
2  reckless disregard for the truth.
3            I was so concerned that it was going to have
4  an impact on the office.  That said, two things
5  weighed heavy on me.  I had spoken to Gordon and
6  Gordon didn't want, if possible, for me to do anything
7  until the election was over, which played into the
8  biggest thing that played on my mind was we had just
9  come off of the presidential election, and there was
10  so much anger.
11            And remember, I'm a democrat, and almost
12  everybody in Broward County in every elective office
13  is a democrat.  And James Comey was front and center
14  in that whatever he released right before the actual
15  voting in that election, many people believed to this
16  day that's what swung the election.  I didn't want to
17  do that.
18            While I may not have thought Ruby was ready,
19  and maybe even lacking in character to hold the
20  office, it wasn't for me to decide, it was for the
21  people, and I didn't want to take an action that could
22  in any way cause the election to go one way or the
23  other.  I just didn't think it was right.
24            I'm kind of old fashioned.  I've been
25  honored to serve as the Public Defender and whoever

Page 80

1  was going to win that office, I was going to support
2  in any way I could in that mission, and it wasn't my
3  choice, so I don't know if I was right or wrong to do
4  that, but that's why I waited.
5       Q.  I see.  And Mr. Weekes had suggested to you
6  or requested that you wait?
7       A.  He did.
8       Q.  Okay.  And right after the election I guess
9  you went ahead and did the termination via -- it looks
10  like you sent a text message, or email or a text
11  message.  How did you go about doing it?
12       A.  I think I sent both.  I think it was a text
13  and email.  I think it was both, yes.
14       Q.  Okay.  And it looks like you sent it on
15  August 19, 2020, you sent it in the morning.
16            Did you consult anyone else other than
17  Ms. Dadowski and Mr. Weekes about the decision to
18  terminate?
19       A.  Diane Cuddihy, and I believe possibly
20  Katherine Keuthan, I'm not sure, and my wife.
21       Q.  And your wife, okay.
22       A.  Yes.
23       Q.  If I may ask what was your wife's take?
24       A.  She was hurt, she was upset, we were
25  shocked.  We were shocked.  Nobody -- you can say a

Page 81

1  lot of things about me, not everybody likes me,
2  whatever, but the things that she said was just so
3  mean and untrue and gratuitous.  I wasn't even
4  involved in this.
5       Q.  Okay.  Any of the issues that Ms. Green
6  raised in the podcast at issue, had anyone else ever
7  raised any of those issues with you before?
8            MS. LAUFER:  Object to form.  You need to
9  clarify issues.
10  BY MR. FRANK:
11       Q.  Well, the issues that you've indicated that
12  you -- the statements Ms. Green made, that you are --
13  that gave rise to your concerns, had anyone else ever
14  made similar statements to you or raised similar
15  issues?
16       A.  Well, actually, yes.  Me.  In most of it.
17  Not talking about her gratuitous comments about me,
18  but on the issues of training, of funding, of hiring.
19  Are you kidding me?  Fifty years we've been screaming
20  this.  Fifty years.  Public Defender is not a word
21  that Ruby just heard or learned.
22            I used to have a poster 40 years ago, 45
23  years ago in my office that said, "I don't want a
24  lawyer.  I want a public defender."
25            For decades everybody has known we are

Howard Finkelstein
April 09, 2021

1   chronically underfunded and yet Broward is one of the
2   best funded Public Defender Offices in the State of
3   Florida.  And that's one of the reasons why her lack
4   of understanding about how the budget worked was just
5   stunning.
6           But when it comes to the fact that most of
7   us would not allow our child to be represented by a
8   young public defender because they're overworked and
9   underpaid, that's the truth but it's okay for the
10  children of poor people.
11          My lawyers on the front end graduated law
12  school and within a week of passing the bar are handed
13  150 files.  It's not right, it's not fair.  But
14  unfortunately the Supreme Court has said it's somehow
15  constitutional.
16          So no, Ruby is not sounding the alarm that
17  we are underfunded.  This has been five decades of
18  underfunding.
19          It's not a new issue that we have lawyers
20  that are inexperienced.  We have some of the most
21  inexperienced lawyers that walk into a courtroom
22  anywhere in the country except for our public defender
23  offices.  It's the only place where somebody who has
24  never handled a case or a trial gets 150 cases.
25          So no, these are not new issues and they're

1   not issues that Ruby can change by knocking a door
2   down or going to Tallahassee and lobbying because
3   that's not how the budgetary process works.
4       Q.   Okay.  Do you recall giving an interview
5   with Rafael Olmeda of the South Florida Sun Sentinel
6   about Ms. Green's termination?
7       A.   Yes.
8       Q.   How did that interview come about?
9       A.   He called me first thing in the morning and
10  he said, what was -- "Oh, look I've got to write this
11  story.  I can tell why you fired her," and I don't
12  remember what I was quoting, but he focused on the
13  comment about black face in a high place.
14      Q.   Right.
15      A.   That was his focus.  I was pretty clear that
16  she was unprofessional, she was not truthful, and
17  that's why I terminated her.
18          You know, if that was the ultimate reason,
19  if you look at that email that I sent, what I
20  expected, either one of them could have resigned and
21  gone and if she had resigned, she could say anything
22  she wants.  But if I'm her boss, she can't go on the
23  radio when I'm not running against her and call me a
24  lazy racist that doesn't care about anything except
25  playing golf, and none of those things are true.

1       Q.   Okay.  Have you had any complaints either
2   internally or formally made by any of your staff
3   regarding wrongful termination or anything of that
4   nature while you were at the Broward County?
5       A.   Yes.  Yes.
6       Q.   Who made them?
7       A.   Okay.  The first one was a guy we hired
8   recovering from a drug issue, we were using him in
9   drug court.
10          I fired him because he followed one of our
11  clients home, broke her door down and tried to rape
12  her.  He sued me.  And we lost and had to pay
13  unemployment compensation for that one.  That was one.
14      Q.   What was the name of that gentleman?
15      A.   Oh, God.  I think his first name began with
16  a B.
17      Q.   When you say he sued, he brought a claim
18  through DEO for unemployment?
19      A.   Right.
20      Q.   And you tried, I guess what you're saying is
21  that you denied the benefits or tried to?
22      A.   Yes, because I've got a thing about my staff
23  trying to rape our clients.
24      Q.   I'm certainly not arguing with you about the
25  merits one way or another, but I wanted to make the

1   distinction between a lawsuit and an unemployment
2   claim.
3       A.   Okay.  I'm trying to think if there was any
4   other wrongful termination lawsuit.  Nothing is coming
5   to mind.
6           There might be, you know, 16 years, there
7   might be but nothing is coming to mind.
8       Q.   Did you ever have any type of ideological
9   conflicts with any of your staff that caused them to
10  resign or you asking them to leave?
11      A.   No ideological conflicts.  I've asked people
12  to leave who did wrong things, but nothing -- there's
13  no ideological -- we don't have an ideology in the
14  Public Defender's Office.  In fact, I had fired two
15  people -- maybe this is what you're referring to --
16  who went on Facebook and basically said that
17  Palestinian mothers should be raped, killed and
18  burned.  I can't remember now what their language was,
19  and I had to terminate them.  I do not believe they
20  ever filed a lawsuit though.  I know they threatened
21  to but I don't recall if they did.
22      Q.   Did you ever have a dispute with a Public
23  Defender named Naheed Norrie?  Does that ring a bell?
24      A.   Naheed -- yes, it rings a bell but not that
25  I could -- no, I don't even know that I've ever had

Howard Finkelstein
April 09, 2021

Page 86

1 any real conversations with him.
2      Q.   You don't recall raising any of the issues
3 that Ms. Green raised in the podcast?
4      A.   Well, when you say raising issues, the
5 issues of high caseloads, low pay, insufficient
6 training, these issues are ever present.  So I
7 wouldn't be surprised if Naheed, if we had a
8 conversation -- I don't have any recollection -- but
9 these are just common fodder of regular public
10 defender conversations that go anywhere from we need
11 to create a farm system for interns so that we have a
12 constant hiring pool, but on the other hand how do we
13 promise jobs when we don't know what the budget is
14 going to be, and you know, so this is constantly going
15 on.
16      Training.  Is training good enough?  Well,
17 training is never good enough so it's always being
18 added, it's being changed.  So, these issues are, like
19 I said, everyday issues and have been since Gideon
20 versus Wainwright.
21      Q.   You've indicated that, I think you said
22 earlier that you did a lot for Ms. Green.  When you
23 say that, what do you mean by that as far as what you
24 did for her?
25      A.   I moved her faster than I should have.  I

Page 87

1 wanted her to succeed wildly because of where she came
2 from.
3      I knew that she had passion, I thought she
4 could make a difference.  I was wrong to move her so
5 quickly and I hope I didn't hurt her by doing that,
6 but I moved her too quickly and her judgment or lack
7 of judgment reared its head and I hope I'm not to
8 blame for moving her too fast, too quickly, that led
9 to some bad decisions.  That I don't know.
10      But I moved her very, very quickly.  And
11 then even after she made some bad decisions and I had
12 to remove her as chief of accounting, she had a raise
13 every time we offered raises.  She was never punished,
14 you know, she was never -- no benefits were taken
15 away.  The opposite, because she did her job.  I don't
16 have any -- I don't have one complaint about Ruby
17 doing her job.
18      Q.   What were some of the purported bad
19 decisions she made that resulted in her being removed
20 from chief?
21      A.   Well, that was one decision.  She and, at
22 that time two other lawyers, Jennifer Edgley, and I
23 can't remember who the third one was, decided to go to
24 a BACDL meeting.  That's Broward Association of
25 Criminal Defense Lawyers.  It is a group that has been

Page 88

1 a problem with taking conflicting positions to our
2 office during my four terms, during my predecessor's
3 time, in fact, to the point where we had one chief
4 assistant who was once on the board there had to
5 resign because the conflicts just abounded constantly.
6      Ruby apparently goes to this meeting, and
7 sure enough, this group brings in Michael Brannon and
8 George Riveras, the same people from the Brannon
9 lawsuit because they now want to gather evidence to
10 file another lawsuit against me and my people are
11 sitting there, including Ruby.
12      Well, Ruby comes and tells me, which was a
13 good thing, but she didn't tell me that she was an
14 officer in the organization.  And I told her that she
15 had to make a choice.  You can be an assistant public
16 defender and an officer in that group, but you cannot
17 be a chief assistant and be an officer in that group
18 because they take conflicting positions to us and I
19 can't have my executive arms, if you will, on a board
20 that takes a contrary position to the Public
21 Defender's Office.
22      And so she was given a choice and she could
23 not make the choice.  And there's a whole bunch of
24 texts that we exchanged back and forth where I said
25 BACDL is a coffee clutch for networking that will

Page 89

1 never change anybody's life.
2      Being the chief assistant you can change the
3 art of thousands of peoples lives for the better.
4 There should be no choice here.  And she said, "I
5 can't decide which one and I had to chose".
6      Well, if you can't decide what's more
7 important, networking or saving the lives of our
8 clients, then you can't be my chief assistant and
9 that's when she was removed.
10      Q.   Okay.  So if I understand correctly, it
11 wasn't something that she did in connection with her
12 job duties, it was this issue of this organization?
13      A.   Yes.  She didn't ask for permission --
14      Q.   Go ahead.  I'm sorry.
15      A.   She didn't ask for permission to be an
16 officer of the organization.  She became an officer of
17 it.  It wasn't about membership in the group.  She was
18 free to be a member of the group.
19      You can't be an officer of that group and a
20 chief assistant.  They do not take the same positions
21 and the conflicts were significant and that was her
22 choice.
23      Q.   As far as the not being able to maintain a
24 leadership position in that group, at the same time
25 while being an executive at the Public Defender's

Howard Finkelstein
April 09, 2021

Page 90

1  Office, is that a formal rule somewhere?
2      A.   It might be.  I'm not -- but I don't know.
3  You know who would know, I know you're deposing Renee.
4  She would know if it's in the formal rules or not.
5      Q.   Okay.
6      A.   But we had made that rule.
7           Renee was the one that was an officer in
8  that group and resigned because of the conflicts.
9      Q.   How would you have communicated that
10  purported rule to the staff?
11     A.   I don't recall.  I just -- I don't recall.
12  And it wasn't Ruby, I wasn't angry at Ruby because she
13  didn't tell me.  I was angry that she couldn't decide
14  which was more important, real people or networking.
15          As public defenders that is something, that
16  is the bar that I set in the office when I tried to
17  transform the culture from a political machine to a
18  client-centric one.
19          BACDL does nothing for our clients.  It only
20  feathers the nest of criminal defense lawyers and
21  judges in the private sector.  Period.
22     Q.   What positions do they take that are
23  contrary, that were contrary to the office?
24     A.   All right.  I have an example.  When Article
25  V came out, one of the big deals that the state

Page 91

1  recoiled from -- now remember, Article V is passed by
2  the people.  The counties don't want to pay for
3  criminal justice.  It kicks into the state.  The state
4  doesn't pass a law and says okay, anybody arrested for
5  a municipal ordinance cannot be represented by a state
6  agency that gets state funds.
7           So, all of a sudden all of the homeless that
8  are being arrested under municipal ordinances cannot
9  be represented by my office unless I sign a contract
10  with the City of Fort Lauderdale where they agree to
11  pay for those specific services.
12          We determined that if we did not sign that
13  contract, it would force Fort Lauderdale to have to
14  hire a private public defender.  That would cost the
15  city too much money and that rather than arresting the
16  homeless, they would just divert them.
17          And BACDL, in order to thwart what we were
18  doing came in and offered to freely represent those
19  people.  And by that I mean plead them guilty and just
20  move the case.
21          Finally when they realized what was
22  happening, they stopped showing up because nobody
23  wanted to work for free.  Since that time the arrest
24  of the homeless as a direct result of what we did was
25  reduced 70 percent.

Page 92

1      Q.   Okay.
2      A.   My point being is, I don't fault them for
3  what they did.  BACDL does what BACDL does.  But they
4  are not the Public Defender's Office and the Public
5  Defender's Office, we and only we, have the
6  responsibility of poor people who don't get any
7  benefit from the BACDL.  And so that was why it wasn't
8  that she became an officer, it was that when we found
9  out and said, "Look, you can't do it."  And here's
10  another example of the conflict.  You just sat there
11  while a lawyer and a psychologist came in to try to
12  get the organization to gather facts and data to sue
13  me and the office again.  That's a conflict.
14     Q.   Okay.  You indicated that you wanted
15  Ms. Green to succeed in light of the -- particularly
16  in light of where she came from.  What's your
17  understanding of her background?
18     A.   I only know what she said.  She came from a
19  very, very humble, poor background.  She has talked
20  about being sold for drugs, bad, you know, really bad
21  things that nobody should ever have to suffer.  Nobody
22  should ever have to go through what she went through
23  and I don't know if it's, I'm just an old hippie from
24  the '60s, I'm at the center core of who I am.  When
25  you see people that have been hurt, if you have the

Page 93

1  ability to open a door for them, that's why God put
2  you there and that's what I did.  I opened the door
3  for her.  And I wanted to make it even bigger in a
4  bigger platform, always.  And to tell you the truth,
5  up until I heard that podcast I still would have.  I
6  had no idea she had such hatred and contempt for me.
7      Q.   What he would plan to do one way or another
8  as it related to if he won the election -- assuming
9  that Ms. Green hadn't said what she said in the
10  podcast, do you know if Mr. Weekes was planning to
11  terminate Ms. Green?
12     A.   I only know because I know the editor of the
13  Sun Sentinel and she told me that they asked Gordon
14  specifically if he won what his plans were for Ruby
15  and he told them that he planned to terminate her.
16     Q.   So he never had that discussion with you,
17  you heard it through the Sun Sentinel?
18     A.   Yes.
19     Q.   Okay.  Was there any particular reason why
20  you didn't -- given the fact that the election had
21  just happened and Mr. Weekes was taking over, that you
22  just didn't defer the decision with regard to
23  Ms. Green to Mr. Weekes?
24     A.   I did weigh that.  I did not believe that I
25  could run the office and get for our clients what we

Howard Finkelstein
April 09, 2021

Page 94

1  needed during the following four months if Ruby
2  returned to the office, to the emails, to the zoom
3  meetings, in light of the fact that this podcast was
4  now out there by whoever saw it and whatever number of
5  people, to have somebody constantly telling my
6  employees, staff and/or clients that I am a bad
7  person, that I don't care about them, that I'm
8  racially deaf, dumb and blind, all of these things
9  would have prevented my ability to lead the office,
10 and to create the environment necessary for my staff
11 to function and my lawyers to perform for our clients.
12 Other than that, I had no plans.
13       Let me be straight with you.  I was retiring
14 after 44 years.  The last year I wanted to make sure
15 that I protected the office from politics so it didn't
16 get destroyed and then whoever one was going to be the
17 next Public Defender, and I wasn't -- it wasn't going
18 to be something I was going to intervene in.
19       After that podcast there was no way I could
20 have her be on my staff working for me because of the
21 contempt, the hatred, and basically calling me an old
22 racist that doesn't care.  How could I have her work
23 through me, telling my clients that I have trust and
24 faith in her, or me going into the community, it was
25 just untenable.  It would become like a disease in the

Page 95

1  office, and so I would have to spend the next four
2  months finding out what Ruby said to counter it.
3  That's not what we do.  That's not what we do.
4  Nothing hurt me more than having to do this.  I didn't
5  want to do this.
6       My career was over.  I was leaving.  I
7  didn't want to fight.  I didn't want to fight with
8  Ruby.  Didn't want to fight with Gordon.  And I felt
9  like for no reason, gratuitously, you decided to pull
10 me up and just beat me up, trash me, and then you want
11 me to sign your paycheck every month.  I don't
12 understand what she was thinking.  And she obviously
13 wasn't thinking, just like she couldn't decide whether
14 to be a chief assistant or a member of a coffee
15 clutch.  The fact that she can't see that you can't go
16 on -- this wasn't even talking to some people
17 privately.  She went on the airways for anybody in the
18 world, including my children, to say awful things
19 about me and my life and how I've lived it and what I
20 have contributed.  Her contempt was awful and the
21 hatred just personal.
22       Q.   So it would be fair to say that you were
23 very personally hurt and offended by it?
24       A.   Yes.
25       Q.   Did you ever consider reaching out to her

Page 96

1  because you were hurt and offended and sounds like you
2  were taken aback by it, or startled, did you ever
3  consider reaching out to Ruby to talk to her about any
4  of these things that she said?
5       A.   If anybody should have reached out, it
6  should have been Ruby.  When I had gone out to attack
7  somebody, when I went out to attack the sheriff of
8  Broward County, I called the sheriff before and I
9  said, "I'm coming after you, this is what I'm going to
10 be doing."  Ruby should have, if she felt that way
11 about me, she should have either told me and if she
12 had integrity, she would have said, "I'm not going to
13 work for someone like you."  She should have resigned
14 and run and done what she wanted.  But to sit there
15 and keep slapping me and then demanding I pay her,
16 while you're inhibiting my ability to do my job, I
17 just don't understand why.  I wasn't even involved.
18       Q.   To be clear, when you talked about this a
19 little bit before, but when you say she inhibited your
20 ability to do your job, you don't have anything else
21 to add to that beyond what we discussed earlier, do
22 you, about how that played out?
23       A.   When there is a conversation in the
24 community, that includes within the jail, the criminal
25 defense community and the community at large that I

Page 97

1  don't care, that I'm a racist, that I don't go to
2  work, that I play golf everyday, these things are
3  lies.  They're lies.  This isn't just somebody with a
4  different opinion.  They're lies.
5       Q.   And I certainly understand the position
6  you're putting forth, but what I'm trying to
7  understand is whether or not you can point to any
8  specific example or event that you tie -- that
9  occurred after Ms. Green said that she said, that it
10 inhibited you, an event that reflected you being
11 inhibited and doing your job as a result of her
12 comments?
13       A.   I can't point to a negative.  I can't point
14 to what somebody was thinking when they were looking
15 at me.  I can't -- nobody walked up to me and said
16 because of what Ruby said and then spit on me.  No.
17 But Ruby did the spitting.
18       Q.   Okay.  Who took over for -- took over
19 Ms. Green's caseload after she was terminated?
20       A.   I believe -- I'm not sure.  You're going to
21 have to ask Gordon this or Renee.  I believe the cases
22 were split.  I don't think they all went to one
23 attorney, but I'm not sure.
24       Q.   As far as the third person that you
25 mentioned who was running for office, running for the

Howard Finkelstein
April 09, 2021

Page 98

1  office, was he terminated as well after, by Mr. Weekes
2  or by yourself?
3     A.  No, he was a retired judge.
4     Q.  Okay.  So he wasn't with the office anymore?
5     A.  No, sir.
6     Q.  Okay.  And I wanted to ask you, have you had
7  a chance to review the interrogatories that were
8  proffered to you in this case?
9     A.  Yes.  Yes.
10     Q.  And I'll represent to you that I received a
11  set of -- I received a set of unsigned or unverified
12  interrogatories.  Is there any particular reason why
13  you haven't executed them yet?
14     A.  I think I signed it today.  And the reason
15  was I don't have an office.  My house burned down, and
16  I'm trying to rebuild -- my wife and I are trying to
17  rebuild our lives.  So like little things are really
18  like difficult, like a fax machine, like, you know.
19     Q.  I understand.  One thing I did want to ask
20  you about is with regard to one of the Interrogatories
21  that we asked, I just wanted to verify, we -- let me
22  just get the number, Interrogatory No. five said,
23  "With regard to your decision to terminate previous
24  Assistant Public Defender Nina DiPietro a/k/a Nina
25  Weatherly," did you give an interview in which you

Page 99

1  state, "I fired her for gross ethical violations, I
2  mean serious violations, and let me tell you it isn't
3  easy to get fired from the Public Defender's Office."
4         Is that something that you actually said in
5  an interview?
6     A.  I mean, I don't have a recollection but it
7  sounds like something I would say, I mean.
8     Q.  Did you terminate Ms. DiPietro?
9     A.  Yes, I think I did.  You're going back a
10  number of years.
11     Q.  Do you still subscribe to the notion of the
12  comment that it's hard to get fired from the Public
13  Defender's Office?
14     A.  Yes.
15     Q.  Okay.
16     A.  Now, let me explain why.  Because --
17     Q.  Okay.
18     A.  Because the job is so damn hard; because I
19  asked these people to give me their blood, sweat, and
20  tears, I give them not enough money to raise a family
21  and feed their kids three square meals a day.  I ask
22  too much of my people.  I just ask too much of them.
23  I don't want to put more of a burden on them.
24     Q.  Okay.  With respect to the timeframe after
25  Ms. Green left or was terminated from your office, you

Page 100

1  indicated in your response to the Interrogatories that
2  you were aware of Mr. Weekes communicating with the
3  State Attorney's Office?
4         MS. LAUFER:  I'm going to object as we've
5  stated in the responses that his only communication
6  with regards to that was with counsel, and I will
7  allow him to answer that but he will not get into the
8  context or the specifics of that communication.
9         MR. FRANK:  Let me back up.  I'll reask the
10  question.  I appreciate that objection.
11  BY MR. FRANK:
12     Q.  Mr. Finkelstein, are you aware of Mr. Weekes
13  communicating with the State Attorney's Office
14  regarding Ms. Green?
15     A.  I became aware of it afterwards through
16  counsel.
17     Q.  Okay.  That's fine then.
18         So you haven't had any discussions with
19  Mr. Weekes about what he said one way or another?
20     A.  No.
21     Q.  Okay.  Do you believe personally it's
22  appropriate for Mr. Weekes to reach out to the State
23  Attorney's Office to discuss Ms. Green?
24         MS. LAUFER:  I'm going to object to form.
25     A.  I would not have done so.

Page 101

1     Q.  Okay.  I think that, Mr. Finkelstein, I
2  think that's all I have for you.  I appreciate your
3  patience.  I don't know if your counsel has some
4  questions for cross for you.
5         MS. LAUFER:  I do not.
6         MR. FRANK:  Mr. Finkelstein, I'm sure you
7  know this, but I have to articulate this for the
8  record.  You have an option to read this if it's
9  ordered --
10         THE WITNESS:  Read.
11         MR. FRANK:  I'm going to order it.  You're
12  electing to read?
13         THE WITNESS:  Yes, sir.
14         MR. FRANK:  Okay.  Terrific.
15         And Ma'am Court Reporter, I am going to
16  order this regular time, if possible.
17         THE STENOGRAPHER:  Are you marking any of
18  the exhibits?
19         MR. FRANK:  I don't need to add anything as
20  exhibits at this point.
21         Thank you for time, Mr. Finkelstein, I
22  appreciate it.
23         THE WITNESS:  You're welcome.
24         THE STENOGRAPHER:  Ms. Laufer, would you
25  like a copy?

Howard Finkelstein
April 09, 2021

Page 102

1    MS. LAUFER:  Yes, please.
2    THE STENOGRAPHER:  And Ms. Taylor?
3    MS. RILEY-TAYLOR:  Yes, please.
4    MR. FRANK:  And I believe we're on for
5 2 o'clock with Mr. Weekes; is that correct?
6    THE STENOGRAPHER:  Yes.
7    (Thereupon, the reading and signing of this
8 Zoom deposition was not waived.
9 The proceedings concluded at 12:40 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 103

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF BROWARD

I, the undersigned authority, certify that Howard

Finkelstein remotely appeared before me and was duly

sworn on the 9th day of April, 2021.

Signed this 19th day of April, 2021.

ESTELLE PREGEN, Stenographer

Notary Public, State of Florida

My Commission No. EE 163287

Expires: March 3, 2024

Page 104

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, ESTELLE PREGEN, Stenographer, do hereby certify

that I was authorized to and did stenographically

report the foregoing Zoom deposition of Howard

Finkelstein; pages 1 through 102; that a review of the

transcript was requested; and that the transcript is a

true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee,

attorney, or counsel of any of the parties, nor am I a

relative or employee of any of the parties' attorneys

or counsel connected with the action, nor am I

financially interested in the action.

Dated this 19th day of April, 2021.

ESTELLE PREGEN, Stenographer

Page 105

April 19, 2021
HOWARD FINKELSTEIN
c/o Cory Laufer, Esquire
claufer@lauferlawyers.com
7251 W. Palmetto Park Road Suite 305
Boca Raton, Florida 33433
Re:  Ruby Green v Howard Finkelstein
Case No.:  20-CV-62160-BLOOM/Valle
Please take notice that on the 9th day of April, 2021,
you gave your deposition in the above cause.  At that
time, you did not waive your signature.  The
transcript is now available for you to read and sign.
Please call (888) 811-3408 or e-mail
production@phippsreporting.com between the hours of
9:00 a.m. and 4:00 p.m., Monday through Friday, to
arrange to come to one of our offices to read or for
access to a read-only PDF transcript via computer.
Please execute the PDF-fillable Errata Sheet which
will be forwarded to you by Phipps Reporting.  The
Errata Sheet can also be downloaded from
www.phippsreporting.com.  Once completed, please
print, sign, and return to us for distribution to all
parties.
If you do not read and sign the deposition within 30
days, the original, which has already been forwarded
to the ordering attorney, may be filed with the Clerk
of the Court.
If you wish to waive your signature now, please sign
your name in the blank at the bottom of this letter
and return to the address listed below.
Very truly yours,
ESTELLE PREGEN, STENOGRAPHER
Phipps Reporting, Inc.
1531 Forum Place, Suite 200-E
West Palm Beach, Florida 33401
I do hereby waive my signature.

Howard Finkelstein

Howard Finkelstein
April 09, 2021

Page 106

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT

ENTER CHANGES ON THIS PAGE

In Re:  RUBY GREEN V HOWARD FINKELSTEIN

Case No.:  20-CV-62160-BLOOM/Valle

Job No.:  183373

HOWARD FINKELSTEIN

April 9, 2021

PAGE    LINE        CHANGE                    REASON

Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated in it
are true.

_____            _____
Date                       HOWARD FINKELSTEIN

Howard Finkelstein
April 09, 2021                                                                                          1

---

**$**

**$2,000**
  32:4
**$3,000**
  32:1

---

**1**

**10,000**
  39:23
**10:00**
  4:2
**11:00**
  49:11
**11th**
  48:24  49:21
  61:23  77:3
**12:40**
  102:9
**135**
  16:2
**13th**
  48:24  49:21
  61:23
**150**
  16:2  82:13,24
**16**
  10:24  11:8
  60:3  76:17
  85:6
**19**
  9:18  80:15
**1975**
  8:19
**1980**
  9:18
**1981**
  9:18
**1987**

  63:18
**1988**
  9:21  10:1  11:7
**1:30**
  58:20

---

**2**

**2**
  102:5
**20**
  41:25
**200**
  33:14  43:15
  44:16  56:12
**2004**
  10:25  11:15
  35:4
**2012**
  28:9
**2018**
  38:4
**2020**
  8:5  52:3,8
  76:7  80:15
**23rd**
  27:1
**25**
  21:4
**27th**
  38:3

---

**3**

**30**
  21:4
**34,000**
  73:14

---

**4**

**40**
  81:22
**44**
  50:20  76:4
  94:14
**45**
  81:22

---

**5**

**50**
  44:1  48:20
**50s**
  44:1
**5:00**
  51:21  60:7

---

**6**

**60**
  40:23
**60s**
  92:24
**63**
  35:25
**65**
  12:13
**67**
  35:24
**67,000**
  12:13

---

**7**

**70**
  91:25
**77**
  8:24
**78**

  8:24

---

**9**

**9:00**
  60:7

---

**A**

**a.m.**
  4:2
**a/k/a**
  98:24
**aback**
  96:2
**ability**
  48:21  66:10,
  11,12,16
  75:21,24  93:1
  94:9  96:16,20
**able**
  24:4  41:4  42:2
  75:15  89:23
**abounded**
  88:5
**absolutely**
  21:16  32:6
  61:21
**absurd**
  62:9
**academic**
  9:6
**accepted**
  32:15
**accessed**
  25:17
**accessible**
  24:25  25:5
  60:10
**accounting**
  87:12

Howard Finkelstein
April 09, 2021

2

| accurate | advice | allowed | appeared |
|---|---|---|---|
| 17:16 55:24 | 21:21 | 41:16 62:4 | 35:15 61:11 |
| acting | affect | ambitions | appearing |
| 74:2,5 | 41:6 66:10,11, | 34:13 | 49:2 |
| action | 12 | amended | applied |
| 5:10 79:21 | affirmative | 70:9 | 17:12 27:16 |
| actively | 69:25 70:8,17, | amendment | appointed |
| 45:1 | 20 75:2 | 5:11 13:25 | 12:11 |
| activities | African-american | 14:1 | appointments |
| 46:19 | 55:24 71:9,10 | analog | 56:17 57:10 |
| actual | age | 21:6 | appreciated |
| 62:25 76:10 | 35:25 43:23 | and/or | 60:8 |
| 79:14 | agencies | 94:6 | approach |
| ADA | 14:10 | anger | 75:18 |
| 27:19 | agency | 79:10 | approached |
| ADAS | 91:6 | angry | 34:20 |
| 16:21 | agenda | 39:22 90:12,13 | approaches |
| addict | 55:16 71:23 | announced | 58:16 |
| 63:17 | agreed | 36:11 | appropriate |
| addicted | 78:15 | anticipating | 100:22 |
| 63:18 | agreement | 66:2 | approved |
| addiction | 61:10 | anticipation | 14:1 |
| 10:18 | ahead | 7:19 66:4 | argue |
| adhering | 15:12,13 60:21 | anybody's | 24:17 |
| 42:9 | 78:12 80:9 | 89:1 | arguing |
| administers | 89:14 | apart | 84:24 |
| 21:19 | Ahern | 7:13 9:1 40:12 | arguments |
| administrate | 52:25 53:5,18, | 67:25 69:5 | 30:4 |
| 21:10 | 20 | apartments | arms |
| administration | airways | 51:10 | 88:19 |
| 43:11 55:11,14 | 95:17 | APD | arrest |
| 72:11 74:9 | alarm | 27:20,21 32:4 | 10:18 62:19 |
| administrative | 82:16 | apologize | 91:23 |
| 19:2 21:11,20 | Alicia | 56:25 | arrested |
| 58:12,16 | 68:5 | apparently | 60:25 91:4,8 |
| admit | Allen | 88:6 | arresting |
| 26:11 | 11:3 | appear | 91:15 |
| advancing | allow | 25:1 | art |
| 29:18 | 57:5 82:7 | appearances | 31:3 89:3 |
|  | 100:7 | 24:17 |  |

Howard Finkelstein
April 09, 2021                                                                                    3

artfully
  6:5
Article
  11:25 13:13,
  21,25 90:24
  91:1
articles
  12:3
articulate
  101:7
Aside
  33:19
aspect
  24:18 39:10
aspects
  10:16
aspirations
  15:4
aspire
  6:5
assigned
  28:22
assistant
  9:23 15:17
  18:15 21:1
  27:20 33:5
  39:20 44:5
  45:2,4,10,13,
  15,20,22,25
  67:4,17 68:19
  69:3 70:14,25
  71:15 72:2
  73:1 88:4,15,
  17 89:2,8,20
  95:14 98:24
assistants
  29:23 49:10
Association
  87:24
assumed
  47:12

assuming
  15:20 53:12
  93:8
attack
  62:15 72:17,21
  96:6,7
attacks
  63:13
attended
  9:3
attending
  5:23
attention
  24:4,6 31:12
  59:1,11
attitude
  14:9
attitudes
  42:2 43:14
attorney
  4:20 5:20 6:9
  9:22 15:18,21
  18:16 24:11
  61:2 62:16
  63:8 97:23
Attorney's
  14:4 24:14
  100:3,13,23
Attorneys
  23:23
attribute
  75:9
August
  8:5 52:3,8
  76:7,14 80:15
authority
  17:17 27:25
average
  15:25
avoid

38:8 72:11,12
  74:18
avoiding
  72:10 74:9
aware
  22:17 33:19
  34:18 37:12
  47:4 52:4
  57:18 100:2,
  12,15
awful
  67:6 95:18,20

_____

              B

BACDL
  87:24 88:25
  90:19 91:17
  92:3,7
backed
  41:3
background
  8:12,14 92:17,
  19
bad
  19:25 20:1,9
  71:8 87:9,11,
  18 92:20 94:6
Baker
  50:17
bar
  82:12 90:16
Barbara
  21:23 22:1,3
barbecue
  51:20
barred
  70:10
baseline
  5:19

basis
  20:9,13 23:6
  31:22 49:6
battle
  40:21
Beach
  24:10 40:13,17
Beach's
  40:13
beat
  95:10
becoming
  35:7,8,9 48:17
bed
  59:21
beginning
  33:7 36:24
beings
  73:7
believed
  66:15 79:15
bell
  85:23,24
bench
  41:25
benefit
  12:23 42:7
  92:7
benefits
  84:21 87:14
better
  23:18 58:12,13
  75:14 78:23
  89:3
beyond
  48:21 73:14
  96:21
big
  5:13 32:4
  51:25 90:25

Howard Finkelstein
April 09, 2021

4

bigger
 93:3,4
biggest
 25:19 62:15
 79:8
black
 61:20 62:18,21
 83:13
blame
 87:8
blind
 94:8
blog
 53:3
blogger
 66:19
blogster
 66:8
blood
 19:25 20:1,9
 99:19
blush
 25:1
board
 42:20 88:4,19
bond
 49:6
book
 41:13
booze
 51:22
born
 61:14
boss
 11:5 73:22
 75:7 83:22
boy
 37:8
Brackey
 10:10

brains
 36:11
brand
 75:14
Brannon
 5:2,5 88:7,8
Brawley
 28:17
break
 5:25 75:12
bred
 29:1
briefly
 70:5
bright
 27:10
brings
 88:7
broad
 22:4
broke
 84:11
Broward
 9:14 63:8
 70:12 79:12
 82:1 84:4
 87:24 96:8
Broward's
 25:20
Buddy
 53:2
budget
 82:4 86:13
budgetary
 19:1 83:3
budgeting
 43:11
bunch
 30:10 32:17
 56:3 88:23

burden
 99:23
burned
 85:18 98:15
burning
 29:4
bushy
 27:10
bust
 62:22

C

calendar
 56:16,21,23
 57:3
calling
 94:21
calls
 59:17,19
 64:16,19
 76:15,21
campaign
 37:3,19 38:21
 46:15,18 47:7,
 15 48:2 52:6,
 11 53:1,13,25
campaigns
 12:21 13:8
canceled
 16:16
candidate
 14:20,24 15:8
 39:8 40:8 41:3
 53:14
candidates
 12:19 15:15
 17:22 53:16
capacity
 45:12

Captain
 44:10
care
 64:2 66:16
 83:24 94:7,22
 97:1
career
 28:20 42:4
 62:8 95:6
Carrie
 24:10
carry
 73:16
carrying
 44:23
caseload
 97:19
caseloads
 86:5
cast
 7:22,23,24 8:5
 52:2
categories
 30:11 31:4
 32:17
caveat
 7:17
cell
 49:2 57:24
 64:17
center
 79:13 92:24
centered
 22:25
centric
 12:8
certifications
 9:6
cetera
 39:25

challenges
51:25

chance
98:7

changes
35:2

changing
35:5,9

Channel
26:13

character
72:22 79:19

characterization
44:24

charge
9:24 19:2
45:22

charged
11:22 40:18

charges
62:20

check
37:1,19

chief
9:23 16:24,25
18:15 29:22
33:5 44:5,23
45:20,21,22,24
49:9 67:4,17
68:19 69:3
71:15 87:12,20
88:3,17 89:2,
8,20 95:14

chiefs
18:4,5 31:1
63:7

child
59:5 82:7

children
40:25 50:18
82:10 95:18

choice
18:7 80:3
88:15,22,23
89:4,22

choices
62:19

chose
12:24 89:5

chronically
14:6 82:1

chronicling
31:8

circumstances
19:14

cite
73:1 74:25

city
91:10,15

claim
5:11 70:9
84:17 85:2

clarification
59:23

clarify
81:9

clarity
68:14

clean
7:4 50:13,14

client
12:7 24:6
57:19

client-centric
90:18

clients
12:5 14:23
19:7 24:5
39:23 41:22
42:7 48:8,25
49:1,3 51:12

84:11,23 89:8
90:19 93:25
94:6,11,23

clutch
88:25 95:15

cocaine
63:17,18,19

codified
41:9

coffee
88:25 95:14

colleagues
38:19

collectively
63:7

College
8:15

color
63:10

combined
25:3

Comey
79:13

comfortable
10:15,16

commence
49:20

comment
55:11 71:19
83:13 99:12

comments
61:13 73:3
74:6 75:10
81:17 97:12

commission
41:24 63:9

committed
66:15 71:17,
21,22

committee
18:3

committees
`17:21

common
86:9

communicate
68:1

communicated
66:24 90:9

communicating
100:2,13

communication
48:25 67:10
100:5,8

communications
7:8

community
42:1 55:16
66:13 75:19
94:24 96:24,25

compared
25:16

compensation
84:13

competency
44:14

complaint
87:16

complaints
84:1

complete
17:17

completely
70:13

computer
50:3

concern
38:12

concerned
40:22 41:5
42:21 51:8,10
69:8 79:3

concerns
47:8 52:5,9
81:13

concluded
102:9

condition
43:17

condominiums
12:22

conferences
50:24

conflict
42:21 92:10,13

conflicting
88:1,18

conflicts
33:17,18 85:9,
11 88:5 89:21
90:8

congress
35:20,21

connection
52:6,10 89:11

connectiveness
51:7,24

consider
95:25 96:3

constant
23:2 86:12

constantly
86:14 88:5
94:5

constitutional
11:21 82:15

consult
80:16

consultant
66:9

contemplate
42:11

contemplation
7:24

contempt
93:6 94:21
95:20

contention
57:14

contest
6:1

contesting
57:3

context
4:25 26:5
42:22 100:8

contract
91:9,13

contrary
88:20 90:23

contributed
95:20

contributing
12:21

control
73:14

controlled
22:15

conversation
72:5 86:8
96:23

conversations
59:1 86:1,10

coordinated
78:8

core
92:24

correctly
68:15 72:25
89:10

correspondence
62:25 63:2

cost
91:14

counsels
25:3

counter
95:2

counties
13:23 91:2

country
82:22

county
9:14 13:19
14:2 28:24
29:9 61:4 63:9
70:12 79:12
84:4 96:8

courthouse
16:12,13,14,16
50:15

courtroom
82:21

courtrooms
22:18

courts
22:17

cover
77:19

coverage
46:22

covering
61:14

COVID
48:9 60:1

coworkers
70:14,25

crazy
35:20

create
48:25 86:11
94:10

created
14:3,6 42:21
63:13 71:7

credentials
9:6

crime
11:23 40:18
60:25

crimes
9:21 31:15
61:5

criminal
10:4 22:18
23:8 39:25
71:25 75:16
87:25 90:20
91:3 96:24

cross
101:4

cry
65:18

Cuddihy
18:11,16 68:24
69:4 80:19

Cuddihy's
18:13,21

culminated
10:17

culture
12:2,7 58:10
90:17

current
20:2

Howard Finkelstein
April 09, 2021                                                                 7

**D**

**D-O-N-N-A**
    54:10

**Dadowski**
    18:19,21 19:11
    20:3,20 66:1
    68:9,16 76:11
    77:4 78:9
    80:17

**Dadowski's**
    18:24,25

**Dallas**
    10:10

**damn**
    99:18

**data**
    32:22 92:12

**dated**
    38:3

**dating**
    33:17

**day-to-day**
    11:16 22:8
    23:6 56:16

**days**
    49:22 59:25
    60:2

**de**
    67:4,14,19
    68:17,20

**deadline**
    59:18

**deaf**
    94:8

**deal**
    14:21 32:5
    49:13 58:20
    66:6

**dealing**
    43:10 49:12
    64:9

**dealings**
    64:11

**deals**
    90:25

**death**
    63:24

**decades**
    81:25 82:17

**decide**
    34:24 79:20
    89:5,6 90:13
    95:13

**decided**
    10:19 11:8
    65:10,12 87:23
    95:9

**decision**
    74:12 75:8
    78:6 80:17
    87:21 93:22
    98:23

**decisions**
    74:16 87:9,11,
    19

**declare**
    39:21

**declared**
    40:1,8

**declares**
    36:25

**dedicated**
    71:24 72:22

**defamed**
    75:20

**defendant**
    24:23 25:2

**defender**

**9:25 10:23**
    11:14 12:20
    15:17,21 16:20
    17:3,4 19:9
    20:3 22:5,23
    23:10,14,19
    27:3,20 28:21
    30:16 34:8
    35:22 40:18,21
    41:16,24 43:2
    44:3 53:14
    56:16 64:18
    67:3,9,16,18
    70:12 73:2
    74:13 79:25
    81:20,24 82:2,
    8,22 85:23
    86:10 88:16
    91:14 94:17
    98:24

**Defender's**
    5:8 7:15 9:13,
    20 10:13 19:12
    23:21 53:6
    69:15 71:21
    85:14 88:21
    89:25 92:4,5
    99:3,13

**defenders**
    13:7 14:4
    15:25 21:1
    23:23 24:13
    39:21 49:18
    70:15 71:1
    72:2 90:15

**defense**
    10:4 25:2,18
    70:9,17,21
    75:2 87:25
    90:20 96:25

**Defenses**
    69:25

**defer**
    93:22

**definitely**
    50:22

**degree**
    8:17,20 9:12
    28:6

**degrees**
    9:7

**delegation**
    63:8

**demanding**
    96:15

**democrat**
    79:11,13

**democratic**
    71:22

**demographics**
    55:14

**demonstrate**
    57:13,15

**demonstrating**
    62:8

**denied**
    84:21

**DEO**
    84:18

**departed**
    20:21

**departing**
    19:4

**depended**
    16:6

**depends**
    58:7

**depoliticize**
    14:14

**deposed**
    4:23 5:1,16

**deposing**
90:3

**deposition**
7:11,20 26:4
102:8

**depositions**
30:8 44:18

**derived**
38:11

**describe**
75:22

**described**
13:16 45:9

**desire**
29:4

**desires**
29:3

**destroyed**
94:16

**determination**
32:8 65:25

**determine**
10:22 31:22

**determined**
91:12

**detriment**
12:4 41:21

**developed**
59:9

**developing**
30:1

**Diane**
18:8,10,11,25
65:7 68:24
69:4 80:19

**died**
10:8

**difference**
87:4

**differs**
62:21

**difficult**
6:22 24:8
98:18

**dinosaur**
35:10 48:17

**Dipietro**
98:24 99:8

**direct**
4:14 63:25
64:19 91:24

**direction**
43:16

**directives**
44:24

**directly**
22:6 24:18
47:21

**directs**
6:16

**discern**
32:20

**discerned**
76:3

**discovery**
37:24

**discuss**
20:5 100:23

**discussion**
61:8 93:16

**discussions**
46:12 100:18

**disease**
94:25

**disgusting**
74:22

**dishonesty**
79:1

**disparities**
63:11

**dispatched**
13:6

**dispute**
85:22

**disregard**
55:1 79:2

**disrepute**
66:14

**distinction**
85:1

**diverse**
71:12

**divert**
91:16

**divide**
73:18

**documentation**
37:17

**documents**
7:19 69:24

**dollars**
24:24

**Donna**
54:8,10

**door**
59:3 83:1
84:11 93:1,2

**doors**
62:23

**double**
62:17

**Doug**
28:16

**dropping**
12:22

**drug**
63:17 84:8,9

**drugs**
10:18 92:20

**duly**
4:12

**dumb**
94:8

**duties**
11:15,20 12:8
14:13 44:6
89:12

---

**E**

**eager**
29:5

**earned**
75:17

**ears**
74:14 76:18

**easiest**
57:22

**Edgley**
87:22

**editor**
93:12

**education**
27:12

**educational**
8:14 9:3

**effect**
7:2 71:14

**effected**
25:24 33:21

**effective**
11:21 12:10
70:13,24

**effectuating**
14:15

**effort**
51:23

**efforts**
14:13 50:12
64:1

**eight**
37:15 70:2

**elected**
9:25 11:17
15:20 16:23
17:3,4 19:4
20:25 21:2
24:13 35:1
41:18,20 42:6
45:11,19 64:18
65:19 73:13

**electeds**
24:1

**electing**
101:12

**election**
43:2 79:7,9,
15,16,22 80:8
93:8,20

**elective**
79:12

**email**
37:25 38:4,11,
24 40:9 41:14
46:5,8,16
48:18 72:15
80:10,13 83:19

**emailed**
67:20

**emails**
7:22 37:24
41:7 58:25
59:16 76:21,22
94:2

**emergency**
49:6 50:16

**employ**
58:15

**employed**
19:12

**employees**
76:13 94:6

**employment**
21:20

**endangered**
50:18

**ended**
40:15

**endorsed**
37:2 39:1

**endorsement**
36:18,23

**endorsements**
15:16

**endorsing**
15:7

**endurance**
5:25

**energy**
27:11 72:9

**entering**
39:4

**entire**
37:2,3 71:24

**entitled**
14:23

**entry**
37:20

**environment**
13:15,18,19
41:2 94:10

**episode**
75:1

**equality**
71:25

**equally**
40:22

**equivalent**
21:6

**especially**
29:25

**establish**
30:22

**et**
39:25

**ethical**
99:1

**ethnically**
71:13

**evaluated**
31:10

**evaluation**
30:22

**evaluations**
29:20,24 31:7,
17,22 44:14

**event**
6:14,15 20:17
37:4,19 46:25
63:3 97:8,10

**events**
46:18,22,24

**eventually**
9:23,24 16:15
17:25 18:3

**everybody**
51:18 60:10
79:12 81:1,25

**everyday**
49:10 86:19
97:2

**evidence**
88:9

**evolved**
17:25

**exact**
72:14

**exactly**
20:19 34:17
61:17

**EXAMINATION**
4:14

**examined**
4:12

**example**
90:24 92:10
97:8

**examples**
55:4

**excess**
24:24

**exchanged**
88:24

**excuse**
59:7

**executed**
98:13

**executive**
18:15 44:5
45:10,13,15,
20,24 69:3
71:15 88:19
89:25

**exhibits**
101:18,20

**existing**
10:5

**exists**
23:7

**expanded**
16:14

**expect**
28:19

**expected**
83:20

**experience**
5:16 36:6

Howard Finkelstein
April 09, 2021

10

43:6,13,21,22
64:9 75:17

**experienced**
75:23

**experiencing**
23:7

**explain**
60:3 78:22
99:16

**expound**
12:17

**express**
34:12 47:8

**expressly**
6:15

**extreme**
24:22

**eye**
19:1

**eyed**
27:10

**eyes**
23:5 74:14

---

**F**

**face**
51:18 77:2
83:13

**Facebook**
78:2 85:16

**faced**
48:19

**facing**
59:6 61:1

**fact**
12:3 62:17
82:6 85:14
88:3 93:20
94:3 95:15

**factors**
31:17

**facts**
92:12

**faith**
61:25 94:24

**false**
56:6,10 61:21

**familiar**
5:21 70:2

**families**
40:25

**family**
99:20

**far**
11:16 14:12
16:19 18:18
28:11 29:18
30:20 31:7
33:7,8 41:8
42:9,25 55:20
60:13 65:4
73:17 74:17
77:18 86:23
89:23 97:24

**farm**
86:11

**fashioned**
79:24

**fast**
87:8

**faster**
86:25

**faucets**
26:18

**fault**
92:2

**fax**
98:18

**faxes**

59:4

**feathers**
90:20

**federal**
40:15

**feed**
40:24 99:21

**feedback**
36:12 46:7

**feel**
6:6 65:19 72:9

**fellow**
38:19

**felonies**
30:17

**felony**
61:2 63:21

**felt**
41:2 59:10
76:2 95:8
96:10

**Fifty**
81:19,20

**fight**
72:13 95:7,8

**fighting**
71:24

**figure**
49:4,15 57:6

**file**
88:10

**filed**
5:6 85:20

**files**
21:19 82:13

**filled**
27:11 41:2

**final**
32:8

**Finally**
91:21

**financial**
25:13

**finding**
95:2

**Finkelstein**
4:10,18,19
8:11 10:10
69:22 100:12
101:1,6,21

**fire**
78:24

**fired**
83:11 84:10
85:14 99:1,3,
12

**firm**
10:5,7,9

**first**
4:12 5:11 11:6
12:1,6 17:14
25:1 27:6,14,
16 28:12 32:25
34:24 38:13
51:15 52:13,20
58:7 70:9
76:17 83:9
84:7,15

**fit**
18:6 29:2,6
31:18

**five**
18:5 35:4
58:18 59:13
82:17 98:22

**fix**
26:19

**flip**
7:3 70:5

**floating**

48:3

**Florida**
8:15,18 9:2
23:20 82:3
83:5

**focus**
59:1 63:10
83:15

**focused**
83:12

**fodder**
86:9

**followed**
84:10

**following**
4:2 59:20 94:1

**follows**
4:13

**force**
91:13

**foresee**
48:22

**formal**
18:13 30:21,25
40:5 90:1,4

**formalized**
31:2

**formally**
84:2

**former**
5:8 67:8,15,17
68:18

**Fort**
91:10,13

**forth**
88:24 97:6

**fortuitous**
72:23

**Forty**
28:4

**found**
25:12 61:15
92:8

**four**
10:24 12:6
18:4 34:8 46:4
58:7 88:2 94:1
95:1

**four-year**
34:15

**fourth**
35:11 70:8

**frames**
36:4

**Frank**
4:15,20 45:7,
8,16,17 67:4,
14 68:17 78:13
81:10 100:9,11
101:6,11,14,19
102:4

**free**
6:6 65:19
89:18 91:23

**freely**
91:18

**freeze**
25:5

**frenzy**
59:18

**Fridays**
51:21

**friends**
77:25

**friendship**
54:20

**front**
30:15 37:25
79:13 82:11

**function**
56:20 94:11

**functioning**
74:7

**functions**
50:16

**fund**
13:23

**fundamentals**
30:19

**funded**
14:5,10 82:2

**funding**
11:25 13:14
14:2 25:24
31:20 81:18

**funds**
14:7 91:6

**funny**
7:3

---

**G**

**garage**
60:14

**gather**
62:3 88:9
92:12

**generally**
22:12 34:6

**generation**
36:5

**gentleman**
67:8,20 68:17,
19 84:14

**gentlemen**
67:25

**George**
88:8

**get all**
44:20

**Gideon**

**86:19**

**gives**
21:21

**giving**
14:22 83:4

**glib**
48:14 57:1

**glued**
76:18

**God**
4:7 48:11,16
77:13 84:15
93:1

**Godsend**
76:16

**goes**
61:4 62:13
63:15 64:23
69:17 88:6

**golf**
64:24 83:25
97:2

**Gordon**
7:14 18:9
33:23 39:18
40:10 47:1,14
48:17 50:9
51:4 61:22
65:7 68:16
71:15 72:16
73:13 74:10
79:5,6 93:13
95:8 97:21

**Gordon's**
73:16

**gosh**
10:24

**government**
11:25 14:10
43:18 50:16

Howard Finkelstein
April 09, 2021

12

Grabowski
22:2

graduated
9:14 82:11

graduation
9:17 17:11

gratuitous
81:3,17

gratuitously
95:9

Green
4:21 27:7
28:9,20 29:14
32:25 37:11
38:5,19,25
39:3 43:1
46:7,12 52:5,
10 64:8 73:6
78:7 81:5,12
86:3,22 92:15
93:9,11,23
97:9 99:25
100:14,23

Green's
33:21 37:20
46:11 47:7
73:2 74:6 83:6
97:19

grid
25:15

gross
99:1

ground
38:6,15

group
62:3 87:25
88:7,16,17
89:17,18,19,24
90:8

guilty
91:19

H

half
24:24

hand
4:4 25:4 86:12

handed
82:12

handle
59:10 64:16

handled
21:5 45:23
82:24

handles
24:10,11 61:5

hands
58:13

happens
24:3

happy
6:7 51:22

hard
60:3 99:12,18

hat
37:11

hatred
93:6 94:21
95:21

head
17:18 23:20
87:7

health
51:24 63:14,22
64:1,2,9

hearings
49:6 50:18

heavy
79:5

helm

14:12

help
4:7 13:8 26:9,
21 29:5 38:20

helped
21:10

Hewitt
24:10

hey
63:15 69:7

high
24:21 28:25
69:16 83:13
86:5

higher
31:15

highly
31:2

hippie
92:23

hire
55:12,21,23
91:14

hired
9:16 11:6
27:23 55:13
84:7

hiring
12:9 17:17
23:3 28:5
81:18 86:12

history
25:20

hitting
48:4

home
49:18,23 50:6,
7 58:1,2,5
59:15,16,25
60:2 64:24
84:11

homeless
91:7,16,24

homicide
9:22 31:16

honored
79:25

hope
6:11 66:4
87:5,7

hoping
66:2

hour
51:22

hours
49:11

house
98:15

Howard
4:10,18 26:9
72:7

huge
25:19 35:8
49:16

human
21:7,8,14,17
43:17 65:20
73:7

humble
92:19

hundred
22:19

hurt
65:16,21,22
75:19 78:25
80:24 87:5
92:25 95:4,23
96:1

hurtful
65:23 71:20

hurting

64:3

---

**I**

**i.e.**
70:14

**idea**
19:8 60:18
73:23 77:12
93:6

**identify**
72:1 73:19
74:18

**ideological**
85:8,11,13

**ideology**
85:13

**ill**
64:2

**immediate**
28:12 32:12

**immediately**
53:21 78:17

**impact**
79:4

**implement**
15:2

**implementing**
21:12

**important**
41:6 89:7
90:14

**impression**
61:16,18

**in-depth**
58:25

**inclination**
52:14

**includes**
50:17 96:24

**including**
58:9 70:25
88:11 95:18

**independently**
69:6

**indicate**
69:9

**indicated**
10:1 24:15
52:13 53:17
55:3 66:21
81:11 86:21
92:14 100:1

**indicating**
77:23

**indigent**
11:22

**individually**
5:7 63:7

**inexperienced**
82:20,21

**inhibited**
96:19 97:10,11

**inhibiting**
96:16

**initial**
18:5,7

**initially**
53:23,24

**injury**
5:3

**inkling**
52:14

**inmates**
57:24 64:17

**Inside**
68:13

**insight**
30:12 43:17

**instance**
29:3 73:1
75:1,22

**instances**
74:4

**institutions**
9:3 43:17

**insubordination**
67:6

**insufficient**
86:5

**insulted**
75:20 79:1

**insurance**
21:20 24:23

**integrity**
25:8 26:1
96:12

**intentions**
37:11

**interact**
73:7

**interaction**
64:8 76:10,12

**interactions**
76:20

**interest**
24:22

**interfered**
70:11

**intern**
27:16

**internal**
40:21

**internally**
84:2

**interns**
9:24 17:9
86:11

**internships**
23:3

**interpreted**
55:22

**interrogatories**
98:7,12,20
100:1

**Interrogatory**
98:22

**interrupted**
25:18

**intervene**
94:18

**interview**
17:22 49:4
83:4,8 98:25
99:5

**interviewing**
23:3

**interviews**
18:5

**introductory**
17:8

**intuitiveness**
74:15

**investigators**
30:8

**involved**
12:20 14:19
25:17 39:8
53:25 65:24
81:4 96:17

**isolated**
51:14

**issue**
14:20,25
15:10,23 38:18
57:2 60:22,23
63:1 81:6
82:19 84:8
89:12

Howard Finkelstein
April 09, 2021

14

issues
  22:20 24:5
  25:18 33:11,20
  35:7 58:20,22,
  23 63:9 81:5,
  7,9,11,15,18
  82:25 83:1
  86:2,4,5,6,18,
  19

_____

**J**

_____

J.D.
  8:22
Jackson
  22:3
Jacobowitz
  67:1
jail
  30:9 49:7,8
  64:16,19 96:24
James
  79:13
jealousies
  33:18
Jennifer
  87:22
jeopardy
  25:25
job
  11:6 12:14
  17:12 23:25
  30:13 33:2,22
  41:4 42:5
  43:10 60:7,9
  66:17 71:10
  75:24 76:16
  87:15,17 89:12
  96:16,20 97:11
  99:18
jobs
  86:13

joint
  50:23
Joshua
  63:24
judge
  22:24 39:21,22
  64:2 98:3
judges
  39:18,24,25
  41:19,20 49:15
  90:21
judgeship
  42:5
judgment
  87:6,7
judicial
  41:23
judiciary
  41:25 42:6
jumps
  25:10,11
jury
  29:1,6,8
justice
  62:18 71:25
  75:16 91:3
justifying
  70:16 71:1
juvenile
  28:25 29:6
  45:22 61:4

_____

**K**

_____

Katherine
  18:8 69:1,2
  80:20
kept
  12:8
Keuthan
  69:1,2 80:20

kicks
  91:3
kidding
  81:19
kids
  29:5 99:21
killed
  24:12 85:17
knocking
  83:1
knowing
  60:23
known
  37:11 81:25

_____

**L**

_____

la
  67:4,14,19
  68:18,20
lack
  75:14 82:3
  87:6
lacking
  79:19
landlord
  26:19
language
  85:18
large
  28:6 31:23,25
  58:17 62:3,20
  96:25
largely
  22:15,25
larger
  18:3
late
  9:18 22:24
Lauderdale

91:10,13
Laufer
  45:5,14 78:11
  81:8 100:4,24
  101:5,24 102:1
laughing
  41:21
law
  8:15 9:12,15
  10:17,20 23:8
  26:21 35:9
  51:15 82:11
  91:4
lawsuit
  5:2,3,6,13
  40:15 85:1,4,
  20 88:9,10
lawyer
  6:9 11:6 29:2,
  11 30:2 31:4
  44:15 52:25
  61:17 62:4
  76:1 81:24
  92:11
lawyers
  12:9 27:14
  29:20,25 30:5,
  23 32:21 49:1,
  2 51:9,10,11
  57:20 59:19
  62:23 66:11
  72:10,19 74:22
  82:11,19,21
  87:22,25 90:20
  94:11
layered
  43:10
lazy
  83:24
lead
  35:6 94:9

Howard Finkelstein
April 09, 2021                                                                15

**leadership**
89:24

**leaky**
26:18

**learn**
51:12

**learned**
52:24 81:21

**learning**
51:11

**leave**
21:19 48:5
61:17 85:10,12

**leaving**
95:6

**lecture**
17:7 22:7

**led**
87:8

**left**
18:22,25 31:13
34:1 61:15,16
71:7 99:25

**legal**
26:17 27:12

**legislative**
63:8

**legislatures**
66:13

**letters**
62:14,24 63:2,
3,6

**liberal**
71:22

**lie**
56:10

**lies**
97:3,4

**lieu**
6:25 58:5

**life**
10:19 24:23
36:6 43:13
61:1,6 71:24
72:23 89:1
95:19

**light**
31:5 92:15,16
94:3

**lightbulbs**
43:12

**likes**
81:1

**Linda**
28:17,18

**line**
54:3

**link**
52:23

**lion's**
24:13

**listen**
7:23 8:1

**listened**
8:2

**literature**
12:22

**live**
41:1

**lived**
51:9 95:19

**liver**
26:19

**lives**
61:20 89:3,7
98:17

**Liz**
21:23,25 22:2

**lobbying**
83:2

**location**
16:4

**locations**
16:5

**locked**
51:14

**logistic**
16:3

**long**
5:22 6:2 14:21
20:20 21:4
26:22,25 28:2
35:11 40:11
42:3 45:4,12,
24 49:23 67:3
77:13

**looked**
55:9 56:22
70:20 74:21

**Lorraina**
17:5

**lose**
24:3

**lost**
48:8 84:12

**lot**
17:10 23:23
30:2,5 31:2,3
32:16 58:2
65:22 71:17
72:4 81:1
86:22

**low**
86:5

**lull**
60:8

**Lynch**
53:1,13,14
73:13

**M**

**Ma'am**
101:15

**machine**
12:4 90:17
98:18

**machinery**
43:18

**Mackami**
69:11

**magical**
27:13

**maintain**
51:7,24 89:23

**maintained**
41:18

**maintains**
21:18

**major**
8:21 9:21
10:14 31:15
55:15 61:5
66:8

**majority**
33:15 65:2

**march**
48:24 49:21
61:20,23 77:3

**marching**
62:7

**marking**
101:17

**Mason**
29:8,15

**massive**
11:25 50:12,19

**mastered**
42:4

materials
   7:18
math
   10:25 11:10
matters
   17:8 19:1,2
maturity
   43:15
Mccue
   22:2
meals
   99:21
mechanism
   14:6
media
   57:21 59:18
   78:1
meet
   27:14 32:19
   37:4,5
meeting
   14:17 27:6
   51:17 76:23
   87:24 88:6
meetings
   50:23 51:23
   94:3
member
   89:18 95:14
membership
   89:17
memories
   69:19
memory
   33:25 34:4
mental
   51:24 63:14,21
   64:1,9
mentally
   64:2

mentioned
   13:13 16:19
   97:25
mentor
   11:4,5
merits
   84:25
message
   46:19 80:10,11
met
   27:15 49:10
   57:11
method
   14:9
metrics
   30:20
Meyers'
   63:24
Miami
   8:16,23 9:2
   40:13
Miami's
   40:12
Michael
   5:2,5 52:25
   53:5 88:7
Michelle
   21:23 22:1,2
   50:10
middle
   33:8
Mike
   24:11
million
   24:24
mind
   20:17 24:21
   25:10,11 79:8
   85:5,7
misdemeanors

28:25
mislead
   31:24
mission
   80:2
missives
   62:16
model
   23:22 36:3
moderator
   61:9
mom
   37:4
moment
   26:3 75:4
money
   10:16,19 14:7
   25:2,16,23
   31:20 40:24,25
   72:18 91:15
   99:20
monitor
   46:21 47:3
monitoring
   29:24
month
   95:11
months
   19:3 37:15
   77:14 94:1
   95:2
moral
   43:11
morality
   72:22
morning
   4:19 22:16
   49:13 55:9
   59:20 80:15
   83:9

mornings
   58:19 59:13
morphing
   48:19
mortgage
   41:5
mother
   37:5
mothers
   85:17
motion
   30:8
motions
   24:17
mouths
   71:8
moved
   86:25 87:6,10
movements
   76:4
moving
   43:15 51:24
   87:8
municipal
   91:5,8

---

**N**

Naheed
   85:23,24 86:7
named
   85:23
names
   21:25 56:10
   68:23
nature
   5:10 23:25
   30:15 50:25
   60:9 63:4 84:4
necessarily

Howard Finkelstein
April 09, 2021                                                                    17

21:15 32:17,21
  38:20
**needing**
  26:19 41:10
**negative**
  75:25 76:2
  97:13
**neither**
  61:12
**nerve**
  51:16
**nest**
  90:20
**networking**
  88:25 89:7
  90:14
**Nevins**
  53:3 54:17,20
  66:19
**new**
  12:13 14:3,6,9
  28:21 29:11
  36:5 56:12
  64:1 82:19,25
**newspaper**
  35:15
**night**
  12:23 55:7
**nights**
  60:6
**Nina**
  98:24
**nine**
  22:17 58:19
  59:14
**nineteen**
  64:21
**nominating**
  41:23
**Norrie**

85:23
**nose**
  63:17
**notes**
  77:6,9,11
**notice**
  26:5
**notion**
  99:11
**Notwithstanding**
  7:8
**November**
  38:3
**nuh-huh**
  6:25
**nuisance**
  42:20
**number**
  52:21,24
  57:24,25 64:18
  94:4 98:22
  99:10
**numbers**
  32:3 49:2

**O**

**o'clock**
  22:17 49:11
  51:21 102:5
**O.J.**
  61:9,14
**oath**
  4:13
**object**
  45:5,14 78:11
  81:8 100:4,24
**objection**
  100:10
**objections**

6:10
**observance**
  74:11
**observation**
  75:5
**observe**
  46:17 74:8
**observed**
  74:2,17 76:3
**obstruction**
  75:23
**obtained**
  9:5
**occasion**
  24:20
**occasionally**
  6:9,21 50:9
**occur**
  51:2
**occurred**
  76:6 97:9
**occurring**
  73:11
**odd**
  48:20
**off-the-cuff**
  35:17
**offended**
  75:10 95:23
  96:1
**offered**
  87:13 91:18
**office's**
  25:14
**office-wide**
  51:17
**officer**
  21:15 88:14,
  16,17 89:16,19
  90:7 92:8

**officers**
  24:12
**official**
  15:20
**officials**
  41:19,20
**old**
  43:24 79:24
  92:23 94:21
**olds**
  33:17
**Olmeda**
  83:5
**once**
  8:2 23:15
  26:20 69:16
  88:4
**ones**
  31:2 69:19
**ongoing**
  63:1
**open**
  22:17,19 93:1
**opened**
  10:6,7 93:2
**opening**
  31:14
**operating**
  50:17
**operation**
  70:11
**operations**
  48:10
**opinion**
  36:14,15 43:7,
  8 78:10 97:4
**opportunity**
  8:9 17:13
**opposed**
  75:11

Howard Finkelstein
April 09, 2021

18

opposite
    52:21 53:10
    87:15
option
    101:8
ordered
    101:9
ordinance
    91:5
ordinances
    91:8
organization
    88:14 89:12,16
    92:12
organizational
    30:6
other's
    51:18
outraged
    79:1
outrageous
    52:22 53:4
    55:13 56:4,5
    65:15
outsiders
    35:12
overseeing
    11:16
overworked
    82:8
Owen
    69:11

——————————

**P**

——————————

p.m.
    102:9
pads
    43:12
page

70:3,6 78:2
Palestinian
    85:17
Palm
    24:10 40:13,17
pals
    41:20
pandemic
    35:8 48:9,23
    49:10 58:1,6
parcel
    16:10 75:13
parcels
    16:15
parking
    60:14
part
    9:16 14:13
    21:11 32:12
    39:13 58:25
    75:6,13
participate
    17:21 24:17
participated
    8:6
particular
    56:19,20 60:10
    64:13 93:19
    98:12
particularly
    5:22 6:2 92:15
parties
    35:13
partners
    10:8
pass
    91:4
passed
    13:22 69:18
    91:1

passing
    82:12
passion
    87:3
passionate
    36:2
patience
    101:3
Patrick
    4:20
pay
    24:4,6 41:5
    84:12 86:5
    91:2,11 96:15
paycheck
    95:11
PD's
    31:8
people's
    23:4 56:9
perceive
    75:18
perceived
    42:1 74:18
percent
    91:25
percentages
    75:12
perception
    73:24 74:1,11
    75:4
perform
    13:7 22:11
    94:11
performance
    29:20 30:21,22
    33:20,21 34:6
performed
    32:25

period
    10:12 37:13
    90:21
periodically
    29:22 31:9
    51:17
periods
    20:12
permeate
    22:20
permission
    39:15 40:2,4,7
    41:10 42:12,17
    89:13,15
Perry
    29:8,15
persnickety
    74:24
person
    21:7 25:12
    32:19 35:3,6
    41:4 42:22
    54:24 65:14
    67:11,12 74:21
    75:1 78:1 94:7
    97:24
personal
    5:3 10:17 64:9
    72:21 95:21
personality
    33:17
personally
    16:22 17:1
    43:20 65:16
    75:9 95:23
    100:21
personnel
    19:2 21:5,19
    29:19
perspective
    20:18

**phenomenon**
73:20

**phone**
49:2 52:21,24
56:18 57:24,25
59:3,4,17,19
60:3 64:17
76:15,17

**phonetic**
22:2

**phrased**
73:4

**physically**
50:5 58:5
60:13 76:19

**Picard**
44:10

**picked**
36:11

**piece**
26:17 59:15

**pizza**
59:16

**place**
15:2 25:25
39:19 49:14,
24,25 60:10
82:23 83:13

**placed**
28:23,24

**places**
28:23 29:11

**plaintiff**
4:11 8:6 27:7

**plaintiff's**
70:9,10

**plan**
93:7

**planned**
93:15

**planning**
93:10

**plans**
93:14 94:12

**platform**
93:4

**platforms**
47:18

**play**
13:15,17 32:14
35:17 64:24
97:2

**played**
13:18 79:7,8
96:22

**playing**
83:25

**plead**
91:19

**please**
4:3 5:25 6:3,6
102:1,3

**pod**
7:22,23,24 8:5
52:2 56:12

**podcast**
52:7,9,15,18
53:21 54:23
65:3,5 68:2,12
75:24 76:6,12
77:5,23 81:6
86:3 93:5,10
94:3,19

**points**
55:15 58:14

**police**
24:12 63:7

**policies**
21:12,19 24:24
41:13

**policy**
15:3 44:13

**political**
8:21 12:3,4,
16,17,23 13:7,
15,17,19 14:24
15:4 34:13
41:18 53:3
66:8 72:13
90:17

**politically**
71:13

**politicking**
38:16

**politics**
38:12 46:9
65:18 94:15

**pool**
86:12

**poor**
63:9,10 82:10
92:6,19

**pop-up**
26:20

**Porter**
17:5

**portions**
8:1

**posed**
25:6

**position**
18:13 39:14
44:3,6,23
45:9,18 88:20
89:24 97:5

**positions**
31:14 88:1,18
89:20 90:22

**possible**
43:19 56:13
79:6 101:16

**possibly**
7:13 66:1
72:13 76:11
80:19

**posted**
78:1

**poster**
81:22

**potentially**
34:20

**power**
41:18

**practice**
9:19 10:2,12,
15,16,20 30:8
35:8 51:13,15

**precipitated**
20:15

**predate**
37:20

**predecessor**
11:1 12:24
13:1,6,18
23:13 28:6

**predecessor's**
88:2

**prepare**
26:4

**prepared**
7:18

**preparing**
7:9 48:5

**presence**
58:24

**present**
44:15 73:15
86:6

**presented**
24:22

**preserve**

Howard Finkelstein
April 09, 2021                                                                                      20

6:12

**presidential**
79:9

**pretrial**
30:8

**pretty**
5:13 33:5,14
35:14 83:15

**prevailing**
5:14

**prevent**
62:6

**prevented**
94:9

**previous**
98:23

**previously**
5:1

**primarily**
36:2

**prior**
34:11,14,17
39:3 41:10
45:10,18 52:8
54:19 58:6
59:25

**prison**
59:6 61:1,6

**private**
9:19 10:2,11,
15 90:21 91:14

**privately**
95:17

**privilege**
71:19

**probably**
6:22 8:25
21:23 23:18
25:20 43:25
51:14 59:14

64:18 65:2
74:10

**problem**
15:6 23:7 25:6
26:18 66:6
88:1

**problematic**
6:23

**problems**
10:17 24:1

**procedures**
21:12 44:17

**proceedings**
4:2 7:5 102:9

**process**
18:2 23:2,4
25:7,9 26:1
31:2 83:3

**processes**
44:18

**professionally**
54:25

**proffered**
98:8

**profile**
24:22

**progress**
30:23 31:8

**progressing**
30:14

**promise**
86:13

**promised**
46:10

**promote**
23:5

**promoting**
30:17

**promotion**
32:9

**promotions**
33:3

**prompted**
10:11 40:9

**prosecute**
62:20

**prosecutor**
22:23 57:21

**prosecutors**
49:16

**protected**
94:15

**protective**
70:10

**protocol**
49:24

**protocols**
62:19

**prove**
75:25 76:1

**provide**
11:21

**provided**
7:21 12:10
37:24

**providing**
14:22

**psychologist**
92:11

**public**
5:8 7:15 9:13,
20,25 10:13,23
11:14 12:20
13:6 14:3
15:17,21,25
16:20 17:3,4
19:9,12 20:2
21:1 22:5,23
23:10,14,19,
20,23 24:13,22
27:3,20 28:21

30:15 34:8
35:22 39:20
40:18,20
41:16,24 43:2
44:2 49:17
53:6,14 56:15
58:22 61:24
64:18 67:3,8,
15,17 69:15
70:12,15,25
71:20 72:2
73:1 74:13
79:25 81:20,24
82:2,8,22
85:14,22 86:9
88:15,20 89:25
90:15 91:14
92:4 94:17
98:24 99:3,12

**pull**
95:9

**pulled**
72:12

**punish**
62:9

**punished**
87:13

**purported**
87:18 90:10

**purpose**
5:17

**purposes**
8:4 57:1 59:23

**purview**
32:7

**put**
6:14 27:11
41:24 93:1
99:23

**putting**
97:6

**Q**

**qualifications**
42:25

**qualified**
43:1,5

**qualify**
25:13

**quick**
33:5

**quickly**
87:5,6,8,10

**quiet**
21:8

**quite**
12:14

**quoting**
83:12

**R**

**race**
15:21 37:21
38:25 39:4,5,
18 41:6 46:17
52:22 53:10

**racial**
55:14 71:24

**racially**
71:12 94:8

**racist**
61:11 83:24
94:22 97:1

**radio**
83:23

**Rafael**
83:5

**raise**
4:3 32:9 87:12
99:20

**raised**
70:1 81:6,7,14
86:3

**raises**
31:21,23,25
87:13

**raising**
86:2,4

**ran**
11:14 14:7
47:22

**ranks**
11:13 12:19

**rape**
84:11,23

**raped**
85:17

**rarely**
31:5

**rates**
30:16

**reach**
57:19,22 69:7,
8,9 100:22

**reached**
42:3 68:11
77:21 96:5

**reaching**
95:25 96:3

**realized**
91:21

**reared**
87:7

**reask**
100:9

**reasons**
19:22 20:13
23:24 71:11
78:25 82:3

**rebuild**

**98:16,17**

**receive**
31:20 33:3

**received**
52:8 54:16
68:20 98:10,11

**receptivity**
73:8

**reckless**
55:1 64:4 79:2

**recoiled**
91:1

**recollection**
27:6 29:14
31:1 32:24
35:15 46:14
86:8 99:6

**recommendation**
32:13

**record**
4:16 5:17,18
6:12,13,15 7:4
8:4 21:24 54:6
101:8

**recovering**
84:8

**recruit**
66:10

**reduced**
91:25

**reduction**
49:6

**refer**
12:15 18:10
69:22,23

**reference**
7:17 38:1,15

**referenced**
18:18 23:13
41:8,10 52:2

**references**
36:4

**referencing**
55:5 63:16

**referring**
8:5 18:10
53:13 61:13
62:25 63:5
66:18,19 85:15

**reflected**
32:22 97:10

**reflective**
42:1

**refute**
57:13

**regard**
22:4 39:19
56:14 93:22
98:20,23

**regarding**
9:1 84:3
100:14

**regards**
100:6

**regular**
33:3 86:9
101:16

**related**
6:10 52:1 93:8

**relationship**
54:19 70:14,25

**relationships**
71:3 72:3
73:3,23 74:7
75:11

**Relative**
37:10

**release**
49:6 50:17

**released**

79:14

**religiously**
71:13

**remainder**
19:8

**remote**
48:21

**remotely**
49:5,18 50:2

**remove**
10:19 87:12

**removed**
25:7,25 87:19
89:9

**Renee**
18:9,18,19
21:10 51:3
54:1 65:7
72:16 77:12
90:3,7 97:21

**reopened**
50:1

**rephrase**
6:7 45:6

**report**
47:6

**reporters**
78:4,5

**reports**
31:8

**represent**
4:21 28:8
37:23 91:18
98:10

**representation**
11:22 12:10
14:22 25:14

**represented**
82:7 91:5,9

**representing**

73:15

**request**
42:11 77:5

**requested**
80:6

**require**
39:15

**required**
40:2 49:9
58:24 59:1

**requires**
43:13,14,16

**researching**
26:4

**resign**
15:3 39:16
42:23 85:10
88:5

**resigned**
83:20,21 90:8
96:13

**Resource**
21:14

**resources**
21:7,8,17
25:13

**respect**
5:5 46:5 75:17
99:24

**respective**
47:17

**respectively**
21:25

**respond**
53:18 54:3

**response**
100:1

**responses**
100:5

**responsibilities**
16:20 22:9

**responsibility**
13:22 92:6

**responsive**
46:8

**result**
63:25 91:24
97:11

**resulted**
5:13 87:19

**resulting**
10:17

**retaliation**
5:11 70:10

**retired**
17:5 67:5 69:4
98:3

**retirement**
76:16

**retiring**
94:13

**retrospect**
37:14

**returned**
94:2

**review**
98:7

**reviewed**
7:19 55:7 77:4

**RILEY-TAYLOR**
102:3

**ring**
37:12 85:23

**ringing**
59:4

**rings**
85:24

**ripped**
40:12

**rise**
81:13

**Riveras**
88:8

**Rob**
67:1

**rocks**
48:4

**role**
18:22,24,25
25:22 36:3
37:2

**rose**
12:18

**Ruby**
4:21 27:7,15
28:9 39:18
40:1,9 43:20
47:13 61:14
65:22 67:7
72:8 73:5,13,
16 79:18 81:21
82:16 83:1
87:16 88:6,11,
12 90:12 93:14
94:1 95:2,8
96:3,6,10
97:16,17

**rule**
41:8,9 42:9
90:1,6,10

**rules**
5:19 38:6,15
39:13,15,17,
19,23 40:1
41:13 62:6
90:4

**rumors**
66:7

**run**
10:23 11:9,20
15:3 34:13,18,

Howard Finkelstein
April 09, 2021
23

19,25 35:3,13
36:25 39:14,
16,24 41:17,19
42:5,17,19,23,
24 43:18 93:25
96:14

**running**
13:2 15:7,15
34:21 35:20,
21,22 36:13
37:1 39:17,18
40:14 41:11
44:2 47:16
48:20 53:1
65:24 72:24
83:23 97:25

**runs**
53:3

---

**S**

**safe**
61:24 62:2

**sanctions**
62:7

**Sante**
28:17,18

**sat**
54:4 92:10

**satellite**
16:12

**Saturdays**
58:9 60:6

**Satz**
24:11

**saving**
89:7

**scenario**
13:14

**school**
8:16 9:15

**Schreiber**
11:3

**Science**
8:21

**screaming**
81:19

**second**
19:1 28:5

**secretary**
56:12

**sector**
90:21

**seek**
15:16,19 39:15
41:10

**seeking**
59:19

**sees**
69:16

**select**
24:17

**send**
62:16

**sending**
40:9 62:14
63:1

**sense**
17:10 73:17

**sentence**
62:20

**Sentinel**
83:5 93:13,17

**separation**
19:15

**serious**
17:14 99:2

**serve**
19:7 43:2
45:4,12 79:25

**served**
71:23

**services**
91:11

**setting**
38:5

**seven**
9:19 26:13
60:2

**Seventy-eight**
8:24

**share**
19:22 24:13
51:5 77:9

**shared**
13:22 23:24
47:21

**she'll**
6:14

**sheriff**
62:17 96:7,8

**shift**
73:11,18 75:15

**shifted**
13:21 14:1

**shine**
31:4

**ship**
48:3

**shocked**
80:25

**shocking**
71:20

**shortly**
53:2

**showing**
46:25 91:22

**shows**
22:23,24

**shut**
48:23

**side**
46:24

**sides**
52:22 53:10

**sign**
91:9,12 95:11

**signed**
98:14

**significant**
76:15 89:21

**signing**
102:7

**similar**
40:17 78:10
81:14

**sir**
4:17 5:9 6:19
7:6,16 18:12,
20 23:12 26:8,
24 27:4 34:10
38:14 50:4
52:17 66:20
98:5 101:13

**sit**
20:8 29:13
32:24 44:12
59:2 96:14

**sitting**
39:24,25 88:11

**situation**
20:6 24:23
52:15

**six**
42:5 59:17
70:6

**sketch**
9:11 26:15

**skyrocketed**
55:15

Howard Finkelstein
April 09, 2021

24

slapping
   96:15
small
   32:3,12
smoothly
   43:18
sober
   10:18 63:18
social
   78:1
sold
   92:20
solemnly
   4:5
soliciting
   38:21
somebody
   24:3 26:17
   42:19 69:16
   82:23 94:5
   96:7 97:3,14
sort
   9:10 11:4
   21:6,20 22:8
   37:17
sought
   66:8
sounding
   82:16
sounds
   5:15 13:5 26:6
   44:22 96:1
   99:7
South
   8:15,18 9:2
   83:5
speak
   23:18 47:1
   58:23 74:10
speaking

22:12 25:23
34:6 73:20
specialized
   31:15
specific
   9:10 28:20
   35:14 55:4
   63:3 69:19
   72:2 73:1
   74:4,20 75:1,
   22 91:11 97:8
specifically
   47:19 70:23
   74:4 75:3
   93:14
specifics
   100:8
speech
   17:7 70:11
speeches
   56:19
spend
   95:1
spent
   12:1,6
spheres
   30:1
spit
   97:16
spitting
   97:17
split
   71:7 97:22
spoke
   68:19
spoken
   7:10,14 68:18
   79:5
spot
   60:14

spread
   49:8 50:11
   72:13
spreading
   51:6
square
   99:21
staff
   40:23 44:23
   45:21 58:12
   61:25 77:2
   84:2,22 85:9
   90:10 94:6,10,
   20
standard
   62:18
standards
   42:1
standpoint
   6:23 16:4
stands
   33:13
Star
   44:9
start
   28:22 29:10
   33:23 52:4
started
   9:13 16:9 21:3
   27:18 51:19
   58:8 62:8
starting
   30:7 35:4
   49:10
startled
   96:2
starts
   59:18 63:16
state
   4:16 13:20,22
   14:2,4 15:17,

21 23:22
24:11,14 62:16
63:8 65:18
82:2 90:25
91:3,5,6 99:1
100:3,13,22
stated
   100:5
statement
   70:24
statements
   81:12,14
station
   26:12
station's
   26:11
stayed
   9:17 46:23
staying
   46:8
stood
   47:23
stop
   28:5 59:3,15
   63:14
stopped
   60:4 91:22
story
   26:20 32:18
   83:11
straight
   94:13
stream
   63:2
street
   16:11 59:16
   62:3
streets
   62:9
stress

Howard Finkelstein
April 09, 2021

25

41:2

**strokes**
22:4

**struggled**
78:24

**stuff**
24:2 33:18
38:10 44:18,20
47:23,25 49:12
54:1

**stunning**
82:5

**subscribe**
99:11

**substantially**
70:11

**substantiate**
75:2

**succeed**
87:1 92:15

**sudden**
48:19 73:8
91:7

**sue**
92:12

**sued**
84:12,17

**suffer**
92:21

**suffering**
26:17

**suggest**
38:16

**suggested**
74:5 80:5

**Sun**
83:5 93:13,17

**Sundays**
58:9 60:7

**super**
50:13,14

**superiors**
70:15 71:1

**supervisor**
28:13

**supervisor's**
32:12

**supplement**
13:24

**support**
14:24 75:19
80:1

**supported**
12:20

**supporting**
12:19 47:13,14

**Supreme**
82:14

**surprised**
39:7,10,11
86:7

**Susan**
17:5

**swear**
4:5

**sweat**
99:19

**sworn**
4:12

**swung**
79:16

**system**
63:11 71:25
75:16 86:11

**systems**
48:25

---

**T**

**tailed**
27:10

**takes**
43:9 44:20
64:2,19 88:20

**talks**
63:20

**Tallahassee**
83:2

**tasks**
21:21 22:10,13

**taste**
71:8

**Taylor**
102:2

**team**
73:10

**tears**
99:20

**technology**
6:24 35:7

**telecommute**
58:2

**telecommuting**
76:8

**telephone**
50:24 76:21,22

**television**
26:6

**telling**
61:24 94:5,23

**tells**
6:16 88:12

**tempering**
43:14

**template**
30:21,24

**tend**
6:4

**tendency**
6:24

**tension**
20:11,15,18

**tenure**
17:20 23:10
29:19 33:8
34:3 56:15

**term**
16:7,8,9 19:8
28:7 34:11,14,
16,19,25 35:11
76:14

**terminate**
75:8 78:7,16
80:18 85:19
93:11,15 98:23
99:8

**terminated**
19:16,18,20
65:13 83:17
97:19 98:1
99:25

**termination**
20:14 70:16
71:2 80:9 83:6
84:3 85:4

**terminology**
27:22

**terms**
7:9 10:24 34:9
78:6 88:2

**Terrific**
6:20 8:8
101:14

**testified**
4:12 68:16
78:8

**testify**

Howard Finkelstein
April 09, 2021

26

45:15 73:19

**testimony**
4:5 57:4

**text**
48:18 53:2
76:22 80:10,12

**texts**
88:24

**thing**
6:21 29:6
35:18,20 39:21
41:13 42:2
43:10 45:21
51:22 54:11
72:14 74:12,20
75:13 79:8
83:9 84:22
88:13 98:19

**third**
35:13 87:23
97:24

**thirty**
22:18

**thoughts**
65:8

**thousands**
89:3

**threatened**
25:8 85:20

**three**
16:10 18:4
37:15 46:1,2
53:16 58:18
59:13 99:21

**three-minute**
26:16

**throw**
37:11

**thumbnail**
9:11 26:15

**thwart**
91:17

**tie**
97:8

**timeframe**
99:24

**times**
22:20 32:16

**tolerated**
38:17

**Tom**
53:1,13,14
73:13

**top**
22:22

**topic**
17:7 26:3

**Torre**
67:4,14,19
68:18,20

**track**
60:16

**tracking**
57:2

**train**
16:21 22:6

**trained**
12:9

**training**
9:24 16:24,25
17:1,4 72:19
81:18 86:6,16,
17

**trajectory**
28:20

**transcript**
7:22 55:8

**transform**
90:17

**transplant**
26:19

**trash**
65:20 95:10

**Trek**
44:9

**trial**
8:10 24:2,6
61:17 75:25
82:24

**trials**
29:1,6,9

**trigger**
20:17

**true**
61:3 64:22,25
83:25

**truth**
4:6,7 55:2
79:2 82:9 93:4

**truthful**
83:16

**tuned**
48:7

**turnover**
30:16

**TV**
26:10,11,12

**twenty**
22:18

**twenty-**
33:16

**twice**
23:15 26:20

**two**
10:14 16:10,11
20:9 25:6
28:23 29:10,11
30:13 40:11,14
46:2,4 49:11,

21 52:19 57:7
59:14 60:1
67:9,25 79:4
85:14 87:22

**two-and-a-half**
26:16

**type**
9:5 15:3 23:7
33:20 34:12
35:17 45:21
46:21 51:22
85:8

**typical**
22:11 23:19,22
33:14

**typically**
28:19,21 29:19
51:2

---

U

**ultimate**
18:7 83:18

**ultimately**
10:22 11:14

**umbrage**
75:10

**umbrella**
13:7

**underfunded**
14:6 82:1,17

**underfunding**
82:18

**undermined**
70:13,24 71:4
72:3 73:24
74:6

**undermines**
73:3

**undermining**
75:11

Howard Finkelstein
April 09, 2021
27

underpaid
82:9

undertook
14:14

unemployment
84:13,18 85:1

unfair
52:23

unfolded
46:15

unfortunately
82:14

unique
24:23

unit
31:16

University
8:15,16,18,23
9:2

unprofessional
61:15 83:16

unsigned
98:11

untenable
94:25

untrue
81:3

untruthful
65:15

unverified
98:11

upset
54:13,23 80:24

utilize
31:19,21

---

**V**

---

vaguely
77:7

veracity
57:2

verbally
42:11

verify
98:21

versus
13:19 86:20

vibrations
73:9

victims
25:5

video
69:17

viewed
71:14,15,16

violations
99:1,2

virus
49:8 50:10
51:6

visits
30:9

voiding
74:9

vote
38:20

voter
14:1

votes
38:21

voting
79:15

---

**W**

---

Wainwright
86:20

wait
27:11 80:6

waited
78:20 80:4

waived
102:8

walk
30:3 72:6
82:21

walked
73:5 97:15

walking
59:4

warranting
70:15 71:1

watch
46:21 53:21
54:2,11

watched
40:11 54:5,16
55:6 65:5,17

watching
65:4

water
73:16

ways
44:9

Weatherly
98:25

weed
18:5

week
58:19 59:13,14
60:2 82:12

Weekes
7:14 20:2,5
33:23 34:12
36:10,17 37:10
38:5,19 39:1
43:24 44:3
45:1 46:6,10
47:20 66:2
68:9,16 76:11

78:9 80:5,17
93:10,21,23
98:1 100:2,12,
19,22 102:5

Weekes'
37:5

weigh
93:24

weighed
79:5

weird
61:10,12

welcome
101:23

west
16:12

whatsoever
30:6

white
62:18,22 71:19

wife
37:1 54:4
65:17 80:20,21
98:16

wife's
54:7 77:25
80:23

wildly
87:1

win
80:1

wish
33:12

withheld
42:15,17,19

witness
4:8,11 5:4
101:10,13,23

witnesses
22:22

Howard Finkelstein
April 09, 2021                                                            28

**won**
   43:1  93:8,14
**word**
   11:10  21:17
   30:25  75:14
   81:20
**worked**
   9:12,21  10:2
   11:8,12  14:19
   28:12  33:25
   50:3  60:2  82:4
**working**
   9:13  10:12
   14:22  16:1
   33:24  34:5
   49:18  53:11,13
   57:16  70:13,24
   94:20
**works**
   83:3
**world**
   23:8  35:4
   95:18
**worried**
   51:16
**worse**
   78:23
**worth**
   43:7
**wracking**
   51:16
**write**
   83:10
**written**
   63:6
**wrong**
   27:22  36:7
   41:4  52:23
   53:4  63:20
   64:24  65:15
   78:20  80:3

   85:12  87:4
**wrongful**
   84:3  85:4
**wrote**
   37:20  38:4,23,
   24  63:3
**WSVN**
   26:13

___

**Y**

**yellow**
   43:12
**young**
   27:10,14  29:25
   30:5  32:4
   33:15  36:2
   39:20  51:9,10
   82:8
**younger**
   43:21

___

**Z**

**zoom**
   76:22  77:3,17
   94:2  102:8