Ruby Green

vs.

Howard Finkelstein

---

Deposition of:

Ruby Green

April 16, 2021

---

*Vol 1*



**EXHIBIT B**

Ruby Green
April 16, 2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO:   20-CV-62160-BLOOM/Valle

RUBY GREEN,

     Plaintiff,

v.

HOWARD FINKELSTEIN, Individually,
in his Capacity as Public Defender
for Broward County, and the Office
of the Pubic Defender for Broward
County.

     Defendants.
_____/

WEB CONFERENCE DEPOSITION OF
RUBY GREEN

VOLUME 1 (Pages 1-188)

DATE TAKEN:  FRIDAY, APRIL 16, 2021

TIME: 1:00 p.m. - 5:15 p.m. EST

(VIA WEB CONFERENCE)

STENOGRAPHICALLY REPORTED VIA WEB CONFERENCE
BY:  FRANCINE O'CLAIRE, RPR

Job No.:  182495

Ruby Green
April 16, 2021

Page 2

```
 1                        APPEARANCES

 2                    VIA WEB CONFERENCE

 3

 4

 5       On behalf of Plaintiff Ruby Green:

 6             Frank & Rice, P.A.
               325 West Park Avenue
 7             Tallahassee, FL  32301

 8             BY:  PATRICK R. FRANK, ESQ.
               lawatf@aol.com
 9

10       On behalf of the Defendants Howard Finkelstein,

11   Individually, in his capacity as Public Defender for

12   Broward County, and the Office of the Public Defender

13   for Broward County:

14             Laufer & Laufer, P.A.
               7251 West Palmetto Park Rd., Suite 305
15             Boca Raton, FL  33433

16             BY:  CORY LAUFER, ESQ.
               claufer@lauferlawyers.com
17

18             Also Present via web conference:

19             Alicia Laufer, Attorney for Defendant

20             Dacia Taylor, General Counsel for Public
               Defender's Office
21

22

23

24

25
```

Ruby Green
April 16, 2021

Page 3

1                       I N D E X

2                                              PAGE

3    Examination

4    Testimony of RUBY GREEN

5         Direct Examination by Mr. Laufer        4

6

7    Certificate of Oath                        185

8    Certificate of Reporter                    186

9    Read Letter                                187

10   Errata Sheet                               188

11

12                    E X H I B I T S

13   EXHIBIT     DESCRIPTION                    PAGE

14    1          11/27/18 Emails from Finkelstein to   66
                 Plaintiff
15    2          08/19/20 Sun-Sentinel Article         73

16    3          10/23/20 Complaint                    87

17    4          Interrogatories - Defendant's first   88

18    5          Interrogatories - Plaintiff's response 89

19    6          01/02/2018 Public Defender Manual     177

20

21   REPORTER'S NOTE:  All documents were sent to Phipps
     Reporting Electronically.  A digital exhibit sticker
22   was placed on the documents which were marked during
     the proceeding.
23

24

25

Ruby Green
April 16, 2021

Page 4

1  Proceedings (Volume 1) commenced at 1:00 p.m. EST

2          THE STENOGRAPHER:  If you'll raise your right

3  hand, please.  Do you solemnly swear that the testimony

4  you are about to give will be the truth, the whole

5  truth, and nothing but the truth?

6          THE WITNESS:  Yes.

7  Thereupon:

8                    RUBY GREEN,

9  having been first duly sworn, was examined and

10  testified as follows:

11                  DIRECT EXAMINATION

12  BY MR. LAUFER:

13     Q.    Good afternoon, ma'am.  Would you give me your

14  full legal name, please?

15     A.    Ruby Lenora Green.

16     Q.    Great.  Ms. Green, my name is Cory Laufer, and

17  I represent the defendants Howard Finkelstein, both in

18  his individual capacity and his capacity as a public

19  defender as well as the Office of the Public Defender

20  for Broward County.  We are here to take your

21  deposition in a lawsuit you have filed against those

22  three defendants.

23     Now, I know you're, obviously, an attorney.  I'm

24  sure you've taken a number of depositions.  So my

25  question to you is, ma'am, have you ever sat for a

Ruby Green
April 16, 2021

Page 5

1  deposition, given one?

2      A.   I want to say I've -- I've given one.  I've

3  given multiple depositions.  I don't remember if I

4  actually sat for one because I did -- When I was young,

5  I was a witness in a trial; but I can't recall whether

6  or not I actually sat for a deposition for that or not.

7      Q.   Well, let's do this, ma'am; have you given a

8  deposition since you turned eighteen?

9      A.   No, I don't -- I don't remember having to, no.

10     Q.   Okay.  So any depositions you would have

11  given, that would have occurred before you turned

12  eighteen?

13     A.   Yes.

14     Q.   Okay.  And in those instances, ma'am, without

15  getting into too much detail, you were witnesses in

16  what type of matters?  Criminal matters?  Civil

17  matters?

18     A.   Right.  It was a criminal case.

19     Q.   Okay.  All right.  Well, of all people, ma'am,

20  I'm sure you know the rules of the road; but I'm going

21  to go over them briefly just so I can cover all my

22  bases; okay?

23     A.   Hmm-hmm.

24     Q.   Okay.  And that's going to be my rule number

25  one right there.  If you want to answer yes or no,

Ruby Green
April 16, 2021

Page 6

1  please make sure you say yes or no out loud.  Don't say

2  huh-uh or uh-huh or nod or shake your head, so the

3  record is real clear; okay?

4      A.   Understood.

5      Q.   If I ask you is that a yes or is that a no,

6  I'm not being smart; I just want to make sure we're

7  clear; okay?

8      A.   Yes.

9      Q.   Great.  And, of course, you understand you're

10  under oath and that you can be held to the answers you

11  give today, correct?

12      A.   Yes.

13      Q.   Okay.  Now, this deposition is over Zoom.  As

14  you already saw from the very beginning of our efforts

15  here, there can be technical glitches at times.

16      If at any point you can't hear me clearly, I need

17  you to tell me so; and I'm going to repeat myself and

18  make sure that you do hear me; okay?

19      A.   Yes.

20      Q.   And even if you hear me, if you're not 100

21  percent of what I'm asking you, I need you to tell me

22  that you're not clear on what I'm asking; and I'll

23  rephrase it so that you do understand; okay?

24      A.   Yes.

25      Q.   Now, the flip side to that coin is if you

Ruby Green
April 16, 2021

Page 7

1   don't tell me either that you don't understand or that

2   you can't hear me, I'm gonna assume that you hear and

3   understand me; okay; is that fair?

4       A.   Yes.

5       Q.   Great.  If you want to take a break at any

6   point, ma'am, just let me know.  We can certainly do

7   that.  My only request would be if there is a question

8   pending, I want you to answer that question; and after

9   that we can take as many breaks as you need; okay?

10      A.   Okay.

11      Q.   All right.  Great.  You are a licensed

12  attorney in the state of Florida, correct?

13      A.   Yes.

14      Q.   When did you obtain your bar license, ma'am?

15      A.   November 2011.  I don't really remember the

16  exact date, but it was November 2011.

17      Q.   No, that's -- That's just fine.  Let's talk a

18  little bit about your background, ma'am.  Let me just

19  say, you grew up in difficult circumstances, did you

20  not?

21      A.   Yes.

22      Q.   Can you just give me, if you don't mind, just

23  the benefit of your -- your circumstances growing up,

24  what you had to overcome, things like that, if you

25  would, please?

Ruby Green
April 16, 2021

Page 8

1    A.   I mean, just growing up in what we call the

2 hood.  I mean, there was so many of us living in the

3 same household.  Not only did we live with, you know,

4 other family members, but I -- We grew up with rats and

5 roaches in the home.  And, you know, I didn't think

6 that I was going to be able to go to college actually

7 at any point in time.  I didn't know anybody who did.

8    And I thought I was going to be like a manager at

9 McDonald's and stuff like that.  I -- You know, even

10 going to high school, I made good grades, you know.

11 I've always made good grades, but, you know, I didn't

12 know anybody that would be able to teach me and tell me

13 that, you know, I could actually do better for myself

14 until I had a guidance counselor who, you know, told me

15 that maybe I should go to a college.

16    And I did based upon what she said.  She applied

17 for me to one school, and I got in to that one school;

18 and it's been, you know, me, you know, trying to better

19 that lifestyle from there on out.

20    **Q.   Understood.  Where did you attend high school,**

21 **ma'am?**

22    A.   Coral Springs High.

23    **Q.   Okay.  I'm not going to hold that against you**

24 **ma'am.  I went to your rival, J. P. Taravella High**

25 **School.**

Page 9

 1    A.   Oh, yeah.

 2         THE STENOGRAPHER:  I'm sorry, I couldn't

 3    understand.

 4         MR. LAUFER:  Yeah.  I'm sorry, madam court

 5    reporter; is there some part you missed?

 6         THE STENOGRAPHER:  Yeah, there was some

 7    overlap.  I didn't hear the end of her answer about the

 8    rival of the school.

 9    A.   Oh, Summins (phonetic), that was another

10    rival.

11    **Q.   Okay.  And what year did you graduate from**

12    **Coral Springs High School?**

13    A.   2005.

14    **Q.   Now, did you live primarily in south Florida**

15    **growing up?**

16    A.   Yeah.

17    **Q.   Okay.  Growing up did you ever live anywhere**

18    **outside of South Florida?**

19    A.   No, aside from when I went to college.

20    **Q.   Sure.  Okay.  All right.  Now, you went to**

21    **Florida State University; is that correct?**

22    A.   Yes.

23    **Q.   Okay.  Not going to hold that against you**

24    **either since I went to the University of Florida.**

25    A.   Oh, my gosh.  You're going to all the other

Ruby Green
April 16, 2021

Page 10

```
 1  opposite schools.

 2      Q.   We're still going to get along just fine,

 3  ma'am.  Okay.  What year did you graduate from Florida

 4  State?

 5      A.   2008, summer it was.

 6      Q.   And with what -- In the summer of 2008?

 7      A.   Yes.

 8      Q.   And with what kind of degree did you graduate

 9  with?

10      A.   Double major, criminology and psychology.

11      Q.   I'm sorry, criminology and what?

12      A.   Psychology.

13      Q.   Okay.  All right.  Obviously, at some point

14  you made the decision to go to law school, correct?

15      A.   Yes, that same year.

16      Q.   All right.  All right.  Did you immediately go

17  from undergraduate to law school or was there time in

18  between?

19      A.   I want to say it was immediate, but it wasn't

20  like, oh, okay, the next week.  It was like I think a

21  month in between.  I graduated the --

22      Q.   Sure.

23      A.   I graduated the summer of 2008, and then I

24  want to say maybe a few weeks later or in September of

25  that same year, I started law school.  There was no
```

Ruby Green
April 16, 2021

Page 11

 1   break.

 2        **Q.    Okay.  Understood, ma'am.  Where did you**

 3   **attend law school?**

 4        A.    Florida Coastal School of Law in Jacksonville.

 5        **Q.    And you graduated from there, correct?**

 6        A.    Yes.

 7        **Q.    What year did you graduate from there?**

 8        A.    December 2010.

 9        **Q.    All right.  Following graduation from -- from**

10   **law school, what was your first job as an attorney?**

11        A.    I want to say I worked at a -- Well,

12   technically throughout law school, I worked at the

13   Public Defender's Office.  I was -- I worked as an -- I

14   was an intern, an extern.  I was -- I did a fellowship

15   there.  I -- I basically worked there the entire time

16   until I transferred here.

17        I also did like a construction law firm for a

18   couple of months, but the majority of the time I worked

19   at the Public Defender's Office; and that was my first

20   job.  I got hired OPS there.

21        I think the same month that I -- that I got the --

22   you know, passing the bar and stuff like that, I got --

23   I started at the Public Defender's Office as an actual

24   attorney in the misdemeanor and --

25              THE STENOGRAPHER:  I'm sorry, the misdemeanor

Ruby Green
April 16, 2021

Page 12

1  and what?

2      A.    Jimmy Ryce Unit.

3  BY MR. LAUFER:

4      **Q.    And did you say you were hired -- did you say**

5  **OPS?**

6      A.    Yes, so it wasn't like -- At the time they

7  couldn't afford to pay me full time, so it was like

8  part time.  And then -- And then I think I eventually

9  became like full time or something like that, but I

10 had --

11     **Q.    Okay.**

12     A.    -- two positions.

13     **Q.    So between December of 2010 and where you**

14 **graduated from Florida Coastal and November of 2011,**

15 **were you still working at the Public Defender's in**

16 **essentially a non-lawyer position?**

17     A.    No.  After I graduated, I was studying for the

18 bar; and the only place I actually did -- was lawyering

19 at was the construction law firm, but it was like as a

20 temp.  And then I -- I worked for a clinical research

21 company after that.  And then I got hired at the P.D.'s

22 Office once I actually got my bar license.

23     I took the bar in February.  I got my passing

24 grades in April, and then it took the bar a long time

25 to, I guess, to go through my application; and then I

Ruby Green
April 16, 2021

Page 13

```
 1  didn't get it until November.
 2     Q.   Okay.  All right.  So from November of 2011,
 3  for how long did you work for -- it was -- I'm sorry,
 4  ma'am, was it the Public Defender's Office in
 5  Jacksonville?
 6     A.   Yes.
 7     Q.   Which circuit is that?
 8     A.   Fourth.
 9     Q.   And for how long were you there, ma'am?
10     A.   Until I came here.  I left -- My last day
11  there was on March 2nd, 2012.  I started at the Public
12  Defender's Office here on March 5, 2012.
13     Q.   Okay.  So -- So then you were only at the
14  Duval County Public Defender's Office as an attorney
15  for approximately the four months?
16     A.   Yes, I wanted to come home.  But, like I said,
17  I technically was there throughout law school.  They
18  knew me and everything.
19     Q.   Okay.  All right.  And then you start at the
20  Broward County Public Defender's Office, correct?
21     A.   Yes, March 5, 2012.
22     Q.   Okay.  And at that point Howard Finkelstein
23  was the Public Defender, correct?
24     A.   Yes.
25     Q.   Did you know anything about Mr. Finkelstein
```

Ruby Green
April 16, 2021

Page 14

1   before you applied for a position in Broward County?

2      A.   No.  I found out later that he was "Help Me

3   Howard."

4      Q.   Was "Help Me Howard" kind of some persona that

5   you were aware of growing up in South Florida?

6      A.   Yeah, from the Channel 7 News, yeah.

7      Q.   Okay.

8      A.   But I never --

9      Q.   If I understand --

10     A.   I never knew they were the same person.

11     Q.   That's what I was going to ask you.  Okay.

12     So we're going to talk a little bit about that

13  point going forward.  But let's get a little background

14  first, ma'am.  Other than the lawsuit that we're here

15  on today, have you ever been a party to any civil

16  litigation that is as a plaintiff suing somebody or as

17  a defendant being sued by somebody?

18     A.   No.  Just like a child, like a child custody.

19  I was the respondent in a child -- in my child custody

20  case.

21     Q.   Sure.  Okay.  Okay.  And where do you

22  currently reside?  What city do you live in?

23     A.   Pompano Beach.

24     Q.   Okay.  And I asked you before about your

25  circumstances.  Now, I'm going to ask you just about

Ruby Green
April 16, 2021

1  **your current situation.  Tell me a little bit about**

2  **your family situation.  Do you have children?  Are you**

3  **married?  Give me some background, if you would please.**

4      A.   I'm still a single mother.  For the majority

5  of the time that I worked at the Public Defender's

6  Office, I was working two, sometimes three jobs, just

7  to support everybody at the present circumstances.

8      There's about five, six -- seven of us in the same

9  household.  And, you know, I was always able to do my

10  work on both ends.  I would, you know, finish my job at

11  the Public Defender's Office and then work at night

12  either at Macy's or a doc review company.

13         THE STENOGRAPHER:  (Interrupted for

14  clarification.)

15      A.   Or a document review company.  And the last

16  year that I was running, I had to stop working both

17  jobs.  I had to sell my home.  And in order for me to

18  be able to even afford to run, it was just -- that's --

19  that was just the position that I was in.

20  BY MR. LAUFER:

21      Q.   **Okay.  I'm sure some of the seven people in**

22  **your house are minors, correct?**

23      A.   Yeah.

24      Q.   **Okay.  I don't want you to tell me any of**

25  **their names or anything.  Can you just describe for me**

Ruby Green
April 16, 2021

1 who these people are, who you're supporting without

2 necessarily giving me their names?

3   A.   So there's -- There's other people that I

4 support that don't live in the household like my mom

5 and my little sister; they live separately.

6   You know, I pay for my mom's housing.  My little

7 sister is a minor.  My mom's been on disability,

8 goodness, for the majority of my life.

9   But it's my -- my sister, she has four kids; and I

10 have one kid.  They're all under eighteen.

11   Q.   Okay.  So if I understand, the seven people

12 that you're supporting would include your mother and

13 your sister and then your sister's four children and

14 your children -- I'm sorry, your child?

15   A.   Right, but that's a separate sister.

16   Q.   Oh, I'm sorry.  Okay.  So your mother and your

17 sister, and then you have a separate sister who has

18 four children --

19   A.   Right.

20   Q.   -- and your sole child?

21   A.   Yes.

22   Q.   And who -- Which of those individuals live

23 with you, ma'am?

24   A.   The one sister with her four kids and me and

25 my daughter.  We all live together.

Ruby Green
April 16, 2021

Page 17

1    Q.   Understood.   Okay.   Your daughter is a minor,
2  correct?
3    A.   Yes.
4    Q.   Okay.
5    A.   But we're all -- We're all moving soon.
6    Q.   I'm sorry, ma'am, you got a little cut off.
7  You said we are all, and I didn't hear the rest.   I
8  apologize.
9    A.   Say that one more time.
10   Q.   I missed what you said.   You had said we are
11 all and then it got a little garbled.   Can you repeat
12 your answer for me, please?
13   A.   Oh, no, in the same -- in the same room, like
14 in the same home.
15   Q.   Understood.   Okay.   All right.   So if I
16 understand you correctly then, there's one other adult
17 living in your home; and that would be your sister,
18 correct?
19   A.   Yes.
20   Q.   She's over the age of eighteen, right?
21   A.   Yes.
22   Q.   Okay.   What is her name, ma'am?
23   A.   Cynthia Jackson.
24   Q.   Okay.   Okay.   So let me ask you this then, you
25 mentioned you had had a number of jobs; were you

Ruby Green
April 16, 2021

Page 18

1    working multiple jobs the entire time you were at the

2    Public Defender's Office of Broward County?

3         A.   Not the entire time, but the last maybe five

4    years with the exception of last year, so five years in

5    between -- I mean, from last year, so 2019 on back.

6         Q.   Understood.

7         A.   Might have been four years.  I want to say I

8    started the second job, and it could have been 2015.  I

9    can't recall -- recall when exactly I started it.

10        It could have been the beginning of 2015, the end

11   of 2014.

12        Q.   Understood.  Okay.  Was anyone aware of the

13   Public Defender's Office that you were working these

14   extra jobs?

15        A.   Yeah, Howard had to give me permission.

16        Q.   Okay.  And how was that permission given?

17        A.   He sent me an email.

18        Q.   And that email you still have?

19        A.   Yes, I believe I gave it; but if I didn't,

20   then I will resend it.

21        Q.   Excellent.  Thank you, ma'am.  Okay.  So when

22   you -- just so -- I just want to make sure, you said

23   "doc review."  To be clear, you mean document review;

24   you were reviewing legal documents?

25        A.   Yes.

Page 19

1    Q.   Okay.  And just -- Can you just briefly

2  describe what -- what that entails, what you do, what

3  the purpose is for it?

4    A.   Before document review, I worked at like the

5  Multiple Sclerosis Foundation, like bone center, where

6  I called people and, you know, asked them for donations

7  for the cause.  And then for document review, we just

8  reviewed documents for companies to see if they had any

9  confidential information that needed to be withheld

10  from, you know, the lawsuit or stuff like that; so

11  that's all it was, like just coding and trying to see

12  what documents we can give and what documents we don't

13  give.

14    Q.   Would you describe that as legal work?

15    A.   Not -- I mean, we're not really giving an

16  opinion but yeah, I mean, they -- I guess so, yes; it

17  would be some type of legal work.

18    Q.   Well, let me ask you this, you say "we," so

19  there was probably other people doing this job along

20  with you; is that fair to say?

21    A.   Yes.

22    Q.   Were all of those individuals attorneys like

23  you?

24    A.   To be honest, I cannot say if they all were

25  because some of the jobs would require -- I mean, I

Ruby Green
April 16, 2021

Page 20

1  guess, I don't know because like some jobs that, you

2  know, you could be -- have a Florida license, some jobs

3  you didn't need a Florida license.  So I can't really

4  say if everybody exactly was, you know, an attorney.  I

5  think some jobs they even sent paralegals, so yeah.

6      **Q.   Okay.  Fair to say some of the work you did in**

7  **document reviewing was work that would have been**

8  **done -- it would have been required to be an attorney,**

9  **correct?**

10     A.   Yes.

11     **Q.   Okay.**

12     A.   And then at Macy's I was a customer service

13  rep, so people would come and return items and make

14  purchases.

15     **Q.   Understood.  Now, you mentioned those extra**

16  **jobs ran through I think you said 2019; is that**

17  **accurate?**

18     A.   Yes.

19     **Q.   What was the reason for leaving those other**

20  **jobs?**

21     A.   I couldn't -- I couldn't campaign and do them

22  all.  I couldn't campaign, work at the Public

23  Defender's Office; and, you know, we have to go visit

24  clients in jails and stuff like that.  I couldn't --

25  There was no way that I could do all of it.

Ruby Green
April 16, 2021

Page 21

1    Q.   Not enough hours in the day?

2    A.   No.

3    Q.   Okay.  So then essentially in order to deal

4  with the campaigning -- and that, obviously, is for the

5  position of Public Defender, correct?

6    A.   Yes.

7    Q.   You had to sacrifice those two other jobs, but

8  you remained in your position at the Public Defender,

9  right?

10   A.   Yes.

11   Q.   Okay.  So then before -- Before you gave up

12  the document review job, were you working a set number

13  of hours or did the amount of hours differ depending on

14  how much you were needed?

15   A.   It really differed.  Most of the times I was

16  on a long-term project, so whenever I would be done

17  with my work here, it just really didn't matter.  At

18  the time, that particular company would allow certain

19  people to stay as late as they could.  Sometimes I

20  would stay until, you know, the wee hours of the

21  morning; and then sometimes I would go in and do just a

22  couple of hours if, you know, let's say they told me we

23  have to be out by 10:00, if I couldn't get to them

24  until six o'clock or 6:30, maybe even 7:00 sometimes,

25  you know, then I would do three hours that day.

Ruby Green
April 16, 2021

1    But then there were some days where I was done

2 with my work at the Public Defender's Office by 5:30,

3 and I could rush there and get a little bit more hours

4 depending on --

5    Q.   So if I understand -- I'm sorry, I didn't mean

6 to cut you off.  If I understand you correctly then,

7 ma'am, you could pretty much set your own schedule,

8 correct?

9    A.   Right.

10    Q.   Can you give me an idea of what the average

11 amount of hours you would have worked in this other

12 position would have been?

13    A.   At the doc review job?

14    Q.   Yes, ma'am.

15    A.   Average maybe 25.

16    Q.   Okay.

17    A.   And that was including working weekends.

18    Q.   Understood.  And you had mentioned that your

19 hours seemed to vary in the Public Defender's Office,

20 what would you say -- In your time at the Broward

21 County Public Defender's Office, what would you say

22 would be the average amount of hours you worked in a

23 week?

24    A.   Maybe about 60.

25    Q.   Okay.  Was there ever a time -- Was there ever

Ruby Green
April 16, 2021

Page 23

1   a time that you worked more than one extra job beyond

2   the Public Defender's Office?

3        A.    What do you mean?

4        Q.    In other words, where you were doing the

5   Public Defender's Office, document review and you

6   mentioned Macy's, was that at the same time or

7   separately at a different time?

8        A.    I would -- Sometimes I would do all three, so

9   if I could be done, it really -- Like I said, with the

10  doc review job, sometimes if they -- It depends on who

11  was working, and it depends on, you know, the -- the

12  shift leader or something like that, if, let's say, I

13  wanted to come at ten o'clock at night, sometimes they

14  would allow me to come at ten o'clock at night.

15       So sometimes I would do P.D.'s Office, and then

16  Macy's was only part time; and sometimes I would do

17  like three hours there.  So sometimes I would do

18  like -- and I didn't have to work every day at Macy's,

19  and so sometimes I would do, you know, the three hours

20  there and then go to document review as well; so, yes,

21  sometimes I was working three jobs in one day and

22  then -- but then, you know, as time progressed it got

23  to be, okay, making sure that Macy's I only work, you

24  know, weekends or Friday, Saturday, Sunday, you know

25  because then it got a little bit too much.

Ruby Green
April 16, 2021

Page 24

1      There's no way I could do three jobs in one day

2   every day, so sometimes, you know, it was just trying

3   to -- By the end, it got towards the end, I was doing

4   like Friday, Saturday, Sunday -- or I tried to do it

5   Friday, Saturday and Sunday.  And some days I just

6   wouldn't even go to doc review, and I would just do

7   Macy's, you know.  It depends on whether or not they

8   called me in saying that they needed me as well, so

9   sometimes --

10      Q.    Okay.

11      A.    There were times that it happened that way,

12   yes.

13      Q.    All right.  So if you were working on average

14   60 hours at the P.D.'s Office and 25 hours doing

15   document review, surely there was a limited amount of

16   time you could work at a place like Macy's, correct?

17      A.    Right.

18      Q.    What would you say would be the average amount

19   of time you would put in between all three jobs on the

20   weeks when you were working all three?

21      A.    I mean, if I did P.D.'s Office at 60, it

22   really -- it really depend -- It really depended

23   because sometimes I would just do 40 at the Public

24   Defender's Office.  It really depends was I in trial,

25   did I have any trials going on.  Some days like because

Ruby Green
April 16, 2021

Page 25

1  of the specialized unit that I have too and then at

2  some points I was supervisor of units, so I didn't

3  really have as much going on.  I can't really -- I want

4  to say total between all of them maybe 70 or something

5  like that because I would -- I would literally and try

6  and only do like nine hours at Macy's a week.

7      Q.   Okay.

8      A.   I really -- I really tried not to overextend

9  myself too much.

10      Q.   Sure.  Now, you mentioned before that you

11  received an email from Mr. Finkelstein which okayed all

12  of this.  Was that just a blanket email allowing you to

13  just work outside of the office in general or did you

14  have to get constant permission for different jobs over

15  different amounts of time?

16      A.   We really didn't have a set way as to what we

17  did as far as work.  My understanding was there was

18  plenty of people that worked there that did not get

19  permission.  I just thought it was respectful that I

20  did get permission, and then he did come back in an

21  email, and I can't remember verbatim what the email

22  said; but I don't want to really, you know, put words

23  in it; but I want to say it was kind of blanket like I

24  had the ability -- because I have been doing a great

25  job, I have the ability to improve my financial

Ruby Green
April 16, 2021

1  situation.

2    Q.   Okay.  In regards to what the words were, I

3  don't want you to guess, your understanding of that was

4  you essentially had blanket authority to do what you

5  needed to do outside of your work for the Public

6  Defender's Office?

7    A.   Right.

8    Q.   Okay.  All right.  Let's -- In a moment we're

9  going to get into your time at the Public Defender's

10  Office and get into kind of the reason why we're here.

11    Let me ask you a few cursory questions first.

12  Obviously, I don't want to know anything that you and

13  your lawyer have discussed.  But what I do want to know

14  is other than your lawyer, have you had any recent

15  conversations with anyone in an effort to either

16  refresh your recollection or obtain information related

17  to issues that might be addressed today in this

18  deposition?

19         MR. FRANK:  Cory, can you specify what you

20  mean by "recent"?

21         MR. LAUFER:  You know what, let's take the

22  word "recent" out.  That's a poor choice of words.  Let

23  me rephrase.

24  BY MR. LAUFER:

25    Q.   Other than your attorney, have you had any

Ruby Green
April 16, 2021

Page 27

1  conversations with anyone for the purpose of either

2  obtaining information for today's deposition or simply

3  refreshing your recollection as to issues that might

4  arise in today's deposition?

5       A.   No, I never sought out any information about

6  what's gonna happen at depositions.

7       Q.   Okay.  No, ma'am, I'm sorry.  I want to make

8  sure we're clear.  I'm not asking if you asked anyone

9  about what might be asked.  I mean, did you speak to

10  anyone to try to gather either information you didn't

11  know or perhaps information that you knew of in the

12  past but speaking to that individual refreshed your

13  recollection?

14       A.   No, no, no, no.  There was no conversations --

15       Q.   Okay.

16       A.   -- with anyone to refresh any recollections.

17       Q.   All right.  Now, same question as to

18  documents; are there any documents you reviewed in

19  order to either gain information or refresh your

20  recollection on information that might be called upon

21  in this deposition today?

22       A.   Any documents, no.  I didn't review anything

23  for the deposition, to be honest.  I literally had

24  final VOP scheduled for today.

25       Q.   I'm sorry.  You had what scheduled?

Ruby Green
April 16, 2021

Page 28

1    A.   I had hearings scheduled.  I didn't have time

2  to prepare or for a deposition.

3    **Q.   Okay.  Understood.  All right.  Let's talk**

4  **about your time with the Broward Public Defender's**

5  **Office.  Let's start with your application coming from**

6  **Jacksonville.  You had told me you wanted to move home.**

7  **Was the Broward Public Defender's Office the only place**

8  **you applied in your effort to get closer to home?**

9    A.   No.  I believe I did Miami, then I did -- I

10  might have done Brevard County, yeah.

11    **Q.   Okay.  Were you offered any positions in any**

12  **other counties besides Broward?**

13    A.   Miami basically -- I forgot what they had

14  said, but it was going to be like -- I want to say like

15  a wait-listed-type thing, but I can't remember if

16  that's what it was.

17    **Q.   Okay.  Whatever it was, they weren't able to**

18  **hire you immediately, which is what you probably**

19  **wanted, right?**

20    A.   Right.

21    **Q.   All right.  But, obviously, Broward was**

22  **willing to take you on and start you right away,**

23  **correct?**

24    A.   Yes.

25    **Q.   Did you interview with any individuals before**

Ruby Green
April 16, 2021

Page 29

 1  being offered the job?

 2      A.   I interviewed with Frank de la Torre and Owen

 3  McNamee.

 4      Q.   **Anyone else besides those two individuals?**

 5      A.   That I can recall, no.  I want to say that I

 6  had -- what's it -- the third phase, like they were

 7  telling me that I would have to come back another day

 8  after that interview and then -- Then they said, okay,

 9  the third phase can meet with you like after you move

10  forward.  I guess Owen and Frank approved.  And then

11  Diane and I want to say a couple other people, I

12  believe how -- I want to say Howard was there, but I

13  can't quite remember if he was or not there.

14      But there was some -- another phase that they told

15  me that I would have to wait on, and then all of a

16  sudden, you know, they were telling me now I can meet

17  with these other people.  I guess they had to get it

18  all together.

19      Q.   **Okay.  So if I understand you correctly,**

20  **ma'am, after meeting with Frank de la Torre and Owen**

21  **McNamee, at some point you had a last phase of your**

22  **interview, which was with Diane Cuddihy I assume that**

23  **was?**

24      A.   Yes.

25      Q.   **And possibly Howard -- Howard Finkelstein;**

Ruby Green
April 16, 2021

Page 30

 1  you're just not sure if he was there or not?

 2      A.   Right.  I know there was another female.  I

 3  want to say it was Susan Porter, but I'm not entirely

 4  sure.  I want to say those were the ones that were

 5  there, but I can't remember.

 6      Q.   I'm sorry, who was the other female?

 7      A.   I want to say it was Susan Porter, and I don't

 8  remember if it was like Renee or anybody else or

 9  Cathy -- if it was Susan or Cathy Kupon (phonetic).  I

10  don't remember.

11      Q.   Okay.  And Cathy is Catherine Kupon, correct?

12      A.   Yes.

13      Q.   And Renee is Renee Dadowski, correct?

14      A.   Right.

15      Q.   Okay.  Sorry, just want to make sure we're

16  clear on the record.  That's all.  You mentioned a wait

17  list with Miami.  What about Brevard; did they offer

18  you a position?

19      A.   I don't remember -- I don't remember if they

20  did, and then I just didn't want to go to them because

21  I got to come back home.  I can't really remember.  I

22  know, I -- I --

23      Q.   Okay.

24      A.   I don't remember that one.

25      Q.   Whether or not Mr. Finkelstein was in that

Ruby Green
April 16, 2021

Page 31

1  third phase of your interview, do you recall having any

2  direct communication with him prior to accepting your

3  position?

4      A.   No, he wouldn't have.  It would have been

5  Cathy.  Cathy is the one -- was the one that would call

6  and give us, you know, like the, "oh, you got a raise

7  type thing" or, oh -- I remember it was at least her

8  that called me as I was walking to the parking garage

9  because they said that they would tell me the following

10 Monday, I think, whether or not I got the position.

11 And I remember it as I got to the car, I got a call

12 from her; and she said I had the job.

13     Q.   Okay.  Can I assume you accepted right away?

14     A.   Yeah, I did.

15     Q.   Okay.  All right.  How soon after that did you

16 begin?

17     A.   Oh, I want to say that interview was maybe

18 mid-February, but I wanted to give the Public

19 Defender's Office two week's notice.  I -- I gave them

20 two week's notice, yeah, so that's how I was able to

21 come.  My last day was like the 2nd of March, and I

22 started here the 5th of March.

23     Q.   All right.  So give or take probably either

24 two weeks later after being offered the job or a little

25 bit thereafter, correct?

Ruby Green
April 16, 2021

Page 32

```
 1     A.   Right.

 2     Q.   Okay.  All right.  And where do you begin?

 3  Where is your first position?

 4     A.   Misdemeanor.

 5     Q.   And are you a lead in misdemeanor or not?

 6     A.   No, I had just come from another, you know,

 7  county; so they wouldn't have given me a lead.

 8     Q.   Okay.

 9     A.   They just probably wanted to -- But I was in

10  misdemeanor.  I was the only attorney in my division.

11  There was certain courtrooms that had maybe two

12  attorneys in each division, but I was the only attorney

13  in mine.

14     Q.   Okay.  So you had a little bit -- a little bit

15  more autonomy than most at that point, correct?

16     A.   What do you mean by what I have?

17     Q.   Well, meaning if you're the only attorney in

18  your courtroom, there's not -- there's not a team lead

19  looking over you at all times, correct?

20     A.   Well, we had a supervisor; but she couldn't be

21  in all places at once.

22     Q.   Right.  Okay.

23     A.   If we would call, we also had a chief.  If we

24  needed her, we would call her as well; but, right,

25  we -- we -- She couldn't be in all places at once.
```

Ruby Green
April 16, 2021

Page 33

1  Neither of them would even be -- you know, come unless

2  there was an emergency, I would say.

3       Q.   Okay.  For how long do you continue in that

4  role as, I guess, a non team lead for misdemeanor?

5       A.   I want to say I did misdemeanor for about nine

6  months before I went --

7       Q.   Okay.  I'm sorry, ma'am.  I didn't mean to

8  interrupt you.  As you can probably see on Zoom,

9  there's sometimes a little bit of a delay; so I may

10  think you're done talking -- and I know you've done

11  that a few times.  I'm sorry, I'll do my best to not do

12  that to you.

13       A.   No, it's okay; but, yeah, I was there for

14  about nine months before I moved to felony.  I want to

15  say it was about nine months.  It could have been a

16  little bit more.

17       Q.   Okay.  When you are first hired for that

18  misdemeanor position, tell me about your compensation.

19  What were the terms of your employment?

20       A.   It was $39,500.

21       Q.   All right.  Did you have any other benefits?

22       A.   We have insurance, but that's kind of like

23  included.  Like they take a portion of the money pretax

24  for insurance purposes.

25       Q.   So did the Public Defender's Office contribute

Ruby Green
April 16, 2021

Page 34

1   anything towards the premiums of your health insurance?

2       A.   I don't know.  I didn't -- I don't know how

3   that works, to be honest.  I don't know if they did or

4   not.  Like they don't -- They didn't give us the money.

5   I don't know if they worked something out with -- I

6   don't know.  I don't know.

7       Q.   Okay.  I mean, generally, ma'am, your health

8   insurance has certain premiums; and as you mentioned

9   with pretax dollars, you can pay for those premiums

10  with your pretax dollars, which gives you kind of a tax

11  benefit.  But my question is, do you know if they were

12  deducting 100 percent of the cost of the premiums from

13  your salary or if they were deducting a percentage of

14  that and they were kicking in a percentage of that, not

15  money to you, but money to the health insurance

16  company?

17      A.   That I don't know.  I would have to look at my

18  paycheck stubs for that.

19      Q.   Okay.  Understood, ma'am.  Any other benefits,

20  any other compensation that you are aware of from when

21  you first started with the Public Defender's Office?

22      A.   No, I don't remember.

23      Q.   Okay.  Throughout your time in misdemeanor, do

24  you operate under the same lead and the same chief?

25      A.   The same supervisor and chief?

Ruby Green
April 16, 2021

Page 35

 1      Q.    Yes, ma'am, correct.

 2      A.    Yes, it's the same supervisor, same chief,

 3  yes, throughout my misdemeanor.

 4      Q.    And, great, and who were those people?

 5      A.    The supervisor was Rhonda Boettcher, and the

 6  chief was Lan DeSantis (phonetic).

 7      Q.    Okay.  At any time in that first nine-month

 8  period, were you eligible for any type of increase in

 9  pay, benefits, et cetera?

10      A.    No, not in misdemeanor; we don't get that.

11  Only if there was like -- Only if there was like

12  maybe -- Let's say sometimes the office would do like

13  bonuses for Christmas or something like that, like a

14  one-time bonus; but other than that, you do not get a

15  raise until you're promoted to like felony.  And then

16  if -- Let's say you're in felony, then you're promoted

17  from a third-degree felony attorney to a second-degree

18  felony attorney, then you get a raise.

19      And sometimes they threw in when they -- I guess

20  when they could a merit raise when, you know, they had

21  more money to spend.

22      Q.    Understood.  So I would imagine things like

23  Christmas bonuses are not merit based just for

24  everyone; is that fair to say?

25      A.    Yeah, I mean, those were very few and far

Ruby Green
April 16, 2021

Page 36

 1   between, but, I mean, yeah.

 2       Q.   Understood, ma'am.   When -- So if I understand

 3   you correctly, you're not even going to be reviewed for

 4   a merit raise until your responsibilities increase by

 5   being promoted upward; is that accurate?

 6       A.   Well, I mean, not in misdemeanor.   When you're

 7   just in misdemeanor normally, I -- Well, I'm just going

 8   to say for myself, no, I did not get a merit raise in

 9   misdemeanor.   And even when I was chief of county

10   court, our attorneys did not get any -- the merit

11   raises either, so I would assume --

12       Q.   Okay.

13       A.   -- that was the same all around.

14       Q.   So it sounds like from what you're telling me,

15   merit raises, you're eligible for a merit raise if you

16   move up the ladder, so to speak?

17       A.   Well, no, so -- Okay.   So I think we're

18   confusing the merit raise.   Merit raise is at some

19   point later, yeah, if you do -- If you're doing a great

20   job, then they consider you for a merit raise if they

21   have extra money.   But when I'm talking about when you

22   actually get raises as far as promotions, that's a

23   different type of raise.   When you're promoted, they

24   give you a raise for your promotion --

25       Q.   Okay.

Ruby Green
April 16, 2021

```
 1     A.    -- merit raise apart from that.
 2     Q.    Sure.  So a promotion raise would be if you
 3  are pushed up the ladder, so to speak; a merit raise
 4  you would be -- you would possibly get just for doing a
 5  good job, not necessarily -- not necessarily for being
 6  pushed up the proverbial ladder?
 7     A.    Right.
 8     Q.    Okay.  Now, when you were moved up after nine
 9  months, to the best of your knowledge, was that your --
10  the first time you were considered for a promotion?
11     A.    To the best of my knowledge, yes, that was the
12  first --
13     Q.    Okay.
14     A.    -- time.
15     Q.    And remind me again, ma'am, what -- You moved
16  up to felony at that point?
17     A.    Yes, third-degree.  When you move from
18  misdemeanor, you go to be a third-degree attorney.
19     Q.    Okay.  So you didn't become a lead in the
20  interim; you simply moved from misdemeanor to third-
21  degree felony?
22     A.    Right.
23     Q.    And in your mind, is that a natural
24  progression that a lot of people take?
25     A.    Yeah, sometimes people move from juvenile that
```

Ruby Green
April 16, 2021

1   way up to felony.  You know, so normally between

2   misdemeanor and juvenile, you move up to felony.

3   Sometimes people cross-train meaning that you -- from

4   misdemeanor you go to juvenile or from juvenile you go

5   to misdemeanor, but majority of the people go up from

6   one of those units.

7        **Q.   Understood.  Now, ma'am, the entire time that**

8   **you are in your misdemeanor position, how would you**

9   **describe your -- the amount, rather, of your**

10  **interaction with Howard Finkelstein?**

11       A.   I don't remember having any interaction with

12  Howard during my misdemeanor term.  The only way that I

13  would see him is if we had office meetings and we had

14  -- we did -- we would have like a big Christmas holiday

15  party and maybe once or twice a year.  We have an

16  office meeting maybe once or twice a year.

17       **Q.   And at that point in time, ma'am, do you know**

18  **how many lawyers there were in the office roughly?**

19       A.   I want to say maybe about 110.

20       **Q.   Okay.  And do you know how many total**

21  **employees, lawyers, staff, everybody?**

22       A.   Maybe about 200.

23       **Q.   All right.  So after nine months, you're moved**

24  **up to third-degree felony; who is your lead at that**

25  **point?**

Ruby Green
April 16, 2021

Page 39

```
 1     A.    My lead at that point was I want to say
 2  Jessica Mishali.
 3     Q.    How do you spell that last name?
 4     A.    M-I-S-H-A-L-I.
 5     Q.    And who was the chief?  Is there a chief of
 6  all of felony or a separate chief for third-degree
 7  felonies; how does that work?
 8     A.    There were separate chiefs for different
 9  divisions, so different judges had different -- a
10  different chief.  And at the time I believe there
11  were -- there was a training chief, which was Susan
12  Porter, so she did all of the training.  And then there
13  was for the felony chief, there was Renee Dadowski.
14  And there was Frank de la Torre.  And then there was
15  another chief, Owen McNamee; he did the mental health
16  stuff, mental health and domestic violence.
17     Q.    All right.  And how long are you in that
18  position?
19     A.    I want to say maybe about another nine months
20  or a little bit more before I became a second-degree
21  felony attorney.
22     Q.    Now, when you move up from misdemeanor to
23  third-degree felony, do you get a raise by virtue of
24  that promotion?
25     A.    Yes.
```

Ruby Green
April 16, 2021

Page 40

1    Q.    And how much of an increase in pay did you
2    receive?
3    A.    I don't know.  I want to say it was maybe
4    $2,000.
5    Q.    Okay.  Any other financial benefit or
6    additional compensation that you get for making that
7    move upward?
8    A.    No.
9    Q.    All right.  So then for another nine months,
10   you are not a lead but just a regular attorney -- no
11   disrespect -- in the third-degree felony division,
12   correct?
13   A.    You mean second-degree?
14   Q.    I'm sorry, I thought you moved from -- You
15   moved from misdemeanor to third-degree felony, correct?
16   A.    Oh, okay; yes.  I thought we were done talking
17   about that one, okay; yes, I did.
18   Q.    And you were there for nine months, correct?
19   A.    About, more or less.
20   Q.    In that first eighteen months between
21   misdemeanor and third-degree felony, do you receive any
22   merit raises separate and apart from promotions?
23   A.    Between me -- misdemeanor -- Between
24   misdemeanor and felony?
25   Q.    And third-degree felony, those 18 -- first 18

Ruby Green
April 16, 2021

Page 41

 1  months.

 2     A.   I don't remember if I got a merit for felony.

 3  I don't remember that.  I don't remember.

 4     Q.   All right.  After the -- the next nine months

 5  in third-degree felony, where do you go next?

 6     A.   To second-degree felony attorney.

 7     Q.   Okay.  Now, same questions I asked you before,

 8  ma'am.  In the third-degree felony division, did you

 9  have -- What type of interaction did you have with

10  Howard Finkelstein?

11     A.   Same.  We -- I rarely saw him unless we had

12  Christmas parties or if we had a office -- a big old

13  office meeting.

14     Q.   And would you say that's a typical --

15     A.   That was --

16     Q.   Sorry.  Continue, ma'am.

17     A.   No, I was just saying that was basically the

18  only times that I saw him because, I mean, if we had

19  any questions or anything, we had our supervisors.

20     Q.   And would you say that was typical for other

21  third-degree felony attorneys?

22     A.   What do you mean, which -- which part?

23     Q.   In other words -- In other words, what I'm

24  saying is, in -- You said same as in misdemeanor, in

25  the third-degree felony division you did not have a lot

Ruby Green
April 16, 2021

Page 42

 1   of interaction with Howard Finkelstein.  My question

 2   is, do you -- Did you find that to be typical of other

 3   third-degree felony attorneys or do you think you just

 4   for some reason had less access to Mr. Finkelstein than

 5   other people similarly situated to you?

 6        A.   I think it's -- I want to say typical for the

 7   entire office.  Unless they sought him out or called to

 8   see if he was coming in, you know, as attorneys,

 9   because of the -- What we found out about him, he

10   was -- Sometimes we would try and go by his office, and

11   he just wouldn't be there.  And, you know, it's just

12   the way it was, you know.  There's no way for us to

13   know based upon how we were structured either, how

14   often he actually came in or not or anything like that.

15        But, you know, for the most part, we wouldn't go

16   to him because we had nothing really to go to him for

17   as far as like case wise or anything like that.  We

18   would just go to our supervisors.  And there was --

19   Nobody sent us to him for any type of information on

20   case information either.  Like if we needed -- If we

21   were having an issue, Howard wasn't the person we went

22   to.  We would -- We would go to Diane Cuddihy if there

23   was an issue, stuff like that.

24        So it wasn't -- I want to say it was typical of

25   the entire office unless he was, you know, best friends

Ruby Green
April 16, 2021

Page 43

1  with people and stuff like that and knew where he was.

2  **Q.   Okay.  Now, when you say "we," in the context**

3  **of people who walk by his office to determine if he was**

4  **there, who were those people?**

5  A.   Just other attorneys and stuff like that, just

6  to see where he was or what he was doing, just other

7  attorneys.  We weren't --

8  **Q.   So if I understand --**

9  A.   We weren't exactly looking, oh, where he was,

10  like, oh, let's go see if he's here today, let's see

11  where he is; like it wasn't that type of situation; it

12  was more so, oh, we wanted to say hi, introduce

13  ourselves; and we would walk by; and he just wouldn't

14  be there.

15  **Q.   Okay.  And when you say "we," who are those**

16  **other attorneys who would do that?**

17  A.   I can't even recall everybody that would do

18  that.  It was just on -- You know, this was so long ago

19  during that timeframe, so I just can't say who all

20  would do that.  I know there was several times that

21  especially as a chief or misdemeanor supervisor, myself

22  May Ross (phonetic) or Jennifer Exby (phonetic) would

23  go there because, like I said, we -- It was kind of

24  like a constant knowledge around the courthouse that he

25  just was not there all the time, like we wouldn't even

Ruby Green
April 16, 2021

Page 44

1  think twice to even go by his office anymore.  Like I
2  said, the main people that we would go to would be like
3  Diane Cuddihy or another chief --
4          THE STENOGRAPHER:  (Interrupted for
5  clarification.)
6      A.   Yes, she just had nothing -- There was nothing
7  we could see from him because he wasn't -- A lot of
8  people want to say that he was technically like checked
9  out from the office, so that's what the whole culture
10 was.
11 BY MR. LAUFER:
12     **Q.   Okay.  When did you first come to that**
13 **realization that that was the apparent thought process**
14 **throughout the courthouse?**
15     A.   Maybe because it was -- Because it was like a
16 whole blog, a JAAB blog or something like that, so when
17 we became -- Not when I was a misdemeanor attorney, but
18 probably as a third-degree attorney, people started
19 talking about the blog and basically like the situation
20 that, you know, the Public Defender's Office and Howard
21 and stuff like that.  And I don't even -- I didn't even
22 like to read it because I felt like it was a whole
23 bashing type thing, but that was the whole -- Everybody
24 in the courthouse was like reading the blog, and a lot
25 of the attorneys were reading the blog.  And that's

Ruby Green
April 16, 2021

Page 45

1  when I came to the realization, my view I was in

2  misdemeanor; so my whole world was misdemeanor; I

3  didn't really know outside of misdemeanor because it

4  was, you know -- We were just baby lawyers.  I just --

5  I just knew I needed to go to court and do my job.  I

6  didn't really focus on, you know, the aspect of the

7  office.

8      But that was when I found out when it was like

9  there was this blog, and there were people who had

10 worked there were talking about the environment and

11 things that went on.  And as time passed, it was what

12 it was.

**13     Q.   Okay.  So when you're talking about the blog,**

**14 are we talking about JAAB Law, jaablaw.com?**

15     A.   I -- I don't know if that is what the site is.

16 I just -- I don't really -- Like I said, I don't look

17 at it.  I haven't recently looked at it, but that is

18 the conversation, yeah, that, I think -- I don't know

19 the website.  But I do know it's JAAB log or something

20 like that.  I don't know if it's the -- I don't know if

21 it has law in it or not.

**22     Q.   Okay.  So when did you first become aware of**

**23 this being the supposed thought around the courthouse?**

**24 Was it from your own experiences or was it from reading**

**25 this blog?**

Ruby Green
April 16, 2021

Page 46

1    A.   Well, all of it, it was my own experiences,

2    other attorneys -- Other attorneys at the office was

3    talking about it.  It was just like -- It was like a

4    thing, you know, complaints and stuff like that, you

5    know, that people had, which I try not to get involved

6    in any way.

7    **Q.   Why?**

8    A.   Why?

9    **Q.   Why not?**

10   A.   To get involved in the complaints?

11   **Q.   Yes, ma'am.**

12   A.   Only because, I mean, I -- I did not know

13   enough.  It was just -- I had just gotten to that

14   office.  I did not know enough in order to say, yeah,

15   this is my -- I share with you, this is my issue.  And

16   to be honest, like at the time, Howard not being there

17   wasn't an issue for me because I kept doing my work;

18   and I, you know, did what I had to do.  I was

19   representing my clients.  And, you know, he wasn't a

20   direct supervisor of mine.  I didn't need him for

21   anything.  You know, it's just like a group is saying,

22   oh, Howard is a celebrity and say hi type thing.  It

23   wasn't like, oh, I need to ask him a question because

24   he would have the answer.

25   **Q.   Sure.  I think what you're trying to say,**

Ruby Green
April 16, 2021

Page 47

```
 1  ma'am -- and correct me if I'm wrong -- is there's a
 2  chain of command at the Public Defender's Office, and
 3  you had your job and your supervisors; and you didn't
 4  typically go directly to the Public Defender himself
 5  for issues dealing with your job; is that accurate?
 6      A.   Right.  There was a chain of command but he
 7  would -- Even if there was an issue, he wasn't really
 8  in the -- I can't -- I can't say that he wasn't in the
 9  chain command because he was, but he wasn't.
10      So he wouldn't be the person that if we had
11  emergencies as, you know -- you know, an assistant
12  public defender that we would -- Eventually we would go
13  to Frank or, you know, whoever the supervisor was; and
14  then Frank would go to like Diane or Cathy.  But Cathy
15  what we knew was the ultimate decision maker.  It
16  wasn't Howard.  So at the time --
17      Q.   And how did you know that?
18      A.   That's how everybody -- That's how everybody
19  felt.  She was -- She was the one that wore the pants.
20  Everybody --
21      Q.   Okay.
22      A.   -- that's -- That was the culture that was in
23  the office.  That's how -- I can't really put it into
24  words as to how we knew that but it was just -- just
25  the way that things were done.  She was the one that
```

Ruby Green
April 16, 2021

Page 48

 1  decided them.  And I don't listen -- All we can do is

 2  speculate -- you know, speculate, you know, as to what

 3  happened behind closed doors.  So, you know, everybody

 4  came out with the, you know, assertion that she did.

 5      Whether or not she consulted with Howard and then

 6  they made the decision and then he took -- made her the

 7  person, the deliverer, I don't know as to all of that.

 8  but the -- The consensus of the office was that she

 9  wore the pants.  That was it.

10      **Q.   But I think you just said that's purely**

11  **speculation, correct?**

12      A.   I could say -- Right.  That's what -- We don't

13  know what -- if she talked to him behind closed doors

14  or not, so I can't say that that was the case.

15      **Q.   Okay.  Now, you mentioned before that you**

16  **didn't want to kind of complain because you didn't know**

17  **enough.  Is there ever a time that you rise up to a**

18  **level where you have firsthand knowledge as to Howard**

19  **Finkelstein's interaction with the so-called chain of**

20  **command?  Did you ever rise up high enough to get**

21  **firsthand knowledge of that?**

22      A.   Yeah, I was -- I was chief of county court.

23      **Q.   Okay.  Now, as -- what -- When did you become**

24  **chief of county court?**

25      A.   Oh, I want to say it was 2017.

Ruby Green
April 16, 2021

Page 49

 1      Q.   Okay.

 2      A.   Or --

 3      Q.   At that point what is the chain of command for

 4   you moving upward?  Who was your direct supervisor and

 5   so forth and so forth?

 6      A.   So under Howard, there would have been

 7   executive -- executive chiefs.  So executive chiefs

 8   they changed because Cathy had retired.  So to fill her

 9   spot, they put both Gordon and Renee in her spot, and

10   Diane was still an executive chief.  Diane was the

11   executive chief even I think before I even got to the

12   office.  So there were three executive chiefs, so those

13   would have been the chain.  That was who I would have

14   probably -- I would have reported to.

15      Q.   Okay.  So Gordon is Gordon Weekes, obviously,

16   correct?

17      A.   Yes.

18      Q.   And who is he paired with; who did you tell

19   me?

20      A.   Renee Dadowski.

21      Q.   Okay.

22      A.   Cathy.

23      Q.   Diane -- Right.  And Diane remained in her

24   position at that point; Diane Cuddihy, correct?

25      A.   Yes.

Ruby Green
April 16, 2021

1    Q.    Okay.  All right.  So at that point do you

2    have more interaction with Howard Finkelstein than you

3    did before becoming a chief?

4    A.    Yes, a little bit more.

5    Q.    Let me ask you this, at that point did you

6    have any other opinions that were negative in nature of

7    Mr. Finkelstein other than the -- I guess you call it

8    rumor or scuttlebutt that he was not in the office

9    enough?

10    A.    But my own opinions, yeah.

11    Q.    And what were those, ma'am?

12    A.    No, I agree he wasn't.  He -- he -- He wasn't

13    in the office, you know, as much.  I remember having, I

14    guess, him sign off from something; and it took about a

15    couple of weeks; and it was, you know, his desk was

16    pretty clear.  I laid the paper on his desk for him to

17    sign off on something, and it didn't happen for a

18    couple of weeks that I could say.  You know, but I will

19    say that if I called him, you know, on the cell phone,

20    he could -- he would, you know, pick up or something

21    like that.  I don't know if it was something for him to

22    read or sign off on.  I want to say it was something --

23    something to read or either sign off on or something

24    like that and -- and we didn't -- we didn't address it

25    for another couple of weeks and but I --

Page 51

1     Q.    Okay.

2     A.    If I called him, then that would be a

3   different story.  I can reach him by cell phone.  But I

4   can't say he was in the office, you know, just like

5   everybody was saying.

6     Q.    Understood.  Okay.  So once you rise to the

7   level of chief, you have more interaction whereby you

8   could be putting things on his desk and because it

9   wasn't either read, in your mind, or executed in return

10  to you --

11    A.    I'm sorry, Mr. Laufer; you cut out.  I

12  couldn't -- You started to say something.

13    Q.    Okay.  Let me rephrase that then.  Let me say

14  it again.

15    When you become chief of county court, you are now

16  in a position to interact with Mr. Finkelstein more,

17  and one of your firsthand experiences was this document

18  that was either not read in your mind or not executed

19  and returned to you in a timely fashion; am I

20  understanding you correctly?

21    A.    No.  That's -- That's just one of the -- I was

22  just giving you an example.  But I've gone --

23    Q.    All right.

24    A.    Even as supervisor of county court before I

25  moved to chief, it wasn't that we couldn't go to

Ruby Green
April 16, 2021

Page 52

1  Howard's office.  Like I said, we used to go by his

2  office all the time just to see if we can say hi; and

3  he wasn't there.  So by the time that I became chief of

4  county court, it just had become a regular thing.  Me

5  just saying talking about that document that I gave for

6  him to read or whatever was just an example of one of

7  the things that, you know, I had done just to make an

8  example.

9      But I'm not saying that he was missing like 24/7

10 every single day, you know, out of the -- out of the,

11 you know, weeks or something like that.

12     But he just -- It wasn't as if he had a regular

13 schedule like all of us coming into the office.

14     **Q.   Okay.  Would you agree with me, ma'am, that**

15 **whether or not Mr. Finkelstein was physically located**

16 **in his office doesn't necessarily mean he wasn't**

17 **working?**

18     A.   Would I agree with you?

19     **Q.   Yes, ma'am.**

20     A.   Yes and no.  I mean, I think that from --

21 working from home is a lot -- He didn't have any cases

22 so I didn't -- I don't know why or how he could be --

23 what could -- he was working on.  I mean, he -- Could

24 he answer emails and stuff from working from home, yes.

25 Can he answer calls from working from home, yes.

Ruby Green
April 16, 2021

Page 53

1        But when it comes to -- I think that the issue

2    that people have is the fact that we're doing the brunt

3    of the work; and we want this person, who is the head

4    of our office as well, to be able to take up a load

5    from us as well.  But I think that was the issue that a

6    lot of people were having from way back when when they

7    were saying that, oh, chiefs didn't have cases or

8    Howard didn't have cases.  But, you know, the work --

9    Maybe he had some different type of work, and maybe the

10   work was answering emails or calls.  I don't call that

11   in a sense work as what we're doing -- filing, motions,

12   going to court, representing clients -- but in a sense,

13   I guess, he was working as far as answering emails or

14   making calls.

15       **Q.   Okay.  So if I'm understanding you, you're**

16   **telling me you don't know; is that accurate?**

17       A.   I don't know.

18       **Q.   You don't know what work he was doing?**

19       A.   I don't know what Howard was doing when he was

20   not at work, correct.

21       **Q.   When he was not physically located in the**

22   **office you mean?**

23       A.   When -- Correct.

24       **Q.   Okay.  Obviously, you know he wasn't --**

25   **Mr. Finkelstein was not litigating cases like you were,**

Ruby Green
April 16, 2021

Page 54

1   correct?

2        A.   Say that again.

3        Q.   Mr. Finkelstein was not actively litigating

4   cases like you were; you know that much, right?

5        A.   Right, he was not.

6        Q.   Was that part of the rumor mills, the

7   scuttlebutt, the problems with Mr. Finkelstein that he

8   would not litigate cases like the assistant public

9   defenders did?

10       A.   Yes, they called it in the trenches.

11       Q.   I understand -- They what, ma'am?  I'm sorry.

12       A.   They called it working in the trenches, yes.

13       Q.   Right.  Mr. Finkelstein was not in the

14   trenches because he was not actively litigating cases

15   like you were, correct?

16       A.   Right.

17       Q.   Okay.  Do you have any knowledge one way or

18   the other as to whether or not other elected public

19   defenders are in the, quote/unquote, trenches; do you

20   know one way or the other?

21       A.   The other public defender that I had in fourth

22   circuit, I know he had a homicide case; and so whether

23   or not any other ones that -- that in the -- in any

24   other circuits, no, I wasn't -- I wasn't sure of it or

25   not.  But I do know that the State Attorney on the

Page 55

1  other side was taking on cases.  He was doing a lot of

2  homicide cases as well, and he was running the office

3  -- his office.  So I think that was the -- I think that

4  was the -- like the -- the balance system that

5  everybody was trying to weigh like how can he -- he's

6  running the office, how can he take cases; and then

7  he's running the office, he's basically not here and

8  how is he not taking cases.

9      Q.   Okay.  Let's just focus on elected public

10  defenders for now.  So you're aware of the elected

11  Public Defender in Jacksonville while you were there

12  handling at least one murder case, correct?

13      A.   At least one.  I'm not sure if he handled any

14  more.

15      Q.   Okay.  And that was approximately we're going

16  to say about ten to 12 years ago; is that fair to say?

17      A.   Almost ten years ago, yes.

18      Q.   Okay.  In the past ten years, are you aware of

19  any Public Defender in the state of Florida actively

20  handling any cases?

21      A.   I thought Carrie Haughwout -- or something

22  like that -- was handling cases; Carrie Haughwout.  I

23  want to say she's the 15 -- in the 15th Circuit.  But

24  because she's so close, that's the only one that I

25  really know about.  I think --

Ruby Green
April 16, 2021

1      Q.   And how did you come across that information?

2      A.   I thought I saw her at a training -- a

3  training.  I want to say she was doing homicide cases

4  or something as well.  I think I saw her at a training

5  we went to.

6      Q.   Okay.  I understand that, ma'am.  But what

7  makes you think that the Public Defender of the 15th

8  Circuit is handling cases?

9      A.   No, I was just saying because she was

10  mentioning her cases so -- at a training.  It was a

11  training that I went to.  I don't remember exactly

12  when.  I don't know if it was exactly that actual

13  Public Defender, but I know it was one in Florida.  It

14  was a female.  There's only a couple of females here in

15  Florida anyway.  It was Diamond Litty and Carrie

16  Hartrot (phonetic) -- Carrie something.

17      Q.   Okay.  So you suspect that she may be actively

18  litigating cases, but you don't know for sure; is that

19  fair to say?

20      A.   For sure, correct.  I never worked at that

21  office.

22      Q.   Okay.  And how many -- When you say that the

23  State Attorney is actively litigating criminal matters,

24  are you referring to the prior State Attorney,

25  Mr. Satz?

Ruby Green
April 16, 2021

Page 57

1     A.   Correct.

**2     Q.   Okay.  And when he was the -- When he was the**

**3  State Attorney for Broward County, how many**

**4  prosecutions did he handle?**

5     A.   That I can't say for sure, but at least from

6  what I saw, at least three that I saw recently, which

7  is the Cruz case.  There was another homicide --

8  another couple of homicides I seen him do, but anything

9  out of those three, I haven't seen him do anything

10  else.

**11     Q.   Now, when you say "recently," was that before**

**12  or after Mr. Satz retired as the Public Defender -- I'm**

**13  sorry, as State Attorney?**

14     A.   Before, and then he's still on the Cruz case.

**15     Q.   Right.  So it's your understanding that**

**16  Michael Satz was prosecuting at least two other murder**

**17  cases beyond the Cruz case when he was the State**

**18  Attorney for Broward County?**

19     A.   Right.  That's the only ones that I can -- I

20  can attest to because those are the only ones that I

21  personally saw.

**22     Q.   Okay.  And is your understanding of what**

**23  Mr. Satz was doing and what the -- what the Public**

**24  Defender in the 15th Circuit was doing, was that what**

**25  led to your frustration with Mr. Finkelstein not being,**

Ruby Green
April 16, 2021

Page 58

1  quote/unquote, in the trenches?

2      A.   It didn't lead to any frustration to, you

3  know, for -- for me to say he wasn't there in the

4  trenches.  I can't say that I was frustrated at this

5  point.

6      **Q.   You wouldn't say you were frustrated at that**

7  **point?**

8      A.   No, not frustrated; but I could say that I

9  wanted to speak up about it.  I wanted to speak up

10  about it.

11      **Q.   Did you ever speak up about -- Did you ever**

12  **speak -- Did you ever speak up about it prior to**

13  **running for or putting your name in the race for Public**

14  **Defender?**

15      A.   No, nobody spoke up about it except for

16  whoever was --

17      **Q.   Okay.**

18      A.   -- anonymously on the so-called blog.

19      **Q.   Sure.  Did you have reason to believe what**

20  **people were anonymously posting on the blog that you**

21  **speak of?**

22      A.   Well, it wasn't just people posting on a blog,

23  like I said.  I was in and out.  I only saw what a lot

24  of people showed me.  Like if we were in court or

25  something like that, maybe a private attorney or

Page 59

1  another P.D. would come over and say, hey, did you read
2  this or something like that.  It wasn't like -- It
3  wasn't like a, oh, my gosh, I -- You know, I need to
4  believe and see everything that they said about people
5  who work there that I believed what they said could,
6  could not have had.  Yes, I did believe it, at least on
7  things that I saw for myself.  I'm pretty much a person
8  that you can't tell me, okay, you can't be this
9  person's friend because I don't like them, right; I
10 have to see and learn about this person for myself; so
11 that's the type of person that I am; and that's what I
12 would do.  I wouldn't just automatically see something
13 and take it as truth.  I literally, you know, like to
14 make sure that I know what I know about, you know, so I
15 can make my own decisions.
16      **Q.   Okay.  So as to Mr. Finkelstein's job duties,**
17 **in making your own decision, were you aware of what the**
18 **duties and responsibilities were for an elected Public**
19 **Defender?**
20      A.   Was I aware at what point in time?
21      **Q.   At any point in time that you felt**
22 **Mr. Finkelstein was, quote/unquote, not in the**
23 **trenches?**
24      A.   Yeah, I mean, at -- At some point I became --
25 I researched and did a lot of studying on Public

Ruby Green
April 16, 2021

Page 60

```
 1   Defenders, but that wasn't until 2018 when I decided to
 2   run.
 3       Q.   Okay.  But you held the opinion that
 4   Mr. Finkelstein was, quote/unquote, not in the trenches
 5   prior to 2018, correct?
 6       A.   Correct.
 7       Q.   So prior to 2018, when you held the opinion
 8   that Mr. Finkelstein was, quote/unquote, not in the
 9   trenches, did you understand what the duties and
10   responsibilities were for an elected Public Defender?
11       A.   I didn't have any research on that at all.  I
12   mean, all I -- All we knew was that he was our boss,
13   and we saw other people working.  He was not.
14       Q.   Okay.  And you're drawing the conclusion that
15   he was not working by virtue of your opinion that he
16   was not physically located in the office, correct?
17       A.   Well, not -- not physically located in the
18   office, not physically in court.  Just things of that
19   nature.  The fact --
20       Q.   Okay.
21       A.   -- no cases because, you know, you can have
22   cases and, you know, be home working -- we know that
23   now -- just a number of things.
24       Q.   Okay.  So in prior to 2018, you held the
25   position that Howard Finkelstein was not doing
```

Ruby Green
April 16, 2021

Page 61

1  sufficient work because he was neither in your mind in
2  the physical office a sufficient amount of time nor was
3  he actively litigating criminal cases; is that accurate
4  to say?

5      A.   Did -- say -- The first part was did I make --
6  Say that one more time.

7      Q.   Sure.  Prior to 2018, you held the opinion
8  that Mr. Finkelstein was not doing enough work based on
9  the fact that in your opinion he was not physically
10 located in the office a sufficient amount of time and
11 because he was not actively litigating criminal cases?

12     A.   I can't say that I -- that was the position
13 that I took because I didn't take a position at that
14 time.  But from -- From what we knew and from the
15 things that Howard used to speak about and the things
16 that we've done, I can say that he was well respected
17 for all the things that he had done in the legal
18 community in Broward County.  But I can also say that
19 it was not that it was a position that I took, but it
20 was a little disappointing that we didn't get to see
21 the Howard that everyone used to talk about.

22     Q.   Okay.  So but it was your opinion then that he
23 did not work sufficiently in roughly 2017 before you
24 did your research?

25     A.   That he didn't work sufficiently, correct.

Ruby Green
April 16, 2021

Page 62

1    Q.   Yes, ma'am.

2    A.   Yeah.

3    Q.   Okay.  Did -- Were you aware at any point in

4    time that you were a public defender, you know,

5    assistant public defender, other than elections, were

6    you aware of any effort to either discipline or recall

7    or impeach Mr. Finkelstein?

8    A.   As the Public Defender?

9    Q.   Yes, ma'am.

10   A.   No, not that I can think of.  There was --

11   Q.   Okay.  And obviously you didn't do anything --

12        THE STENOGRAPHER:  (Interrupted for

13   clarification.)

14        MR. LAUFER:  Hang on, Ms. Green.  Sorry.

15   You're starting to get very -- Like your voice is very

16   modulated.  It's very hard -- It's getting harder to

17   hear you now.

18        Mr. Frank, I don't know if you're having that

19   issue too.  It's starting to get a little garbly and

20   modulated.  Is there anything you might be able to do

21   to remedy that problem?

22   A.   Can you hear me now?  No, I changed it to

23   wi-fi.  Can you hear me now?

24   BY MR. LAUFER:

25   Q.   Much better.  Whatever you're doing now, much

Ruby Green
April 16, 2021

Page 63

 1  better.

 2       MR. LAUFER:  Madam court reporter, if you

 3  don't mind, can you tell us what the last thing you

 4  received was?

 5       THE STENOGRAPHER:  Question:  "Okay.  Did --

 6  Were you aware at any point in time that you were a

 7  public defender, you know, assistant public defender,

 8  other than elections, were you aware of any effort to

 9  either discipline or recall or impeach Mr. Finkelstein?

10  Answer:  As the Public Defender?  Question:  Yes,

11  ma'am.  Answer:  No, not that I can think of.  There

12  was -- ".

13     A.   Unless it happened -- Unless it happened

14  before I came to work here, I have no idea.

15  BY MR. LAUFER:

16     Q.   Okay.  And certainly you didn't take any

17  official action or lodged any official complaints that

18  you would have in an effort to cause any of that to

19  happen, correct?

20     A.   No, nobody did.

21     Q.   All right.  Let's -- Do you at some point

22  become aware that Mr. Finkelstein intended to not run

23  for office this last -- this last election cycle?

24     A.   Yes, it was -- I believe it was --

25     Q.   When did -- I'm sorry, ma'am.  You got a

Ruby Green
April 16, 2021

Page 64

1    little garbled there again.  What?

2        A.    I believe it was in the papers.

3        Q.    **And do you recall roughly when you learned of**

4    **that?**

5        A.    I want to say maybe 2017 or the beginning of

6    2018.  I can't say for sure.  I can't remember.

7        Q.    **Okay.  And do you recall anyone entering the**

8    **race for that office?**

9        A.    Gordon was the first person to enter the race.

10   I don't remember when he entered the race.

11       Q.    **I'm sorry, ma'am.  You broke up again.  Gordon**

12   **was the first person?**

13       A.    Right.  He was the first person to enter the

14   race.

15       Q.    **And did you say something else?**

16       A.    Did I say something else?  No, Gordon was the

17   first person to enter the race.  I don't remember when

18   he entered the race.

19       Q.    **Okay.  It was before you did, though, correct?**

20       A.    Correct.  It was before I did.

21       Q.    **Okay.  Okay.  Did you -- At what point in time**

22   **do you make the decision to enter the race?**

23       A.    I made the decision in October, and I believe

24   I filed in November.

25       Q.    **Okay.  At that point in time, were you aware**

Ruby Green
April 16, 2021

Page 65

1  of the office policy on running for office while still

2  being employed by the Public Defender's Office?

3     A.   Yes.

4     Q.   And what was that policy, ma'am?

5     A.   Well, basically we couldn't talk about the

6  office.  They used -- Whenever someone was campaigning

7  for people, they would send out a whole like email

8  about campaigning and stuff like that but it was -- It

9  wasn't a real policy.  We didn't actually get a real

10  policy or something as to, you know, what we should and

11  shouldn't do until Howard sent an email after I told

12  him I was running.  But we had a whole -- There was

13  like an email -- campaign email that they would send

14  out like no campaigning during work hours; you would

15  have to get permission if you wanted to like go help

16  someone on a campaign during -- during hours or

17  something like that.

18     I can't remember what the exact email was, but

19  there was no policy of like running while you're in the

20  office type thing like a -- that I could remember.

21     Q.   Okay.  I'm going to show you, ma'am, what

22  we're going to mark as Composite Exhibit 1 for today's

23  deposition.  It's a series of two different emails, and

24  I want to show you the first one, which is dated

25  November 27 of 2018; do you see that?

Ruby Green
April 16, 2021

Page 66

```
 1      A.   I see it.

 2           (Exhibit No. 1 was marked.)

 3   BY MR. LAUFER:

 4      Q.   Okay.  And do you see that it's from

 5   Mr. Finkelstein and shows basically the entire office;

 6   do you see that?

 7      A.   Yeah, that's to the entire office, correct.

 8      Q.   Under -- Okay.  Do you recall receiving this

 9   email?

10      A.   Yes, but that's after.

11      Q.   Okay.

12      A.   I -- Yeah, after I decided to run, that's when

13   he sent that email.

14      Q.   Right.  You see in the second paragraph -- I

15   want to make sure I'm reading this right.  It says Ruby

16   Green has informed me that she intends to run for

17   Public Defender.  Gordon Weekes filed to run for Public

18   Defender earlier -- earlier this year upon learning of

19   my intent to retire; did I read that right?

20      A.   Yes.

21      Q.   Okay.  Is that also your recollection of the

22   chronology?

23      A.   Yeah.  Like I said before, I do know that

24   Howard said it either 2017 or something like that, and

25   I don't remember when -- when exactly it was he said he
```

Ruby Green
April 16, 2021

Page 67

1   was going to retire; but I do know Gordon was the first

2   person that was in the race.

3       **Q.   You can take your time if you want to read**

4   **this or not, ma'am, and you can; you're more than**

5   **welcome.  My question is, did you have an understanding**

6   **as to what Howard Finkelstein's concerns were in**

7   **sending this email?**

8       A.   I -- I -- my -- I do -- I can't speculate as

9   to what his intention was when he sent that email, to

10  be honest.  I can't really say.

11      But, I mean, I think -- At first when he sent it,

12  I thought he basically wanted to talk to me and Gordon

13  individually; but I guess what he's saying here is what

14  he wants us not to do while we're campaigning, I guess,

15  in the office.

16          MR. LAUFER:  Okay.  Let's stop for one second.

17  One of the problems I'm having here is somebody's on a

18  mobile device, so when text messages are coming in, it

19  buzzes; and I can't hear what's being -- what the

20  witness is saying.

21          Is there any way that we can -- you either

22  turn that off or whomever is on a mobile device?

23      A.   I'm on a mobile device.  It's the only device

24  that I have.  I have another mobile device that I can

25  get on, but, I mean, yeah, if emails and stuff are

Ruby Green
April 16, 2021

Page 68

1  coming through, I guess I can stop the notifications.

2  BY MR. LAUFER:

3      Q.   Is there a way to do that?  With that

4  buzz-buzz, you know, I --

5      A.   Yes, hold on one moment.

6      Q.   It's kind of hard to hear.

7      A.   Yeah, let me try and do that right quick.

8      Maybe if I put it on do not disturb.

9      Q.   You're talking to the wrong person if you're

10  looking for technical advice.

11     A.   Yeah, I don't know.  I'm gonna try and put it

12  on do not disturb.  Hopefully that will do something.

13     Q.   Thank you.

14     A.   You're welcome.

15     Q.   Okay.  And, obviously, ma'am, it goes without

16  saying, you're not getting text messages on this

17  deposition, right?

18     A.   No, no, no, no.

19     Q.   Okay.  All right.  Let's go back on the

20  record.  Oh, we're still on the record, rather.  I'm

21  sorry.  Let's just -- Hopefully that kills the buzzing,

22  but I appreciate that, ma'am.

23     I'm gonna take you down to the second email in

24  this group, and it looks like this one was sent maybe

25  two minutes -- if you'll see that one was sent at 9:56

Ruby Green
April 16, 2021

Page 69

1  on the 27th, this one was sent at 9:54 on the 27th just

2  a few minutes earlier; do you recall receiving this

3  email?

4      A.   Yes.

5      Q.   And you would agree with me this is from

6  Mr. Finkelstein to Gordon Weekes and yourself as well

7  as Diane Cuddihy and Renee Dadowski, correct?

8      A.   Yes.

9      Q.   And read it if you need to, but I'm just going

10  to ask you what did you take this email to mean?  What

11  did you take from this, ma'am?

12      A.   I -- When I first saw it, I just thought it

13  was when Howard, I guess, ran for Public Defender way

14  back when, it was a lot of issues between him and the

15  previous Public Defender.  And I'm -- I'm -- I thought

16  that maybe he just didn't want all of those issues back

17  and forth office commotion of, you know, back stabbing,

18  saying stuff into the office about, you know, bad about

19  each other or, you know, about me and Gordon, like we

20  weren't fighting in the office type thing.

21      Q.   Sure.  I'm gonna highlight for you, ma'am, a

22  sentence that's in the second paragraph.  Now, I'll

23  just read it for the record.  It says, "Your campaigns,

24  however, are different because they have the potential

25  of pulling the office apart and distracting our

Ruby Green
April 16, 2021

1  employees from our very important mission."  Do you

2  find that to be a reasonable concern?

3      A.   No.  I mean, because he was involved in some

4  things of the sort when he ran for Public Defender, and

5  he got into issues.  I think it's like a normal thing

6  when politics arise, there's going to be differences of

7  opinions.  There's going to be people who will go one

8  way and, you know, there are going to be people who go

9  another.  It's just that's how it is.  Including when

10 someone's elected as a public official, you're going to

11 have people who are going to leave the office because

12 they don't want, you know, that Public Defender or

13 State Attorney or whomever it is that's in charge,

14 they'd rather work elsewhere.  I don't believe that

15 that was a true statement.

16     Q.   Let -- Let me rephrase that.  I didn't ask you

17 if it was a true statement.  I want to make sure we're

18 on the same page here.  I'm not saying did he have

19 reason to fear that you and Gordon Weekes would somehow

20 pull the office apart.  What I'm saying is, do you

21 think it's a reasonable concern that the elected Public

22 Defender when two of his employees are running for his

23 office that it has the potential of pulling the office

24 apart; in other words, is that a reasonable concern to

25 have, not to say that it's true or it's going to

Ruby Green
April 16, 2021

Page 71

1  happen, but be a reasonable concern?

2      A.   About whether reasonable concern if an

3  election has the potential of pulling the office apart;

4  is that the question?

5      Q.   **Yes.  Yes, ma'am.**

6      A.   I guess it could.  But it's again --

7      Q.   **Okay.**

8      A.   It would be speculation, you know, for me to

9  say that it -- if it could, you know.

10     Q.   **Sure.  You would agree with me the Public**

11  **Defender's chief concern should be the clients of the**

12  **Public Defender's Office, correct?**

13     A.   Correct.

14     Q.   **And anything that would harm the ability to**

15  **represent those clients that should -- that's a concern**

16  **of the Public Defender; wouldn't you agree?**

17     A.   Yes, anything that would harm the ability to

18  represent clients, yeah.

19     Q.   **Okay.  So you see in the third full paragraph**

20  **it says, "I want to set some ground rules going**

21  **forward."  Is it your belief that you followed these**

22  **ground rules throughout your entire -- throughout your**

23  **entire time campaigning for the position?**

24     A.   Yes.

25     Q.   **And if you want to read it -- I don't want to**

Ruby Green
April 16, 2021

Page 72

1    sandbag you, ma'am.  If you want to take a moment to

2    read it, by all means, please do.

3         Can you see it okay?

4         A.    Yes, I do believe I followed the ground rules.

5         Q.    Okay.  I think --

6         A.    I think the only real ground rules he had

7    there was -- there was no politicking in the office.

8         Q.    Sure.  You could understand the rationale for

9    that, correct?

10        A.    Well -- Well, I think legally we shouldn't

11   have been -- You know, regardless of what I know about

12   the campaign and whether or not there was actual

13   politicking in the office because I believe that there

14   was because I was also asked to be a part of it for

15   Gordon's campaign, but, nonetheless, I -- I understand

16   why someone would say that.  But do I --

17        Q.    Okay.

18        A.    Is just because I understand why somebody

19   would say that doesn't mean that one way or another

20   it's fair for one and not the -- not the other.

21        Q.    Of course, absolutely, ma'am.  I want to show

22   you what we're going to mark as Exhibit 2 for today's

23   deposition.  And this is the Sun-Sentinel story

24   entitled "Public defender candidate fired the morning

25   after losing Broward primary."  I know you've seen this

Ruby Green
April 16, 2021

Page 73

1  before, but let me show it to you, ma'am.  Have you

2  seen this article before?

3      A.   Yes, I have.

4           (Exhibit No. 2 was marked.)

5  BY MR. LAUFER:

6      Q.   So what I want to ask you, ma'am, there's a

7  quote in here from you that, in part, says, quote, "I

8  was told not to run, I was told I couldn't do it and I

9  was told I was going to get fired"; do you see that

10  quote?

11     A.   Yes.

12     Q.   Is that an accurate quote of you, ma'am?

13     A.   Yes, it is.

14     Q.   So let me ask you this, when you say I was

15  told not to run, that's kind of what we call in writing

16  passive voice; it doesn't tell you who is saying that.

17  Can you tell me who it was that told you not to run for

18  Public Defender?

19     A.   It was just people in the community.  Gordon

20  would send people to come and talk to me and tell me

21  not to run.  You know, I can't really say who exactly

22  it was because it was just different people in the

23  community like events and stuff that I would go to.

24     Some people I wouldn't even know would, you know,

25  come up and say stuff like that to me, you know, if I

Ruby Green
April 16, 2021

Page 74

1   would go to events and stuff like that.  It wasn't

2   just, oh, this person I know.  Like people who know me,

3   obviously, supported me; but most of the time these

4   were people I just met or were getting to know or

5   trying to see if, you know, I can get -- gather some

6   support for my campaign.

7        And when it came to other statements like, you

8   know, there was just people saying that I wouldn't be

9   able to do it, and, you know, and then Gordon would be

10  on some forum saying that he would fire me and, you

11  know, just stuff like that.

12       Q.   Okay.  Did Gordon Weekes tell you not to run

13  for Public Defender?

14       A.   He did not tell me personally not to run, no.

15       Q.   Did he tell you some other way?

16       A.   He -- From my understanding is is that he sent

17  people to tell me not to run because he would only want

18  the position for eight years, and then I would be next.

19       Q.   Is this more courthouse scuttlebutt or things

20  posted on blogs?

21       A.   No, I received calls from like a pastor and,

22  you know, some of it was scuttlebutt; but I received a

23  call from a pastor.  I can't quite remember who else I

24  received a call from, but I know for sure there was a

25  pastor that told me that he spoke with Gordon; and this

Ruby Green
April 16, 2021

Page 75

1  is what Gordon wanted to relate to me and --

2      Q.    Okay.

3      A.    -- if I'm not mistaken there were --

4      Q.    Who was that pastor, ma'am?

5      A.    Allen Jackson.

6      Q.    And where -- Allen Jackson is a pastor where?

7  In other words, how would I find him?

8      A.    That I have -- I don't know where he pastors.

9  All I know is that he goes around by the name of Al --

10 Pastor Allen Jackson.  I don't know where he pastors.

11     Q.    Okay.  But he's a local individual?

12     A.    Yes, he's a local individual.

13     Q.    And he told you that Gordon told him to tell

14 you that Gordon only wanted the position for eight

15 years and that you could have it afterwards?

16     A.    Correct.

17     Q.    Okay.  Anyone else that you can recall

18 alleging to be an emissary from Gordon Weekes giving

19 you a similar message don't run or don't run now?

20     A.    There -- There were.  I just can't remember

21 the names off the top of my head.  I simply can't.  It

22 was -- It was -- The whole situation, it just wasn't

23 called for.

24     Q.    Is there anyone whose name you can recall,

25 ma'am?

Ruby Green
April 16, 2021

Page 76

```
 1      A.   Besides Pastor Allen Jackson, no.
 2      Q.   Right.
 3      A.   Like I said --
 4      Q.   Certainly Howard Finkelstein never told you
 5 that, correct?
 6      A.   No, Howard never told me that.
 7      Q.   Same question, did Howard allegedly send any
 8 emissaries to convey his feelings through somebody
 9 else?
10      A.   To somebody else to me?
11      Q.   Yes, ma'am.
12      A.   About?
13      Q.   About do not run for Public Defender.
14      A.   No.
15      Q.   But in your opinion -- In your experience, was
16 it the rumor mill, the scuttlebutt of the courthouse
17 that Howard Finkelstein did not want you to run?
18      A.   Yes, because he publicly supported Gordon in
19 our emails.  Whenever Gordon would get an endorsement,
20 he would send emails out to the entire Public
21 Defender's Office.  When I would get an endorsement, we
22 would not get an email.  He's done articles in his
23 support for Gordon so and I -- and I believe, if I'm
24 not mistaken, he also contributed to his campaign --
25      Q.   Okay.
```

Ruby Green
April 16, 2021

Page 77

 1     A.    -- and he also --

 2     Q.    **Okay.**

 3     A.    Some of my friends went to Gordon's like fund

 4  raisers.  And Howard was there as well giving speeches.

 5     Q.    **Okay.  Ma'am, contributing to one's campaign**

 6  **is not the same thing as telling you not to run;**

 7  **wouldn't you; agree?**

 8     A.    Is it the same thing in a -- in a political

 9  situation like this, yes.

10     Q.    **Okay.  You contributed to Gordon Weeks's**

11  **campaign, did you not?**

12     A.    Yes, I did.

13     Q.    **Was that your way of telling yourself not to**

14  **run?**

15     A.    No, that was way before I decided to run.

16     Q.    **Okay.**

17     A.    That was --

18     Q.    **Wasn't Mr. Finkelstein -- I'm sorry, ma'am.**

19  **Go ahead.**

20     A.    When we were chiefs, we were basically told we

21  had to support Gordon and that we had to make -- They

22  gave us a list of people who we had to call as well.

23  It was basically, you know, known without known saying

24  that you had to support Gordon when we were chiefs.

25        At the time that I donated to Gordon, I was a

Ruby Green
April 16, 2021

Page 78

1   chief.  And they gave us lists of people to call in

2   order to get Gordon -- get them on Gordon's side to

3   support them as well, and they gave it to us.

4        **Q.   And was it -- Wasn't Mr. Finkelstein's**

5   **endorsement of Mr. Weeks prior to you entering the**

6   **race?**

7        A.   His public endorsement, no.  The entire time

8   he had been saying he wasn't going to endorse one

9   person or the other.

10       **Q.   Okay.**

11       A.   That -- I believe that was the -- When I came

12  out, I believe that was the initial article that came

13  out, I want to say maybe by the Broward Beat; but he

14  was saying that he wasn't going to like publicly

15  endorse anyone or something like that.  That didn't

16  happen until -- He didn't endorse publicly until later.

17       **Q.   Okay.  You just made the statement "we were**

18  **told we had to support Gordon."  Who made that**

19  **statement?**

20       A.   No one like -- No one -- Like Howard, no, he

21  didn't make that statement.  But it was -- It was

22  basically told of us that we had to go and be involved

23  in his campaign --

24       **Q.   Okay.**

25       A.   -- not necessarily to support.

Page 79

 1      Q.    Who told you that, ma'am?

 2      A.    If I can't remember, he had -- The treasurer

 3  at the time was -- If I'm not mistaken, if it was Frank

 4  or something like that; and they were setting meetings

 5  and they were giving us -- they were doing -- I think

 6  they emailed us saying that we needed to have a

 7  meeting, you know, to go over his campaign stuff.

 8      I'm trying to figure out what else and how did

 9  I -- how did we get the lists as to who we had to call

10  and make calls for, but I know it was during the

11  workday that we had gotten lists as to who we needed to

12  call in order to support him.  But necessarily I can't

13  recall who said, oh, you got to support him or else.

14  No one said you have to support him or else.  It was

15  just, you know, email saying that this is -- Without

16  even asking us, you know, without even asking me, hey,

17  are you going to support Gordon or whatever; we were

18  just told that we had to be at some functions.

19      Q.    Okay.  Ma'am, when you say Frank, do you

20  mean -- is that Frank de la Torre?

21      A.    Right.  I believe he was the treasurer at the

22  time, if I'm not mistaken.  I don't know what part he

23  played, but I do know that, you know, without asking,

24  we were just basically told to be a part.

25      Q.    Okay.  Ma'am, hang on one second.  I want to

Ruby Green
April 16, 2021

Page 80

 1   be real clear here because this is a serious

 2   accusation.  You just told me that you were told,

 3   quote, we were told we had to support Gordon; and then

 4   you said we weren't told; we were told we had to

 5   support Gordon or else, so let's put the --

 6       A.   No.

 7       Q.   -- or else --

 8       A.   I never said --

 9       Q.   Hang on, ma'am.  Let me --

10       A.   Okay.

11       Q.   Let me just finish my question.  Let's put the

12   "or else" aside, I'm going to ask the same question

13   again; were you told that we, whomever we is, were told

14   we had to support Gordon?

15       A.   We were told without being told.  I never said

16   "or else."  It wasn't -- I said it was not an or else

17   type of situation.  It was not you're going to support

18   him or else type of situation.

19       We were told without being told that we, you know,

20   were going to go to his functions; we were going to

21   call people on his behalf without being asked to do it.

22       Like they didn't come to us and say, hey, do you

23   want to be a part of Gordon's campaign or, you know, do

24   you want to make calls on his behalf or anything like

25   that.

Ruby Green
April 16, 2021

Page 81

```
 1      We -- it wasn't -- To me, it wasn't an option.  To
 2  me, it -- to, you know -- To me, my understanding,
 3  there was no option that I could or else maybe I
 4  wouldn't be a chief anymore.  It was like a --
 5      Q.   And why did you understand that if you were
 6  told that without being told that?
 7      A.   Because I wasn't asked.
 8      Q.   I'm sorry?  Okay.
 9      A.   Because I wasn't asked.
10      Q.   Okay.  So if I -- Sorry, ma'am.  If I
11  understand you correctly, it sounds like somebody gave
12  you tasks that one would do if one were supporting
13  Gordon Weekes without asking you whether you wished to
14  do it or not; is that fair to say?
15      A.   Right.
16      Q.   Okay.  So whomever -- whether it was Frank de
17  la Torre or someone else -- it sounds like that person
18  assumed that you did support Gordon's campaign at that
19  time; is that accurate to say?
20      A.   I can't say what someone -- to be honest, what
21  someone assumed.  I can't say --
22      Q.   Okay.
23      A.   -- if it was like I was thinking like I'm a
24  voluntold is what they say or if someone assumed, I
25  can't say that.  But I do know --
```

Ruby Green
April 16, 2021

Page 82

1    Q.   **Right.**

2    A.   -- how I felt at that time, and at that time I

3    felt like I had to based upon --

4    Q.   **Okay.**

5    A.   -- what was -- you know, how everything went

6    down.

7    Q.   **I understand.  But fair to say, you don't know**

8    **one way or the other whether this was being forced upon**

9    **you or whether it was someone who just assumed you**

10   **would support Gordon; you don't know their intention**

11   **one way or the other; is that fair?**

12   A.   Right.

13   Q.   **Okay.  All right.  Were there any other --**

14   **Were there any other people in the -- amongst the**

15   **chiefs, executive chiefs or the actual Public Defender**

16   **who told you do not run for Public Defender?**

17   A.   No.

18   Q.   **Okay.  Now, I'm going to ask you the same**

19   **question as to --**

20        THE STENOGRAPHER:  (Interrupted for

21   clarification.)

22   BY MR. LAUFER:

23   Q.   **And, ma'am, I'm going to allow you to say what**

24   **you're saying; but it got a little garbled.**

25   **Do you mind starting up with what you were just**

Ruby Green
April 16, 2021

Page 83

1   saying?

2       A.   No, I was saying like because there was --

3   wouldn't be because there were a couple that actually

4   supported me in my run.

5       Q.   Okay.  Now, same questions, ma'am, for -- I'm

6   going to show you on my cursor here.  The third portion

7   of your quote, I was told I was going to get fired; do

8   you see that?  I'll make it bigger.

9       A.   Yes.

10      Q.   Okay.  So, again, let me ask you, before you

11  got into the race, was there anybody cautioning you

12  don't do this, Ms. Green; you're going to get fired if

13  you do?

14      A.   Yes.

15      Q.   Okay.  And that's -- let me -- Let me now

16  narrow that down a little.  Did you ever hear that from

17  Howard Finkelstein?

18      A.   Not from Howard.

19      Q.   Did you ever hear that directly from Gordon

20  Weekes?

21      A.   Yes.

22      Q.   Okay.  And I want to make sure we're not

23  confusing the statement he made to the Sun-Sentinel.  I

24  mean before --

25      A.   No.

Ruby Green
April 16, 2021

Page 84

```
 1      Q.   -- your campaign got started.

 2      A.   Not before my campaign got started, no.

 3      Q.   Okay.  Same question as before, were there any

 4  emissaries, did anybody such as Pastor Jackson say to

 5  you, Ms. Green, I've got a message from either Howard

 6  Finkelstein or Gordon Weekes if you choose to run for

 7  Public Defender, you're going to get fired; did you get

 8  anything like that?

 9      A.   No.

10      Q.   Is the sole source of your statement I was

11  told I was going to get fired the statement that Gordon

12  Weekes made in the Sun-Sentinel interview?

13      A.   Not -- That wasn't the sole source, no.  It

14  was other people saying it as well.  Like I said,

15  community leaders, I guess, saying it that, you know,

16  that it was a possibility that they would try and fire

17  me.

18      Q.   Okay.

19      A.   And, you know --

20      Q.   Okay.

21      A.   -- and it -- It alarmed some people,

22  especially when Gordon came out and said it in the

23  Sun-Sentinel interview.  So it wasn't just that.  It

24  was a general statement of what people were saying,

25  everything that people were saying, about how this
```

Ruby Green
April 16, 2021

Page 85

 1  campaign would be -- would go.

 **2**     Q.   **But none of those people said they had some**

 **3**  **sort of inside information from someone who could play**

 **4**  **a role in your termination, correct?**

 5     A.   Well, if -- There was at least one person that

 6  had come to me and said that Gordon told them directly

 7  that he was going to fire me.  They did not say

 8  Howard --

 **9**     Q.   **Did that --**

10     A.   -- but they said Gordon.

**11**     Q.   **Was that before or after Mr. Weeks made that**

**12**  **statement to the Sun-Sentinel Editorial Board?**

13     A.   I want to say it was after.

**14**     Q.   **Okay.  So you already heard it from Mr. Weeks**

**15**  **at that point, right?**

16     A.   By that point I had -- Of course, right.  So,

17  I mean --

**18**     Q.   **Okay.  So someone telling you that, that**

**19**  **shouldn't have been news to you, correct?**

20     A.   Right.  And then like that -- It wasn't

21  exactly news, but you just never knew because he kind

22  of backtracked.  When we were on another forum, I

23  believe it was a Bless Broward forum, and someone asked

24  him the exact same question; and he kind of backtracked

25  and kind of said he was going to pray about it.

Ruby Green
April 16, 2021

Page 86

1      So I didn't know entirely whether or not he

2  just -- he was actually going to act upon it or not

3  based upon that.

4      Q.   Understood.  Do -- What is your recollection

5  of what Mr. Weeks said to the Sun-Sentinel Editorial --

6  Editorial Board regarding the possibility of you

7  working under his administration?

8      A.   That he -- That he would not keep me, and I

9  said that I would keep him because one of the issues in

10  the office is having experienced attorneys.  I

11  remembered that part, at least.

12      Q.   I'm sorry, ma'am, having what attorneys?  I

13  didn't hear that word.

14      A.   Experienced attorneys in the office, like

15  keeping, being able to --

16      Q.   Okay.

17      A.   -- like retain them.

18      Q.   Understood.  Understood.  So do you recall

19  Mr. Weeks's exact words?

20      A.   I can only remember that he would not keep me.

21  That's -- That's all I can recall.

22      Q.   Okay.  All right.  Ma'am, I'm going to show

23  you what we're going to mark as Exhibit 2 for today's

24  deposition.  And this is your complaint in this action.

25          MR. FRANK:  That would be Exhibit 3, I think,

Ruby Green
April 16, 2021

Page 87

1   Cory.

2           MR. LAUFER:  Oh.

3           MR. FRANK:  You marked the Sun-Sentinel.

4           MR. LAUFER:  You're right.  You're right.

5           (Exhibit No. 3 was marked.)

6           MR. FRANK:  I'm not sure if you intended the

7   first one to be the emails that you introduced at the

8   beginning of the composite because you had two emails.

9   Was that going to be a composite?

10          MR. LAUFER:  I think I said composite.

11  There's two different emails, so it's a composite.

12          MR. FRANK:  All right.

13  BY MR. LAUFER:

14      Q.   I'm going to show you -- Bear with me for one

15  second.  I'm going to show you paragraph eight in your

16  complaint.  I'm going to make it as big as I can for

17  you.  I see you leaning forward there.

18      Okay.  Can you read -- Is that large enough for

19  you?  Can you see paragraph eight?

20      A.   Yes.

21      Q.   Okay.  And would you agree with me that

22  what -- what's being said here is that

23  Mr. Finkelstein's decision to terminate your employment

24  was -- can't highlight it -- sorry -- was based on

25  statements and/or speech that she -- you -- made -- had

Ruby Green
April 16, 2021

Page 88

1  made during her -- your -- campaign for the Public

2  Defender's Office; do you see that?

3      A.   Yes, I see that.

4      Q.   Okay.  What I want to do now is I want to show

5  you what we'll mark as Exhibit 4, which are your answer

6  to interrogatories.  Bear with me for one second.

7      And I want to look at Interrogatory No. 14.  At

8  first what I'm going to do is -- Exhibit 4 is going to

9  be the interrogatories themselves because your

10  responses don't have the actual question on them.

11      Do you see that No. 14 asks you to identify the

12  protected speech which forms the basis of your claim;

13  do you see that?

14      A.   Right; I see that.

15          (Exhibit No. 4 was marked.)

16  BY MR. LAUFER:

17      Q.   And now I'm going to click over to what we'll

18  mark as Exhibit 5, which is your answer to

19  interrogatories, and we'll go to No. 14; and it says

20  the aggregate statements made by the plaintiff during

21  the Adams Brothers Podcast, and it gives some

22  specifics, a date, and whom you're addressing; do you

23  see that?  Did I characterize that properly?

24      A.   Right.

25          (Exhibit No. 5 was marked.)

Ruby Green
April 16, 2021

Page 89

1  BY MR. LAUFER:

2     Q.    I'm sorry, that's way too small.  I see you

3  leaning forward.  I'm going to make that bigger for

4  you.  Is that better?

5     A.    Yes, it's so much better.

6     Q.    Okay.  Sorry about that.  So my question is,

7  when you are talking about statements, speech made

8  during the campaign, would you agree with me based on

9  this interrogatory answer that you are limiting that to

10  the statements you made on the Adams Brothers Podcast?

11     A.    That I -- That I'm limited to it as, I

12  believe --

13     Q.    If that's --

14     A.    Based upon what Howard said in his -- in his

15  -- in the article, it was based upon that podcast.

16     Q.    Right.  And that's -- That's a point I'm

17  trying to make.  You -- You don't have any reason to

18  believe that Mr. Finkelstein heard something else that

19  you said somewhere else on the campaign and that that

20  was somehow lumped into his decision; it was all based

21  on the Adams Brothers Podcast, correct?

22     A.    That's my understanding.

23     Q.    Okay.  All right.  When is the last time --

24  Strike that.  I shouldn't ask.  Let me ask you a better

25  question.  Have you ever viewed the Adams Brothers

Ruby Green
April 16, 2021

Page 90

1   Podcast in question?

2       A.   No, I only -- I only performed it.

3       Q.   Right.  You've never watched it since -- since

4   it was recorded?

5       A.   No.

6       Q.   Have you ever seen a transcript of the -- of

7   what was said?

8       A.   Transcript of the podcast, no.

9       Q.   Okay.  Given that Mr. Finkelstein terminated

10  you based on what was said in that podcast, you never

11  had the curiosity to go back and look to see if there

12  was anything you said that might have warranted that?

13      A.   No, I know, you know, generally the things

14  that we talked about in that podcast; and, you know, I

15  was, you know, asked to do the podcast and, you know,

16  there were people out in the community, meaning the

17  Adams Brothers, that wanted to know a little bit more

18  about the criminal justice system, a little bit more

19  about me, who was running; so I did it.

20      Q.   I understand that, ma'am.  Would you agree

21  with me that at the end of this deposition if you were

22  asked about everything that you said in this

23  deposition, wasn't the best place to look to get that

24  answer be a transcript?

25          MR. FRANK:  Objection; relevance; predicate.

Ruby Green
April 16, 2021

Page 91

1  Go ahead.

2      A.   If we had -- If we had a transcript.  Like I

3  said, I didn't have a transcript and --

4  BY MR. LAUFER:

5      **Q.   You're not --**

6      A.   Go ahead.

7      **Q.   No, please, continue.**

8      A.   No, I was saying like the entire situation for

9  me has been quite like heart-wrenching because of the

10  fact like I don't really like going back looking at

11  things that I have found out about the campaign because

12  I know what pain it has caused me.  I don't like

13  looking at that stuff.  I don't look at any of my

14  campaign stuff.

15      I'm only on social media now if I have an event

16  that somebody wants me to do.  I don't have -- I

17  don't -- I don't have the wherewithal to be the person

18  that I thought I was back then.

19      I don't -- I don't -- I'm not going to go back and

20  look at that stuff.

21      **Q.   Okay.  So is it fair to say that -- Ms. Green,**

22  **do you want to take a minute?**

23      A.   No, I'm fine.

24          MR. LAUFER:  Okay.  You know what, Counsel,

25  we've been going for a while.  Ms. Green, I appreciate

Ruby Green
April 16, 2021

Page 92

1  you wanting to move forward.  Why don't we take five

2  minutes anyway; is that okay?

3          Let's just take five minutes, and we'll come

4  back at 3:10 if that's all right.

5          MR. FRANK:  Are you all right with that, Ruby?

6          THE WITNESS:  Yes, I'm sorry.

7          MR. FRANK:  No, you don't need to apologize.

8          MR. LAUFER:  No, you have no reason to

9  apologize, ma'am.  Why don't we take five minutes;

10  we'll come back at 3:10.

11          MR. FRANK:  Okay.

12          (Recess had at 3:06 p.m. - 3:11 p.m. EST.)

13  BY MR. LAUFER:

14      Q.    And, ma'am, I want to go back to -- I think we

15  were at Exhibit 5, which I'm going to pull up in just a

16  minute.  But given that you have not gone back and

17  watched the podcast and you have not looked at a -- at

18  a transcript of it, how would you characterize your

19  recollection of the entire -- the entire podcast?

20      A.    What do you mean about my recollection, like

21  as to what was happening, like what was said or what

22  happened?

23      Q.    Yeah, in other words -- Yes, ma'am.  How --

24  how -- Without having viewed it -- Well, let me back up

25  for a second.  The podcast was August the 8th of 2020,

Page 93

1  correct?

2      A.   Yes.

3      Q.   That was, what, eight plus months ago,

4  correct?

5      A.   Yes.

6      Q.   So my question is without having watched it

7  again and without having reviewed the transcript, how

8  clear is your recollection of this 40-something-minute

9  conversation that took place over eight months ago?

10     A.   It's clear.

11     Q.   Okay.  All right.  Let me show you exhibit --

12     A.   I can't say verbatim, but it's clear.

13     Q.   Of course.  Understood.  Let me show you again

14  your answer to No. 14, and just tell me if I'm reading

15  this right, ma'am.  It says during the podcast at

16  issue, plaintiff spoke to issues of public concern

17  including lack of funding for Broward County Public

18  Defender's Office, the existence of minimum mandatory

19  sentencing, training of public defenders and issues of

20  racial justice within the criminal justice system.

21     Now, I would imagine by stating that you put the

22  word including in here that you don't mean that that's

23  everything that was discussed in this podcast, right?

24     A.   Right.

25     Q.   Okay.  So my question to you, ma'am, is do you

Ruby Green
April 16, 2021

Page 94

```
 1  believe that these were the -- the subject -- this was

 2  the subject matter that Mr. Finkelstein based the

 3  decision to terminate you on?

 4          MR. FRANK:  Objection --

 5     A.   Yes.

 6          MR. FRANK:  -- calls for speculation.  Go

 7  ahead.

 8     A.   Yes.

 9  BY MR. LAUFER:

10     Q.   Was that a yes, ma'am?

11     A.   Yes.

12     Q.   Okay.  So then let me ask you this, the flip

13  side of that, if you discussed other issues, would you

14  agree with me that those are not issues that

15  Mr. Finkelstein based his termination of you on?

16          MR. FRANK:  Same objection.

17          THE WITNESS:  I'm sorry.  Oh, sorry.

18          MR. LAUFER:  Sure.

19          MR. FRANK:  Same objection.  Go ahead.

20     A.   What?  I didn't --

21  BY MR. LAUFER:

22     Q.   I'll rephrase it.  Your counsel has objected

23  to the form of the question, which, obviously, you can

24  still answer.  But I'm going to rephrase it for you

25  because we kind of got garbled there for a minute.
```

Ruby Green
April 16, 2021

Page 95

1      **So by virtue of the fact that you believe these to**

2   **be the topics that caused Mr. Finkelstein, the topics**

3   **discussed, that is, that caused Mr. Finkelstein to**

4   **terminate you; is it fair to say then if other topics**

5   **were discussed, those are ones that did not cause you**

6   **to be terminated?**

7      A.   No, I wouldn't say that.  Like I can't really

8   speculate all together as to what his decision was.

9      You know, I just know that based upon what I

10  remember from the podcast, I engaged in protected

11  speech; and this is some of the stuff that the

12  community was asking me questions on.  These are not

13  questions that I was put, you know, that they give me

14  ahead of time that I was -- like they gave me so I

15  could answer and I knew what the questions were going

16  to be.

17      But these are the questions that the community had

18  in mind in order to ask because they wanted to know

19  what was going on in the criminal justice system.  They

20  wanted to know what was going on at the Public

21  Defender's Office.  And, you know, obviously, at some

22  points in time, we have our platforms that we as

23  candidates talk about; but I can't tell you that, you

24  know, what is -- speculate as to what exactly in its

25  entirety that he decided to fire me on based -- but

Ruby Green
April 16, 2021

Page 96

 1  other than what he said in the papers.

 2      Q.   Right.  So you don't have any firsthand

 3  information from Mr. Finkelstein as to precisely what

 4  it was you said in this podcast that led him to make

 5  the decision to terminate you; is that fair?

 6      A.   That's fair, other than what he just said in

 7  the papers, which was basically what we outlined.

 8      Q.   What do you mean "what we outlined"?

 9      A.   Well, I mean, he -- what you had showed me,

10  No. 8, I believe, is what he said in the paper No. 8,

11  if I'm not sure.  On a different exhibit, I can't

12  recall which exhibits it was; but there was like a

13  No. 8 that Mr. Finkelstein had stated out in the public

14  on the paper as to what was the reasons that he fired

15  me, and it was because of the podcast and something

16  that I had said during the podcast so --

17      Q.   Right.  But what I'm trying to -- What I'm

18  trying to understand, I think you've already said it,

19  but I want to make sure we're clear, that it's -- It's

20  clear that something that you said on the podcast

21  caused Mr. Finkelstein to determine that you should be

22  terminated, but we -- You don't know specifically what

23  of the many things that were said in that

24  40-something-minute podcast was what made him make his

25  decision; is that fair to say?

Ruby Green
April 16, 2021

Page 97

1    A.    Yes, you can say that.

2    Q.    Okay.  And these topics that you put in on

3  No. 14, that's not necessarily you saying these are the

4  topics; this is just a random -- some of the topics

5  that were discussed; is that fair to say?

6         MR. FRANK:  Objection to form.  Go ahead.

7    A.    Right.  Those are -- Those are the main things

8  that we discussed during the podcast, correct.

9  BY MR. LAUFER:

10   Q.    Understood.  Okay.  All right.  Let's go over

11  some of the things that were said during the podcast,

12  and I'm going to ask you questions about some of those

13  things; all right?

14   A.    Yes.

15   Q.    Okay.  During the podcast you stated, quote,

16  and, you know, we need change at the Broward County

17  Public Defender's Office because a black face in a high

18  place doesn't always want to advance the race; do you

19  recall saying that, ma'am?

20   A.    Right; I did say that.

21   Q.    I'm sorry, is that yes?

22   A.    Yes.

23   Q.    Okay.  Do you have any reason to believe one

24  way or the other if that was a statement that caused

25  Mr. Finkelstein to militate towards terminating you?

Ruby Green
April 16, 2021

Page 98

1     A.   I don't know it's entirely sure.  I want to

2  say that one of the articles that he mentioned that was

3  one of the reasons.

4     **Q.   Okay.  Do you happen to know what article that**

5  **might have been?**

6     A.   I -- I don't know.  I'm not entirely sure, but

7  I'm pretty sure I remembered that being that he --

8  because I said that.  I can't remember which article it

9  was.

10    **Q.   Okay.  If that article does not exist, would**

11 **you -- Is there any other basis for you to believe**

12 **that?**

13        MR. FRANK:  Believe what?

14        MR. LAUFER:  Yeah, that's -- Sorry.  That was

15 a poorly-worded question.

16 BY MR. LAUFER:

17    **Q.   Your belief is that Mr. Finkelstein may have**

18 **said that in an article.  If that is not the case and**

19 **there's no such article, do you have any other basis**

20 **for that belief?**

21    A.   Besides that, no.  I don't have any other

22 basis besides the fact that I'm recalling that that was

23 an issue for him.

24    **Q.   Okay.**

25    A.   It could have -- It could have been the DVR

Ruby Green
April 16, 2021

Page 99

1  Law Article or another Sun-Sentinel article.

2      Q.   Okay.  What -- What did you mean by that

3  statement?

4      A.   Just all skin-folk and kinfolk is the actual

5  saying.  But when it comes to politics, it's, you know,

6  you're rising high and someone that looks like you may

7  necessarily not want to, you know, advance the issues

8  that result in -- You know, like let's say people of

9  color, you may not want to advance, you know, the

10  people of colors, the issues that they have.

11      You know, like if they have -- You know, like we

12  have the NAACP for it; they're supposed to, you know,

13  advocate on the rights of, you know, people who are of

14  color.

15      So that's what that kind of means, like just

16  because you're in a high place and you look like us

17  doesn't mean that you're going to advocate for us.

18      Q.   And was this directed at any one individual?

19      A.   When I said that?

20      Q.   Yes, ma'am.

21      A.   It was -- It was just a general statement.  It

22  was, you know, a black face in a high place doesn't

23  necessarily want to advance the race; it could go for

24  anyone who is, you know, of color and who isn't doing

25  their job for the advancement of colored people.

Ruby Green
April 16, 2021

Page 100

1    Q.    Okay.  You would agree with me that this Adams

2  Brothers Podcast was at least, in part, done to advance

3  your campaign, correct?

4    A.    Well, I mean, I can't necessarily say that it

5  was done to advance my campaign.  To be honest, when I

6  first met or met them -- or when they first reached out

7  to me, they didn't want me.  They wanted Gordon, I

8  believe, in order to, you know, do the campaign.  So,

9  you know, he was the popular person to seek out, I

10  guess.  And so I was just telling my story.  It was

11  just me, you know, in a campaign moment.  Everybody

12  reached out -- you know, a lot of people.  I don't want

13  to say everybody.  That's like too general.

14    But a lot of people reached out for, you know,

15  people -- candidates -- to do podcasts and, you know,

16  forums and panels and stuff like that so it was just --

17  it was just like one of the things in the mill as

18  opposed to, oh, I know these people; I really want to

19  go do their show.  I was kind of hesitant because I

20  thought they favored him over me already.

21    Q.    Okay.  But you said a moment in the campaign.

22  This was at least, in part, a campaign moment, correct?

23    A.    Yes, yes, yes, yes, it was; yeah.

24    Q.    Okay.  And you would agree with me you had two

25  opponents at that point in time in the primary,

Ruby Green
April 16, 2021

1   correct?

2       A.   Yes.

3       Q.   Mr. Weeks and Judge Lynch, correct?

4       A.   Yes.

5       Q.   Okay.  And only one of those two candidates

6   has a black face, correct?

7       A.   Yes.

8       Q.   That wasn't a statement aimed at Mr. Weeks?

9       A.   No, it was a general statement that was made

10  for black people as a whole.  It wasn't just, oh, I'm

11  attacking Mr. Weeks.  It was, you know, we have a lot

12  of black people that are running.  If they're running

13  for the right reasons, you know, that's what it was.

14      And, you know, it was just a general statement all

15  together.

16      You know, if it was -- You know, if the shoe fit,

17  if he -- You know, if people felt like he fell in that

18  category, then he fell in that category.  But, you

19  know, if the shoe fit that somebody else who was also

20  running that was also a black face that, you know,

21  people didn't necessarily care about and, you know,

22  they needed to do their jobs as well; and they fit in

23  that category.  So it also goes for me.  I'm a black

24  face in a high place.  Do I -- You know, people could

25  have felt the same way about me.  Did I really want to

Ruby Green
April 16, 2021

Page 102

1  do the work on behalf of colored people, I got that a

2  lot.  People would always come to me and say that, you

3  know, a white man put me in the race and stuff like

4  that; so it was just a general statement.

5      Q.    People would come to you and say a white man

6  put you in the race?

7      A.    Yeah, yeah.

8      Q.    What does that mean?

9      A.    That, you know --

10      Q.    To the best of your knowledge, what does that

11  mean?

12      A.    It -- It just means that they -- They felt

13  like or a white man put me in to like split the vote or

14  something like that, so that, you know, I was working

15  for the -- you know, somebody else or something like

16  that.  It was like, yeah, it's all weird; but that was

17  stuff they were saying.

18      Q.    Given that Judge Lynch is white, would that be

19  implication that Judge Lynch somehow put you into the

20  race to split the black vote, I guess?

21      A.    Well, I don't think -- I don't -- I didn't

22  hear from anyone that it was Judge Lynch putting me in,

23  but the saying that people would come to me and say,

24  oh, you know, I don't -- I'm a little hesitant about

25  voting for you because they say that a white man put

Ruby Green
April 16, 2021

Page 103

1  you in the race.  I don't know who this white man was,

2  who they were talking about; but that was what people

3  would come up to me and say that, like public people in

4  the public, you know, somebody, you know, put out a

5  rumor or something like that; but that's what they

6  would say.

7      **Q.   Okay.  Just to be clear, though, your getting**

8  **in the race had nothing to do with Judge Lynch or some**

9  **plan to split the -- allegedly split the black vote,**

10  **correct?**

11      A.   No, no, no.  I got into it before Judge Lynch.

12  I didn't even really know him or anything like that.  I

13  knew he was a judge at some point, but I didn't know

14  him -- that man.  But, you know, I -- I knew him more,

15  you know, when we started being candidates.  But he got

16  in after I did.  I got in before him.

17      **Q.   Okay.  Another statement that you made on the**

18  **podcast was, quote, I was told as a supervisor -- as a**

19  **supervisor and as a chief, not to go to the courtroom,**

20  **not to train our attorneys.**

21      **So my question to you is, first and foremost, do**

22  **you know if this statement was a basis for**

23  **Mr. Finkelstein deciding to terminate you?**

24      A.   I -- I don't know if it was or not.  It could

25  have been.

Ruby Green
April 16, 2021

Page 104

1      Q.   All right.  And that would be -- And that

2  would be -- Any way you would have learned about that,

3  whether at the time you made the statement, at the time

4  you were terminated subsequently, no one's provided you

5  information that pertains to that particular statement,

6  correct?

7      A.   No, I don't know.

8      Q.   Okay.  Who told you as a supervisor and as a

9  chief not to go to the courtroom and not to train

10  attorneys?

11     A.   It was -- The person that ended up telling me

12  as a whole were -- were Gordon and Diane, and I believe

13  Renee may have been in the office as well.  But I'm not

14  entirely sure if Renee was there or not.  But when it

15  comes to Miss -- the felony attorneys not being able to

16  sit with misdemeanor attorneys on trials, that was the

17  phone call from Renee.

18         But when it came to don't go to court, don't, you

19  know -- don't -- don't, I guess, train the attorneys,

20  that was definitely Diane.

21         She specifically said that it would -- It would

22  diminish the chief capacity.  So I don't know -- I

23  didn't know what that mean.  I guess it meant that, you

24  know, they saw me so often, then they wouldn't be like,

25  oh, my gosh, she coming to the courtroom.  You know,

Ruby Green
April 16, 2021

Page 105

1  they wanted us to, I guess, be scary once we appeared

2  in court; so it didn't have to be that often.

3       But that's what she said it would diminish their

4  chief capacity.

5       Q.   So if I understand you correctly, ma'am, if

6  you were to go to the courtroom too often, it would

7  be -- it would somehow diminish the importance of you

8  as the chief arriving?

9       A.   Well, I'm saying that.  I'm saying that that's

10 what I thought that she meant.  But when she --

11      Q.   Okay.

12      A.   -- told me that, they didn't specify as, you

13 know, what it was.  Because, you know, as a supervisor,

14 I was always going to the courtrooms.  My chief was

15 always going to the courtrooms because that's the

16 community that we forged.  We said that we didn't want

17 to be like other chiefs.  We were going to go to the

18 courtrooms and everything, and then all of a sudden

19 when I became chief, there was a problem for a chief to

20 go to the courtrooms; and she -- The only thing she

21 said was that it diminished our chief's capacity.  I

22 don't -- I didn't know.

23      Q.   Understood.

24      A.   I just assumed what she thought or what she

25 was thinking as to when she said it.  I don't know

Ruby Green
April 16, 2021

Page 106

1  exactly what she was thinking when she said it.

2      Q.    Understood.  But that's only half of it.  It

3  was not to go to the courtroom and not to train our

4  attorneys.  Let me move over to the second half of it

5  then.  Not to train our attorneys, who told you --

6  Well, who told you not to train the attorneys?

7      A.    That was Diane again.  I was told -- When she

8  told me that, it was -- I didn't -- I did not know

9  when -- At first when she told me not to go to the

10  courtrooms, I kind of got upset, and I called Howard.

11      And I called Howard, and Howard was just like,

12  yes, you know, what's up.  I was just like, you know,

13  they're telling me -- meaning Diane, Gordon and

14  Renee -- were telling me not to go to the courtrooms.

15      I didn't want to just sit in my office twiddling

16  my thumbs, and he was telling me, yeah, I want you to

17  go to the courtrooms; I really, really want you to go,

18  like that's -- that's -- that's why I got -- you know,

19  made you chief or whatever because I know that, you

20  know, you do all these things.

21      But then when I would go back in, you know, and

22  they told me not to train, they would tell me it was --

23  it was a decision that Howard made.  So I didn't know

24  who was telling me the truth.  Was, you know, Howard --

25  Was Howard saying these things that I shouldn't go to

Ruby Green
April 16, 2021

Page 107

1  court, that I shouldn't train the attorneys or was it

2  something that the executive chiefs made up.

3      But what I was told by the executive chiefs, at

4  least on one occasion, that I had to make a

5  determination by a Monday whether or not I wanted to

6  continue to train my attorneys.

7      And I went back that following Monday after having

8  discussion with my two supervisors, and I told them I

9  still want to train my attorneys; and that was it.

10     They -- That was something that was said.  It was

11  a weird situation that I was in when I was asked not to

12  train my attorneys.

13     **Q.   Okay.  So we talked about not training your**

14  **attorneys, but you kind of went back to don't go to the**

15  **courtroom and what Howard said.  Did you ever say to**

16  **Mr. Finkelstein, hey, they don't want me to train my**

17  **attorneys; but I want to?**

18     A.   I did not.  I did not go back to him because

19  of what had happened in the first situation.

20     When they had told me one thing, I went to Howard;

21  he told me another.  And then they basically told me

22  that it was a decision that Howard made.  So I thought

23  that it was a decision that Howard made going forward

24  that he also did not want me to train the attorneys; so

25  there was no need for me to also call him for that.

Ruby Green
April 16, 2021

Page 108

1    Q.   Do you believe going into a courtroom is

2 synonymous with training the attorneys?  That's what

3 I'm trying to figure out.

4    A.   Correct.  No, I don't.  What -- What I was

5 saying is, is that the situation about going into the

6 courtrooms happened first.  And then I, after that

7 happened, when they told me not to go into the

8 courtrooms, they -- that's when I called Howard; and

9 then that's when he told me what he told me.

10       And then on another separate occasion is when they

11 told me not to train the attorneys.  And then that's

12 when I -- They gave me the ultimatum of basically

13 continuing to train my attorneys or, you know, they

14 didn't give me like as to what would actually happen to

15 me; but I assumed that they were going to probably look

16 for somebody else to fill my position if I didn't like

17 do what they wanted me to do and --

18    Q.   And by --

19    A.   After I decided that Monday -- They gave me

20 until that Monday to, you know, decide whether or not I

21 wanted to continue to train my attorneys.

22       And I went back on that Monday to Dianne's office,

23 and I told her -- it was only her at that time -- that

24 I did want to continue to train my attorneys because I

25 didn't want to have new attorneys thrown into the

Page 109

1  courtrooms to the wolves; and a lot of the attorneys

2  never -- had never been in a courtroom practicing law.

3  So I thought that it would be efficient for, you know,

4  me to, you know, help show them how it's done, you

5  know, so --

6     **Q.   Do you have any understanding as to why**

7  **someone would tell you not to train the attorneys that**

8  **you were supervising?**

9     A.   That's -- that -- That was the issue, and a

10  lot of -- Even the chief, you know, had been before me,

11  I decided to do the same plan that she had, train the

12  attorneys in the courtrooms; and that was a big issue

13  for a lot of people at the office was because they were

14  saying supervisors and chiefs weren't going to the

15  courtrooms; they didn't have cases.

16     But when we became -- They used to call us a

17  posse, when we became that posse, I was a supervisor

18  under that head chief, we decided that we were going to

19  both go to the courtrooms; and we were going to train

20  the attorneys.

21     We never had any issues at that time.  But as soon

22  as I became chief, then it was a issue that the

23  attorneys were being trained and that the attorney --

24  that the chiefs were going to the court.

25     And I never understood why.  It wasn't a

Ruby Green
April 16, 2021

Page 110

1  reasonable thing in my mind that someone would want to

2  prevent this from happening, no.  I can -- Yeah.

**3     Q.   And you never asked anybody why wouldn't you**

**4  want me to train these attorneys?**

5     A.   Well, I did.  I did ask Diane, and she

6  basically said this is what Howard said; so I did not

7  question it.  So I did -- I did not question it.

**8     Q.   Was it -- Was it your understanding that**

**9  Mr. Finkelstein wanted untrained attorneys?**

10     A.   I mean, I don't know what he wanted.  I can't

11  speculate to say -- to save my life as to what they

12  wanted and -- and in those courtrooms.  It's -- None of

13  it made any sense to me as to why when I became chief

14  as opposed to a different chief that we were able to

15  train them and do all of these things; and then once I

16  became chief we were not able to.  I don't -- I can't

17  tell you what -- what they were -- what's going through

18  their heads.  All I could do was speculate, and I don't

19  really want to do that.  But this is what happened.

20  That's how it happened.  And it was surprising to me

21  that that was the response that I was getting.

**22     Q.   So when you asked that question, the only**

**23  answer was this is the way Mr. Finkelstein wants it;**

**24  you didn't get any substantive explanation?**

25     A.   Right, no substantive.

Page 111

1    Q.    Is it possible -- Is it possible the training

2  was supposed to come from somebody else other than you?

3    A.    Well, no -- No, that's -- That's not how it

4  was done.  That's what I am saying, like we had a chief

5  of training; but the chief training only touched

6  like -- Let's say your couple of -- Your first two

7  weeks at the Public Defender's Office is like you're

8  doing a training or whatever; you're going through, you

9  know, what happens in a courtroom and stuff like that.

10      That's your two weeks.  Normally that's how it

11  happens.  And then you're left to your supervisors and

12  your chiefs of misdemeanor or juvenile.

13      And then every so often, I would set up trainings

14  to do in conjunction with juvenile on, you know,

15  updated case law, maybe them learning how to try a

16  case.  We would do mock trials and stuff like that.

17      We -- We did not have a system where someone else

18  was training our attorneys but for us.  And until you

19  got to the felony level, you got a felony training

20  that -- that Sue Porter was over, and then after Sue

21  Porter, it was Lorena Mastrarrigo, but other than that,

22  that's how it was.

23    Q.    So is this an issue of allocation of your time

24  and resources; they want you doing something else

25  instead or did you get the idea that there was some

Ruby Green
April 16, 2021

1  **benefit to having untrained lawyers?**

2      A.   I don't know what it was, and there was --

3  there was -- Obviously, there's no benefit; and,

4  obviously, I don't know -- There was nothing else that

5  I could have been doing but for assisting my attorneys.

6      As a chief of county court, you have at least 12

7  attorneys, and then you have -- And sometimes you can

8  have maybe a little bit more if we have the funding in

9  order to staff two to a courtroom; and then you have

10  two supervisors who are under you.  But there's nothing

11  else for me to do but train my attorneys, you know, or

12  else I wouldn't have anything to do.  I wouldn't --

13  They didn't want me to keep my cases that I had prior

14  to coming, so I had no case count.

15      So what I would do is, I would, you know, take

16  cases with my attorneys; and I would try the cases with

17  them.  I would, you know, help them with motions to

18  suppress and, you know, stuff like that.  So that would

19  have been my job.  You know, other than that, I didn't

20  have anything else.  Like there was no, oh, certain

21  task that a chief, you know, in that manner needed to

22  do but for monitor the people that were under them

23  making sure that they were doing their job.

24      **Q.   Understood.  Ms. Green, do you have any reason**

25  **to believe that anyone of the Public Defender's Office**

Ruby Green
April 16, 2021

1  wanted untrained lawyers representing their clients?

2     A.   I -- I -- I don't know why someone would say

3  not to train the attorneys.  That's all I can say.  I

4  can't say --

5     Q.   Sure.

6     A.   -- why it would be said or anything like that.

7  All I know is what was said, and that was said; and it

8  was literally told to me and given to me by ultimatum

9  that I had, you know, to choose between training my

10  attorneys or letting them know if I wanted to continue

11  to train the attorneys.  That was the ultimatum I was

12  given.  That's --

13     Q.   Well, usually the ultimatum, there's a

14  consequence in the ultimatum; did they give you a

15  consequence?

16     A.   At -- I mean, shortly after I'm pretty sure I

17  was demoted after that.  I don't recall how long after,

18  but I know I was demoted after that.

19     Q.   Do you think that's why you were demoted?

20     A.   With a -- With, you know, a couple other

21  reasons, you know, so I don't -- I don't know entirely

22  sure like what -- what happened.

23     Q.   Okay.  So we'll get to that demotion in a

24  little bit.  But nobody made clear to you specifically

25  why you were demoted?

Ruby Green
April 16, 2021

Page 114

```
 1     A.    In -- no one -- Me and Howard were talking

 2  through text messages as to another ultimatum that I

 3  had.  But, you know, other than that, you know, when I

 4  got the call that I was actually going to be demoted,

 5  it wasn't from Howard; it was from Diane.

 6     Q.    Okay.  And it wasn't made clear to you by

 7  anyone as to why you were demoted?

 8     A.    They would not -- They did not give me

 9  specific reasons as to what exactly it was in its

10  entirety.

11     Q.    All right.  Let's talk about a statement that

12  you made in the podcast in which you said, quote, why

13  would you as an administration when George Floyd

14  happened, why would you tell the office not to march in

15  solidarity with Black Lives Matters; so my question to

16  you, ma'am, is who told you that you specifically could

17  not march in solidarity with Black Lives Matters?

18     A.    We got an email from the office, Howard in

19  particular, that basically said that we could not march

20  as the office for, you know, the protests that were

21  going on.  And all the -- All the other Public

22  Defender's Office were marching in solidarity at

23  protests for this matter.  But that was the email that

24  we received from Howard that as a office we could not,

25  you know, march.
```

Ruby Green
April 16, 2021

1    Q.   In all your time in the Broward County Public

2  Defender's Office, do you recall the office marching as

3  an office, as you say, for any other issue?

4    A.   I can't -- I can't say, no.  I can't that I

5  can recall, no.

6    Q.   Okay.  Do you have any reason to believe that

7  this specific statement led to your termination?

8    A.   I can't say.  I -- I can't say in its

9  entirety.  All I know is that it was speech, you know.

10 So I want to say all of this stuff is inclusive of the

11 speech that I gave on August 8, 2020, you know.

12   Q.   Okay.  Just to be clear, ma'am, nobody from

13 the Public Defender's office told you you could not

14 march, correct?

15   A.   I -- Well, yes, Howard told us that we could

16 not march at -- on behalf of the Public Defender's

17 Office.

18        But in our individual capacities, no one said from

19 the Public Defender's Office no; but I can tell you

20 based upon that email, people were afraid to go out

21 there even in their individual capacity to march

22 because they thought that it would be retaliatory or

23 they would get fired and stuff like that based upon,

24 you know, what that email said and how it said it.

25        And a lot of people were very, very upset.  I'm

Ruby Green
April 16, 2021

Page 116

1  sorry, I have to plug this in somehow.  I don't know.

2  My battery's going dead.  But, you know, a lot of

3  people were upset.  Sorry.  A lot of people were upset

4  and -- and they did not want to risk marching.  But

5  there were a few of us that did and I -- I did because

6  I was prevalent of an organization of Broward

7  Association, so I went out there to show face.

8      **Q.   Do you have this email still that was the**

9  **cause of all these people's fears?**

10     A.   I want to say I gave it, but I'm not sure.  I

11  think I might.  The thing that bothered is that I may

12  not have it and I have -- I can search, but when my

13  email was terminated -- When I was terminated, my

14  emails was terminated as well.  So the only emails that

15  I saved were probably 2018 and prior from the office

16  that I was able to save.  But that was only because I

17  had switched computers, so I saved everything from that

18  computer to a drive.  And I didn't -- I didn't have the

19  ability to do that because when they terminated me,

20  they terminated me; but I might have it; I might have

21  screen shotted it or something like that and I'll --

22  I'll write it down to get --

23     **Q.   Thank you.  Based on your recollection of the**

24  **email, what was it that was said that gave you fear**

25  **that you would be retaliated against by marching with**

Ruby Green
April 16, 2021

1    Black Lives Matters?

2        A.    It was just the tone of the email was just,

3    you know, from the big boss like --

4        Q.    I understand.  What about the email, ma'am?

5        A.    I can't remember the email verbatim, so I can

6    just tell you from the email, that's what -- That's how

7    people -- people were fearful of it and --

8        Q.    What other people besides you?

9        A.    Huh?

10       Q.    What other people besides you were fearful of

11   retaliation for marching with Black Lives Matters?

12       A.    Attorneys in the courtroom -- in the -- in the

13   office.

14       Q.    Which attorneys?

15       A.    There were several.  I can't remember all of

16   them, like --

17       Q.    I'm sorry, ma'am.  Ma'am, hold on.  Ms. Green,

18   when you're leaning back and looking up, I think it's

19   harder to hear you because your voice is not traveling

20   the same way.

21       Is there any way you can kind of go back to the

22   way you were before?

23       A.    I can't because I don't have my regular

24   charger, and I have only a sitting charger --

25       Q.    Okay.

Ruby Green
April 16, 2021

Page 118

```
 1      A.   -- so --

 2      Q.   Is there any way you can maybe point -- maybe

 3  point yourself in a better direction?  So, I'm sorry,

 4  ma'am, I didn't hear what you said.  So my question was

 5  what -- Which of these attorneys were fearful of

 6  retaliation for marching with Black Lives Matters?

 7      A.   Just some attorneys I didn't know that I, you

 8  know, and some attorneys that mentioned it in passing.

 9  Like I think Ms. Schraywood (phonetic) may have wrote

10  an email or something like that that she was either

11  upset that we weren't doing it or something like that.

12      Some people were floating around text messages

13  that, you know, they don't think -- that they don't

14  feel comfortable going based upon the email; can't

15  recall who in its entirety that, you know; but I do

16  remember email that I think Ms. Schraywood may have

17  sent but I don't -- I don't remember specifically how

18  many other people or who specifically those people

19  were; but I do know it was just a thing that was going

20  around, that some people were afraid and somebody would

21  come and show up to -- somebody showed up to the event

22  was like, oh, this person didn't want to come because

23  they were afraid as to what may happen to them.

24      Q.   So this is more -- Would you agree this is

25  more scuttlebutt and rumor?
```

Ruby Green
April 16, 2021

Page 119

1    A.    No, I -- I personally saw some of these people

2   say these things but I can't -- I can't -- I don't

3   know.  I don't know everybody at the office.  There's

4   110 attorneys, so if I'm friends with some person and

5   then they get a message from another person and they

6   show me their phone or something like that, I don't --

7   I can't sit up here and say this is not true feelings

8   that they have; but I do know that they work there.

9    **Q.    Okay.  Do you -- Would you agree with me,**

10  **ma'am, there is a distinction between not having the**

11  **entire march -- I'm sorry, the entire office march**

12  **together and precluding individuals from doing that if**

13  **they wish?**

14   A.    No, but -- The whole issue of what was said on

15  the podcast was as an office, as any other Office of

16  the Public Defender in like a couple of other

17  offices -- or three other offices in the state were

18  actually marching on behalf of it.  The issue that was

19  raised was about the Public Defender's Office actually

20  marching on behalf of.  In the email we got was we were

21  not able to march on behalf of the office.  So I think

22  that was the distinction between what you're saying,

23  personal or individual capacity, you know, that's not

24  what -- That's not what the issue is.  The issue was as

25  an office, you know, why can't we stand up for things

Ruby Green
April 16, 2021

Page 120

1  that are going wrong when we represent people like

2  this, such as judge -- George Floyd, you know, we

3  represent.

4      Q.   I understand.  I understand, ma'am.  Let me

5  ask the question again.  Do you recognize that there is

6  a distinction between not wanting the entire office to

7  march together as one office versus precluding anyone

8  who wished to do so on their own; do you not see the

9  distinction between those two?

10     A.   Well, no.  There's a distinction, but that

11 wasn't -- That wasn't an issue.  That wasn't an issue

12 that was raised as, you know, just saying that as an

13 office we can't do it is not, you know, an entire -- I

14 don't want -- I just don't want the entire office out

15 there.  That's not what was said.  What was said was

16 basically that as an office we are not going to do it.

17     Q.   Okay.  So what you just said, there was no

18 explanation; we're just not doing it as an office; is

19 that accurate?

20     A.   That we're just not doing it as an office,

21 that's basically what -- what the email said and it

22 was, you know -- And later I think that the -- Later I

23 believe that they tried to say that it was because the

24 office wasn't coming in for COVID reasons or something

25 like that. and they didn't want -- They didn't want

Ruby Green
April 16, 2021

Page 121

1  anyone to be able to say anything about, you know, us

2  not wanting to come in for COVID; but we're out here

3  marching or I don't know.

4       Q.   Where -- Where was that said, ma'am?  Where

5  was that said?

6       A.   I don't know.  I don't know if it was an email

7  or if anybody spoke with Gordon, and he said that to

8  somebody and somebody passed it along.  I can't

9  remember exactly where it was, but I know for sure that

10  they came back -- somebody came back and said that the

11  reason was, was that because of COVID or something like

12  that they didn't really want the office.

13       Howard may have even said it in an article, maybe

14  Broward Beat or something like that, that because of

15  COVID or whatever, the office was closed down; and they

16  didn't want, you know, issues or something like that.

17  with that.

18       Q.   In your mind, was that not a reasonable

19  precaution to not force everyone into a march when

20  COVID was at its height?

21       A.   No, it wasn't because everybody was taking

22  precautions.  And the way that it was said was an

23  afterthought, an afterthought to what was said, meaning

24  like the uproar that people were getting.  I'm not sure

25  if everybody's directly emailed or spoke with Gordon or

Ruby Green
April 16, 2021

Page 122

1   directly emailed or spoke with Howard.  I'm not sure of

2   that, but I do know it was an afterthought as to

3   what -- what was said, that people were like angry that

4   we weren't, you know, doing it as an office and stuff

5   like that.  So I think it was just --

6        Q.   Ma'am, you just -- You just told me, ma'am,

7   **that this email didn't list a reason why you weren't**

8   **going out there; how could this be an afterthought if**

9   **there was no rationale given in the initial email?**

10       A.   Right, that's what I'm saying.  The

11  afterthought would be after people are complaining

12  about it, then all of a sudden you make up a reason as

13  to why you did not want the office to do it.  That's

14  what everybody --

15       Q.   **How do you know that to be the case?**

16       A.   I -- I -- That's what it felt like.  I don't

17  know entirely for sure, but it was an afterthought.  It

18  wasn't a situation that -- reasoning that we were given

19  all at one time.

20       Q.   **Okay.  And the basis for that is that's what**

21  **everybody was saying, correct?**

22       A.   Everybody was saying what?

23       Q.   **That this was an afterthought because people**

24  **were angry about not being able to march together as**

25  **one office?**

Ruby Green
April 16, 2021

Page 123

1    A.    Everybody wasn't saying that, no.

2    Q.    So who did?

3    A.    There were a lot of people that were saying

4  it, but it wasn't everybody.

5    Q.    Who knew that was an afterthought, ma'am, and

6  told you so?

7    A.    Who -- Who knew it was an afterthought?  No

8  one specifically said "afterthought."  That's what --

9  That's the name I'm giving it.  But I'm saying to you

10 that it was an afterthought.  When you asked about when

11 the -- everything occurred and how it occurred, it was

12 an afterthought.  It wasn't someone came back and said,

13 oh, it's an afterthought.  People were complaining

14 about the fact that we didn't do it.  And then after

15 then another statement basically came out and was said

16 about why they didn't want to do it.

17   Q.    Right.  Where did you get that information

18 from?  Who told you that?

19   A.    Who told me what?

20   Q.    That that wasn't the original rationale and

21 that was a rationale that they came up with afterwards.

22   A.    No, nobody -- I'm telling you that's what

23 happened.  It was after the fact.  I don't -- We were

24 not given a reason to begin with but -- but that we

25 weren't going to do it.  And then I can't really

Ruby Green
April 16, 2021

Page 124

1  remember the email in its entirety.  I don't know if

2  they may have mentioned it there or not, if people

3  didn't believe it or not; but I do know that after the

4  fact after people were getting upset about it or

5  whatever, there was -- I don't know if Howard mentioned

6  it in one of his articles that he -- he -- I think he

7  may have; I think he may have, that he basically said

8  what the reason was as to why he didn't want to do it.

9  And I -- That's an afterthought.

10     Q.   Okay.  Ma'am, you don't know that that wasn't

11  the original rationale, do you?  You weren't a part of

12  that decision-making process?

13     A.   No, I don't know.

14     Q.   Okay.  It just simply wasn't conveyed to you,

15  correct?

16     A.   Correct.

17     Q.   Okay.  Let me ask you this, ma'am, do you --

18  Tell me what you think Black Lives Matters stands for.

19  Can you just sum it up briefly, what does Black Lives

20  Matters stand for?

21     A.   It's just an alliance.  It's an alliance.

22     Q.   I know.  But for what though?  What -- what --

23  What are they trying to advance?

24     A.   What are they trying to -- They're trying to

25  establish social equity and justice for -- you know,

Ruby Green
April 16, 2021

Page 125

1  for everything that's going on, especially criminal

2  justice reform.  They focus on criminal justice reform.

3  It's just --

4      Q.   Okay.

5      A.   -- you know, it's a social action group.

6      Q.   Understood, ma'am.  Do you believe that Howard

7  Finkelstein's decision to not have the entire office

8  marching in solidarity during COVID was based on the

9  fact that he did not -- he did not believe in those

10 same tenets and principles?

11     A.   I cannot say what he believes and what he

12 doesn't.

13     Q.   Okay.  Do you believe that Mr. Finkelstein is

14 a racist?

15     A.   I can't -- I can't say.  I can't say.

16     Q.   You --

17     A.   I don't -- I don't know specifically as to

18 what his thought processes are in his own mind whether

19 or not he is or isn't.  But, I mean -- I mean, I can

20 say that, you know, what the observations and stuff

21 that I've made, not necessarily that everybody's a

22 racist just because they do one or two things but it --

23 You know, I can't say based upon everything that I can

24 say sitting here thinking that he says to himself that

25 he's a racist; and he doesn't believe in black issues

Ruby Green
April 16, 2021

Page 126

1    and stuff like that.

2        Q.    But you don't know; you don't have a feeling

3    one way or the other on that issue?

4        A.    That he's a racist?

5        Q.    Yes, ma'am.

6        A.    I -- I can't say that I do.  I don't -- I

7    can't say that I do.  All I can say personally what he

8    identifies as, I -- I don't know.

9        Q.    Do you think racism played any part in

10   Mr. Finkelstein's decision to not have the entire

11   office march in a Black Lives Matter march during

12   COVID?

13       A.    It could.  It couldn't.  I have no idea.  Like

14   I said before that I don't -- I don't know.

15       Q.    And if the -- If the office were to march in

16   solidarity as one, is it your understanding that

17   everyone would have to do that?

18       A.    No, I wouldn't even --

19       Q.    Okay.

20       A.    That wouldn't even be a policy.  It wasn't --

21   It wasn't something that you -- you can force other

22   people to do.  It wasn't that.  The email basically

23   said as an office is we couldn't do it.  But, you know,

24   with all the papers that was coming out about other

25   offices being able to march on behalf of that matter,

Ruby Green
April 16, 2021

Page 127

1   if they wanted to, you know, it would have been nice if

2   we were able to do it as an office.  That's all I'm

3   saying, you know --

4       Q.   What?

5       A.   Huh?

6       Q.   What other Public Defender's Offices marched

7   as an office in a Black Lives Matter march during the

8   height of COVID?

9       A.   I can't -- I don't know all of them off the

10  top of my head.  I want to say it may have been a West

11  Palm Beach office.  It may have not been.  But I think

12  it was at least a couple other Public Defender's

13  Offices.  You can look it up, Google it and stuff like

14  that; but it was definitely other Public Defender's

15  Offices that were marching in solidarity with -- for

16  the issue at hand.

17      Q.   Okay.  But that's not something that you're

18  aware of as we sit here right now?

19      A.   Right.  I don't know off the top of my head

20  which ones it was.  You know, but I do know for sure

21  that there were some.

22          That's where basically we got the idea to do it.

23  Well, it wasn't -- One of the attorneys in the office

24  got the idea to do it from my understanding because

25  other offices were doing it.  And then there was

Ruby Green
April 16, 2021

1  another outside attorney that really wanted to do it.

2  **Q.   Okay.  To the best of your knowledge, other**

3  **than your -- Other, not including you, I mean, any of**

4  **these people whose names you don't know besides**

5  **Ms. Schraywood, do you know of anyone else who suffered**

6  **some sort of retaliation for marching for Black Lives**

7  **Matters?**

8     A.   No, I didn't.  I don't -- Not that I know of.

9  I can't say for sure.  I don't -- Like I said, I

10  don't -- I don't know.  I'm not involved in everybody's

11  life there, so I can't say.

12  **Q.   Sure.  As we sit here today, do you genuinely**

13  **believe that you were terminated From the Broward**

14  **Public Defender's Office because of your solidarity**

15  **with Black Lives Matters?**

16     A.   I cannot -- I can -- I don't know for sure.

17  You know, all I know is that I went on a podcast, Adams

18  Podcast, and from what Howard said it was because of

19  the speech that I made on there, you know; and that was

20  on a weekend.  It was not even a working day.  It was

21  on a weekend at nighttime, and, you know, and I was

22  fired for making that speech.

23  **Q.   Okay.  But my question, ma'am, was do you**

24  **believe that you were terminated because of your**

25  **beliefs and solidarity with the Black Lives Matters'**

Ruby Green
April 16, 2021

Page 129

1   movement?

2          MR. FRANK:   Objection; foundation.   Go ahead.

3      A.   There's no way I can really answer that.   I

4   don't know.   All I know and all we know is that based

5   upon what Howard said it was because of and, you know,

6   this could -- it could be included based upon

7   everything that I said in that podcast, like you were

8   -- you went over several things and several things that

9   were probably not even mentioned, we, you know, talked

10  about; but all I know is that I went on a podcast; I

11  made a speech; and I was fired for it based upon what

12  Howard said.

13  BY MR. LAUFER:

14     **Q.   Okay.   And just to be clear, as we sit here**

15  **today, you don't know one way or the other whether**

16  **Howard Finkelstein believes in the same principles and**

17  **tenets that are espoused by Black Lives Matters; you do**

18  **not know?**

19     A.   I can't say that he does.   I can't say that he

20  doesn't at this point.

21     **Q.   Okay.   Let me tell you -- Let's talk about**

22  **another thing you said in the podcast.   You said,**

23  **quote, and, you know, I, you know --**

24          THE STENOGRAPHER:   (Interrupted for

25  clarification.)

Ruby Green
April 16, 2021

Page 130

```
 1              MR. LAUFER:  Sure.  Let me start over.
 2  BY MR. LAUFER:
 3      Q.  You said, quote, and, you know, I, you know, I
 4  can go into depth; the funding situation is really,
 5  really horrible at the Public Defender's Office.
 6          To the best of your knowledge, ma'am, have you
 7  ever heard anyone at the Public Defender's Office make
 8  a statement that they were sufficiently funded and that
 9  funding wasn't an issue?
10      A.  Right, that it's an issue.  Right, it's an
11  issue.
12      Q.  My point is you've never heard somebody say
13  the opposite of that, funding is great; we got plenty
14  of money?
15      A.  Right, so that's what -- That's why, you know,
16  was saying it is, you know, something that the
17  community cares about; and, you know, people in the
18  office, not only the attorneys but the staff, they --
19  they -- You know, everybody cares about funding in that
20  office.  That's why I was one of the -- That was one of
21  my platforms of, you know, one of the things that I
22  spoke about in relates to the campaign.
23      Q.  I understand, ma'am.  I need you to answer my
24  question, though.  No one thinks that funding is
25  adequate at the Public Defender's Office to the best of
```

Ruby Green
April 16, 2021

Page 131

1  your knowledge, correct?

2        MR. FRANK:  Objection; predicate.  Go ahead.

3     A.   Well I don't -- You can't say no one, you

4  know.  I don't know everybody, you know, at the office

5  but --

6  BY MR. LAUFER:

7     Q.   Okay.

8     A.   But the majority of people, and I'm pretty

9  sure the public at large understand and know that the

10  Public Defender's Office and what they say is that it's

11  over worked and under paid.

12     Q.   "Over worked and under paid," ma'am; do you

13  have any reason to believe that Howard Finkelstein

14  doesn't think the exact same thing?

15        MR. FRANK:  Objection; predicate; form.  Go

16  ahead.

17     A.   Like I said, I can't speculate as to what he

18  thinks.

19  BY MR. LAUFER:

20     Q.   You -- you -- As we sit here today, you have

21  no idea whether Mr. Finkelstein thinks that's the

22  funding is sufficient and that everyone -- that people

23  aren't over worked and under paid?

24     A.   I -- I can't -- I can't speculate as to what

25  he thinks.

Ruby Green
April 16, 2021

Page 132

1      Q.    Understood.  Do you -- Do you reasonably

2   believe that that statement is one that would cause

3   Mr. Finkelstein to terminate your employment?

4      A.    That what statement, that --

5      Q.    That the funding situation is really, really

6   horrible at the Public Defender's Office?

7      A.    Oh, I -- Like I said, I don't know.  I don't

8   know.  I can't say specifically what it is.  All the

9   generalization that we got from, you know, Howard that

10  he put out into the media was that it was the protected

11  speech that I had made.  I made a speech, and he said

12  that because of that speech, you know, and what I said

13  during the speech.  You know, he didn't specify which

14  portions of that speech, but that speech, you know.

15     Q.    Ma'am, I'm not looking for an argument.  I

16  want to know what you think.  Do you think that you

17  were terminated because you said that the funding in

18  the Public Defender's Office is really, really

19  horrible?

20          MR. FRANK:  Objection; objection to form.  Go

21  ahead.

22     A.    I could have been, and, you know, I could have

23  been.  Maybe.  I -- I -- Like I said, I cannot

24  speculate as to what all the reasons were but for what

25  Howard said.

Ruby Green
April 16, 2021

Page 133

1  BY MR. LAUFER:

2      Q.   Okay.  Do you know -- do you know how it is

3  that -- Do you know how it is the Public Defender

4  Office is funded?  Do you know how funding works?

5      A.   Just a little bit.  I know that the State

6  gives us money.  We're paid by the State, and I do

7  think that we get some funding from the PDA, Public

8  Defender Association, or something like that.

9      Q.   So do you know if -- Does the money come

10 directly to each Public Defender's Office or does it go

11 to one general pauper?

12     A.   That I'm not sure.

13     Q.   Do you know who it is that is in charge of

14 funding for the Public Defender's Association?

15     A.   No.

16     Q.   Okay.  Well, you stated on the podcast why

17 can't you go up there, the same as these other Public

18 Defender's around the state are going to Tallahassee to

19 fight for their people; it needs to stop, like we need

20 change; and, you know, it's just a triple effect; what

21 does that mean?

22     A.   It's -- it's -- So the State Attorney in

23 Miami-Dade County along with the Public Defender Carlos

24 Martinez in Miami-Dade County, they were -- there

25 was -- They were going to Tallahassee to fight for

Ruby Green
April 16, 2021

Page 134

1  funding, and all we got was an office email.

2     The email basically said these people are going to

3  get money for their people basically.  It showed an

4  article.

5     **Q.   Who sent that email?**

6     A.   Howard.  Howard sent the email.  So it was

7  like, Howard, if these people can go do it and, you

8  know, we know we want money, why can't you do it as

9  opposed to getting the -- the -- you know, just, you

10  know, having somebody go to Tallahassee with them from

11  our office that can advocate on our behalf along with

12  those people; so it's just like an email that they gave

13  us, that Howard sent us, showing that Catherine

14  Fernandez --

15         THE STENOGRAPHER:  (Interrupted for

16  clarification.)

17     A.   Yes, Howard sent an email showing that

18  Catherine Fernandez Longo and Carlos Martinez from

19  Miami.  So Catherine Fernandez Longo was the State

20  Attorney there; and Carlos Martinez is the Public

21  Defender in Miami.

22     They were going to Tallahassee to fight for

23  funding for their people.  And, you know, when he sent

24  us that email, a lot of people felt like, you know, why

25  if they can go, why can't you go to do the same thing

Ruby Green
April 16, 2021

Page 135

1  because we didn't know how necessarily it worked.  If

2  they were going to fight for their people, they're

3  going to get, you know, money, but we're -- we're over

4  here suffering working all these hours and if you're

5  not going, how are we going to get the money; so it was

6  like it's -- it was that type of situation.  That's

7  what it was.

8      **Q.   So, ma'am, your understanding -- You**

9  **understand that Mr. Finkelstein sent an email to you**

10  **stating that the State Attorney and Public Defender of**

11  **Miami-Dade County were going up to Tallahassee to get**

12  **funding for their county only; is that accurate?**

13     A.   No, that's not accurate.  It's just -- They

14  were trying to get funding.  It wasn't like -- I can't

15  remember the whole entire email, but it's not even my

16  understanding.  I know that Howard sent an email to the

17  office saying that those two people were going to

18  advocate on, you know, their attorney's behalves to get

19  funding.

20     **Q.   For their people, correct?**

21     A.   Right, that's what I remember.  It was just --

22     **Q.   What do you -- What did you mean by "their**

23  **people"?**

24     A.   Like their attorneys, their staffs and stuff

25  like that.  It wasn't like, oh, my gosh, only -- only

Ruby Green
April 16, 2021

Page 136

1  Miami-Dade County or whatever, but it was like -- You

2  know, we -- from the -- From the email I'm thinking

3  back on it; it was a long time ago; but it was to get

4  funding to advocate for funding, to advocate for like

5  an increase in, you know, funding for the offices.

6      And, you know, it just made sense because the --

7  you know, the State Attorney was going, and the Public

8  Defender was going, you know, so it was like -- It made

9  it seem as if, wow, they're -- they both might go up

10  there and get the money, but we might not get any money

11  because we don't have anybody going up there to talk

12  for Broward.

13      Q.   Do you understand, ma'am, who Mr. Martinez is?

14      A.   Yeah, he is the Public Defender in Broward.

15      Q.   Okay.  Do you -- Do you know if he had any

16  role with the Public Defender Association?

17      A.   No, I'm not sure.

18      Q.   No.  You don't know that he's the legislative

19  chair for the Public Defender's Association?

20      A.   No.

21      Q.   Okay.  You wouldn't know that that's his job

22  is to deal with the Florida legislature?

23      A.   No, because I don't work there.  I don't know

24  him.  And all I know is that at some point we did have

25  a person from our office, which was Bob Wells, that was

Ruby Green
April 16, 2021

Page 137

1 going to Tallahassee to fight for us; and all of a

2 sudden Howard said that, you know, he didn't want to be

3 involved in the politics.

4     So coupled with that, the notion was that he

5 didn't want to send anybody up there to help us type

6 thing.

7     **Q.   You're not aware that Bob Wells was at one**

8 **point in time, he was on that same committee with**

9 **Mr. Martinez?**

10    A.   I know he was on a committee.  I don't know

11 who was on the committee with him.

12    **Q.   Right.  Fair to say, ma'am, you have no idea**

13 **how the funding works with the Public Defender's**

14 **Association, correct?**

15    A.   Well, I don't know.  No, I don't know in its

16 entirety, no.

17    **Q.   Sure.  But yet you stated in the Adams**

18 **Brothers Podcast that Mr. Finkelstein should go up and**

19 **advocate just as the Public Defender, State Attorney in**

20 **Miami-Dade County did?**

21    A.   Correct.  I do believe that, and I still

22 believe that he should, as the Public Defender, we need

23 to go and advocate.

24    **Q.   Do you know -- Do you know how or who does the**

25 **advocating on behalf of the Public Defender**

Ruby Green
April 16, 2021

1  **Association?**

2     A.   No, I don't know who does it on -- I'm not --

3  You know, I don't know specifically about the Public

4  Defender Association.  My reference is for the office,

5  who's advocating for our office, not just the Public

6  Defender Association, but for our office.

7     **Q.   Okay.  You also stated he, meaning**

8  **Mr. Finkelstein, maybe come to work maybe once or twice**

9  **a week for maybe an hour or two, doesn't know people's**

10 **names, you know, stuff like that.  So I want to just**

11 **take -- Do you recall stating that, ma'am?**

12    A.   Yes.

13    **Q.   Okay.  Let's take the first portion that he**

14 **maybe once or twice a week or for maybe one hour or two**

15 **comes to work; what is the basis of that statement?**

16    A.   Being able to watch him leave after he comes

17 in late and leaves early or us walking out, you know,

18 not seeing his car there anymore or him just not being

19 there.  As we discussed earlier, it was few and far

20 between, you know, when he actually came to the office.

21 You know, I can't exactly say what days he came and

22 what days he couldn't.  But I do -- We do know that

23 especially going by his office a lot, just because I

24 was in trial a lot, and, you know, going by his office,

25 walking, you know, to Diane to ask questions because we

Ruby Green
April 16, 2021

Page 139

1  had emergencies and stuff in trials, he was not there.

**2**      Q.    Who's we?

3      A.    We, I'm just saying attorneys in general.

4  It's just attorneys in general.

**5**      Q.    I understand, ma'am.  But your answer is
**6**  "attorneys in general," I keep asking you about that.
**7**  I'm -- I want to know your firsthand knowledge.  You're
**8**  basing the statements based on you watching
**9**  Mr. Finkelstein come and go at work?

10      A.    Well, sometimes if I was -- because my -- For
11  the ending of my career there, my building was
12  basically in the garage; so sometimes I would come out
13  to go to court or whatever; and he would be walking
14  through.  And then by the time that I got out of court,
15  which would have been like a couple hours or something
16  like that, he was not there anymore.

**17**      Q.    Okay.  But to be clear, if you see him walking
**18**  through the parking garage, that doesn't necessarily
**19**  mean that he's not working, correct?

20      A.    What, well, no, I'm not --

21           MR. FRANK:  The parking garage?

22      A.    The parking -- Right, that's what I'm saying.

23  I'm trying to -- What do you mean, just because he

24  doesn't go --

25  BY MR. LAUFER:

Ruby Green
April 16, 2021

1    Q.   That if he's going to and from his vehicle, do

2  you not -- is it -- Is it your contention that that's

3  not a part of his job that he can't be going somewhere

4  for work?

5    A.   As often as he does it, that's my -- That is

6  my belief, correct, that as often as he does it, that

7  wasn't.

8    Q.   And that's based on your understanding of what

9  the Public Defender -- what the Public Defender does on

10  a daily basis, correct?

11    A.   I'm sorry, what?

12    Q.   Is that -- is that -- That is based on your

13  understanding of what the Public Defender does on a

14  daily basis?

15    A.   No, I don't -- that's not -- I don't know what

16  he does on a daily basis.  I can't tell you.  All you

17  asked me what I've been able to see, just me; and

18  that's what I've seen, you know.

19    Q.   In the Adams Brothers Podcast, you stated

20  that -- Sorry, bear with me for one second.

21    You stated, quote, but I'm telling you if you're

22  treated like trash in your own office, you know,

23  you're -- your wanting someone to fight for you.  My

24  question to you, ma'am, is do you believe that people

25  in the Public Defender's Office were treated like

Ruby Green
April 16, 2021

1   trash?

2      A.   Yes.

3      Q.   **Are we switching devices here?**

4      A.   Yes.  Yes.

5      Q.   **We'll wait a second.**

6      A.   I do believe to an extent, yes, they were --

7   or we were.

8      Q.   **Who was treated like trash?**

9      A.   The staff and the attorneys, I mean.

10     Q.   **All of them?**

11     A.   Just in general, right.  Well, I can't say

12  "all of them" because there were some people that got

13  perks for being friends of Howard or something like

14  that.

15     But there was some people that got the shorter,

16  you know -- a lot of people that got the short end of

17  the stick.

18     Q.   **And who was it that was -- whoa.**

19         MR. FRANK:  That's me.  Sorry.

20  BY MR. LAUFER:

21     Q.   **Ms. Green?**

22     A.   Yes.  Sorry, I had to put my phone on the

23  charger.

24     Q.   **We're okay to go?**

25     A.   Yes.

Ruby Green
April 16, 2021

Page 142

1      Q.   Okay.  Who was it that was treating those

2  individuals like trash?

3      A.   Just the office in general, I mean,

4  administration.

5      Q.   Okay.  All of administration?

6      A.   I can't -- I don't -- I don't know.  I don't

7  know what happened after I left as chief what went on

8  in meetings, what were said in the meetings.  I can't

9  say.  I don't know who, but, I mean --

10     Q.   Right.  But the statement -- You made the

11  statement that when you made the statement, who did you

12  believe was treating the attorneys and the staff like

13  trash?

14     A.   The administration.

15     Q.   Okay.  And what was your understanding of who

16  the individuals were in administration at that point in

17  time?

18     A.   Diane, Howard, Gordon and Renee.

19     Q.   Anyone else?

20     A.   No, I believe those were -- That was the

21  administration at the time.

22     Q.   You keep talking about statements that made --

23  statements that were in the public interest.  What --

24  How was that a statement that is in the public

25  interest?

Page 143

1          MR. FRANK:  Did you say public interest,

2    issues of public concern?  That's the statement not on

3    the record.

4          MR. LAUFER:  Public concern or public

5    interest.  Go ahead, Ms. Green.

6          MR. FRANK:  About the same thing.

7    A.   So --

8          MR. FRANK:  Go ahead.

9    A.   How what was said about administration

10   treating, because the public had the perception that we

11   were public pretenders, not public defenders; so they

12   had a issue about the way we were representing people.

13       They had an issue about what was actually going on

14   in the office like funding and, you know, how many

15   cases the attorneys had; and, you know, what the

16   training that attorneys had.  Sometimes some people

17   would go through the office and hand out six lawyers at

18   a time.  So it was just -- All of those issues

19   encompassed what the public had perceived about the

20   Public Defender's Office, and, you know, obviously, you

21   know, that was one of the issues.

22   BY MR. LAUFER:

23       **Q.   And after making that statement, did you have**

24   **any thoughts as to how Howard Finkelstein, Renee**

25   **Dadowski, Gordon Weekes or Diane Cuddihy would react?**

Ruby Green
April 16, 2021

1    A.    No, it was a common theme.  The blog had been

2  on it for years.  People who had left the office was on

3  it for years.  It was --

4    **Q.    Ma'am, that's not my question.**

5    A.    I did not --

6    **Q.    That's not --**

7    A.    I did not have a thought process as to what

8  was said because it was done while I was running for

9  Public Defender.  I'm not just gonna say, you know,

10  just say anything just to say things.  I'm not gonna

11  just run for things just to run for office.  It was --

12  I ran for office because I believed to make a change

13  because these are the things that people were saying

14  about us, and I thought that I could make a change.

15    So, no, you know, I didn't have a reaction about

16  what I was saying because what I was saying was issues

17  that the public had concern about; and it was issues

18  that the attorneys in the office had concern about and

19  the staff at the office had concern about.

20    **Q.    And what would the public do with the**

21  **information that you gave them as to administration**

22  **treating the lawyers and staff like trash?  What would**

23  **they do with that information?**

24    A.    They would -- Based upon everything that I

25  said in the totality of the circumstances, they would

Ruby Green
April 16, 2021

Page 145

1  be able to determine whether or not who was fit and

2  ready to run that office.

3      Like I was still doing cases and stuff like that.

4  I had knowledge of what was going on inside the office.

5  I had knowledge of what was going on in court, so it

6  was a portion of my campaign, you know, speech.

7      **Q.   Okay.  But you would agree with me, Howard**

8  **Finkelstein was the Public Defender at that point in**

9  **time?**

10     A.   At the time which I made the statement?

11     **Q.   Yes, ma'am.**

12     A.   Yes, he was the Public Defender at that time.

13     **Q.   And the constitutional duties to run that**

14  **office fell on him, correct?**

15     A.   Yes.

16     **Q.   Do you know what the constitutional duties are**

17  **for the Public Defender?  Do you know what that is and**

18  **where you can find that?**

19     A.   The constitutional duties, no.

20     **Q.   Okay.  I'm sorry, ma'am.  I may have asked you**

21  **this, but can you tell me specifically who else in the**

22  **office made a statement that administration treated the**

23  **lawyers and the staff like trash?**

24     A.   I listed several people on, you know, my, I

25  think, interrogatories, you know, Magda Janicki,

Page 146

```
 1   Caroline McCray.  Caroline was demoted for just asking
 2   for a mitigation expert in order to help a client in a
 3   case.  You know, she -- These were not statements that
 4   were made after the speech or anything like that.
 5   Again, the office was closed when that speech was made.
 6   We were not allowed to come to the courthouse on behalf
 7   of the office.  But, I mean, it was all -- I would say
 8   the blog, people who have left the office, George
 9   Reres, Brian Greenbald (phonetic), Jason Blank, you
10   know, trying to name people off the top of my head.
11   There was several -- lots of people.  Almost the entire
12   courthouse community can basically say the same.  Bruce
13   Raticoff.  I'm just trying to remember all the names
14   that, you know, I put forth but --
15       Q.   Ma'am, you also mentioned in the podcast,
16   quote, so if you are arrested for a crime that you
17   could face life in prison for and you have an attorney
18   that has never tried a felony case before, are you
19   going to feel comfortable with them representing you;
20   do you remember saying that?
21       A.   Yes.
22       Q.   Okay.  Can you tell me when you said that, did
23   you mean as a -- as a lead attorney or like the first
24   chair --
25       A.   Yes.
```

Ruby Green
April 16, 2021

Page 147

1    Q.    -- second chair?  What were you talking about,

2  first chair?

3    A.    Right, as a lead.  We had attorneys that

4  were -- The turn over was so bad that, you know, people

5  were just being moved up so fast into positions that,

6  you know, they weren't quite in some -- if I'm not

7  mistaken some people had said they're not quite ready

8  for, but, you know, they -- but the administration

9  said, well, we just need a warm body.  And, you know,

10  so we had leads, like I said, was just getting put into

11  positions that, you know, they had never tried a felony

12  case before.

13    Q.    Tell me who those attorneys were; who did

14  that?

15    A.    I -- I can't remember all of them.  Like I

16  said, I don't know everybody's name --

17    Q.    Ma'am, I'm --

18    A.    -- but --

19    Q.    Ma'am, I'm asking for one name, one person.

20    A.    Jennifer Blackman.

21    Q.    So it's your testimony that Jennifer Blackman

22  was a first-chair counsel on a felony case who had

23  never tried a felony case before?

24    A.    Correct, I even had to bring her -- In order

25  to get some trial experience, I had to bring her on a

Ruby Green
April 16, 2021

Page 148

1  trial of mine in order so she can get some trial

2  appearance.

3     **Q.  All right.  Anyone else you can think of?**

4     A.   Not any trial experience, but felony trial

5  experience, correct.

6     **Q.  Now, I just want to be clear because you had**

7  **said facing life in prison, was that a crime -- a**

8  **felony in which life in prison was on the table?**

9     A.   Well, where -- where she tried with me?

10    **Q.  No, ma'am.  When she tried it by herself**

11 **having never done it before.**

12    A.   No, no, no, no.  She -- Actually she never had

13 any cases of her own she went to trial on.  I brought

14 her on her, if it's not -- if I'm not mistaken, her

15 second felony trial.  The other one she did with

16 another lead attorney, but she actually didn't have no

17 trials of her own.

18    **Q.  Ma'am, did Jennifer Blackman sit first chair**

19 **on a felony case in which life in prison was on the**

20 **line having never tried a felony case before?**

21    A.   Did she sit first chair, no; but that wasn't

22 the statement.  The statement was what if you had that,

23 like if you're given an attorney who had never tried a

24 case before, a felony case; and you're facing life in

25 prison, which as a lead attorney your cases are -- the

Ruby Green
April 16, 2021

Page 149

1  defendants are facing 30 years to life, that's what a

2  first-degree felony is, so if you're -- if you're asked

3  to go to trial, how -- how would you feel comfortable

4  without -- without them knowing or had ever done any

5  felony trials with them sitting on your case and I'm

6  pretty -- and people would not want that.  The public

7  did not want that.  The people in custody, who called

8  us public pretenders, did not want that.

9      Q.   Ma'am, let me ask you the question one more

10  time.  Did Jennifer Blackman try a first-degree felony

11  case in which life in prison was on the line as first

12  chair having never tried a felony case before?

13      A.   I can't say that she did.

14      Q.   Can you tell me any assistant public defender

15  for which that happened?

16      A.   I'm not sure.  I'm not sure.

17      Q.   Understood.  Ma'am, let me read you back your

18  statement.  You stated, so if you are arrested for a

19  crime that you could be facing life in prison for and

20  you have an attorney that has never tried a felony case

21  before, are you going to feel comfortable with them

22  representing you.  To the best of your knowledge, did

23  that situation ever exist under the Finkelstein

24  administration?

25      A.   Correct, it did.  There were lead attorneys,

Ruby Green
April 16, 2021

Page 150

1  as I explained to you, that had never had a felony

2  trial.  Jennifer Blackman was one of them.  She was a

3  lead attorney.  If she was called to go to trial on one

4  of her cases, then she -- she would be in that

5  situation.  And that's exactly what I was explaining.

6  Now, I had to take her --

7      **Q.    Okay.**

8      A.    -- on one of my cases, and another lead

9  attorney took her on another case.  But she had not

10  ever had her own felony case, and that was the issue

11  that I was explaining to, you know, if you were to go

12  to trial on a -- with a -- with an attorney who had

13  never had, you know, a felony trial experience, you

14  know, especially as first chair, would you feel

15  comfortable.  So that's exactly -- Yeah, I -- That's

16  exactly what the statement said.

17      **Q.    Ma'am, you just told me that situation was not**

18  **Jennifer Blackman, so I'm confused.  Was it or was it**

19  **not?**

20      A.    That's not what I said.  That's not what I

21  said.  I did not say that.  I specifically said exactly

22  what that statement said.  If you have a lead attorney

23  who has never tried a felony case, you know, that, you

24  know, and then you're -- you're -- you have a life

25  felony that's pending and the judge says go to trial on

Ruby Green
April 16, 2021

Page 151

1  it, you will not feel comfortable with that lead

2  attorney who has never tried a felony case of their

3  own.

4      **Q.    Ma'am, did Jennifer Blackman try a first**

5  **chair, a first-degree felony, where life in prison was**

6  **on the line before having tried any felony case before;**

7  **yes or no?**

8      A.   That I -- I don't think so, no.

9      **Q.    Okay.  So listen to my question, ma'am.  Can**

10  **you give me the name of any attorneys for which that**

11  **occurred, they sat first chair defending a first-degree**

12  **felony having never tried a felony case before; yes or**

13  **no; can you give me an answer?**

14      A.   Well, no, I don't know specifically.  But that

15  wasn't what I was talking about in the podcast.  It was

16  if so but --

17      **Q.    Okay.**

18      A.   -- attorneys that were leads that had never

19  tried felony cases before them becoming --

20      **Q.    That's not what you said.**

21      A.   There was --

22      **Q.    Ma'am --**

23      A.   There were cases --

24      **Q.    -- I'll read it again.**

25      A.   -- felony attorneys who were at that office

Ruby Green
April 16, 2021

Page 152

1  who had not tried a felony case before becoming a lead.

2      **Q.   Ma'am, that's not what you said.  I know you**

3  **didn't -- You've never read the transcript.  You've**

4  **never seen the podcast, so let me read back to you what**

5  **you said.  So if you are arrested for a crime that you**

6  **could be facing life in prison for and you have an**

7  **attorney that has never tried a felony case before, are**

8  **you going to feel comfortable with them representing**

9  **you.  So my question, ma'am, is tell me what attorney**

10  **sat first chair on a first-degree felony where life in**

11  **prison was on the table having never tried a felony**

12  **case before.**

13      A.   We keep going in circles.  I keep saying the

14  same thing.  I heard what you read.  That is exactly

15  what I meant.  If you have a lead attorney who has

16  never tried a case -- felony case before, who wants --

17  who would feel comfortable with them?  I don't know --

18  I don't know exactly.

19      **Q.   Okay.**

20      A.   Like I said, everybody in the courtroom -- or,

21  I mean, the attorneys or whatever, I do know there was

22  quite a few leads that were -- that had not had felony

23  trials of their own.

24      **Q.   So, ma'am --**

25      A.   They were put in a position --

Ruby Green
April 16, 2021

1    Q.    -- your --

2    A.    -- in a case that was a life felony, which

3    what we did is represent people as leads for 30 years

4    to life, then I wouldn't think that anybody would feel

5    comfortable in that situation.

6    **Q.    Sure.  So, ma'am, it's your testimony today**

7    **that when you made the statement in the Adams Brothers**

8    **Podcast, you were not saying that this is what happened**

9    **in the Finkelstein administration?**

10   A.    I was saying that there were leads that had

11   not tried their own felony cases.  I was -- I was

12   saying that exactly what was going on in the situation.

13   I did not -- I said if they -- if you have a case

14   where you were facing life in prison and you were given

15   an attorney, that, you know, that had not had any

16   felony trials, you wouldn't feel comfortable; and

17   that's exactly what it means.

18   **Q.    Okay.  Okay.  So but you can't tell me the**

19   **name of one attorney who tried a first-degree felony as**

20   **first chair with life -- with life in prison on the**

21   **line having never tried a felony case before?  Yes or**

22   **no?**

23   A.    No, it wasn't a -- It wasn't a, oh, my gosh,

24   like this happened and somebody got life in prison.  It

25   was if you had one, if you had this situation that was

Ruby Green
April 16, 2021

Page 154

1  going on, then you would not feel comfortable because

2  we have leads that are sitting here right now that

3  don't have -- that did not have their own felony

4  trials.  So it was a "if" situation.  It wasn't -- It

5  was a "if" coupled with the facts that we have felony

6  attorneys that did not have their own felony trials.

7      Q.    You're saying it might have happened, but you

8  don't know that it actually did happen?

9      A.    Correct but --

10     Q.    Okay.  Thank you.

11     A.    The general statement that I made --

12     Q.    Thank you.

13     A.    -- was that like coupled with what-if

14  situation, if you were in this possible situation, but

15  you were given one of these attorneys that didn't have

16  their own felony trial.

17     Q.    Sure.  Okay.  Ma'am, you also stated, quote,

18  I'm actually the only person that is on the ballot that

19  has tried cases within the past 20 years; do you

20  remember saying that?

21     A.    Yes.

22     Q.    And the ballot consisted of you, Judge Lynch

23  and Gordon Weekes, correct?

24     A.    Right.

25     Q.    What is the basis of that statement?

Ruby Green
April 16, 2021

Page 155

 1     A.   I was the only person on the ballot that had

 2  tried cases that was actively trying cases.

 **3     Q.   What I meant was how do you know that neither**

 **4  Judge Lynch nor Gordon Weekes had tried any cases in**

 **5  the past 20 years?**

 6     A.   If I'm not mistaken, George -- not George --

 7  Judge Lynch had mentioned it before, and I know he had

 8  been a judge for a long time as well; so he couldn't

 9  have tried any cases while he was a judge.

 **10     Q.   Okay.**

 11     A.   And then with Gordon, I had said that quite a

 12  few times.  He -- he -- The last case that we could

 13  find that he had tried was in -- in maybe one or

 14  something.

 **15     Q.   I'm sorry, Ms. Green.  You're breaking up.**

 16     A.   Within the last -- Every time I tell you --

 17          THE STENOGRAPHER:  (Interrupted for

 18  clarification.)

 19     A.   Can you hear me now?

 20  BY MR. LAUFER:

 **21     Q.   You said last we checked --**

 22     A.   Can you hear me now?

 **23     Q.   I can't hear the last bit that you said.**

 24          MR. LAUFER:  Let's -- Let's take a ten-second

 25  break and let the internet catch up here.

Ruby Green
April 16, 2021

Page 156

1          Madam court reporter, what was the last thing

2   that you got?

3          THE STENOGRAPHER:  Answer:  "And then with

4   Gordon, I had said that quite a few times.  He -- he --

5   The last case that we could find that he had tried was

6   in -- in maybe one or something."

7      A.   Maybe -- Maybe 2001, but each and every time

8   that I said it, he never refuted it; so I don't know if

9   he actually knew when the last time he tried a case was

10  or if that was exactly it.

11  BY MR. LAUFER:

12     Q.   **And what did you do -- Where did you look to**

13  **come up with that information?**

14     A.   I believe we looked on Odyssey, which is the

15  court system.

16     Q.   **Okay.  You also stated that Howard**

17  **Finkelstein, quote, created the mental health court,**

18  **now at some point or another he then wanted to**

19  **dismantle the mental health court; do you remember**

20  **making that statement?**

21     A.   Yes.

22     Q.   **Okay.  Do you believe you were terminated**

23  **because of that statement, ma'am?**

24     A.   Like I said before, I can't say whether or

25  not.  I believe that it was a part of the protected

Ruby Green
April 16, 2021

Page 157

1   speech that I gave on August 8.  I -- I don't know

2   specifically.  All I can say is what Howard said.

3       Q.   Okay.  Do you have any insight in the

4   rationale as to Mr. Finkelstein's position on how the

5   mental court -- I'm sorry, the mental health court

6   could work or whether it should remain in existence?

7       A.   Do I have -- Do I have any knowledge as to

8   what -- why or what his -- what was it?

9       Q.   I'm sorry, ma'am.  Do you have any insight as

10  to Mr. Finkelstein's position on how the mental health

11  court should run or whether it should exist at all?

12      A.   Well, I mean, from being in the office, I -- I

13  do know that he didn't feel as if mental health court

14  was working like he wanted it to work, I guess; and

15  there were -- there were times where we were supposed

16  to try and get all of our cases from out of mental

17  health court.  But it didn't actually happen according

18  to plan.  So we still have mental health court.  You

19  know, it's still functioning.  He just didn't like

20  certain judges.

21      Q.   Ma'am, is that a criticism of Mr. Finkelstein

22  in your mind?

23      A.   About what?

24      Q.   About allegedly wanting to dismantle the

25  mental health court.

Ruby Green
April 16, 2021

Page 158

1     A.    No, it's not a -- It's not a criticism.  It's

2   a telling what's going on.  I was telling everything as

3   it was going on.  It wasn't like, oh, my gosh, oh, like

4   you know, can you believe this man.  I'm just saying

5   what I was saying.  We have specific issues.  The

6   specific issues was we had mental health court, and now

7   they are trying to dismantle it at some point; and, you

8   know, that's a concern for the public, you know.  We --

9   The public had serious issues about people getting

10  treatment in mental health court.

11    **Q.    Ma'am, do you know if there's any prohibitions**

12  **with the Public Defender's Office on speaking on behalf**

13  **of the elected Public Defender to the media or making**

14  **statements about his intentions or what he wants to do,**

15  **et cetera?**

16    A.    No.  I don't -- I don't -- never got any

17  policy or anything as to that.

18    **Q.    Okay.  On page -- or, I'm sorry, you also**

19  **stated the following:  Quote, you tell me, if we were**

20  **drug addicts and we used to come to court with cocaine**

21  **on their noses, you know, would we be able to be in a**

22  **position that he would be able to be in?  No.**

23    **What did you mean by that?**

24    A.    It was -- It was a statement that I made that,

25  you know, as a person of color, I would not be able to

Ruby Green
April 16, 2021

Page 159

1   do the same things and also rise up and get a high

2   position like that.  It just wouldn't happen.

3        **Q.   So when you say if we were drug addicts, who's**

4   **the "we" in that statement?**

5        A.   Just any person of color, any person of color,

6   like it's just like there -- We have to admit at some

7   point that people are treated differently the way that

8   they look; we're treated differently.  So things

9   that -- and I want to call them privileges, you know

10  things that certain people may be privy to and engaged

11  in, not necessarily we can do stuff like that.  You

12  know, we're held to and we call that, you know,

13  basically that -- the black tax, you know.

14       We always have to do things 150 percent as opposed

15  to if somebody's doing 100 in order to get and maintain

16  to where someone else is.

17       **Q.   I'm sorry, ma'am, the black what?  What was**

18  **the word after it?**

19       A.   The black tax.

20       **Q.   T-A-X, tax you said?**

21       A.   Yes, T-A-X.

22       **Q.   Okay.  Understood.  Is the fact that**

23  **Mr. Finkelstein got the chance after his personal**

24  **issues in the '80s, is that in any way a criticism on**

25  **your part of Mr. Finkelstein in your mind?**

Ruby Green
April 16, 2021

 1     A.    That he was given a -- I'm sorry, the fact

 2   that he was given a chance?

 3     **Q.    A second chance, sure.**

 4     A.    What was it a --

 5     **Q.    You pointing that out, do you believe that to**

 6   **be a criticism of Mr. Finkelstein?**

 7     A.    No, it was an example, like I said, the black

 8   tax, like we have to work ten times as hard like, you

 9   know, it wouldn't -- It wouldn't just be that we can

10   just come up in a situation like that knowing what our

11   past was.  It wouldn't be a situation.  It was not a

12   criticism.  It was an example.

13     **Q.    Okay.  Now, shortly thereafter, the host of**

14   **the podcast stated that that was white privilege**

15   **existing and being alive and well in Broward County.**

16   **You agreed with that statement, did you not?**

17     A.    Yep, I still do.

18     **Q.    Do you believe there's white privilege in the**

19   **Public Defender's Office?**

20     A.    Of course.

21     **Q.    Okay.  I mean, obviously, there are both black**

22   **and white employees in the Public Defender's Office,**

23   **right?**

24     A.    Right.

25     **Q.    Do you think that white individuals in the**

Ruby Green
April 16, 2021

Page 161

1    Public Defender's Office would be offended by that

2    statement?

3        A.   To my knowledge, no.

4        Q.   Okay.  Do you think --

5        A.   Because it's if you say no, if you literally

6    said there's no white privilege, then you're not in

7    reality.  You know, at some point people have to admit

8    that, you know, this stuff exists; and you may not know

9    it.  You know, you may not come from the same

10   situations as everybody, you know; but I'm pretty sure

11   no one ever mentioned it.  And I have tons of white

12   friends that are still there, you know.  It wasn't a

13   situation where -- and I wasn't the one that, you know,

14   wrote a lot of the -- you know, every single thing the

15   platform that I had wrote.  You know, some of it did

16   come from white people so I just -- I don't believe

17   that anyone was offended that I know of.

18       Q.   Do you think Mr. Finkelstein was offended in

19   that you used his personal anecdote as an alleged

20   example of white privilege?

21            MR. FRANK:  Objection; calls for speculation.

22   Go ahead.

23       A.   I can't -- I can't say what he -- what he was

24   offended about.  All I know is what the purpose was is

25   like based upon what he said.  I can't really say.  I

Ruby Green
April 16, 2021

 1  can't state that that was a cause.

 2  BY MR. LAUFER:

 3      Q.   Okay.  You also made various statements about

 4  Mr. Finkelstein's apparent proclivity of playing golf;

 5  where did that information come from?

 6      A.   Say that one more time.

 7      Q.   Sure.  You had made statements about

 8  Mr. Finkelstein's proclivity in playing golf instead of

 9  working; do you recall making that statement, ma'am?

10      A.   Right.

11      Q.   What is the basis of your knowledge for that

12  statement?

13      A.   The basis of my knowledge, that he -- he told

14  me he likes to play golf.

15      Q.   Okay.  He told you that?

16      A.   He told me he liked to play golf.  He and

17  Frank and Owen, they all played golf together.

18      Q.   Okay.  And you had stated it's just -- You

19  just get to go home and play golf, and, you know, that

20  is your day; so it's your understanding when

21  Mr. Finkelstein leaves the office, even if it's during

22  the workday, that he goes home to play golf?

23      A.   Is that -- Is that my statement is that what?

24  Is that my -- what I think?

25      Q.   Is that what you were trying to say, ma'am?

Ruby Green
April 16, 2021

Page 163

1      A.    Was I trying to say he just gets to go home

2  and play golf?

3      **Q.    Yes.**

4      A.    What I was -- What I was making a play on was

5  the fact that he just gets to go home and, you know, do

6  something fun, something that he likes.  That's what --

7  That's what the whole thing is about like --

8      **Q.    Okay.  But that would only be a criticism if**

9  **he played during the workday, correct?**

10     A.    It would -- It be a criticism if it was -- The

11  entire statement was basically that he wasn't doing

12  anything as in the trenches that we were doing, so, I

13  mean, I can't necessarily say it was, you know,

14  criticizing.  Like I said, it was just an example as to

15  the differences between what I was doing versus what he

16  was doing.

17     **Q.    Ma'am, people in the trenches can go home and**

18  **play golf, can't they?**

19     A.    They can.  They can go home and play if, you

20  know, obviously after they're doing their work; but

21  normally the people in the trenches are in court doing

22  motions or in depositions or, you know, talking to

23  witnesses.

24     **Q.    What you were trying to say here, ma'am, is**

25  **that rather than work, Mr. Finkelstein plays golf,**

Ruby Green
April 16, 2021

Page 164

 1  correct?

 2      A.   That's not -- that's not -- Like I said, I was

 3  making an example as to the differences between what

 4  the attorneys in the trenches were doing versus what,

 5  you know, he was doing.

 6      **Q.   Okay.  But weren't you trying to say that**

 7  **rather than make jail visits and trying cases, he was**

 8  **playing golf, correct?**

 9           MR. FRANK:  Objection; asked and answered.  Go

10  ahead.

11  BY MR. LAUFER:

12      **Q.   You can answer, ma'am.**

13      A.   Again, the statement that I made was really

14  simple.  It was an example as to what he was doing

15  versus what the attorneys in the trenches were doing.

16      I can't sit up here and -- and say that, oh, my

17  gosh, I'm saying that he's going home to play golf all

18  the time; this is what he's doing.  But it was just

19  like an example as to this is what he likes to do.  He

20  gets to go home and have fun versus we're here working.

21      **Q.   Okay.  Right.  So Mr. Finkelstein was not**

22  **working as hard as you because he had time to play**

23  **golf; isn't that what you're telling us?**

24      A.   Is that what I was trying to say?

25      **Q.   Yes, ma'am.**

Ruby Green
April 16, 2021

Page 165

1          MR. FRANK:  Objection.

2     A.    That he was not -- I'm sorry.  Okay.  Say that

3  one more time.  I was trying to say what?

4  BY MR. LAUFER:

5     **Q.    You were trying to say that he does not work**

6  **as hard as you and others like you, but instead he's**

7  **playing golf?**

8     A.    That's -- I mean, is that -- That's not the

9  whole general statement that I was making.  I was

10  basically saying about people who work in the trenches

11  and, you know, everything that we have to do and go do

12  something fun, like whether or not he's golfing or not,

13  you know, I don't know what he's doing on his everyday

14  life; but I do know that he says he likes to golf; and,

15  you know, he does it with other people at work.

16         And I'm trying to figure out if there was another

17  occasion where someone may have slipped up and said

18  that they were going out golfing with him, but I can't

19  remember specifically.

20    **Q.    Slipped up and said something; is that what**

21  **you just said, ma'am?**

22    A.    Say that again.

23    **Q.    Did you just say someone slipped up and said**

24  **something?**

25    A.    Right.  I don't know if someone slipped up and

Ruby Green
April 16, 2021

Page 166

1   said that they were going to go out golfing with him;

2   but I don't know if that meant -- and it was during the

3   daytime.  I don't know if that meant they were going to

4   go over the weekend or that they were going to leave

5   work early or not, you know, so, I mean, I don't know.

6       **Q.   Ma'am, let's be fair for a second.  You don't**

7   **know anything about whether or not Mr. Finkelstein**

8   **plays golf or at what -- how often he does; is that**

9   **fair to say?**

10          MR. FRANK:  Objection; form; relevance.  Go

11   ahead.

12      A.   I do know that he plays golf.  How often he

13   does it, I do not know.

14   BY MR. LAUFER:

15      **Q.   Because that's based on the fact that he told**

16   **you "I like to play golf"?**

17      A.   Correct.

18      **Q.   Okay.  You were saying that --**

19      A.   I don't know if he -- I don't know if he said

20   it specifically just like that, but he did tell me that

21   he likes to golf.

22      **Q.   Ma'am, you were making the statement to try to**

23   **state that Mr. Finkelstein doesn't work hard and that**

24   **if you were the Public Defender, you would work hard**

25   **and that you wouldn't have to play golf, right?**

Ruby Green
April 16, 2021

Page 167

1          MR. FRANK:  Objection; form.  Go ahead.

2     A.   My whole platform statement was what I would

3 do as Public Defender.  This is all the things that I

4 would do, all the things that I would do as a Public

5 Defender, all the changes that I would make.  That's --

6 That's what my speech was about.

7 BY MR. LAUFER:

**8     Q.   I understand, ma'am.  And in doing so, you**

**9 drew a comparison between you and Mr. Finkelstein, who**

**10 is not in the trenches but apparently plays golf**

**11 instead, correct?**

12          MR. FRANK:  Objection to form.  I think she's

13 answered this multiple times.  I think we should move

14 on, Counsel.

15          MR. LAUFER:  Counsel, I'll be the judge of

16 that.

17 BY MR. LAUFER:

**18     Q.   Ma'am, answer the question, please.**

19     A.   Say that one more time.  I'm -- I'm confused

20 because it does sound like it's the same thing I've

21 been saying.  I -- I do not sit up here and -- and --

22 and saying that, oh, my gosh, this is exactly what he's

23 doing.  No, no, no, no.  What I was saying was what I

24 would do as the Public Defender.  Now, you know, I do

25 know that he likes to play golf; so that was the

Page 168

1  reference I made if that's what you're asking, that it

2  was the reference that I made.

3      But the entirety of the statement was meant for

4  the fact that what I would do as a Public Defender.

5  I'm already active, you know, in the courtroom.  I'm

6  already doing things as far as being active in the

7  community as well.  And these are the changes that I

8  would make as the Public Defender.

9      **Q.   Ma'am, I want to read you your whole statement**

10 **one more time; and we'll go over this once more.  You**

11 **stated he hasn't had any cases; he hasn't had any --**

12 **has nothing, but no jail visits, I don't even think any**

13 **jail calls, anything like that.  It's just -- You just**

14 **get to go home and play golf and, you know, that is**

15 **your day.  You're trying to tell me that was not a**

16 **criticism of Mr. Finkelstein?**

17          MR. LAUFER:  Is she thinking about it or is

18 she frozen?  Mr. Frank, are you still there?  Can you

19 hear me?

20          MR. FRANK:  Yeah, I'm here.  Are you okay,

21 Ruby?

22          MR. LAUFER:  Oh, I think she's frozen.

23          Madam court reporter, you got my question.

24          MR. LAUFER:  We thought you were frozen.

25 Either you were really really thinking about your

Ruby Green
April 16, 2021

Page 169

1   answer or you were frozen.

2      A.   Yeah, no my other phone overheated.  So say

3   that one more time.

4         MR. LAUFER:  Sure.  Madam court reporter, can

5   you please read that back?

6         THE STENOGRAPHER:  Question:  "Ma'am, I want

7   to read you your whole statement one more time; and

8   we'll go over this once more.  You stated he hasn't had

9   any cases; he hasn't had any -- has nothing, but no

10  jail visits, I don't even think any jail calls,

11  anything like that.  It's just -- You just get to go

12  home and play golf and, you know, that is your day.

13  You're trying to tell me that was not a criticism of

14  Mr. Finkelstein?"

15        MR. FRANK:  Objection to form.  Go ahead.

16     A.   It was -- Like I said, it was another example.

17  I was trying to show people what I would do as the

18  Public Defender.  It was just another example as to

19  what was happening, the concerns that people were

20  having, the concerns that had been on the blogs for

21  many many years.  I was addressing all of that.  It was

22  just another example.

23  BY MR. LAUFER:

24     **Q.   Can you honestly tell me you didn't think that**

25  **would be offensive to Mr. Finkelstein?**

Ruby Green
April 16, 2021

Page 170

 1    A.    He -- He never spoke about it ever offending

 2   him.

 3         MR. FRANK:   Objection; calls for speculation;

 4   form.  Go ahead.

 5    A.    He never spoke about it being offensive when

 6   it was on any other platform or any other social site

 7   or media or whatever so I never can't -- I can't really

 8   say whether or not it affected him or not.  All I can

 9   say what affected him is based upon what he says out of

10   his own mouth; and the only thing he said out of his

11   mouth was the speech that I made.  So I can't say what

12   it was, which part of the speech; but all I know is it

13   was a whole -- a speech in its entirety.

**14    Q.    Okay.  Ma'am, on those random anonymous blogs**

**15   of those nature, did anyone who was a current employee**

**16   of the Public Defender's office who received paychecks**

**17   from the Public Defender's Office ever make such a**

**18   statement about Mr. Finkelstein to your knowledge?**

19    A.    I believe that there were several.

**20    Q.    Tell me who they were.**

21    A.    I -- there -- It's anonymous.  It was just

22   things --

**23    Q.    No --**

24    A.    Let me tell you --

**25    Q.    That's not what I asked.**

Ruby Green
April 16, 2021

Page 171

1    A.    It was only things that people who were in the

2    office would know.  And at some points in time, you

3    know, it was just -- it was just clear that it was

4    people from the office.

5        Q.    Ma'am, just if you could listen to my question

6    and answer it, that's what I would appreciate.

7        You clearly made the statement that we just spoke

8    of as you; it was not anonymous, right?

9        A.    Correct.  It was not anonymous.

10       Q.    Do you know of any other current employee of

11   the Public Defender's Office who received paychecks

12   from the Public Defender's Office who made a statement

13   similar to the one you made while in the employee of

14   the -- the employer rather of the Public Defender's

15   Office not anonymously, as themselves?

16       A.    So the persons have to work in the office and

17   actually posted as themselves and not --

18            MR. FRANK:  Talking about current employees?

19            MR. LAUFER:  Right.

20   BY MR. LAUFER:

21       Q.    In other words, an employee who at the time

22   was a current employee -- at the time was an employee

23   of the Public Defender's Office, either verbally or

24   posting a statement similar to yours?

25       A.    That was -- That did not post it anonymously

Ruby Green
April 16, 2021

Page 172

1 but they said it with their name; they put their name

2 on it, no, I did not.

3    Q.   Or --

4    A.   No, I did not know anyone who put their name

5 on the post.

6    Q.   Okay.  Or said it verbally?

7    A.   Or said it verbally to -- to that -- to

8 Howard?

9    Q.   Yes.

10   A.   I don't know if anyone who had the guts to go

11 to their boss and say certain things to their boss.

12 But, I mean, behind the backs, that's a different

13 story.

14   Q.   Okay.  But you certainly said that about

15 Howard on a podcast, right; wasn't he your boss?

16   A.   But Howard was not running.  It was a manager

17 I was speaking of as part of a political campaign.  I

18 can't go in on a political platform and say, you know,

19 I'm just running just to run.  I just want to just run.

20 You know, you -- you -- you -- There are issues that

21 are at stake that, you know, that are of concern which

22 would cause someone to run -- want to run for office

23 because they reasonably believe that they can make a

24 change and a difference.

25   Q.   Ma'am, are you telling me that you couldn't

Ruby Green
April 16, 2021

Page 173

1   run for Public Defender without criticizing Howard

2   Finkelstein for allegedly playing golf rather than

3   doing a full day's work?

4          MR. FRANK:  Objection; predicate; form.  Go

5   ahead.

6      A.   Well, it wasn't -- Like I said, it wasn't

7   criticism.  It was examples of everything that was

8   going on.  These are things that was going on in the

9   office.  It was examples of what was going on.  I -- At

10  no point in time did I say it was going to be

11  criticized, criticized, criticized.  What I wanted to

12  present was the examples as to what was going on.  I

13  had to give him an example.  They would think I was a

14  crazy person to just be sitting on that stage and not

15  be able to tell them what's actually happening and

16  what's going on in the criminal justice system.

17     Q.   Ma'am, you couldn't tell them I intend to try

18  cases; I intend to be in the trenches; I intend to work

19  around the clock without insinuating that Howard

20  Finkelstein didn't do that?

21         MR. FRANK:  Objection to form.  Go ahead.

22     A.   Yeah, no; there was no way.  What would be the

23  purpose that you would have to -- What would be the

24  purpose of you running if you say that you intend to

25  try cases, if you're intending on doing this; and that

Ruby Green
April 16, 2021

Page 174

 1  was it.  They would say then what's wrong with --

 2  what's going on right now, and then you would have to

 3  explain to them what's wrong.  And this is the reason

 4  why I'm running because it's not actually happening.

 5      People on the outside community don't know.  They

 6  don't work there in the Public Defender's Office, so

 7  they don't know what's actually going in the Public

 8  Defender's Office in order to sit up there and say,

 9  hey, you know, she said try cases so we should be

10  proud.  They didn't know certain things about what was

11  going on, so how could they make a decision about, you

12  know, what -- what to do as opposed to, you know, what

13  they shouldn't do if they don't actually know.

14      This is why they came up with questions because

15  they had questions about what was going on.

**16      Q.   To the best of your knowledge, did Judge Lynch**

**17  or did Gordon Weekes criticize Mr. Finkelstein in their**

**18  runs for Public Defender?**

19      A.   Tom did.  I don't know if Gordon did or not.

20  I don't think Gordon did because that would be, you

21  know, in a situation -- that would put him in a bad

22  position.

**23      Q.   But it wouldn't put you in a bad situation?**

24      A.   It -- Would it put me in a bad situation?

**25      Q.   Right, it wouldn't have?**

Ruby Green
April 16, 2021

Page 175

```
 1      A.   No, no, it wouldn't.  You know, in the end it
 2  did.  In the end, obviously, I found out that based
 3  upon me doing the podcast was something that Howard did
 4  not, you know, like, you know; but it wouldn't have put
 5  me in a different position because Howard wasn't
 6  supporting me.  He wasn't supporting Gordon.
 7      If he's supporting someone, obviously, as Gordon,
 8  you know, he wouldn't be able to make examples of
 9  Howard.
10      Q.   Given Mr. Finkelstein's shortcomings in your
11  mind, did you ever contemplate -- Did you ever
12  contemplate resigning from the Public Defender's
13  Office?
14      A.   No, I was going to work there as long as I
15  could.  I really loved my job at the Public Defender's
16  Office.  You know, I -- I truly believed that if, you
17  know, we came together at some point that we can make
18  it better.
19      I thought that I was going to be the person that
20  could make it better, obviously.  But, you know, the
21  public needs good attorneys, you know.  They need good
22  representation.  So that's why I wanted -- I would be
23  there till the end, no matter.  They need good
24  representation, and that was my whole thing, you know,
25  about representing people on the other side.  Like I do
```

Ruby Green
April 16, 2021

Page 176

1  believe that people -- Say that, sorry?  Someone --

2      Q.    I didn't say anything.

3      A.    No, but I was saying I do believe that, you

4  know, no matter what someone has done, they do believe

5  to -- They do deserve to be represented with a zealous

6  advocate so --

7      Q.    Absolutely.  You don't think Mr. Finkelstein

8  thinks differently, do you?

9      A.    Like I said, I don't know.  I'm pretty sure

10  he's a public --

11      Q.    Did we lose Ms. Green again?

12      A.    All right.  Is it better?

13      Q.    Yeah, much better.  Thank you.

14      A.    No, listen, Howard was a warrior in his time.

15  I understand why he ran for Public Defender.  Okay.  He

16  was a warrior in his time.  So I don't believe that he

17  doesn't -- doesn't believe that people need zealous

18  advocates.  From what I know about him in his time,

19  which was before my time, he was -- he was advocating,

20  you know, on behalf of clients.

21      Q.    Okay.  You two didn't have a time at the same

22  time?  There was no overlap in your time?

23      A.    No, I would have to be a ghost.  I'm just

24  kidding.  No, no, we -- When I say "his time," meaning

25  where he was, I guess, representing clients.

Ruby Green
April 16, 2021

1    Q.    I see.  Okay.  All right.  Now, I'm going to

2  show you what we're going to mark as exhibit -- oh,

3  boy, is it 6 or 7 -- 6, I think.

4        And it is a 31-page document entitled Law Office

5  of the Public Defender Policy Manual.

6        And what I'm going to do, ma'am, is I'm going to

7  kind of thumb through it and just want to ask you a

8  general question of have you ever seen this document

9  before; but I'll go kind of slow through it; and you

10  can tell me if you've seen it before.

11    A.    Okay.

12        (Exhibit No. 6 was marked.)

13  BY MR. LAUFER:

14    Q.    And if at any point, you know, you can't see

15  those, let me know.

16        MR. FRANK:  Is this contemporaneous that's in

17  effect now?  Do we know what year this was promulgated?

18        MR. LAUFER:  Yep, we do, sir.  It is

19  originally from June 1, 2005, last updated January 2,

20  2018; and that's on the first page.

21        MR. FRANK:  Okay.

22  BY MR. LAUFER:

23    Q.    So I'm just going to thumb through again.

24  Ma'am, if at any point you tell me you've seen it, just

25  let me know.  I'll stop thumbing.  I'll keep going

Ruby Green
April 16, 2021

Page 178

1    until you know --

2        A.   Yes, yes.

3        Q.   Okay.  All right.  So let me ask you this,

4    ma'am.  Obviously, you said some statements we've gone

5    over.  I want to direct your attention to page seven of

6    the handbook.  And the first sentence says employees

7    are expected to be courteous, friendly and helpful in

8    dealing with clients, their families, the public and

9    fellow employees.  Do you think all the statements that

10   you made in the Adams Brothers Podcast were courteous

11   to your fellow employees?

12       A.   Yes, because they were -- They shared

13   similar -- They shared similar statements.  They shared

14   my views.  There was a lot of people at the Public

15   Defender's Office that supported me that was -- that

16   was the views that we shared.

17       Q.   That's not my question.  That's not my

18   question, ma'am.  Aren't the members of administration

19   fellow employees?

20       A.   The members of administration fellow

21   employees?

22       Q.   Yes, ma'am.

23       A.   I guess.

24       Q.   Didn't you say that they treated staff and

25   lawyers like trash?

Ruby Green
April 16, 2021

Page 179

1    A.   That administration treated staff and lawyers
2  like trash, yes, I did say that.
3    **Q.   Okay.  So do you think that's being courteous**
4  **to your fellow employees?**
5    A.   It wasn't -- It wasn't on -- on their behalf.
6  It wasn't, you know, for that purpose.  It was
7  literally for campaign purposes.
8    **Q.   I understand.  I'm not asking for the purpose,**
9  **ma'am.  I'm just saying do you think that was a**
10  **statement courteous to your fellow employees?**
11    A.   I -- I do.  It was separate and apart from me
12  being at work, correct.  I do believe that I was
13  courteous.  It was separate and apart from me being at
14  work.
15    **Q.   All right.  Ma'am, I didn't ask you if it was**
16  **apart of you being at work.  Is this statement you made**
17  **about administration, who are your fellow employees, a**
18  **courteous statement to them?**
19    A.   It was a statement that was meant for my
20  campaign.  It wasn't meant for to take jabs at the
21  administration specifically while we're in the office
22  or anything like that.  So it -- I can't -- I don't
23  know how to answer that question.  It wasn't -- I --
24  I -- It wasn't for that purpose so -- so --
25    **Q.   I'm not asking for the purpose.**

Ruby Green
April 16, 2021

Page 180

1     A.    So, yes, I was courteous.

2     Q.    Do you --

3     A.    I was courteous, yes.

4     Q.    You were courteous to the administration?

5     A.    I was courteous to administration, yes.

6     Q.    In the Adams Brothers Podcast, correct?

7     A.    That -- I mean, in the -- in the statements

8  that I made in the Adams Brothers Podcast has nothing

9  to do with whether or not the administration thinks

10  that it was courteous or not.  It was specifically me

11  giving examples as to what was going on, so, I mean,

12  whether or not --

13     Q.    Ma'am?

14     A.    -- you think it was courteous or whether or

15  not it wasn't, it has no bearing.  I don't know how to

16  answer that.

17     Q.    Well, I'm -- Ma'am, you don't get to know what

18  the -- It's not your decision as to what's the bearing

19  is or what administration thought it was courteous.

20  The question is were all your statements in the Adams

21  Brothers Podcast courteous to administration; yes or

22  no?

23     A.    Well, yes.

24           MR. FRANK:  Objection.  Hold on for a second.

25           Cory, this is based on a false predicate.

Ruby Green
April 16, 2021

Page 181

1  This is within the scope of employment, not with her

2  campaign.  So you're -- You're conflating two issues,

3  and she's absolutely right to bring it up.

4          MR. LAUFER:  Then make a form objection and --

5  and -- and let -- have the answer -- the question

6  answered.

7          MR. FRANK:  Objection to -- Objection; asked

8  and answered and form.  Go ahead.

9  BY MR. LAUFER:

10     Q.   **Ma'am, were all your statements in the Adams**

11  **Brothers Podcast courteous to administration?**

12     A.   Yes, in the form in which it was intended

13  so --

14     Q.   **I don't know -- What does that mean?  I'm not**

15  **asking you the form it was intended, ma'am.  Were the**

16  **statements made --**

17     A.   I can't --

18     Q.   **-- courteous to administration?**

19     A.   I can't answer to that.  It's -- it's -- Like

20  I said, I can't answer that.  That's not something I

21  can answer.  I'm sorry, like it's not -- I feel like

22  it's just -- It's not one way or another on this

23  question.  That's -- That's why I'm saying, that's why

24  I had to explain it.  It wasn't one way or another.  It

25  wasn't -- I wasn't at work.  So I'm gonna say, yes, it

Ruby Green
April 16, 2021

Page 182

1  was courteous because it was on the basis of my

2  campaign.

3     **Q.    So you can say anything you want in your**

4  **campaign about fellow employees as long as it's on the**

5  **basis of a campaign; is that your statement?**

6     A.    No, I'm not saying that.  I wasn't saying

7  specific people or whatever in this particular

8  statement.  What I was saying was is that for the

9  purposes of the campaign, I was giving examples as to

10  what was going on.  So if I made references to

11  administration, that was an example as to what was

12  going on and what needed to change.

13     **Q.    I'm not asking for the purpose of your**

14  **statements.  If you would make a statement -- Ma'am, if**

15  **you had made the statement inside the office that**

16  **administration was treating the lawyers and staff like**

17  **trash, would that be acceptable?**

18     A.    Yeah, if you have an open-door policy.  If you

19  have an open-door policy, you can go to administration

20  and talk to them, hey, we feel like we're being treated

21  like trash, yeah, that -- that would be acceptable.

22  Why not?  I -- That's how people should be able to come

23  in and say, hey, I'm concerned about this issue or that

24  issue and not be retaliated against for it.

25     **Q.    Did you ever do that?**

Ruby Green
April 16, 2021

Page 183

1      A.    Did I ever?

2      Q.    **Did you ever -- Ma'am, can you hear me?**

3      A.    It's cutting up.

4      Q.    **Yeah.  My question was prior to making that**
5  **statement on the Adams Brothers Podcast, did you go to**
6  **anyone in administration and you expressed you believed**
7  **they were treating the lawyers and staff of the Public**
8  **Defender's like trash?**

9      A.    By that point it was -- it was fruitless.  How
10  could I?  I had already put myself into a race, and why
11  would I -- It wasn't being done in the first place.  So
12  why would I go to the administration and say, hey, I'm
13  going to drop out of the race and, you know, if you
14  guys make these changes when, you know, for years, you
15  know, people had been talking about the issues of the
16  office; and none of it changed.  So what would have
17  been -- What would have been the point?

18      Q.    **So but you kept working there, right?**

19      A.    I did not.

20      Q.    **Okay.  But you kept working there, right?**

21      A.    To make a difference, I did.  I did keep
22  working there at the time because I -- I thought that
23  it was a great example to show that you have somebody
24  who's running for office who's also in the trenches
25  with the people.

Ruby Green
April 16, 2021

Page 184

1      Q.   So then by your logic, the only reason why you

2    were running for office was because the current

3    administration treated the employees like trash?

4      A.   That was not -- That was not what I said.  We

5    needed changes.  We needed funding, more funding.  We

6    needed someone that would advocate for funding.  We

7    needed better training.  There was several things, you

8    know, that we needed to decrease the turnover.  There

9    was several different things.  That was not -- That was

10   not the sole issue as to why I started to run.  It was

11   several issues that were not just my issues.

12     Q.   Okay.

13          THE STENOGRAPHER:  (Interrupted for break.)

14          MR. LAUFER:  Oh, absolutely.

15          (Recess had at 5:15 p.m. and continued in

16   Volume 2 at 5:23 p.m.)

17                     * * * *

18

19

20

21

22

23

24

25

Ruby Green
April 16, 2021

Page 185

1                    CERTIFICATE OF OATH

2

3

4   STATE OF FLORIDA  )

5   COUNTY OF BROWARD )

6

7

8

9

10          I, the undersigned authority, certify that

11  RUBY GREEN appeared remotely via web conference before

12  me on the 16th day of April, 2021, and was duly sworn.

13

14          Signed this 22nd day of April, 2021.

15

16

17

18

19

20

21

22  _Francine L. O'Claire_

23  _____

24  FRANCINE O'CLAIRE, RPR
    Notary Public State of Florida
25  Comm# 1654948 Exp. 03/31/2025.

Ruby Green
April 16, 2021

Page 186

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA  )

4    COUNTY OF BROWARD )

5

6          I, FRANCINE O'CLAIRE, RPR, do hereby certify

7    that I was authorized to and did stenographically

8    report the foregoing deposition of RUBY GREEN; that a

9    review of the transcript was requested; and that the

10   foregoing transcript, pages numbered 1 through 188 is a

11   true record of my stenographic notes.

12         I FURTHER CERTIFY that I am not a relative,

13   employee, attorney or counsel of any of the parties or

14   counsel connected with the action, nor am I financially

15   interested in the action.

16              DATED this 22nd day of April, 2021.

17

18

19

20   _____
     FRANCINE O'CLAIRE
21   Court Reporter, RPR

22

23

24

25

Ruby Green
April 16, 2021

Page 187

1  April 22, 2021

2

3  Ruby Green,
   c/o Frank & Rice, P.A.
4  325 West Park Avenue.
   Tallahassee, FL 32301.
5
   ATTN:  Mr. Frank
6
   Re:  Ruby Green v. Howard Finkelstein, et al
7  Case No. 20-cv-62160-BLOOM/Valle

8  Please take notice that on the 16th day of April, 2021,
   you gave your deposition in the above cause.  At that
9  time you did not waive your signature.

10

   The above-addressed attorney has ordered a copy of this
11  transcript and will make arrangements with you to read
   their copy.  Please execute the Errata Sheet, which can
12  be found at the back of the transcript, and have it
   returned to us for distribution to all parties.

13

14  If you do not read and sign the deposition within a
   reasonable amount of time, the original, which has
15  already been forwarded to the ordering attorney, may be
   filed with the Clerk of the Court.

16

17  If you wish to now waive signature, please sign your
   name in the blank at the bottom of this letter and
18  return to the email address listed below.
   Very truly yours,

19
   Francine O'Claire, RPR
20  Phipps Reporting, Inc.
   Production@phippsreporting.com

21
   I do hereby waive my signature.

22

   _____
23  Ruby Green

24  Job No.:  182495

25

Ruby Green
April 16, 2021

Page 188

1                           ERRATA SHEET

2                    DO NOT WRITE ON THE TRANSCRIPT
                     ENTER CHANGES ON THIS SHEET
3

4    RUBY GREEN vs. HOWARD FINKELSTEIN, et al

5    Deponent:   RUBY GREEN
     Date Taken:  April 16, 2021
6    Case No.:    20-cv-62160-BLOOM/Valle

7    PAGE    LINE        REMARKS

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20

21   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
22   are true.

23   Signature of Witness:  _____

24   Dated this _____ day of _____, _____.

25   Job No.:  182495

Ruby Green
April 16, 2021

---

**Exhibits**

---

**Exhibit 001 Green**
 3:14 65:22
 66:2

**Exhibit 002 Green**
 3:15 72:22
 73:4 86:23

**Exhibit 003 Green**
 3:16 86:25
 87:5

**Exhibit 004 Green**
 3:17 88:5,8,
 15

**Exhibit 005 Green**
 3:18 88:18,25
 92:15

**Exhibit 006 Green**
 3:19 177:12

---

**$**

---

**$2,000**
 40:4
**$39,500**
 33:20

---

**1**

---

**1**
 4:1 65:22
 66:2 177:19
**100**
 6:20 34:12

159:15
**10:00**
 21:23
**110**
 38:19 119:4
**12**
 55:16 112:6
**14**
 88:7,11,19
 93:14 97:3
**15**
 55:23
**150**
 159:14
**15th**
 55:23 56:7
 57:24
**18**
 40:25
**1:00**
 4:1

---

**2**

---

**2**
 72:22 73:4
 86:23 177:19
 184:16
**20**
 154:19 155:5
**200**
 38:22
**2001**
 156:7
**2005**
 9:13 177:19
**2008**
 10:5,6,23

**2010**
 11:8 12:13
**2011**
 7:15,16 12:14
 13:2
**2012**
 13:11,12,21
**2014**
 18:11
**2015**
 18:8,10
**2017**
 48:25 61:23
 64:5 66:24
**2018**
 60:1,5,7,24
 61:7 64:6
 65:25 116:15
 177:20
**2019**
 18:5 20:16
**2020**
 92:25 115:11
**24/7**
 52:9
**25**
 22:15 24:14
**27**
 65:25
**27th**
 69:1
**2nd**
 13:11 31:21

---

**3**

---

**3**
 86:25 87:5

**30**
 149:1 153:3
**31-page**
 177:4
**3:06**
 92:12
**3:10**
 92:4,10
**3:11**
 92:12

---

**4**

---

**4**
 88:5,8,15
**40**
 24:23
**40-something-
 minute**
 93:8 96:24

---

**5**

---

**5**
 13:12,21
 88:18,25
 92:15
**5:15**
 184:15
**5:23**
 184:16
**5:30**
 22:2
**5th**
 31:22

---

**6**

---

**6**
 177:3,12

Ruby Green
April 16, 2021

2

**60**
22:24 24:14,
21

**6:30**
21:24

---
**7**
---

**7**
14:6 177:3

**70**
25:4

**7:00**
21:24

---
**8**
---

**8**
96:10,13
115:11 157:1

**80s**
159:24

**8th**
92:25

---
**9**
---

**9:54**
69:1

**9:56**
68:25

---
**A**
---

**ability**
25:24,25
71:14,17
116:19

**absolutely**
72:21 176:7
181:3 184:14

**acceptable**
182:17,21

**accepted**
31:13

**accepting**
31:2

**access**
42:4

**accurate**
20:17 36:5
47:5 53:16
61:3 73:12
81:19 120:19
135:12,13

**accusation**
80:2

**act**
86:2

**action**
63:17 86:24
125:5

**active**
168:5,6

**actively**
54:3,14 55:19
56:17,23
61:3,11 155:2

**actual**
11:23 56:12
72:12 82:15
88:10 99:4

**Adams**
88:21 89:10,
21,25 90:17
100:1 128:17
137:17 140:19
153:7 178:10
180:6,8,20
181:10 183:5

**addicts**
158:20 159:3

**additional**
40:6

**address**
50:24

**addressed**
26:17

**addressing**
88:22 169:21

**adequate**
130:25

**administration**
86:7 114:13
142:4,5,14,
16,21 143:9
144:21 145:22
147:8 149:24
153:9 178:18,
20 179:1,17,
21 180:4,5,9,
19,21 181:11,
18 182:11,16,
19 183:6,12
184:3

**admit**
159:6 161:7

**adult**
17:16

**advance**
97:18 99:7,9,
23 100:2,5
124:23

**advancement**
99:25

**advice**
68:10

**advocate**
99:13,17

**addicts**
158:20 159:3

**additional**
40:6

**address**
50:24

**advocates**
176:18

**advocating**
137:25 138:5
176:19

**affected**
170:8,9

**afford**
12:7 15:18

**afraid**
115:20
118:20,23

**afternoon**
4:13

**afterthought**
121:23 122:2,
8,11,17,23
123:5,7,8,10,
12,13 124:9

**age**
17:20

**aggregate**
88:20

**agree**
50:12 52:14,
18 69:5
71:10,16 77:7
87:21 89:8
90:20 94:14
100:1,24
118:24 119:9
145:7

**agreed**
160:16

Ruby Green
April 16, 2021

3

ahead
77:19 91:1,6
94:7,19 95:14
97:6 129:2
131:2,16
132:21 143:5,
8 161:22
164:10 166:11
167:1 169:15
170:4 173:5,
21 181:8

aimed
101:8

alarmed
84:21

alive
160:15

alleged
161:19

allegedly
76:7 103:9
157:24 173:2

alleging
75:18

Allen
75:5,6,10
76:1

alliance
124:21

allocation
111:23

allowed
146:6

allowing
25:12

amount
21:13 22:11,
22 24:15,18
38:9 61:2,10

amounts
25:15

and/or
87:25

anecdote
161:19

angry
122:3,24

anonymous
170:14,21
171:8,9

anonymously
58:18,20
171:15,25

answering
53:10,13

answers
6:10

anymore
44:1 81:4
138:18 139:16

apologize
17:8 92:7,9

apparent
44:13 162:4

apparently
167:10

appearance
148:2

appeared
105:1

application
12:25 28:5

applied
8:16 14:1
28:8

approved
29:10

approximately
13:15 55:15

April
12:24

argument
132:15

arise
27:4 70:6

arrested
146:16 149:18
152:5

arriving
105:8

article
73:2 78:12
89:15 98:4,8,
10,18,19 99:1
121:13 134:4

articles
76:22 98:2
124:6

asks
88:11

aspect
45:6

assertion
48:4

assistant
47:11 54:8
62:5 63:7
149:14

assisting
112:5

Association
116:7 133:8,
14 136:16,19
137:14 138:1,
4,6

assume
7:2 29:22
31:13 36:11

assumed
81:18,21,24
82:9 105:24
108:15

attacking
101:11

attend
8:20 11:3

attention
178:5

attest
57:20

attorney
4:23 7:12
11:10,24
13:14 20:4,8
26:25 32:10,
12,17 35:17,
18 37:18
39:21 40:10
41:6 44:17,18
54:25 56:23,
24 57:3,13,18
58:25 70:13
109:23 128:1
133:22 134:20
135:10 136:7
137:19
146:17,23
148:16,23,25
149:20 150:3,
9,12,22 151:2
152:7,9,15
153:15,19

attorney's
135:18

Ruby Green
April 16, 2021

4

**attorneys**
19:22 32:12
36:10 41:21
42:3,8 43:5,
7,16 44:25
46:2 86:10,
12,14 103:20
104:10,15,16,
19 106:4,5,6
107:1,6,9,12,
14,17,24
108:2,11,13,
21,24,25
109:1,7,12,
20,23 110:4,9
111:18 112:5,
7,11,16
113:3,10,11
117:12,14
118:5,7,8
119:4 127:23
130:18 135:24
139:3,4,6
141:9 142:12
143:15,16
144:18 147:3,
13 149:25
151:10,18,25
152:21 154:6,
15 164:4,15
175:21

**August**
92:25 115:11
157:1

**authority**
26:4

**automatically**
59:12

**autonomy**
32:15

**average**
22:10,15,22
24:13,18

**aware**
14:5 18:12
34:20 45:22
55:10,18
59:17,20
62:3,6 63:6,
8,22 64:25
127:18 137:7

---

**B**

---

**baby**
45:4

**back**
18:5 25:20
29:7 30:21
53:6 68:19
69:14,16,17
90:11 91:10,
18,19 92:4,
10,14,16,24
106:21 107:7,
14,18 108:22
117:18,21
121:10 123:12
136:3 149:17
152:4 169:5

**background**
7:18 14:13
15:3

**backs**
172:12

**backtracked**
85:22,24

**bad**
69:18 147:4
174:21,23,24

**balance**
55:4

**ballot**
154:18,22
155:1

**bar**
7:14 11:22
12:18,22,23,
24

**based**
8:16 35:23
42:13 61:8
82:3 86:3
87:24 89:8,
14,15,20
90:10 94:2,15
95:9,25
115:20,23
116:23 118:14
125:8,23
129:4,6,11
139:8 140:8,
12 144:24
161:25 166:15
170:9 175:2
180:25

**bases**
5:22

**bashing**
44:23

**basically**
11:15 28:13
41:17 44:19
55:7 65:5
66:5 67:12
77:20,23
78:22 79:24
96:7 107:21
108:12 110:6
114:19

**basing**
139:8

**basis**
88:12 98:11,
19,22 103:22
122:20 138:15
140:10,14,16
154:25
162:11,13
182:1,5

**battery's**
116:2

**Beach**
14:23 127:11

**bear**
87:14 88:6
140:20

**bearing**
180:15,18

**Beat**
78:13 121:14

**begin**
31:16 32:2
123:24

**beginning**
6:14 18:10
64:5 87:8

**behalf**
80:21,24
102:1 115:16
119:18,20,21
126:25 134:11

Ruby Green
April 16, 2021

5

137:25 146:6
158:12 176:20
179:5

**behalves**
135:18

**belief**
71:21 98:17,
20 140:6

**beliefs**
128:25

**believed**
59:5 144:12
175:16 183:6

**believes**
125:11 129:16

**benefit**
7:23 34:11
40:5 112:1,3

**benefits**
33:21 34:19
35:9

**big**
38:14 41:12
87:16 109:12
117:3

**bigger**
83:8 89:3

**bit**
7:18 14:12
15:1 22:3
23:25 31:25
32:14 33:9,16
39:20 50:4
90:17,18
112:8 113:24
133:5 155:23

**black**
97:17 99:22
101:6,10,12,

20,23 102:20
103:9 114:15,
17 117:1,11
118:6 124:18,
19 125:25
126:11 127:7
128:6,15,25
129:17
159:13,17,19
160:7,21

**Blackman**
147:20,21
148:18 149:10
150:2,18
151:4

**Blank**
146:9

**blanket**
25:12,23 26:4

**Bless**
85:23

**blog**
44:16,19,24,
25 45:9,13,25
58:18,20,22
144:1 146:8

**blogs**
74:20 169:20
170:14

**Board**
85:12 86:6

**Bob**
136:25 137:7

**body**
147:9

**Boettcher**
35:5

**bone**
19:5

**bonus**
35:14

**bonuses**
35:13,23

**boss**
60:12 117:3
172:11,15

**bothered**
116:11

**boy**
177:3

**break**
7:5 11:1
155:25 184:13

**breaking**
155:15

**breaks**
7:9

**Brevard**
28:10 30:17

**Brian**
146:9

**briefly**
5:21 19:1
124:19

**bring**
147:24,25
181:3

**broke**
64:11

**Brothers**
88:21 89:10,
21,25 90:17
100:2 137:18
140:19 153:7
178:10 180:6,
8,21 181:11
183:5

**brought**
148:13

**Broward**
4:20 13:20
14:1 18:2
22:20 28:4,7,
12,21 57:3,18
61:18 72:25
78:13 85:23
93:17 97:16
115:1 116:6
121:14 128:13
136:12,14
160:15

**Bruce**
146:12

**brunt**
53:2

**building**
139:11

**buzz-buzz**
68:4

**buzzes**
67:19

**buzzing**
68:21

---

C

---

**call**
8:1 31:5,11
32:23,24 50:7
53:10 73:15
74:23,24
77:22 78:1
79:9,12 80:21
104:17 107:25
109:16 114:4
159:9,12

Ruby Green
April 16, 2021

6

**called**
19:6 24:8
27:20 31:8
42:7 50:19
51:2 54:10,12
75:23 106:10,
11 108:8
149:7 150:3

**calls**
52:25 53:10,
14 74:21
79:10 80:24
94:6 161:21
168:13 169:10
170:3

**campaign**
20:21,22
65:13,16
72:12,15 74:6
76:24 77:5,11
78:23 79:7
80:23 81:18
84:1,2 85:1
88:1 89:8,19
91:11,14
100:3,5,8,11,
21,22 130:22
145:6 172:17
179:7,20
181:2 182:2,
4,5,9

**campaigning**
21:4 65:6,8,
14 67:14
71:23

**campaigns**
69:23

**candidate**
72:24

**candidates**

95:23 100:15
101:5 103:15

**capacities**
115:18

**capacity**
4:18 104:22
105:4,21
115:21 119:23

**car**
31:11 138:18

**care**
101:21

**career**
139:11

**cares**
130:17,19

**Carlos**
133:23
134:18,20

**Caroline**
146:1

**Carrie**
55:21,22
56:15,16

**case**
5:18 14:20
42:17,20
48:14 54:22
55:12 57:7,
14,17 98:18
111:15,16
112:14 122:15
146:3,18
147:12,22,23
148:19,20,24
149:5,11,12,
20 150:9,10,
23 151:2,6,12
152:1,7,12,16

153:2,13,21
155:12 156:5,
9

**cases**
52:21 53:7,8,
25 54:4,8,14
55:1,2,6,8,
20,22 56:3,8,
10,18 57:17
60:21,22
61:3,11
109:15
112:13,16
143:15 145:3
148:13,25
150:4,8
151:19,23
153:11 154:19
155:2,4,9
157:16 164:7
168:11 169:9
173:18,25
174:9

**catch**
155:25

**category**
101:18,23

**Catherine**
30:11 134:13,
18,19

**Cathy**
30:9,11 31:5
47:14 49:8,22

**caused**
91:12 95:2,3
96:21 97:24

**cautioning**
83:11

**celebrity**
46:22

**cell**
50:19 51:3

**center**
19:5

**cetera**
35:9 158:15

**chain**
47:2,6,9
48:19 49:3,13

**chair**
136:19 146:24
147:1,2
148:18,21
149:12 150:14
151:5,11
152:10 153:20

**chance**
159:23 160:2,
3

**change**
97:16 133:20
144:12,14
172:24 182:12

**changed**
49:8 62:22
183:16

**Channel**
14:6

**characterize**
88:23 92:18

**charge**
70:13 133:13

**charger**
117:24 141:23

**checked**
44:8 155:21

**chief**
32:23 34:24,
25 35:2,6

Ruby Green
April 16, 2021

7

36:9 39:5,6,
10,11,13,15
43:21 44:3
48:22,24
49:10,11 50:3
51:7,15,25
52:3 71:11
78:1 81:4
103:19 104:9,
22 105:4,8,
14,19 106:19
109:10,18,22
110:13,14,16
111:4,5
112:6,21
142:7

**chief's**
105:21

**chiefs**
39:8 49:7,12
53:7 77:20,24
82:15 105:17
107:2,3
109:14,24
111:12

**child**
14:18,19
16:14,20

**children**
15:2 16:13,
14,18

**choice**
26:22

**choose**
84:6 113:9

**Christmas**
35:13,23
38:14 41:12

**chronology**
66:22

**circles**
152:13

**circuit**
13:7 54:22
55:23 56:8
57:24

**circuits**
54:24

**circumstances**
7:19,23 14:25
15:7 144:25

**city**
14:22

**civil**
5:16 14:15

**claim**
88:12

**clarification**
15:14 44:5
62:13 82:21
129:25 134:16
155:18

**clear**
6:3,7,22
18:23 27:8
30:16 50:16
80:1 93:8,10,
12 96:19,20
103:7 113:24
114:6 115:12
129:14 139:17
148:6 171:3

**click**
88:17

**client**
146:2

**clients**
20:24 46:19
53:12 71:11,

15,18 113:1
176:20,25
178:8

**clinical**
12:20

**clock**
173:19

**close**
55:24

**closed**
48:3,13
121:15 146:5

**closer**
28:8

**Coastal**
11:4 12:14

**cocaine**
158:20

**coding**
19:11

**coin**
6:25

**college**
8:6,15 9:19

**color**
99:9,14,24
158:25 159:5

**colored**
99:25 102:1

**colors**
99:10

**comfortable**
118:14 146:19
149:3,21
150:15 151:1
152:8,17
153:5,16
154:1

**command**
47:2,6,9
48:20 49:3

**commenced**
4:1

**committee**
137:8,10,11

**common**
144:1

**commotion**
69:17

**communication**
31:2

**community**
61:18 73:19,
23 84:15
90:16 95:12,
17 105:16
130:17 146:12
168:7 174:5

**companies**
19:8

**company**
12:21 15:12,
15 21:18
34:16

**comparison**
167:9

**compensation**
33:18 34:20
40:6

**complain**
48:16

**complaining**
122:11 123:13

**complaint**
86:24 87:16

**complaints**

Ruby Green
April 16, 2021

8

46:4,10 63:17

**composite**
65:22 87:8,9,
10,11

**computer**
116:18

**computers**
116:17

**concern**
70:2,21,24
71:1,2,11,15
93:16 143:2,4
144:17,18,19
158:8 172:21

**concerned**
182:23

**concerns**
67:6 169:19,
20

**conclusion**
60:14

**confidential**
19:9

**conflating**
181:2

**confused**
150:18 167:19

**confusing**
36:18 83:23

**conjunction**
111:14

**consensus**
48:8

**consequence**
113:14,15

**considered**
37:10

**consisted**
154:22

**constant**
25:14 43:24

**constitutional**
145:13,16,19

**construction**
11:17 12:19

**consulted**
48:5

**contemplate**
175:11,12

**contemporaneous**
177:16

**contention**
140:2

**context**
43:2

**continue**
33:3 41:16
91:7 107:6
108:21,24
113:10

**continued**
184:15

**continuing**
108:13

**contribute**
33:25

**contributed**
76:24 77:10

**contributing**
77:5

**conversation**
45:18 93:9

**conversations**
26:15 27:1,14

**convey**
76:8

**conveyed**
124:14

**Coral**
8:22 9:12

**correct**
6:11 7:12
9:21 10:14
11:5 13:20,23
15:22 17:2,18
20:9 21:5
22:8 24:16
28:23 30:11,
13 31:25
32:15,19 35:1
40:12,15,18
47:1 48:11
49:16,24
53:20,23
54:1,15 55:12
56:20 57:1
60:5,6,16
61:25 63:19
64:19,20 66:7
69:7 71:12,13
72:9 75:16
76:5 85:4,19
89:21 93:1,4
97:8 100:3,22
101:1,3,6
103:10 104:6
108:4 115:14
122:21
124:15,16
131:1 135:20
137:14,21
139:19 140:6,
10 145:14
147:24 148:5
149:25 154:9,

23 163:9
164:1,8
166:17 167:11
171:9 179:12
180:6

**correctly**
17:16 22:6
29:19 36:3
51:20 81:11
105:5

**Cory**
4:16 26:19
87:1 180:25

**cost**
34:12

**counsel**
91:24 94:22
147:22
167:14,15

**counselor**
8:14

**count**
112:14

**counties**
28:12

**county**
4:20 13:14,20
14:1 18:2
22:21 28:10
32:7 36:9
48:22,24
51:15,24 52:4
57:3,18 61:18
93:17 97:16
112:6 115:1
133:23,24
135:11,12
136:1 137:20
160:15

Ruby Green
April 16, 2021

9

couple
  11:18 21:22
  29:11 50:15,
  18,25 56:14
  57:8 83:3
  111:6 113:20
  119:16 127:12
  139:15
coupled
  137:4 154:5,
  13
court
  9:4 36:10
  45:5 48:22,24
  51:15,24 52:4
  53:12 58:24
  60:18 63:2
  104:18 105:2
  107:1 109:24
  112:6 139:13,
  14 145:5
  156:1,15,17,
  19 157:5,11,
  13,17,18,25
  158:6,10,20
  163:21 168:23
  169:4
courteous
  178:7,10
  179:3,10,13,
  18 180:1,3,4,
  5,10,14,19,21
  181:11,18
  182:1
courthouse
  43:24 44:14,
  24 45:23
  74:19 76:16
  146:6,12
courtroom
  32:18 103:19

104:9,25
105:6 106:3
107:15 108:1
109:2 111:9
112:9 117:12
152:20 168:5
courtrooms
  32:11 105:14,
  15,18,20
  106:10,14,17
  108:6,8
  109:1,12,15,
  19 110:12
cover
  5:21
COVID
  120:24 121:2,
  11,15,20
  125:8 126:12
  127:8
crazy
  173:14
created
  156:17
crime
  146:16 148:7
  149:19 152:5
criminal
  5:16,18 56:23
  61:3,11 90:18
  93:20 95:19
  125:1,2
  173:16
criminology
  10:10,11
criticism
  157:21 158:1
  159:24 160:6,
  12 163:8,10
  168:16 169:13

173:7
criticize
  174:17
criticized
  173:11
criticizing
  163:14 173:1
cross-train
  38:3
Cruz
  57:7,14,17
Cuddihy
  29:22 42:22
  44:3 49:24
  69:7 143:25
culture
  44:9 47:22
curiosity
  90:11
current
  15:1 170:15
  171:10,18,22
  184:2
cursor
  83:6
cursory
  26:11
custody
  14:18,19
  149:7
customer
  20:12
cut
  17:6 22:6
  51:11
cutting
  183:3

cycle
  63:23
Cynthia
  17:23

_____

D

Dadowski
  30:13 39:13
  49:20 69:7
  143:25
daily
  140:10,14,16
date
  7:16 88:22
dated
  65:24
daughter
  16:25 17:1
day
  13:10 21:1,25
  23:18,21
  24:1,2 29:7
  31:21 52:10
  128:20 162:20
  168:15 169:12
day's
  173:3
days
  22:1 24:5,25
  138:21,22
daytime
  166:3
de
  29:2,20 39:14
  79:20 81:16
dead
  116:2
deal

Ruby Green
April 16, 2021                                                                                      10

dealing
  47:5 178:8
December
  11:8 12:13
decide
  108:20
decided
  48:1 60:1
  66:12 77:15
  95:25 108:19
  109:11,18
deciding
  103:23
decision
  10:14 47:15
  48:6 59:17
  64:22,23
  87:23 89:20
  94:3 95:8
  96:5,25
  106:23
  107:22,23
  125:7 126:10
  174:11 180:18
decision-making
  124:12
decisions
  59:15
decrease
  184:8
deducting
  34:12,13
defendant
  14:17
defendants
  4:17,22 149:1
defender
  4:19 13:23

21:5,8 47:4,
12 54:21
55:11,19
56:7,13
57:12,24
58:14 59:19
60:10 62:4,5,
8 63:7,10
66:17,18
69:13,15
70:4,12,22
71:16 72:24
73:18 74:13
76:13 82:15,
16 84:7
119:16 133:3,
8,23 134:21
135:10 136:8,
14,16 137:19,
22,25 138:4,6
140:9,13
144:9 145:8,
12,17 149:14
158:13 166:24
167:3,5,24
168:4,8
169:18 173:1
174:18 176:15
177:5
Defender's
  11:13,19,23
  12:15 13:4,
  12,14,20
  15:5,11 18:2,
  13 20:23
  22:2,19,21
  23:2,5 24:24
  26:6,9 28:4,7
  31:19 33:25
  34:21 44:20
  47:2 65:2
  71:11,12

76:21 88:2
93:18 95:21
97:17 111:7
112:25 114:22
115:2,13,16,
19 119:19
127:6,12,14
128:14 130:5,
7,25 131:10
132:6,18
133:10,14,18
136:19 137:13
140:25 143:20
158:12
160:19,22
161:1 170:16,
17 171:11,12,
14,23 174:6,8
175:12,15
178:15 183:8
defenders
  54:9,19 55:10
  60:1 93:19
  143:11
defending
  151:11
degree
  10:8 37:21
delay
  33:9
deliverer
  48:7
demoted
  113:17,18,19,
  25 114:4,7
  146:1
demotion
  113:23
depend
  24:22

depended
  24:22
depending
  21:13 22:4
depends
  23:10,11
  24:7,24
deposition
  4:21 5:1,6,8
  6:13 26:18
  27:2,4,21,23
  28:2 65:23
  68:17 72:23
  86:24 90:21,
  23
depositions
  4:24 5:3,10
  27:6 163:22
depth
  130:4
Desantis
  35:6
describe
  15:25 19:2,14
  38:9
deserve
  176:5
desk
  50:15,16 51:8
detail
  5:15
determination
  107:5
determine
  43:3 96:21
  145:1
device
  67:18,22,23,
  24

Ruby Green
April 16, 2021

11

devices
141:3

Diamond
56:15

Diane
29:11,22
42:22 44:3
47:14 49:10,
23,24 69:7
104:12,20
106:7,13
110:5 114:5
138:25 142:18
143:25

Dianne's
108:22

differ
21:13

differed
21:15

difference
172:24 183:21

differences
70:6 163:15
164:3

differently
159:7,8 176:8

difficult
7:19

diminish
104:22 105:3,
7

diminished
105:21

direct
4:11 31:2
46:20 49:4
178:5

directed
99:18

direction
118:3

directly
47:4 83:19
85:6 121:25
122:1 133:10

disability
16:7

disappointing
61:20

discipline
62:6 63:9

discussed
26:13 93:23
94:13 95:3,5
97:5,8 138:19

discussion
107:8

dismantle
156:19 157:24
158:7

disrespect
40:11

distinction
119:10,22
120:6,9,10

distracting
69:25

disturb
68:8,12

division
32:10,12
40:11 41:8,25

divisions
39:9

doc

15:12 18:23
22:13 23:10
24:6

document
15:15 18:23
19:4,7 20:7
21:12 23:5,20
24:15 51:17
52:5 177:4,8

documents
18:24 19:8,12
27:18,22

dollars
34:9,10

domestic
39:16

donated
77:25

donations
19:6

doors
48:3,13

Double
10:10

drawing
60:14

drew
167:9

drive
116:18

drop
183:13

drug
158:20 159:3

duly
4:9

duties
59:16,18 60:9

145:13,16,19

Duval
13:14

DVR
98:25

___

E

earlier
66:18 69:2
138:19

early
138:17 166:5

Editorial
85:12 86:5,6

effect
133:20 177:17

efficient
109:3

effort
26:15 28:8
62:6 63:8,18

efforts
6:14

eighteen
5:8,12 16:10
17:20 40:20

elected
54:18 55:9,10
59:18 60:10
70:10,21
158:13

election
63:23 71:3

elections
62:5 63:8

eligible
35:8 36:15

Ruby Green
April 16, 2021

12

email
18:17,18
25:11,12,21
65:7,11,13,18
66:9,13 67:7,
9 68:23 69:3,
10 76:22
79:15 114:18,
23 115:20,24
116:8,13,24
117:2,4,5,6
118:10,14,16
119:20 120:21
121:6 122:7,9
124:1 126:22
134:1,2,5,6,
12,17,24
135:9,15,16
136:2

emailed
79:6 121:25
122:1

emails
52:24 53:10,
13 65:23
67:25 76:19,
20 87:7,8,11
116:14

emergencies
47:11 139:1

emergency
33:2

emissaries
76:8 84:4

emissary
75:18

employed
65:2

employee
170:15

171:10,13,21,
22

employees
38:21 70:1,22
160:22 171:18
178:6,9,11,
19,21 179:4,
10,17 182:4
184:3

employer
171:14

employment
33:19 87:23
132:3 181:1

encompassed
143:19

end
9:7 18:10
24:3 90:21
141:16 175:1,
2,23

ended
104:11

ending
139:11

endorse
78:8,15,16

endorsement
76:19,21
78:5,7

ends
15:10

engaged
95:10 159:10

entails
19:2

enter
64:9,13,17,22

entered
64:10,18

entering
64:7 78:5

entire
11:15 18:1,3
38:7 42:7,25
66:5,7 71:22,
23 76:20 78:7
91:8 92:19
119:11 120:6,
13,14 125:7
126:10 135:15
146:11 163:11

entirety
95:25 114:10
115:9 118:15
124:1 137:16
168:3 170:13

entitled
72:24 177:4

environment
45:10

equity
124:25

espoused
129:17

essentially
12:16 21:3
26:4

EST
4:1 92:12

establish
124:25

event
91:15 118:21

events
73:23 74:1

eventually
12:8 47:12

everybody's
121:25 125:21
128:10 147:16

everyday
165:13

exact
7:16 65:18
85:24 86:19
131:14

EXAMINATION
4:11

examined
4:9

examples
173:7,9,12
175:8 180:11
182:9

Exby
43:22

Excellent
18:21

exception
18:4

executed
51:9,18

executive
49:7,10,11,12
82:15 107:2,3

exhibit
65:22 66:2
72:22 73:4
86:23,25 87:5
88:5,8,15,18,
25 92:15
93:11 96:11
177:2,12

Ruby Green
April 16, 2021

13

exhibits
96:12

exist
98:10  149:23
157:11

existence
93:18  157:6

existing
160:15

exists
161:8

expected
178:7

experience
76:15  147:25
148:4,5
150:13

experienced
86:10,14

experiences
45:24  46:1
51:17

expert
146:2

explain
174:3  181:24

explained
150:1

explaining
150:5,11

explanation
110:24  120:18

expressed
183:6

extent
141:6

extern
11:14

extra
18:14  20:15
23:1  36:21

―――――――――

F

face
97:17  99:22
101:6,20,24
116:7  146:17

facing
148:7,24
149:1,19
152:6  153:14

fact
53:2  60:19
61:9  91:10
95:1  98:22
123:14,23
124:4  125:9
159:22  160:1
163:5  166:15
168:4

facts
154:5

fair
7:3  19:20
20:6  35:24
55:16  56:19
72:20  81:14
82:7,11  91:21
95:4  96:5,6,
25  97:5
137:12  166:6,
9

false
180:25

families
178:8

family

8:4  15:2

fashion
51:19

fast
147:5

favored
100:20

fear
70:19  116:24

fearful
117:7,10
118:5

fears
116:9

February
12:23

feel
118:14  146:19
149:3,21
150:14  151:1
152:8,17
153:4,16
154:1  157:13
181:21  182:20

feeling
126:2

feelings
76:8  119:7

fell
101:17,18
145:14

fellow
178:9,11,19,
20  179:4,10,
17  182:4

fellowship
11:14

felonies

39:7

felony
33:14  35:15,
16,17,18
37:16,21
38:1,2,24
39:6,13,21,23
40:11,15,21,
24,25  41:2,5,
6,8,21,25
42:3  104:15
111:19  146:18
147:11,22,23
148:4,8,15,
19,20,24
149:2,5,10,
12,20  150:1,
10,13,23,25
151:2,5,6,12,
19,25  152:1,
7,10,11,16,22
153:2,11,16,
19,21  154:3,
5,6,16

felt
44:22  47:19
59:21  82:2,3
101:17,25
102:12  122:16
134:24

female
30:2,6  56:14

females
56:14

Fernandez
134:14,18,19

fight
133:19,25
134:22  135:2
137:1  140:23

Ruby Green
April 16, 2021

14

fighting
69:20

figure
79:8 108:3
165:16

filed
4:21 64:24
66:17

filing
53:11

fill
49:8 108:16

final
27:24

financial
25:25 40:5

find
42:2 70:2
75:7 145:18
155:13 156:5

fine
7:17 10:2
91:23

finish
15:10 80:11

Finkelstein
4:17 13:22,25
25:11 29:25
30:25 38:10
41:10 42:1,4
50:2,7 51:16
52:15 53:25
54:3,7,13
57:25 59:22
60:4,8,25
61:8 62:7
63:9,22 66:5
69:6 76:4,17
77:18 83:17

84:6 89:18
90:9 94:2,15
95:2,3 96:3,
13,21 97:25
98:17 103:23
107:16 110:9,
23 125:13
129:16
131:13,21
132:3 135:9
137:18 138:8
139:9 143:24
145:8 149:23
153:9 156:17
157:21
159:23,25
160:6 161:18
162:21 163:25
164:21 166:7,
23 167:9
168:16
169:14,25
170:18 173:2,
20 174:17
176:7

Finkelstein's
48:19 59:16
67:6 78:4
87:23 125:7
126:10 157:4,
10 162:4,8
175:10

fire
74:10 84:16
85:7 95:25

fired
72:24 73:9
83:7,12 84:7,
11 96:14
115:23 128:22
129:11

firm
11:17 12:19

first-chair
147:22

first-degree
149:2,10
151:5,11
152:10 153:19

firsthand
48:18,21
51:17 96:2
139:7

fit
101:16,19,22
145:1

flip
6:25 94:12

floating
118:12

Florida
7:12 9:14,18,
21,24 10:3
11:4 12:14
14:5 20:2,3
55:19 56:13,
15 136:22

Floyd
114:13 120:2

focus
45:6 55:9
125:2

force
121:19 126:21

forced
82:8

foremost
103:21

forged
105:16

forgot
28:13

form
94:23 97:6
131:15 132:20
166:10 167:1,
12 169:15
170:4 173:4,
21 181:4,8,
12,15

forms
88:12

forum
74:10 85:22,
23

forums
100:16

forward
14:13 29:10
71:21 87:17
89:3 92:1
107:23

found
14:2 42:9
45:8 91:11
175:2

foundation
19:5 129:2

fourth
13:8 54:21

Frank
26:19 29:2,
10,20 39:14
47:13,14
62:18 79:3,
19,20 81:16
86:25 87:3,6,
12 90:25
92:5,7,11
94:4,6,16,19

97:6 98:13
129:2 131:2,
15 132:20
139:21 141:19
143:1,6,8
161:21 162:17
164:9 165:1
166:10 167:1,
12 168:18,20
169:15 170:3
171:18 173:4,
21 177:16,21
180:24 181:7

**Friday**
23:24 24:4,5

**friend**
59:9

**friendly**
178:7

**friends**
42:25 77:3
119:4 141:13
161:12

**frozen**
168:18,22,24
169:1

**fruitless**
183:9

**frustrated**
58:4,6,8

**frustration**
57:25 58:2

**full**
4:14 12:7,9
71:19 173:3

**fun**
163:6 164:20
165:12

**functioning**

157:19

**functions**
79:18 80:20

**fund**
77:3

**funded**
130:8 133:4

**funding**
93:17 112:8
130:4,9,13,
19,24 131:22
132:5,17
133:4,7,14
134:1,23
135:12,14,19
136:4,5
137:13 143:14
184:5,6

---

### G

---

**gain**
27:19

**garage**
31:8 139:12,
18,21

**garbled**
17:11 64:1
82:24 94:25

**garbly**
62:19

**gather**
27:10 74:5

**gave**
18:19 21:11
31:19 52:5
77:22 78:1,3
81:11 95:14
108:12,19
115:11

116:10,24
134:12 144:21
157:1

**general**
25:13 84:24
99:21 100:13
101:9,14
102:4 133:11
139:3,4,6
141:11 142:3
154:11 165:9
177:8

**generalization**
132:9

**generally**
34:7 90:13

**genuinely**
128:12

**George**
114:13 120:2
146:8 155:6

**get all**
157:16

**get along**
10:2

**ghost**
176:23

**give**
4:4,13 6:11
7:22 15:3
18:15 19:12,
13 22:10
31:6,18,23
34:4 36:24
95:13 108:14
113:14 114:8
151:10,13
173:13

**giving**

16:2 19:15
51:22 75:18
77:4 79:5
123:9 180:11
182:9

**glitches**
6:15

**golf**
162:4,8,14,
16,17,19,22
163:2,18,25
164:8,17,23
165:7,14
166:8,12,16,
21,25 167:10,
25 168:14
169:12 173:2

**golfing**
165:12,18
166:1

**good**
4:13 8:10,11
37:5 175:21,
23

**goodness**
16:8

**Google**
127:13

**Gordon**
49:9,15 64:9,
11,16 66:17
67:1,12 69:6,
19 70:19
73:19 74:9,
12,25 75:1,
13,14,18
76:18,19,23
77:10,21,24,
25 78:2,18
79:17 80:3,5,

14 81:13
82:10 83:19
84:6,11,22
85:6,10 100:7
104:12 106:13
121:7,25
142:18 143:25
154:23 155:4,
11 156:4
174:17,19,20
175:6,7

**Gordon's**
72:15 77:3
78:2 80:23
81:18

**gosh**
9:25 59:3
104:25 135:25
153:23 158:3
164:17 167:22

**grades**
8:10,11 12:24

**graduate**
9:11 10:3,8
11:7

**graduated**
10:21,23 11:5
12:14,17

**graduation**
11:9

**great**
4:16 6:9 7:5,
11 25:24 35:4
36:19 130:13
183:23

**Green**
4:8,15,16
62:14 66:16
83:12 84:5
91:21,25

112:24 117:17
141:21 143:5
155:15 176:11

**Greenbald**
146:9

**grew**
7:19 8:4

**ground**
71:20,22
72:4,6

**group**
46:21 68:24
125:5

**growing**
7:23 8:1
9:15,17 14:5

**guess**
12:25 19:16
20:1 26:3
29:10,17 33:4
35:19 50:7,14
53:13 67:13,
14 68:1 69:13
71:6 84:15
100:10 102:20
104:19,23
105:1 157:14
176:25 178:23

**guidance**
8:14

**guts**
172:10

**guys**
183:14

---

**H**

---

**half**
106:2,4

**hand**
4:3 127:16
143:17

**handbook**
178:6

**handle**
57:4

**handled**
55:13

**handling**
55:12,20,22
56:8

**hang**
62:14 79:25
80:9

**happen**
27:6 50:17
63:19 71:1
78:16 98:4
108:14 118:23
154:8 157:17
159:2

**happened**
24:11 48:3
63:13 92:22
107:19 108:6,
7 110:19,20
113:22 114:14
123:23 142:7
149:15 153:8,
24 154:7

**happening**
92:21 110:2
169:19 173:15
174:4

**hard**
62:16 68:6
160:8 164:22
165:6 166:23,
24

**harder**
62:16 117:19

**harm**
71:14,17

**Hartrot**
56:16

**Haughwout**
55:21,22

**head**
6:2 53:3
75:21 109:18
127:10,19
146:10

**heads**
110:18

**health**
34:1,7,15
39:15,16
156:17,19
157:5,10,13,
17,18,25
158:6,10

**hear**
6:16,18,20
7:2 9:7 17:7
62:17,22,23
67:19 68:6
83:16,19
86:13 102:22
117:19 118:4
155:19,22,23
168:19 183:2

**heard**
85:14 89:18
130:7,12
152:14

**hearings**
28:1

**heart-wrenching**

height
  121:20 127:8

held
  6:10 60:3,7,
  24 61:7
  159:12

helpful
  178:7

hesitant
  100:19 102:24

hey
  59:1 79:16
  80:22 107:16
  174:9 182:20,
  23 183:12

high
  8:10,20,22,24
  9:12 48:20
  97:17 99:6,
  16,22 101:24
  159:1

highlight
  69:21 87:24

hire
  28:18

hired
  11:20 12:4,21
  33:17

Hmm-hmm
  5:23

hold
  8:23 9:23
  68:5 117:17
  180:24

holiday
  38:14

home
  8:5 13:16

15:17 17:14,
17 28:6,8
30:21 52:21,
24,25 60:22
162:19,22
163:1,5,17,19
164:17,20
168:14 169:12

homicide
  54:22 55:2
  56:3 57:7

homicides
  57:8

honest
  19:24 27:23
  34:3 46:16
  67:10 81:20
  100:5

honestly
  169:24

hood
  8:2

horrible
  130:5 132:6,
  19

host
  160:13

hour
  138:9,14

hours
  21:1,13,20,
  22,25 22:3,
  11,19,22
  23:17,19
  24:14 25:6
  65:14,16
  135:4 139:15

house
  15:22

household
  8:3 15:9 16:4

housing
  16:6

Howard
  4:17 13:22
  14:3,4 18:15
  29:12,25
  38:10,12
  41:10 42:1,21
  44:20 46:16,
  22 47:16
  48:5,18 49:6
  50:2 53:8,19
  60:25 61:15,
  21 65:11
  66:24 67:6
  69:13 76:4,6,
  7,17 77:4
  78:20 83:17,
  18 84:5 85:8
  89:14 106:10,
  11,23,24,25
  107:15,20,22,
  23 108:8
  110:6 114:1,
  5,18,24
  115:15 121:13
  122:1 124:5
  125:6 128:18
  129:5,12,16
  131:13 132:9,
  25 134:6,7,
  13,17 135:16
  137:2 141:13
  142:18 143:24
  145:7 156:16
  157:2 172:8,
  15,16 173:1,
  19 175:3,5,9
  176:14

Howard's
  52:1

huh-uh
  6:2

_____

            I

idea
  22:10 63:14
  111:25 126:13
  127:22,24
  131:21 137:12

identifies
  126:8

identify
  88:11

imagine
  35:22 93:21

immediately
  10:16 28:18

impeach
  62:7 63:9

implication
  102:19

importance
  105:7

important
  70:1

improve
  25:25

include
  16:12

included
  33:23 129:6

including
  22:17 70:9
  93:17,22
  128:3

Ruby Green
April 16, 2021                                                                18

inclusive
115:10

increase
35:8 36:4
40:1 136:5

individual
4:18 27:12
75:11,12
99:18 115:18,
21 119:23

individually
67:13

individuals
16:22 19:22
28:25 29:4
119:12 142:2,
16 160:25

information
19:9 26:16
27:2,5,10,11,
19,20 42:19,
20 56:1 85:3
96:3 104:5
123:17
144:21,23
156:13 162:5

informed
66:16

initial
78:12 122:9

inside
85:3 145:4
182:15

insight
157:3,9

insinuating
173:19

instances
5:14

insurance
33:22,24
34:1,8,15

intend
173:17,18,24

intended
63:22 87:6
181:12,15

intending
173:25

intends
66:16

intent
66:19

intention
67:9 82:10

intentions
158:14

interact
51:16

interaction
38:10,11 41:9
42:1 48:19
50:2 51:7

interest
142:23,25
143:1,5

interim
37:20

intern
11:14

internet
155:25

interrogatories
88:6,9,19
145:25

interrogatory
88:7 89:9

interrupt
33:8

interrupted
15:13 44:4
62:12 82:20
129:24 134:15
155:17 184:13

interview
28:25 29:8,22
31:1,17
84:12,23

interviewed
29:2

introduce
43:12

introduced
87:7

involved
46:5,10 70:3
78:22 128:10
137:3

issue
42:21,23
46:15,17 47:7
53:1,5 62:19
93:16 98:23
109:9,12,22
111:23 115:3
119:14,18,24
120:11 126:3
127:16 130:9,
10,11 143:12,
13 150:10
182:23,24
184:10

issues
26:17 27:3
47:5 69:14,16
70:5 86:9
93:16,19

94:13,14
99:7,10
109:21 121:16
125:25 143:2,
18,21 144:16,
17 158:5,6,9
159:24 172:20
181:2 183:15
184:11

items
20:13

_____

J

JAAB
44:16 45:14,
19

jaablaw.com
45:14

jabs
179:20

Jackson
17:23 75:5,6,
10 76:1 84:4

Jacksonville
11:4 13:5
28:6 55:11

jail
164:7 168:12,
13 169:10

jails
20:24

Janicki
145:25

January
177:19

Jason
146:9

Jennifer

43:22 147:20,
21 148:18
149:10 150:2,
18 151:4

**Jessica**
39:2

**Jimmy**
12:2

**job**
11:10,20
15:10 18:8
19:19 21:12
22:13 23:1,10
25:25 29:1
31:12,24
36:20 37:5
45:5 47:3,5
59:16 99:25
112:19,23
136:21 140:3
175:15

**jobs**
15:6,17 17:25
18:1,14 19:25
20:1,2,5,16,
20 21:7 23:21
24:1,19 25:14
101:22

**judge**
101:3 102:18,
19,22 103:8,
11,13 120:2
150:25 154:22
155:4,7,8,9
167:15 174:16

**judges**
39:9 157:20

**June**
177:19

**justice**
90:18 93:20
95:19 124:25
125:2 173:16

**juvenile**
37:25 38:2,4
111:12,14

———————

**K**

**keeping**
86:15

**kicking**
34:14

**kid**
16:10

**kidding**
176:24

**kids**
16:9,24

**kills**
68:21

**kind**
10:8 14:4
25:23 26:10
33:22 34:10
43:23 48:16
68:6 73:15
85:21,24,25
94:25 99:15
100:19 106:10
107:14 117:21
177:7,9

**kinfolk**
99:4

**knew**
13:18 14:10
27:11 43:1
45:5 47:15,24
60:12 61:14

85:21 95:15
103:13,14
123:5,7 156:9

**knowing**
149:4 160:10

**knowledge**
37:9,11 43:24
48:18,21
54:17 102:10
128:2 130:6
131:1 139:7
145:4,5
149:22 157:7
161:3 162:11,
13 170:18
174:16

**Kupon**
30:9,11

———————

**L**

**la**
29:2,20 39:14
79:20 81:17

**lack**
93:17

**ladder**
36:16 37:3,6

**laid**
50:16

**Lan**
35:6

**large**
87:18 131:9

**late**
21:19 138:17

**Laufer**
4:12,16 9:4
12:3 15:20
26:21,24

44:11 51:11
62:14,24
63:2,15 66:3
67:16 68:2
73:5 82:22
87:2,4,10,13
88:16 89:1
91:4,24 92:8,
13 94:9,18,21
97:9 98:14,16
129:13 130:1,
2 131:6,19
133:1 139:25
141:20 143:4,
22 155:20,24
156:11 162:2
164:11 165:4
166:14 167:7,
15,17 168:17,
22,24 169:4,
23 171:19,20
177:13,18,22
181:4,9
184:14

**law**
10:14,17,25
11:3,4,10,12,
17 12:19
13:17 45:14,
21 99:1 109:2
111:15 177:4

**lawsuit**
4:21 14:14
19:10

**lawyer**
26:13,14

**lawyering**
12:18

**lawyers**
38:18,21 45:4
112:1 113:1

Ruby Green
April 16, 2021

143:17 144:22
145:23 178:25
179:1 182:16
183:7

**lead**
32:5,7,18
33:4 34:24
37:19 38:24
39:1 40:10
58:2 146:23
147:3 148:16,
25 149:25
150:3,8,22
151:1 152:1,
15

**leader**
23:12

**leaders**
84:15

**leads**
147:10 151:18
152:22 153:3,
10 154:2

**leaning**
87:17 89:3
117:18

**learn**
59:10

**learned**
64:3 104:2

**learning**
66:18 111:15

**leave**
70:11 138:16
166:4

**leaves**
138:17 162:21

**leaving**
20:19

**led**
57:25 96:4
115:7

**left**
13:10 111:11
142:7 144:2
146:8

**legal**
4:14 18:24
19:14,17
61:17

**legally**
72:10

**legislative**
136:18

**legislature**
136:22

**Lenora**
4:15

**letting**
113:10

**level**
48:18 51:7
111:19

**license**
7:14 12:22
20:2,3

**licensed**
7:11

**life**
16:8 110:11
128:11 146:17
148:7,8,19,24
149:1,11,19
150:24 151:5
152:6,10
153:2,4,14,
20,24 165:14

**lifestyle**
8:19

**likes**
162:14 163:6
164:19 165:14
166:21 167:25

**limited**
24:15 89:11

**limiting**
89:9

**list**
30:17 77:22
122:7

**listed**
145:24

**listen**
48:1 151:9
171:5 176:14

**lists**
78:1 79:9,11

**literally**
25:5 27:23
59:13 113:8
161:5 179:7

**litigate**
54:8

**litigating**
53:25 54:3,14
56:18,23
61:3,11

**litigation**
14:16

**Litty**
56:15

**live**
8:3 9:14,17
14:22 16:4,5,
22,25

**Lives**
114:15,17
117:1,11
118:6 124:18,
19 126:11
127:7 128:6,
15,25 129:17

**living**
8:2 17:17

**load**
53:4

**local**
75:11,12

**located**
52:15 53:21
60:16,17
61:10

**lodged**
63:17

**log**
45:19

**logic**
184:1

**long**
12:24 13:3,9
33:3 39:17
43:18 113:17
136:3 155:8
175:14 182:4

**long-term**
21:16

**Longo**
134:18,19

**looked**
45:17 92:17
156:14

**Lorena**
111:21

Ruby Green
April 16, 2021

21

lose
176:11

losing
72:25

lot
37:24 41:25
44:7,24 52:21
53:6 55:1
58:23 59:25
69:14 100:12,
14 101:11
102:2 109:1,
10,13 115:25
116:2,3 123:3
134:24
138:23,24
141:16 161:14
178:14

lots
146:11

loud
6:1

loved
175:15

lumped
89:20

Lynch
101:3 102:18,
19,22 103:8,
11 154:22
155:4,7
174:16

——————————

M

M-I-S-H-A-L-I
39:4

Macy's
15:12 20:12
23:6,16,18,23

24:7,16 25:6

madam
9:4 63:2
156:1 168:23
169:4

made
8:10,11 10:14
48:6 64:23
78:17,18
83:23 84:12
85:11 87:25
88:1,20 89:7,
10 96:24
101:9 103:17
104:3 106:19,
23 107:2,22,
23 110:13
113:24 114:6,
12 125:21
128:19 129:11
132:11 136:6,
8 142:10,11,
22 145:10,22
146:4,5 153:7
154:11 158:24
162:3,7
164:13 168:1,
2 170:11
171:7,12,13
178:10 179:16
180:8 181:16
182:10,15

Magda
145:25

main
44:2 97:7

maintain
159:15

major
10:10

majority
11:18 15:4
16:8 38:5
131:8

make
6:1,6,18
18:22 20:13
27:7 30:15
52:7 59:14,15
61:5 64:22
66:15 70:17
77:21 78:21
79:10 80:24
83:8,22 87:16
89:3,17 96:4,
19,24 107:4
122:12 130:7
144:12,14
164:7 167:5
168:8 170:17
172:23 174:11
175:8,17,20
181:4 182:14
183:14,21

maker
47:15

makes
56:7

making
23:23 40:6
53:14 59:17
112:23 128:22
143:23 156:20
158:13 162:9
163:4 164:3
165:9 166:22
183:4

man
102:3,5,13,25
103:1,14
158:4

manager
8:8 172:16

mandatory
93:18

manner
112:21

Manual
177:5

march
13:11,12,21
31:21,22
114:14,17,19,
25 115:14,16,
21 119:11,21
120:7 121:19
122:24
126:11,15,25
127:7

marched
127:6

marching
114:22 115:2
116:4,25
117:11 118:6
119:18,20
121:3 125:8
127:15 128:6

mark
65:22 72:22
86:23 88:5,18
177:2

marked
66:2 73:4
87:3,5 88:15,
25 177:12

married
15:3

Martinez
133:24

Ruby Green
April 16, 2021

134:18,20
136:13 137:9

**Mastrarrigo**
111:21

**matter**
21:17 94:2
114:23
126:11,25
127:7 175:23
176:4

**matters**
5:16,17 56:23
114:15,17
117:1,11
118:6 124:18,
20 128:7,15
129:17

**Matters'**
128:25

**Mccray**
146:1

**Mcdonald's**
8:9

**Mcnamee**
29:3,21 39:15

**meaning**
32:17 38:3
90:16 106:13
121:23 138:7
176:24

**means**
72:2 99:15
102:12 153:17

**meant**
104:23 105:10
152:15 155:3
166:2,3 168:3
179:19,20

**media**

91:15 132:10
158:13 170:7

**meet**
29:9,16

**meeting**
29:20 38:16
41:13 79:7

**meetings**
38:13 79:4
142:8

**members**
8:4 178:18,20

**mental**
39:15,16
156:17,19
157:5,10,13,
16,18,25
158:6,10

**mentioned**
17:25 20:15
22:18 23:6
25:10 30:16
34:8 48:15
98:2 118:8
124:2,5 129:9
146:15 155:7
161:11

**mentioning**
56:10

**merit**
35:20,23
36:4,8,10,15,
18,20 37:1,3
40:22 41:2

**message**
75:19 84:5
119:5

**messages**
67:18 68:16

114:2 118:12

**met**
74:4 100:6

**Miami**
28:9,13 30:17
134:19,21

**Miami-dade**
133:23,24
135:11 136:1
137:20

**Michael**
57:16

**mid-february**
31:18

**militate**
97:25

**mill**
76:16 100:17

**mills**
54:6

**mind**
7:22 37:23
51:9,18 61:1
63:3 82:25
95:18 110:1
121:18 125:18
157:22 159:25
175:11

**mine**
32:13 46:20
148:1

**minimum**
93:18

**minor**
16:7 17:1

**minors**
15:22

**minute**

91:22 92:16
94:25

**minutes**
68:25 69:2
92:2,3,9

**misdemeanor**
11:24,25
32:4,5,10
33:4,5,18
34:23 35:3,10
36:6,7,9
37:18,20
38:2,4,5,8,12
39:22 40:15,
21,23,24
41:24 43:21
44:17 45:2,3
104:16 111:12

**Mishali**
39:2

**missed**
9:5 17:10

**missing**
52:9

**mission**
70:1

**mistaken**
75:3 76:24
79:3,22 147:7
148:14 155:6

**mitigation**
146:2

**mobile**
67:18,22,23,
24

**mock**
111:16

**modulated**
62:16,20

Ruby Green
April 16, 2021

23

mom
  16:4

mom's
  16:6,7

moment
  26:8 68:5
  72:1 100:11,
  21,22

Monday
  31:10 107:5,7
  108:19,20,22

money
  33:23 34:4,15
  35:21 36:21
  130:14 133:6,
  9 134:3,8
  135:3,5
  136:10

monitor
  112:22

month
  10:21 11:21

months
  11:18 13:15
  33:6,14,15
  37:9 38:23
  39:19 40:9,
  18,20 41:1,4
  93:3,9

morning
  21:21 72:24

mother
  15:4 16:12,16

motions
  53:11 112:17
  163:22

mouth
  170:10,11

move
  28:6 29:9
  36:16 37:17,
  25 38:2 39:22
  40:7 92:1
  106:4 167:13

moved
  33:14 37:8,
  15,20 38:23
  40:14,15
  51:25 147:5

movement
  129:1

moving
  17:5 49:4

multiple
  5:3 18:1 19:5
  167:13

murder
  55:12 57:16

**N**

NAACP
  99:12

names
  15:25 16:2
  75:21 128:4
  138:10 146:13

narrow
  83:16

natural
  37:23

nature
  50:6 60:19
  170:15

necessarily
  16:2 37:5
  52:16 78:25
  79:12 97:3

  99:7,23 100:4
  101:21 125:21
  135:1 139:18
  159:11 163:13

needed
  19:9 21:14
  24:8 26:5
  32:24 42:20
  45:5 79:6,11
  101:22 112:21
  182:12 184:5,
  6,7,8

negative
  50:6

news
  14:6 85:19,21

nice
  127:1

night
  15:11 23:13,
  14

nighttime
  128:21

nine-month
  35:7

nod
  6:2

non-lawyer
  12:16

nonetheless
  72:15

normal
  70:5

noses
  158:21

notice
  31:19,20

notifications

68:1

notion
  137:4

November
  7:15,16 12:14
  13:1,2 64:24
  65:25

number
  4:24 5:24
  17:25 21:12
  60:23

**O**

oath
  6:10

objected
  94:22

objection
  90:25 94:4,
  16,19 97:6
  129:2 131:2,
  15 132:20
  161:21 164:9
  165:1 166:10
  167:1,12
  169:15 170:3
  173:4,21
  180:24 181:4,
  7

observations
  125:20

obtain
  7:14 26:16

obtaining
  27:2

occasion
  107:4 108:10
  165:17

Ruby Green
April 16, 2021

24

occurred
   5:11 123:11
   151:11

October
   64:23

Odyssey
   156:14

offended
   161:1,17,18,
   24

offending
   170:1

offensive
   169:25 170:5

offer
   30:17

offered
   28:11 29:1
   31:24

office
   4:19 11:13,
   19,23 12:22
   13:4,12,14,20
   15:6,11 18:2,
   13 20:23
   22:2,19,21
   23:2,5,15
   24:14,21,24
   25:13 26:6,10
   28:5,7 31:19
   33:25 34:21
   35:12 38:13,
   16,18 41:12,
   13 42:7,10,25
   43:3 44:1,9,
   20 45:7 46:2,
   14 47:2,23
   48:8 49:12
   50:8,13 51:4
   52:1,2,13,16

53:4,22 55:2,
3,6,7 56:21
60:16,18
61:2,10 63:23
64:8 65:1,2,
6,20 66:5,7
67:15 69:17,
18,20,25
70:11,20,23
71:3,12 72:7,
13 76:21
86:10,14 88:2
93:18 95:21
97:17 104:13
106:15 108:22
109:13 111:7
112:25
114:14,18,20,
22,24 115:2,
3,13,17,19
116:15 117:13
119:3,11,15,
19,21,25
120:6,7,13,
14,16,18,20,
24 121:12,15
122:4,13,25
125:7 126:11,
15,23 127:2,
7,11,23
128:14 130:5,
7,18,20,25
131:4,10
132:6,18
133:4,10
134:1,11
135:17 136:25
138:4,5,6,20,
23,24 140:22,
25 142:3
143:14,17,20
144:2,11,12,

18,19 145:2,
4,14,22
146:5,7,8
151:25 157:12
158:12
160:19,22
161:1 162:21
170:16,17
171:2,4,11,
12,15,16,23
172:22 173:9
174:6,8
175:13,16
177:4 178:15
179:21 182:15
183:16,24
184:2

offices
   119:17 126:25
   127:6,13,15,
   25 136:5

official
   63:17 70:10

okayed
   25:11

one's
   77:5 104:4

one-time
   35:14

open-door
   182:18,19

operate
   34:24

opinion
   19:16 60:3,7,
   15 61:7,9,22
   76:15

opinions
   50:6,10 70:7

opponents
   100:25

opposed
   100:18 110:14
   134:9 159:14
   174:12

opposite
   10:1 130:13

OPS
   11:20 12:5

option
   81:1,3

order
   15:17 21:3
   27:19 46:14
   78:2 79:12
   95:18 100:8
   112:9 146:2
   147:24 148:1
   159:15 174:8

organization
   116:6

original
   123:20 124:11

originally
   177:19

outlined
   96:7,8

overcome
   7:24

overextend
   25:8

overheated
   169:2

overlap
   9:7 176:22

Owen
   29:2,10,20

Ruby Green
April 16, 2021

25

39:15 162:17

**P**

**P.D.**
59:1

**P.d.'s**
12:21 23:15
24:14,21

**p.m.**
4:1 92:12
184:15,16

**paid**
131:11,12,23
133:6

**pain**
91:12

**paired**
49:18

**Palm**
127:11

**panels**
100:16

**pants**
47:19 48:9

**paper**
50:16 96:10,
14

**papers**
64:2 96:1,7
126:24

**paragraph**
66:14 69:22
71:19 87:15,
19

**paralegals**
20:5

**parking**
31:8 139:18,

21,22

**part**
9:5 12:8
23:16 41:22
42:15 54:6
61:5 72:14
73:7 79:22,24
80:23 86:11
100:2,22
124:11 126:9
140:3 156:25
159:25 170:12
172:17

**parties**
41:12

**party**
14:15 38:15

**passed**
45:11 121:8

**passing**
11:22 12:23
118:8

**passive**
73:16

**past**
27:12 55:18
154:19 155:5
160:11

**pastor**
74:21,23,25
75:4,6,10
76:1 84:4

**pastors**
75:8,10

**pauper**
133:11

**pay**
12:7 16:6
34:9 35:9

40:1

**paycheck**
34:18

**paychecks**
170:16 171:11

**PDA**
133:7

**pending**
7:8 150:25

**people**
5:19 15:21
16:1,3,11
19:6,19 20:13
21:19 25:18
29:11,17 35:4
37:24,25
38:3,5 42:5
43:1,3,4
44:2,8,18
45:9 46:5
53:2,6 58:20,
22,24 59:4
60:13 65:7
70:7,8,11
73:19,20,22,
24 74:2,4,8,
17 77:22 78:1
80:21 82:14
84:14,21,24,
25 85:2 90:16
99:8,10,13,25
100:12,14,15,
18 101:10,12,
17,21,24
102:1,2,5,23
103:2,3
109:13 112:22
115:20,25
116:3 117:7,
8,10 118:12,
18,20 119:1

120:1 121:24
122:3,11,23
123:3,13
124:2,4
126:22 128:4
130:17 131:8,
22 133:19
134:2,3,7,12,
23,24 135:2,
17,20,23
140:24
141:12,15,16
143:12,16
144:2,13
145:24 146:8,
10,11 147:4,7
149:6,7 153:3
158:9 159:7,
10 161:7,16
163:17,21
165:10,15
169:17,19
171:1,4 174:5
175:25 176:1,
17 178:14
182:7,22
183:15,25

**people's**
116:9 138:9

**perceived**
143:19

**percent**
6:21 34:12
159:14

**percentage**
34:13,14

**perception**
143:10

**performed**
90:2

Ruby Green
April 16, 2021

26

period
  35:8

perks
  141:13

permission
  18:15,16
  25:14,19,20
  65:15

person
  14:10 42:21
  47:10 48:7
  53:3 59:7,10,
  11 64:9,12,
  13,17 67:2
  68:9 74:2
  78:9 81:17
  85:5 91:17
  100:9 104:11
  118:22 119:4,
  5 136:25
  147:19 154:18
  155:1 158:25
  159:5 173:14
  175:19

person's
  59:9

persona
  14:4

personal
  119:23 159:23
  161:19

personally
  57:21 74:14
  119:1 126:7

persons
  171:16

pertains
  104:5

phase

29:6,9,14,22
31:1

phone
  50:19 51:3
  104:17 119:6
  141:22 169:2

phonetic
  9:9 30:9 35:6
  43:22 56:16
  118:9 146:9

physical
  61:2

physically
  52:15 53:21
  60:16,17,18
  61:9

pick
  50:20

place
  12:18 24:16
  28:7 90:23
  93:9 97:18
  99:16,22
  101:24 183:11

places
  32:21,25

plaintiff
  14:16 88:20
  93:16

plan
  103:9 109:11
  157:18

platform
  161:15 167:2
  170:6 172:18

platforms
  95:22 130:21

play
  85:3 162:14,

16,19,22
163:2,4,18,19
164:17,22
166:16,25
167:25 168:14
169:12

played
  79:23 126:9
  162:17 163:9

playing
  162:4,8 164:8
  165:7 173:2

plays
  163:25 166:8,
  12 167:10

plenty
  25:18 130:13

plug
  116:1

podcast
  88:21 89:10,
  15,21 90:1,8,
  10,14,15
  92:17,19,25
  93:15,23
  95:10 96:4,
  15,16,20,24
  97:8,11,15
  100:2 103:18
  114:12 119:15
  128:17,18
  129:7,10,22
  133:16 137:18
  140:19 146:15
  151:15 152:4
  153:8 160:14
  172:15 175:3
  178:10 180:6,
  8,21 181:11
  183:5

podcasts
  100:15

point
  6:16 7:6 8:7
  10:13 13:22
  14:13 29:21
  32:15 36:19
  37:16 38:17,
  25 39:1 49:3,
  24 50:1,5
  58:5,7 59:20,
  21,24 62:3
  63:6,21
  64:21,25
  85:15,16
  89:16 100:25
  103:13 118:2,
  3 129:20
  130:12 136:24
  137:8 142:16
  145:8 156:18
  158:7 159:7
  161:7 173:10
  175:17
  177:14,24
  183:9,17

pointing
  160:5

points
  25:2 95:22
  171:2

policy
  65:1,4,9,10,
  19 126:20
  158:17 177:5
  182:18,19

political
  77:8 172:17,
  18

politicking

Ruby Green
April 16, 2021

27

72:7,13

**politics**
70:6 99:5
137:3

**Pompano**
14:23

**poor**
26:22

**poorly-worded**
98:15

**popular**
100:9

**Porter**
30:3,7 39:12
111:20,21

**portion**
33:23 83:6
138:13 145:6

**portions**
132:14

**position**
12:16 14:1
15:19 21:5,8
22:12 30:18
31:3,10 32:3
33:18 38:8
39:18 49:24
51:16 60:25
61:12,13,19
71:23 74:18
75:14 108:16
152:25 157:4,
10 158:22
159:2 174:22
175:5

**positions**
12:12 28:11
147:5,11

**posse**

109:17

**possibility**
84:16 86:6

**possibly**
29:25 37:4

**post**
171:25 172:5

**posted**
74:20 171:17

**posting**
58:20,22
171:24

**potential**
69:24 70:23
71:3

**practicing**
109:2

**pray**
85:25

**precaution**
121:19

**precautions**
121:22

**precisely**
96:3

**precluding**
119:12 120:7

**predicate**
90:25 131:2,
15 173:4
180:25

**premiums**
34:1,8,9,12

**prepare**
28:2

**present**
15:7 173:12

**pretax**
33:23 34:9,10

**pretenders**
143:11 149:8

**pretty**
22:7 50:16
59:7 98:7
113:16 131:8
149:6 161:10
176:9

**prevalent**
116:6

**prevent**
110:2

**previous**
69:15

**primarily**
9:14

**primary**
72:25 100:25

**principles**
125:10 129:16

**prior**
31:2 56:24
58:12 60:5,7,
24 61:7 78:5
112:13 116:15
183:4

**prison**
146:17 148:7,
8,19,25
149:11,19
151:5 152:6,
11 153:14,20,
24

**private**
58:25

**privilege**
160:14,18

161:6,20

**privileges**
159:9

**privy**
159:10

**problem**
62:21 105:19

**problems**
54:7 67:17

**Proceedings**
4:1

**process**
44:13 124:12
144:7

**processes**
125:18

**proclivity**
162:4,8

**progressed**
23:22

**progression**
37:24

**prohibitions**
158:11

**project**
21:16

**promoted**
35:15,16
36:5,23

**promotion**
36:24 37:2,10
39:24

**promotions**
36:22 40:22

**promulgated**
177:17

**properly**
88:23

prosecuting
57:16

prosecutions
57:4

protected
88:12 95:10
132:10 156:25

protests
114:20,23

proud
174:10

proverbial
37:6

provided
104:4

psychology
10:10,12

public
4:18,19
11:13,19,23
12:15 13:4,
11,14,20,23
15:5,11 18:2,
13 20:22
21:5,8 22:2,
19,21 23:2,5
24:23 26:5,9
28:4,7 31:18
33:25 34:21
44:20 47:2,4,
12 54:8,18,21
55:9,11,19
56:7,13
57:12,23
58:13 59:18,
25 60:10
62:4,5,8
63:7,10 65:2
66:17 69:13,
15 70:4,10,

12,21 71:10,
12,16 72:24
73:18 74:13
76:13,20 78:7
82:15,16 84:7
88:1 93:16,
17,19 95:20
96:13 97:17
103:3,4 111:7
112:25 114:21
115:1,13,16,
19 119:16,19
127:6,12,14
128:14 130:5,
7,25 131:9,10
132:6,18
133:3,7,10,
14,17,23
134:20 135:10
136:7,14,16,
19 137:13,19,
22,25 138:3,5
140:9,13,25
142:23,24
143:1,2,4,10,
11,19,20
144:9,17,20
145:8,12,17
149:6,8,14
158:8,9,12,13
160:19,22
161:1 166:24
167:3,4,24
168:4,8
169:18
170:16,17
171:11,12,14,
23 173:1
174:6,7,18
175:12,15,21
176:10,15
177:5 178:8,

14 183:7

publicly
76:18 78:14,
16

pull
70:20 92:15

pulling
69:25 70:23
71:3

purchases
20:14

purely
48:10

purpose
19:3 27:1
161:24
173:23,24
179:6,8,24,25
182:13

purposes
33:24 179:7
182:9

pushed
37:3,6

put
24:19 25:22
47:23 49:9
68:8,11 80:5,
11 93:21
95:13 97:2
102:3,6,13,
19,25 103:4
132:10 141:22
146:14 147:10
152:25 172:1,
4 174:21,23,
24 175:4
183:10

putting

51:8 58:13
102:22

—————————

**Q**

question
4:25 7:7,8
27:17 34:11
42:1 46:23
63:5,10 67:5
71:4 76:7
80:11,12
82:19 84:3
85:24 88:10
89:6,25 90:1
93:6,25 94:23
98:15 103:21
110:7,22
114:15 118:4
120:5 128:23
130:24 140:24
144:4 149:9
151:9 152:9
167:18 168:23
169:6 171:5
177:8 178:17,
18 179:23
180:20 181:5,
23 183:4

questions
26:11 41:7,19
83:5 95:12,
13,15,17
97:12 138:25
174:14,15

quick
68:7

quote
73:7,10,12
80:3 83:7
97:15 103:18

Ruby Green
April 16, 2021

114:12 129:23
130:3 140:21
146:16 154:17
156:17 158:19

**quote/unquote**
54:19 58:1
59:22 60:4,8

—————————
**R**
—————————

**race**
58:13 64:8,9,
10,14,17,18,
22 67:2 78:6
83:11 97:18
99:23 102:3,
6,20 103:1,8
183:10,13

**racial**
93:20

**racism**
126:9

**racist**
125:14,22,25
126:4

**raise**
4:2 31:6
35:15,18,20
36:4,8,15,18,
20,23,24
37:1,2,3
39:23

**raised**
119:19 120:12

**raisers**
77:4

**raises**
36:11,15,22
40:22

**ran**
20:16 69:13
70:4 144:12
176:15

**random**
97:4 170:14

**rarely**
41:11

**Raticoff**
146:13

**rationale**
72:8 122:9
123:20,21
124:11 157:4

**rats**
8:4

**reach**
51:3

**reached**
100:6,12,14

**react**
143:25

**reaction**
144:15

**read**
44:22 50:22,
23 51:9,18
52:6 59:1
66:19 67:3
69:9,23 71:25
72:2 87:18
149:17 151:24
152:3,4,14
168:9 169:5,7

**reading**
44:24,25
45:24 66:15
93:14

**ready**
145:2 147:7

**real**
6:3 65:9 72:6
80:1

**reality**
161:7

**realization**
44:13 45:1

**reason**
20:19 26:10
42:4 58:19
70:19 89:17
92:8 97:23
112:24 115:6
121:11 122:7,
12 123:24
124:8 131:13
174:3 184:1

**reasonable**
70:2,21,24
71:1,2 110:1
121:18

**reasoning**
122:18

**reasons**
96:14 98:3
101:13 113:21
114:9 120:24
132:24

**recall**
5:5 18:9 29:5
31:1 43:17
62:6 63:9
64:3,7 66:8
69:2 75:17,24
79:13 86:18,
21 96:12
97:19 113:17
115:2,5

118:15 138:11
162:9

**recalling**
98:22

**receive**
40:2,21

**received**
25:11 63:4
74:21,22,24
114:24 170:16
171:11

**receiving**
66:8 69:2

**recent**
26:14,20,22

**recently**
45:17 57:6,11

**recess**
92:12 184:15

**recognize**
120:5

**recollection**
26:16 27:3,
13,20 66:21
86:4 92:19,20
93:8 116:23

**recollections**
27:16

**record**
6:3 30:16
68:20 69:23
143:3

**recorded**
90:4

**reference**
138:4 168:1,2

**references**
182:10

Ruby Green
April 16, 2021

30

referring
  56:24
reform
  125:2
refresh
  26:16 27:16,
  19
refreshed
  27:12
refreshing
  27:3
refuted
  156:8
regular
  40:10 52:4,12
  117:23
relate
  75:1
related
  26:16
relates
  130:22
relevance
  90:25 166:10
remain
  157:6
remained
  21:8 49:23
remedy
  62:21
remember
  5:3,9 7:15
  25:21 28:15
  29:13 30:5,8,
  10,19,21,24
  31:7,11 34:22
  38:11 41:2,3
  50:13 56:11

64:6,10,17
65:18,20
66:25 74:23
75:20 79:2
86:20 95:10
98:8 117:5,15
118:16,17
121:9 124:1
135:15,21
146:13,20
147:15 154:20
156:19 165:19
remembered
  86:11 98:7
remind
  37:15
Renee
  30:8,13 39:13
  49:9,20 69:7
  104:13,14,17
  106:14 142:18
  143:24
rep
  20:13
repeat
  6:17 17:11
rephrase
  6:23 26:23
  51:13 70:16
  94:22,24
reported
  49:14
reporter
  9:5 63:2
  156:1 168:23
  169:4
represent
  4:17 71:15,18
  120:1,3 153:3

representation
  175:22,24
represented
  176:5
representing
  46:19 53:12
  113:1 143:12
  146:19 149:22
  152:8 175:25
  176:25
request
  7:7
require
  19:25
required
  20:8
Reres
  146:9
research
  12:20 60:11
  61:24
researched
  59:25
resend
  18:20
reside
  14:22
resigning
  175:12
resources
  111:24
respected
  61:16
respectful
  25:19
respondent
  14:19

response
  110:21
responses
  88:10
responsibilitie
s
  36:4 59:18
  60:10
rest
  17:7
result
  99:8
retain
  86:17
retaliated
  116:25 182:24
retaliation
  117:11 118:6
  128:6
retaliatory
  115:22
retire
  66:19 67:1
retired
  49:8 57:12
return
  20:13 51:9
returned
  51:19
review
  15:12,15
  18:23 19:4,7
  21:12 22:13
  23:5,10,20
  24:6,15 27:22
reviewed
  19:8 27:18
  36:3 93:7

reviewing
    18:24 20:7
Rhonda
    35:5
rights
    99:13
rise
    48:17,20 51:6
    159:1
rising
    99:6
risk
    116:4
rival
    8:24 9:8,10
roaches
    8:5
road
    5:20
role
    33:4 85:4
    136:16
room
    17:13
Ross
    43:22
roughly
    38:18 61:23
    64:3
Ruby
    4:8,15 66:15
    92:5 168:21
rule
    5:24
rules
    5:20 71:20,22
    72:4,6

rumor
    50:8 54:6
    76:16 103:5
    118:25
run
    15:18 60:2
    63:22 66:12,
    16,17 73:8,
    15,17,21
    74:12,14,17
    75:19 76:13,
    17 77:6,14,15
    82:16 83:4
    84:6 144:11
    145:2,13
    157:11
    172:19,22
    173:1 184:10
running
    15:16 55:2,6,
    7 58:13 65:1,
    12,19 70:22
    90:19 101:12,
    20 144:8
    172:16,19
    173:24 174:4
    183:24 184:2
runs
    174:18
rush
    22:3
Ryce
    12:2

                S

sacrifice
    21:7
salary
    34:13

sandbag
    72:1
sat
    4:25 5:4,6
    151:11 152:10
Saturday
    23:24 24:4,5
Satz
    56:25 57:12,
    16,23
save
    110:11 116:16
saved
    116:15,17
scary
    105:1
schedule
    22:7 52:13
scheduled
    27:24,25 28:1
school
    8:10,17,20,25
    9:8,12 10:14,
    17,25 11:3,4,
    10,12 13:17
schools
    10:1
Schraywood
    118:9,16
    128:5
Sclerosis
    19:5
scope
    181:1
screen
    116:21
scuttlebutt
    50:8 54:7

74:19,22
    76:16 118:25
search
    116:12
second-degree
    35:17 39:20
    40:13 41:6
seek
    100:9
sell
    15:17
send
    65:7,13 73:20
    76:7,20 137:5
sending
    67:7
sense
    53:11,12
    110:13 136:6
sentence
    69:22 178:6
sentencing
    93:19
separate
    16:15,17
    39:6,8 40:22
    108:10
    179:11,13
separately
    16:5 23:7
September
    10:24
series
    65:23
service
    20:12
set
    21:12 22:7

25:16 71:20
111:13

**setting**
79:4

**shake**
6:2

**share**
46:15

**shared**
178:12,13,16

**shift**
23:12

**shoe**
101:16,19

**short**
141:16

**shortcomings**
175:10

**shorter**
141:15

**shortly**
113:16 160:13

**shotted**
116:21

**show**
65:21,24
72:21 73:1
83:6 86:22
87:14,15 88:4
93:11,13
100:19 109:4
116:7 118:21
119:6 169:17
177:2 183:23

**showed**
58:24 96:9
118:21 134:3

**showing**

134:13,17

**shows**
66:5

**side**
6:25 55:1
78:2 94:13
175:25

**sign**
50:14,17,22,
23

**similar**
75:19 171:13,
24 178:13

**similarly**
42:5

**simple**
164:14

**simply**
27:2 37:20
75:21 124:14

**single**
15:4 52:10
161:14

**sir**
177:18

**sister**
16:5,7,9,13,
15,17,24
17:17

**sister's**
16:13

**sit**
104:16 106:15
119:7 127:18
128:12 129:14
131:20
148:18,21
164:16 167:21
174:8

**site**
45:15 170:6

**sitting**
117:24 125:24
149:5 154:2
173:14

**situated**
42:5

**situation**
15:1,2 26:1
43:11 44:19
75:22 77:9
80:17,18 91:8
107:11,19
108:5 122:18
130:4 132:5
135:6 149:23
150:5,17
153:5,12,25
154:4,14
160:10,11
161:13
174:21,23,24

**situations**
161:10

**skin-folk**
99:4

**slipped**
165:17,20,23,
25

**slow**
177:9

**small**
89:2

**smart**
6:6

**so-called**
48:19 58:18

**social**

91:15 124:25
125:5 170:6

**sole**
16:20 84:10,
13 184:10

**solemnly**
4:3

**solidarity**
114:15,17,22
125:8 126:16
127:15
128:14,25

**somebody's**
67:17 159:15

**someone's**
70:10

**sort**
70:4 85:3
128:6

**sought**
27:5 42:7

**sound**
167:20

**sounds**
36:14 81:11,
17

**source**
84:10,13

**south**
9:14,18 14:5

**speak**
27:9 36:16
37:3 58:9,11,
12,21 61:15

**speaking**
27:12 158:12
172:17

**specialized**

Ruby Green
April 16, 2021

33

25:1

**specific**
  114:9 115:7
  158:5,6 182:7

**specifically**
  96:22 104:21
  113:24 114:16
  118:17,18
  123:8 125:17
  132:8 138:3
  145:21 150:21
  151:14 157:2
  165:19 166:20
  179:21 180:10

**specifics**
  88:22

**speculate**
  48:2 67:8
  95:8,24
  110:11,18
  131:17,24
  132:24

**speculation**
  48:11 71:8
  94:6 161:21
  170:3

**speech**
  87:25 88:12
  89:7 95:11
  115:9,11
  128:19,22
  129:11
  132:11,12,13,
  14 145:6
  146:4,5 157:1
  167:6 170:11,
  12,13

**speeches**
  77:4

**spell**
  39:3

**spend**
  35:21

**split**
  102:13,20
  103:9

**spoke**
  58:15 74:25
  93:16 121:7,
  25 122:1
  130:22 170:1,
  5 171:7

**spot**
  49:9

**Springs**
  8:22 9:12

**stabbing**
  69:17

**staff**
  38:21 112:9
  130:18 141:9
  142:12
  144:19,22
  145:23 178:24
  179:1 182:16
  183:7

**staffs**
  135:24

**stage**
  173:14

**stake**
  172:21

**stand**
  119:25 124:20

**stands**
  124:18

**start**
  13:19 28:5,22

130:1

**started**
  10:25 11:23
  13:11 18:8,9
  31:22 34:21
  44:18 51:12
  84:1,2 103:15
  184:10

**starting**
  62:15,19
  82:25

**state**
  7:12 9:21
  10:4 54:25
  55:19 56:23,
  24 57:3,13,17
  70:13 119:17
  133:5,6,18,22
  134:19 135:10
  136:7 137:19
  162:1 166:23

**stated**
  96:13 97:15
  133:16 137:17
  138:7 140:19,
  21 149:18
  154:17 156:16
  158:19 160:14
  162:18 168:11
  169:8

**statement**
  70:15,17
  78:17,19,21
  83:23 84:10,
  11,24 85:12
  97:24 99:3,21
  101:8,9,14
  102:4 103:17,
  22 104:3,5
  114:11 115:7
  123:15 130:8

132:2,4
138:15
142:10,11,24
143:2,23
145:10,22
148:22 149:18
150:16,22
153:7 154:11,
25 156:20,23
158:24 159:4
160:16 161:2
162:9,12,23
163:11 164:13
165:9 166:22
167:2 168:3,9
169:7 170:18
171:7,12,24
179:10,16,18,
19 182:5,8,
14,15 183:5

**statements**
  74:7 87:25
  88:20 89:7,10
  139:8 142:22,
  23 146:3
  158:14 162:3,
  7 178:4,9,13
  180:7,20
  181:10,16
  182:14

**stating**
  93:21 135:10
  138:11

**stay**
  21:19,20

**STENOGRAPHER**
  4:2 9:2,6
  11:25 15:13
  44:4 62:12
  63:5 82:20
  129:24 134:15

155:17 156:3
169:6 184:13

**stick**
141:17

**stop**
15:16 67:16
68:1 133:19
177:25

**story**
51:3 72:23
100:10 172:13

**Strike**
89:24

**structured**
42:13

**stubs**
34:18

**studying**
12:17 59:25

**stuff**
8:9 11:22
19:10 20:24
39:16 42:23
43:1,5 44:21
46:4 52:24
65:8 67:25
69:18 73:23,
25 74:1,11
79:7 91:13,
14,20 95:11
100:16 102:3,
17 111:9,16
112:18
115:10,23
122:4 125:20
126:1 127:13
135:24 138:10
139:1 145:3
159:11 161:8

**subject**
94:1,2

**subsequently**
104:4

**substantive**
110:24,25

**sudden**
29:16 105:18
122:12 137:2

**Sue**
111:20

**sued**
14:17

**suffered**
128:5

**suffering**
135:4

**sufficient**
61:1,2,10
131:22

**sufficiently**
61:23,25
130:8

**suing**
14:16

**sum**
124:19

**summer**
10:5,6,23

**Summins**
9:9

**Sun-sentinel**
72:23 83:23
84:12,23
85:12 86:5
87:3 99:1

**Sunday**
23:24 24:4,5

**supervising**
109:8

**supervisor**
25:2 32:20
34:25 35:2,5
43:21 46:20
47:13 49:4
51:24 103:18,
19 104:8
105:13 109:17

**supervisors**
41:19 42:18
47:3 107:8
109:14 111:11
112:10

**support**
15:7 16:4
74:6 76:23
77:21,24
78:3,18,25
79:12,13,14,
17 80:3,5,14,
17 81:18
82:10

**supported**
74:3 76:18
83:4 178:15

**supporting**
16:1,12 81:12
175:6,7

**supposed**
45:23 99:12
111:2 157:15

**suppress**
112:18

**surely**
24:15

**surprising**
110:20

**Susan**
30:3,7,9
39:11

**suspect**
56:17

**swear**
4:3

**switched**
116:17

**switching**
141:3

**sworn**
4:9

**synonymous**
108:2

**system**
55:4 90:18
93:20 95:19
111:17 156:15
173:16

---

**T**

**T-A-X**
159:20,21

**table**
148:8 152:11

**taking**
55:1,8 121:21

**talk**
7:17 14:12
28:3 61:21
65:5 67:12
73:20 95:23
114:11 129:21
136:11 182:20

**talked**
48:13 90:14
107:13 129:9

Ruby Green
April 16, 2021

35

talking
33:10 36:21
40:16 44:19
45:10,13,14
46:3 52:5
68:9 89:7
103:2 114:1
142:22 147:1
151:15 163:22
171:18 183:15

Tallahassee
133:18,25
134:10,22
135:11 137:1

Taravella
8:24

task
112:21

tasks
81:12

tax
34:10 159:13,
19,20 160:8

teach
8:12

team
32:18 33:4

technical
6:15 68:10

technically
11:12 13:17
44:8

telling
29:7,16 36:14
53:16 77:6,13
85:18 100:10
104:11
106:13,14,16,
24 123:22

140:21 158:2
164:23 172:25

temp
12:20

ten
23:13,14
55:16,17,18
160:8

ten-second
155:24

tenets
125:10 129:17

term
38:12

terminate
87:23 94:3
95:4 96:5
103:23 132:3

terminated
90:9 95:6
96:22 104:4
116:13,14,19,
20 128:13,24
132:17 156:22

terminating
97:25

termination
85:4 94:15
115:7

terms
33:19

testified
4:10

testimony
4:3 147:21
153:6

text
67:18 68:16
114:2 118:12

theme
144:1

thing
28:15 31:7
44:23 46:4,22
52:4 63:3
65:20 69:20
70:5 77:6,8
105:20 107:20
110:1 116:11
118:19 129:22
131:14 134:25
137:6 143:6
152:14 156:1
161:14 163:7
167:20 170:10
175:24

things
7:24 35:22
45:11 47:25
51:8 52:7
59:7 60:18,23
61:15,17 70:4
74:19 90:13
91:11 96:23
97:7,11,13
100:17
106:20,25
110:15 119:2,
25 125:22
129:8 130:21
144:10,11,13
159:1,8,10,14
167:3,4 168:6
170:22 171:1
172:11 173:8
174:10 184:7,
9

thinking
81:23 105:25
106:1 125:24

136:2 168:17,
25

thinks
130:24
131:18,21,25
176:8 180:9

third-
37:20

third-degree
35:17 37:17,
18 38:24
39:6,23
40:11,15,21,
25 41:5,8,21,
25 42:3 44:18

thought
8:8 25:19
40:14,16
44:13 45:23
55:21 56:2
67:12 69:12,
15 91:18
100:20
105:10,24
107:22 109:3
115:22 125:18
144:7,14
168:24 175:19
180:19 183:22

thoughts
143:24

threw
35:19

thrown
108:25

thumb
177:7,23

thumbing
177:25

thumbs
  106:16
till
  175:23
time
  8:7 10:17
  11:15,18
  12:6,7,8,9,24
  15:5 17:9
  18:1,3 21:18
  22:20,25
  23:1,6,7,16,
  22 24:16,19
  25:15 26:9
  28:1,4 34:23
  35:7 37:10,14
  38:7,17 39:10
  43:25 45:11
  46:16 47:16
  48:17 52:2,3
  59:20,21
  61:2,6,10,14
  62:4 63:6
  64:21,25 67:3
  71:23 74:3
  77:25 78:7
  79:3,22 81:19
  82:2 89:23
  95:14,22
  100:25 104:3
  108:23 109:21
  111:23 115:1
  122:19 136:3
  137:8 139:14
  142:17,21
  143:18 145:9,
  10,12 149:10
  155:8,16
  156:7,9 162:6
  164:18,22
  165:3 167:19

  168:10 169:3,
  7 171:2,21,22
  173:10
  176:14,16,18,
  19,21,22,24
  183:22
timeframe
  43:19
timely
  51:19
times
  6:15 21:15
  24:11 32:19
  33:11 41:18
  43:20 155:12
  156:4 157:15
  160:8 167:13
today
  6:11 14:15
  26:17 27:21,
  24 43:10
  128:12 129:15
  131:20 153:6
today's
  27:2,4 65:22
  72:22 86:23
told
  8:14 21:22
  28:6 29:14
  65:11 73:8,9,
  15,17 74:25
  75:13 76:4,6
  77:20 78:18,
  22 79:1,18,24
  80:2,3,4,13,
  15,19 81:6
  82:16 83:7
  84:11 85:6
  103:18 104:8
  105:12 106:5,

  6,7,8,9,22
  107:3,8,20,21
  108:7,9,11,23
  113:8 114:16
  115:13,15
  122:6 123:6,
  18,19 150:17
  162:13,15,16
  166:15
Tom
  174:19
tone
  117:2
tons
  161:11
top
  75:21 127:10,
  19 146:10
topics
  95:2,4 97:2,4
Torre
  29:2,20 39:14
  79:20 81:17
total
  25:4 38:20
totality
  144:25
touched
  111:5
train
  103:20 104:9,
  19 106:3,5,6,
  22 107:1,6,9,
  12,16,24
  108:11,13,21,
  24 109:7,11,
  19 110:4,15
  112:11 113:3,
  11

trained
  109:23
training
  39:11,12
  56:2,3,4,10,
  11 93:19
  107:13 108:2
  111:1,5,8,18,
  19 113:9
  143:16 184:7
trainings
  111:13
transcript
  90:6,8,24
  91:2,3 92:18
  93:7 152:3
transferred
  11:16
trash
  140:22 141:1,
  8 142:2,13
  144:22 145:23
  178:25 179:2
  182:17,21
  183:8 184:3
traveling
  117:19
treasurer
  79:2,21
treated
  140:22,25
  141:8 145:22
  159:7,8
  178:24 179:1
  182:20 184:3
treating
  142:1,12
  143:10 144:22
  182:16 183:7

Ruby Green
April 16, 2021

**treatment**
158:10

**trenches**
54:10,12,14,
19 58:1,4
59:23 60:4,9
163:12,17,21
164:4,15
165:10 167:10
173:18 183:24

**trial**
5:5 24:24
138:24 147:25
148:1,4,13,15
149:3 150:2,
3,12,13,25
154:16

**trials**
24:25 104:16
111:16 139:1
148:17 149:5
152:23 153:16
154:4,6

**triple**
133:20

**true**
70:15,17,25
119:7

**truth**
4:4,5 59:13
106:24

**turn**
67:22 147:4

**turned**
5:8,11

**turnover**
184:8

**twiddling**
106:15

**type**
5:16 19:17
31:7 35:8
36:23 41:9
42:19 43:11
44:23 46:22
53:9 59:11
65:20 69:20
80:17,18
135:6 137:5

**typical**
41:14,20
42:2,6,24

**typically**
47:4

---

**U**

**uh-huh**
6:2

**ultimate**
47:15

**ultimatum**
108:12 113:8,
11,13,14
114:2

**undergraduate**
10:17

**understand**
6:9,23 7:1,3
9:3 14:9
16:11 17:16
22:5,6 29:19
36:2 43:8
54:11 56:6
60:9 72:8,15,
18 81:5,11
82:7 90:20
96:18 105:5
117:4 120:4

130:23 131:9
135:9 136:13
139:5 167:8
176:15 179:8

**understanding**
25:17 26:3
51:20 53:15
57:15,22 67:5
74:16 81:2
89:22 109:6
110:8 126:16
127:24 135:8,
16 140:8,13
142:15 162:20

**understood**
6:4 8:20 11:2
17:1,15 18:6,
12 20:15
22:18 28:3
34:19 35:22
36:2 38:7
51:6 86:4,18
93:13 97:10
105:23 106:2
109:25 112:24
125:6 132:1
149:17 159:22

**unit**
12:2 25:1

**units**
25:2 38:6

**University**
9:21,24

**untrained**
110:9 112:1
113:1

**updated**
111:15 177:19

**uproar**
121:24

**upset**
106:10 115:25
116:3 118:11
124:4

**upward**
36:5 40:7
49:4

---

**V**

**vary**
22:19

**vehicle**
140:1

**verbally**
171:23 172:6,
7

**verbatim**
25:21 93:12
117:5

**versus**
120:7 163:15
164:4,15,20

**view**
45:1

**viewed**
89:25 92:24

**views**
178:14,16

**violence**
39:16

**virtue**
39:23 60:15
95:1

**visit**
20:23

**visits**
164:7 168:12
169:10

Ruby Green
April 16, 2021

**voice**
62:15 73:16
117:19

**volume**
4:1 184:16

**voluntold**
81:24

**VOP**
27:24

**vote**
102:13,20
103:9

**voting**
102:25

**W**

**wait**
29:15 30:16
141:5

**wait-listed-
type**
28:15

**walk**
43:3,13

**walking**
31:8 138:17,
25 139:13,17

**wanted**
13:16 23:13
28:6,19 31:18
32:9 43:12
58:9 65:15
67:12 75:1,14
90:17 95:18,
20 100:7
105:1 107:5
108:17,21
110:9,10,12
113:1,10

127:1 128:1
156:18 157:14
173:11 175:22

**wanting**
92:1 120:6
121:2 140:23
157:24

**warm**
147:9

**warranted**
90:12

**warrior**
176:14,16

**watch**
138:16

**watched**
90:3 92:17
93:6

**watching**
139:8

**website**
45:19

**wee**
21:20

**week**
10:20 22:23
25:6 138:9,14

**week's**
31:19,20

**weekend**
128:20,21
166:4

**weekends**
22:17 23:24

**Weekes**
49:15 66:17
69:6 70:19
74:12 75:18

81:13 83:20
84:6,12
143:25 154:23
155:4 174:17

**weeks**
10:24 24:20
31:24 50:15,
18,25 52:11
78:5 85:11,14
86:5 101:3,8,
11 111:7,10

**Weeks's**
77:10 86:19

**weigh**
55:5

**weird**
102:16 107:11

**Wells**
136:25 137:7

**West**
127:10

**what-if**
154:13

**wherewithal**
91:17

**white**
102:3,5,13,
18,25 103:1
160:14,18,22,
25 161:6,11,
16,20

**whoa**
141:18

**whomever**
67:22 70:13
80:13 81:16

**wi-fi**
62:23

**wise**
42:17

**wished**
81:13 120:8

**withheld**
19:9

**witnesses**
5:15 163:23

**wolves**
109:1

**word**
26:22 86:13
93:22 159:18

**words**
23:4 25:22
26:2,22 41:23
47:24 70:24
75:7 86:19
92:23 171:21

**wore**
47:19 48:9

**work**
13:3 15:10,11
19:14,17
20:6,7,22
21:17 22:2
23:18,23
24:16 25:13,
17 26:5 39:7
46:17 53:3,8,
9,10,11,18,20
59:5 61:1,8,
23,25 63:14
65:14 70:14
102:1 119:8
136:23 138:8,
15 139:9
140:4 157:6,
14 160:8
163:20,25

Ruby Green
April 16, 2021

165:5,10,15
166:5,23,24
171:16 173:3,
18 174:6
175:14
179:12,14,16
181:25

**workday**
79:11 162:22
163:9

**worked**
11:11,12,13,
15,18 12:20
15:5 19:4
22:11,22 23:1
25:18 34:5
45:10 56:20
131:11,12,23
135:1

**working**
12:15 15:6,16
18:1,13 21:12
22:17 23:11,
21 24:13,20
52:17,21,23,
24,25 53:13
54:12 60:13,
15,22 86:7
102:14 128:20
135:4 139:19
157:14 162:9
164:20,22
183:18,20,22

**works**
34:3 133:4
137:13

**world**
45:2

**wow**
136:9

**write**
116:22

**writing**
73:15

**wrong**
47:1 68:9
120:1 174:1,3

**wrote**
118:9 161:14,
15

---
**Y**
---

**year**
9:11 10:3,15,
25 11:7 15:16
18:4,5 38:15,
16 66:18
177:17

**years**
18:4,7 55:16,
17,18 74:18
75:15 144:2,3
149:1 153:3
154:19 155:5
169:21 183:14

**young**
5:4

---
**Z**
---

**zealous**
176:5,17

**Zoom**
6:13 33:8

Ruby Green

vs.

Howard Finkelstein

---

Deposition of:

Ruby Green

April 16, 2021

*Vol 2*

---



PHIPPS REPORTING

*Raising the Bar!*

Ruby Green
April 16, 2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO:  20-CV-62160-BLOOM/Valle

RUBY GREEN,

       Plaintiff,

v.

HOWARD FINKELSTEIN, Individually,
in his Capacity as Public Defender
for Broward County, and the Office
of the Pubic Defender for Broward
County.

       Defendants.
_____/

WEB CONFERENCE DEPOSITION OF
RUBY GREEN

VOLUME 2 (Pages 189-232)

DATE TAKEN:  FRIDAY, APRIL 16, 2021

TIME:  5:23 p.m. - 6:15 p.m. EST

(VIA WEB CONFERENCE)

STENOGRAPHICALLY REPORTED VIA WEB CONFERENCE
BY:  FRANCINE O'CLAIRE, RPR

Job No.:  182495

Ruby Green
April 16, 2021

Page 189

1                              APPEARANCES

2                        (VIA WEB CONFERENCE)

3

4        On behalf of Plaintiff Ruby Green:

5                Frank & Rice, P.A.
                 325 West Park Avenue
6                Tallahassee, FL  32301

7                BY:  PATRICK R. FRANK, ESQ.

8                lawatf@aol.com

9

10       On behalf of the Defendants Howard Finkelstein,

11   individually, in his capacity as Public Defender for

12   Broward County, and the Office of the Public Defender

13   For Broward County:

14

15               Laufer & Laufer, P.A.
                 7251 West Palmetto Park Rd., Suite 305
16               Boca Raton, FL  33433

17               BY:  CORY LAUFER, ESQ.
                 clewfer@lauferlawyers.com

18

19               Also Present via web conference:

20               Alicia Laufer, Attorney for Defendant

21               Dacia Taylor, General Counsel for Public
                 Defender's Office

22

23

24

25

Ruby Green
April 16, 2021

Page 190

1                              I N D E X

2   EXAMINATION                                          PAGE

3   Testimony of RUBY GREEN

4        Direct Examination by Mr. Laufer              191

5

6

    Certificate of Oath                                228
7
    Certificate of Reporter                            229
8
    Read Letter                                        230
9
    Errata Sheet                                       231
10

11

12

13

14                        E X H I B I T S

15

16   EXHIBIT         DESCRIPTION                        PAGE

17   No. 7           Text Messages between             196
                     Finkelstein and Defendant
18

19

20   REPORTER'S NOTE:  All documents were sent to Phipps
     Reporting Electronically.  A digital exhibit sticker
21   was placed on the documents which were marked during
     the proceeding.
22

23

24

25

Ruby Green
April 16, 2021

Page 191

1  Proceedings commenced (Volume 2) at 5:23 p.m. EST.

2                    DIRECT EXAMINATION

3  BY MR. LAUFER:

4      **Q.    Ma'am, a little while ago you had said that,**

5  **you know, it would not have made much sense for you to**

6  **run for Public Defender if you couldn't contrast your**

7  **style with that of the -- of Mr. Finkelstein; do you**

8  **remember saying that?**

9      A.    Wasn't just Mr. Finkelstein.  It was the

10 office as a whole as to what was going on.  It wasn't

11 that.

12     **Q.    Sure.**

13     A.    It wasn't specifically just him, but it was an

14 office as a whole, correct.

15     **Q.    Well, but, I mean, he is the Public Defender,**

16 **correct?**

17     A.    He's the Public Defender, but all of my

18 statements were not just about in --

19          MR. LAUFER:  Ms. Green, I think we lost you.

20 Anybody hear Ms. Green?  No.  Counsel, you don't hear

21 her, right?

22          MR. FRANK:  I don't.  She's -- She just said

23 she left, so she's going to re-enter the meeting.

24          THE WITNESS:  Okay.  I'm back now.

25          MR. LAUFER:  Okay.  Hang on, Ms. Green.  I

Ruby Green
April 16, 2021

Page 192

1  don't know where the court reporter lost you.

2          Madam court reporter, can you tell us where

3  you last heard Ms. Green?

4          THE STENOGRAPHER:  "He's the Public Defender,

5  but all of my statements were not just about in -- "

6      A.   Were not just about him.  It was

7  encompassed -- Everything that was going under the

8  Public Defender's Office, it wasn't just about Howard.

9      You know, like I said, I was making examples,

10  everything that I saw that was going on, you know, at

11  the Public Defender's Office that I know that needed to

12  change was -- was the stuff that I mentioned.  And

13  everything -- It's not even just the Public Defender's

14  Office.  I even went into the State Attorney's Office

15  and talked about the minimum mandatories and how

16  they're the only ones that can waive it, you know, and

17  stuff like that.

18  BY MR. LAUFER:

19      **Q.   I understand, ma'am.  You would agree with**

20  **me -- I don't want this to sound pompous.  But Howard**

21  **Finkelstein, for all intents and purposes, is the**

22  **Public Defender's Office?  I mean, everybody works**

23  **under his supervision at his pleasure; that's just the**

24  **way the statute's set up, isn't it?**

25      A.   No, he is the Public Defender; but he is not

Ruby Green
April 16, 2021

Page 193

1  the Public Defender's Office.  The Public Defender's
2  Office is encompassed by so many other moving parts.
3  It's not just attorneys.  It's staff.  It's, you know,
4  investigators and people that go out and interview
5  clients at the jail, our ERU people.  Then you have,
6  you know, just -- just the regular citizens who are the
7  docket -- I guess we call them docket clerks, who run
8  our every day, the --
9      **Q.   Ma'am, I understand all that.  When you sign**
10 **the pleading of the Public Defender, aren't you signing**
11 **on behalf of Howard Finkelstein?**
12     A.   Are we -- Are we signing on behalf of him?  We
13 are.
14     **Q.   When you do, when you --**
15     A.   We are the assistants, correct.  We are
16 assistant public defenders so --
17     **Q.   Okay.  My question, ma'am, is we talked**
18 **earlier about your statement in the Adams Brothers**
19 **Podcast that you were the only candidate that had tried**
20 **a case in the past 20 years.  Do you recall making any**
21 **other statements to attempt to differentiate yourselves**
22 **from either Gordon Weekes or Judge Lynch?**
23     A.   I don't recall.  I don't know.
24     **Q.   Okay.  Ma'am, I'm going to show you what we'll**
25 **mark as Exhibit --**

Ruby Green
April 16, 2021

Page 194

1    A.   Now --

**2    Q.   -- 7 for today's deposition.  I'm sorry?**

3    A.   Any other statements in -- any other -- Any

4    other statements at any other podcast or that podcast

5    or any other forum?

**6    Q.   No, ma'am, just that podcast.**

7    A.   At that podcast, I believe I talked about

8    Judge Lynch maybe having an issue with -- I think there

9    was a journal that came out where he was sentencing

10   people of color two to three times as much as people of

11   color, and then I think I mentioned about Gordon that

12   there was a case where he was representing someone and

13   he -- the guy got life in prison and, you know, came

14   back that he didn't file certain motions on his behalf

15   or something like that.  I think I mentioned that.

**16   Q.   Okay.  And I just want to be just quick and**

**17   easy about this, do you know how many times Lynch**

**18   appears in the transcript of the Adams Brothers**

**19   Podcast?**

20   A.   No, like I said, I would not know because I

21   didn't see a transcript.

**22   Q.   Understood, ma'am.  If -- if -- If the**

**23   transcript shows zero, would you have any reason to**

**24   dispute that?**

25   A.   If -- Would I have any reason to dispute it?

Ruby Green
April 16, 2021

Page 195

```
 1      Q.    To -- To not agree with what's in the
 2  transcript.
 3          MR. FRANK:  We haven't seen the transcript.
 4  It's not in evidence, so if you want to show her the
 5  transcript.
 6          MR. LAUFER:  I think it was provided to you,
 7  Counsel.  You're sure it wasn't provided to you?
 8          MR. FRANK:  I don't have it.
 9          MR. LAUFER:  Understood.  That's fine.  I'll
10  get it to you, not a problem.
11  BY MR. LAUFER:
12      Q.    Ma'am, do you know how many times the name
13  Weeks appears in the transcript?
14      A.    Like I said, no I wouldn't know.  I didn't
15  receive a transcript.
16      Q.    Okay.  Well, then just going by your own
17  memory, do you know how many times you said the word
18  Gordon in the Adams Brothers Podcast?
19      A.    I don't.  I don't know.  It could have been
20  just general statements or it could have just about me
21  just saying opponents or something like that, I
22  believe.
23      Q.    Okay.  Understood.  All right.  Ma'am, I'm
24  going to show you what we're going to mark as Exhibit 7
25  for today's deposition.  It is -- It should be a
```

Ruby Green
April 16, 2021

Page 196

1  composite exhibit because it is nine pages of text

2  messages.

3      And in a moment I'm going to share my screen, and

4  I'm going to direct your attention to the fifth page;

5  and I'm going to be -- Hold on.  All right.  Ma'am, do

6  you recognize this -- these text messages in -- in this

7  page, page five?  Do you want me to make it bigger?  I

8  see you struggling a little.  How is that -- Is that a

9  little better?

10     A.    Uh-huh.

11          (Exhibit No. 7 was marked.)

12  BY MR. LAUFER:

13     Q.    Okay.  Do you know when this text message was

14  sent?

15     A.    Probably when I was a supervisor at the Public

16  Defender's Office.

17     Q.    The one afterward -- I mean, at some point it

18  says here in the middle November 17, 2017; so I would

19  imagine the back and forth above it would have to be

20  before the November 17, 2017, right?

21     A.    Right.  So by that time --

22     Q.    Okay.

23     A.    I think by that time, by November, I believe I

24  was a chief then.

25     Q.    Okay.  All right.  I'm going to read a part of

Ruby Green
April 16, 2021

Page 197

1  your statement here.  Well, I'll just read the whole

2  thing.  "Good morning" -- this is from you -- "just

3  finished reading your book.  You have an amazing story

4  and am glad you are fulfilling your purpose.  I've

5  never known anyone who has taken the opportunity to

6  learn about and relate to their clients as much as you

7  have.  I'm glad you got your second chance to pass

8  God's Test:to live."

9       So my question, ma'am, is do you -- As we sit here

10  today, do you no longer believe that Mr. Finkelstein

11  through his entire time at the Public Defender took the

12  opportunity to learn about and relate to his clients?

13       A.   No, what I was -- What I've been saying this

14  entire time is, is that I have -- I did not know Howard

15  prior to all of this.  When all of this stuff was going

16  on, when he was given a second chance, when he was

17  practicing and being an amazing attorney, when he was

18  going through his drug rehab problems, even though

19  people speculated that's the reason he wasn't coming to

20  work because he was in rehab or all of that, through

21  all of that I did not know him as that person.

22       At some point we were on really good terms where

23  we -- you know, he told us to read his book.  You know,

24  and as supervisor I read his book.  I thought his story

25  was incredible.  But that's not what was at issue here

Ruby Green
April 16, 2021

Page 198

1   at the Public Defender's Office when I was running for

2   my campaign.  We were in different era.  And even after

3   me running for office, I had -- there was a -- I

4   believe Howard sent me an email by -- based upon the

5   statement that I made in the Sun-Sentinel questionnaire

6   where I, you know, basically praised the fact that, you

7   know, he -- he had done good things for his time; but,

8   you know, I think that things need to be changed.  He

9   praised me for that.  He praised me for that.

10      So I do believe that he had done, like I said

11  before, good things for his time.  But it's a different

12  era now.  There is a lot of things that needed to be

13  changed.

14      **Q.   So when you were telling Howard that you had**

15  **never known anyone to have taken the opportunity to**

16  **learn about and relate to their clients as much as he**

17  **did, you were speaking of the past and not in November**

18  **of 2017 or thereabouts, 2017 --**

19      A.   Right.

20      **Q.   -- is that accurate?**

21      A.   Right.  As -- As you can see, I was talking

22  about the book and everything that he was talking

23  about --

24      **Q.   Okay.**

25      A.   -- in the book, right.

Ruby Green
April 16, 2021

Page 199

1      Q.    So you did not -- So is it fair to say that in
2   2017 you did not believe that Mr. Finkelstein was still
3   maintaining that same level of relating to his clients
4   and learning about them?
5      A.    Correct.  Because he didn't -- he didn't --
6   How could he?  He didn't have any, you know.  I --
7   There's no way that I can make true that statement if
8   he didn't have any clients.
9      Q.    You don't think every client at the Public
10  Defender's Office is Mr. Finkelstein's client?
11     A.    It -- it -- We have to go with this two ways.
12  Technically, yes, because of, you know, he is the
13  Public Defender; and we are the assistant public
14  defenders.  But, you know, in reality he's not the one
15  that goes in and fights for their -- on their behalf.
16  It's the assigned attorney that does that.
17     Q.    Sure.  I mean, the Public Defender's Office
18  has thousands of clients, does it not?
19     A.    Right.
20     Q.    Even -- Even in your mind, the greatest Public
21  Defender in the world couldn't represent thousands of
22  clients by him or herself, right?
23     A.    Right.
24     Q.    Okay.  Ma'am, you mentioned before about the
25  anonymous posting in the JAAB blog -- the J-A-A-B

Ruby Green
April 16, 2021

Page 200

1  blog -- right?

2      A.   Right.  Well, I mean, there wasn't -- There's

3  not a specific anonymous posting but --

4      Q.   **Well, people do is what I mean to say.**

5      A.   Say that again.

6      Q.   **People post anonymously on that -- on that**

7  **blog, correct?**

8      A.   Right.  I don't know -- Yeah, I don't know if

9  anybody actually has, you know, uses their real name on

10  it or not, like I said.

11     Q.   **I got you.  Have you ever posted anonymously**

12  **on the JAAB blog?**

13     A.   No, I --

14     Q.   **Have you ever posted as -- Oh, I'm sorry.  I**

15  **didn't mean to cut you off.  Continue.**

16     A.   No, I read it and I -- You know, people have

17  shown me like -- like clippings of it or whatever, but

18  no.

19     Q.   **You've never posted as you on the JAAB blog?**

20     A.   No, I never posted as me on JAAB blog.

21     Q.   **Okay.  Did you ever consider speaking to**

22  **Mr. Finkelstein about what you said in the Adams**

23  **Brothers Podcast subsequent to the podcast?**

24     A.   Did I?  Well, no, at the time, I was so -- I

25  had taken off two weeks from work in order to run the

Ruby Green
April 16, 2021

Page 201

1  campaign, so I was going through the campaign; and I
2  wasn't supposed to come back to work until the day that
3  I was fired.
4      **Q.   Ma'am, didn't you tell me that you could**
5  **contact Mr. Finkelstein on his cell phone; and he**
6  **almost always answered it?**
7      A.   That's not what the issue was.  The issue was
8  I was so focused on my campaign that I wasn't -- I
9  wasn't doing anything else but campaign stuff.  I was
10 literally out at polls --
11     **Q.   I understand.**
12     A.   -- every day to the time it closed and then,
13 you know, doing other shows, preparing other shows and
14 then, you know --
15     **Q.   I understand that, ma'am.  And I know --**
16 **Ma'am, I know you didn't do it; and I know that would**
17 **have taken up time.  I get what you're saying.**
18     **My question is did you ever contemplate it?  Did**
19 **you ever consider it?  Did the thought ever cross your**
20 **mind even momentarily?**
21     A.   No, it didn't.  It did not.
22     **Q.   All right.  Ma'am, let's talk a little bit**
23 **about your damages in this case.  At the time you were**
24 **terminated, you were earning approximately how much**
25 **money from the Public Defender's Office?**

Ruby Green
April 16, 2021

Page 202

1    A.   By the time I was terminated, I want to say I

2   was under -- earning 72,000 maybe -- I think 72,000.

3    **Q.   And did you -- As you got promoted, did you**

4   **obtain any other benefit compensation, et cetera, that**

5   **you didn't have initially in that first nine months in**

6   **misdemeanor, next nine months in third-degree felonies,**

7   **et cetera?**

8    A.   Well, that -- Besides insurance, you know, you

9   have to -- I believe -- I'm not sure if insurance was

10  immediate.  I think you had to work a few months prior

11  to in misdemeanor like maybe two, three months in order

12  to get the insurance.

13  **Q.   Yeah.  Okay.**

14   A.   But that was the only thing that -- the only

15  other benefit that I would say that I received besides

16  merit raises here and there.

17  **Q.   And you kept the insurance throughout, did you**

18  **not?**

19   A.   Yes.  Yeah, you keep the insurance throughout,

20  right.

21  **Q.   Sure.  Well, I mean you could have declined it**

22  **at some point; but you did not do that?**

23   A.   Who would do that such thing?

24  **Q.   I hear you.  Some people do, trust me.  I**

25  **know.  Okay.  So let me show you -- Let me take you**

Ruby Green
April 16, 2021

Page 203

1  back to Exhibit 5, and these are your answers -- your

2  interrogatory answers as pertains to damages.  So you

3  see lost three months of income, approximately $22,000;

4  do you see that, ma'am?

5      A.   Right.

6      Q.   Now, is that your salary before taxes or after

7  taxes?

8      A.   I want to say after, and it was rounded.

9      Q.   Okay.  That would come out to roughly a shade

10  over 47,000 a month, correct?

11     A.   Right, I believe I was making around 6 -- a

12  little over 6,000 a month so close to -- Yeah, I want

13  to say that.

14     Q.   6,000 was your take-home pay, right, not --

15  that would be the net, not the gross, correct?

16     A.   I'm -- I did not look at my statement, maybe

17  net.

18     Q.   Don't worry about that.

19     A.   Right, I would gross -- Okay.

20     Q.   I got you.  We'll look at the records for

21  that.  Don't worry about that, ma'am.  So it looks like

22  this -- Your second line is I would read this to mean

23  that you've had six therapy appointments, $20 times six

24  is $120; is that right?

25     A.   I've had more therapy appointments then.

Ruby Green
April 16, 2021

Page 204

1    Q.   That was going to be my next question.

2    A.   I would have to actually look at the calendar

3  to see how many.  I try -- I normally have therapy once

4  a week.  I know for sure I didn't have it last week

5  because my therapist was out sick, but I did have it

6  this week.  And then there were a few therapy

7  appointments that I wasn't -- I didn't have to pay for

8  because with the insurance we had before, it lapsed or

9  before I was unable to have it, I got four free

10  sessions.  I know that.

11    Q.   Okay.  So but just for the purposes of your

12  response interrogatories, at the time you filed --

13  filled this out, it was six appointments; I'm reading

14  this right, correct, 20 times six is 120?

15    A.   Yes, right.  It was roughly six appointments,

16  that's correct.

17    Q.   I got you.  Can you -- Can you ballpark for

18  me -- I'm not -- I mean, I know you don't know for

19  sure.  I'm not going to hold you to it.  Can you give

20  me a rough estimate as to what that number is up to now

21  and the number of appointments?

22    A.   Maybe can I -- Do you know what date this was

23  filed on?

24    Q.   It looks like March the 9th of 2021 so, what,

25  five weeks ago?

Ruby Green
April 16, 2021

Page 205

1    A.    So I think I've had four appointments since

2  then, so except for the last week --

3    **Q.    Okay.**

4    A.    -- if I'm not mistaken.

5    **Q.    So roughly ten, right?**

6    A.    Yes, up an extra $80 probably.

7    **Q.    Understood.  Okay.  Ma'am, prior -- From the**

8  **time you started working at the Public Defender's**

9  **Office until the time you were terminated, had you ever**

10  **had any type of therapy similar to what you're doing**

11  **now post termination?**

12    A.    I had one -- I had therapy when I lost my

13  daughter in 2017.  I got the four free sessions and

14  that's -- that's what -- that's what I was doing with

15  the sessions.

16    **Q.    Okay.  When you say "lost your daughter," did**

17  **she pass away?**

18    A.    I had a stillborn.

19    **Q.    Oh, goodness.  I'm sorry.**

20    A.    Yeah.

21    **Q.    Okay.**

22    A.    And then I -- yeah so --

23    **Q.    Okay.  So you had four therapy sessions at**

24  **that point.  Any other -- Any other therapy during the**

25  **time you were at the Broward County Public Defender's**

Ruby Green
April 16, 2021

 1  **Office?**

 2      A.   No, that was it.  And I saw a psychologist --

 3  a psychiatrist for that -- that as well when I lost my

 4  daughter; I saw a psychiatrist --

 5      **Q.   Okay.**

 6      A.   -- for that, you know, posttraumatic stress.

 7      **Q.   Sure.  Okay.  And is your -- I would imagine**

 8  **from what you're telling me, your therapy sessions are**

 9  **ongoing correct?**

10      A.   Yes, they are.

11      **Q.   Okay.  Sorry.  Bear with me for one second.**

12  **Is there -- are you -- your interrogatory answers**

13  **reflect two different therapists, a Adams-Meredith and**

14  **a Ms. Swanson.  Is there a reason for two different**

15  **therapists?  Do they fulfill two different roles?**

16      A.   Yes.

17      **Q.   What -- Tell me about that.**

18      A.   No, they don't fulfill two different roles.

19  What happened was is that with the free treatments, the

20  four free treatments that I had, I had first sought

21  Dawn for that treatment; and when I was unable to pay

22  for any further treatments until I got insurance when I

23  was employed again; and then I found out that Dawn

24  didn't take the insurance that I had.  Therefore, there

25  was no way I could pay for her services without it

Ruby Green
April 16, 2021

Page 207

1  being on my insurance.  And my co-pay is $20.  I can

2  afford $20, as opposed to 100 and something.  So

3  that -- and then I had to wait until I got insurance

4  and sought out people that were actually taking clients

5  during COVID.  And then I was able to find Ms. Swanson

6  after contacting my insurance and, you know, seeing who

7  was in my network.  And then I had another issue with

8  that, then my insurance switched networks; and so I

9  couldn't see Ms. Swanson for a little bit.  That's why

10  the sessions aren't, you know, as much.  But when they

11  switched, I was apparently unable to have Ms. Swanson

12  either until now she was able to get on to the new

13  network that we have.  And I think she was able to do

14  that in March.

15      Q.   Okay.  To the best of your knowledge, all such

16  therapists have kept notes the way they're supposed to,

17  correct, medical records, et cetera?

18      A.   I would hope so.  I can tell you from the free

19  one I had before, who didn't know my name, at every

20  session so now --

21      Q.   Yeah.

22      A.   -- I feel confident that she -- that she does

23  what she needs to do.

24      Q.   Understood.  Okay.  Are you taking any

25  medication as a result of the allegations that you've

Ruby Green
April 16, 2021

1  made in your complaint?

2    A.   I have chosen not to go that route.  Now, I

3  will -- I -- I had a side effect from when I took

4  medication previously for the PTSD.  And, you know, I

5  -- I can't see myself wanting to be medicated on that.

6  I feel as if therapy is, you know, medication in and of

7  itself but, no.  I'm sorry to go on but --

8    **Q.   No, ma'am.  That's fine.  You -- Strike that.**

9  **Has any medical profession -- professional given you a**

10 **diagnosis as it pertains to anything related to the**

11 **therapy sessions that you're going through right now?**

12   A.   Yeah, I believe Dawn did.  Dawn gave me a

13 diagnosis.

14   **Q.   And what was that, ma'am?**

15   A.   I don't -- Depression I know for sure.  I

16 don't know if she said -- I don't -- I don't know if

17 she said anything else, but I remember depression.

18   **Q.   Okay.  Okay.  Do you know if any therapist has**

19 **linked the diagnosis of depression to the events that**

20 **are alleged in your complaint?**

21   A.   Have they told me that they've linked it?

22   **Q.   Yes, ma'am.**

23   A.   No, we don't -- we don't -- they don't

24 diagnose -- they don't really -- It's not like when I'm

25 going to a psychiatrist or a psychologist.  I --

Ruby Green
April 16, 2021

Page 209

1  It's -- The therapy sessions we just mostly talk, and I

2  don't see a psychologist or a psychiatrist, so, no, I

3  haven't -- I don't know if they did or not in their own

4  mind or in their notes, you know, but --

5      Q.   Understood.

6      A.   -- from -- I don't talk like that with them.

7  They don't say I'm going to link this to this that I am

8  aware of.  They could, but I don't know specifically.

9      Q.   Understood, ma'am.  I'm going to bring you

10 back to your interrogatory answer just in a moment.  I

11 just want to go back to No. 17.  You had mentioned

12 depression which, obviously, is here in the

13 interrogatory answer.  Has anyone diagnosed you with

14 having anxiety or is that a term that you came up with?

15     A.   We -- Me and my therapist, we talked about

16 that as well.  So, I mean, yes, anxiety as well, that

17 could have been it.  I'm sorry, I don't have --

18     Q.   Okay.

19     A.   -- everything but --

20     Q.   I understand.  You also -- You were specific

21 about a full body rash.  Did you see any kind of

22 medical professional for a full body rash?

23     A.   I saw Skin Center.

24     Q.   Okay.  Okay.  I don't want to know anything

25 that you and your attorney have discussed, but do you

Ruby Green
April 16, 2021

Page 210

 1   individually have an understanding as to where your

 2   claim for $5 million in emotional distress damages come

 3   from?  And if it only comes from your counsel, I do not

 4   want to know about it.  I'm asking if you have an

 5   independent knowledge as to where that comes from?

 6         MR. FRANK:  Are you talking about the

 7   methodology?

 8         MR. LAUFER:  Yes.  Yes, sir.

 9         MR. FRANK:  Okay.

10     A.   Of -- Of the emotional distress damages?

11   BY MR. LAUFER:

12     Q.   **How -- Right, how that number came to be.**

13     A.   Well, I mean, I -- I can't -- Like I said, I

14   can't really specify.  I can just say that I came up

15   with that number because I do think that the jury

16   should award substantial, you know, damages and, you

17   know, because of everything that I've gone through,

18   everything that I continue -- I continue to go through

19   every time somebody see me, they always make reference

20   to you're that girl or it's so crazy to see you on the

21   other side and, you know, I just -- I don't like -- I

22   don't really -- I don't really know.  I can't go to

23   people and say shut up or, you know, please leave me

24   alone or don't talk about it because -- and I don't

25   want to have a breakdown to where I'm at work, but, you

Ruby Green
April 16, 2021

Page 211

1  know, it just keeps happening.  I'll be in court and

2  like, you know, even though I don't see certain people,

3  you know, every day, so it's just like every time

4  because of I guess the virus because we don't see

5  everybody every day, it's just a new person just comes

6  up and just, you know, just says something, you know,

7  slick or smart about me being on another side or, you

8  know --

9      Q.   I understand, ma'am.  Would your answer be the

10 same if my question was to the punitive damage claim of

11 $2.5 million --

12     A.   Right.

13     Q.   -- as far as how that was calculated?

14     A.   Right.

15          MR. FRANK:  Are you okay, Ruby?

16 BY MR. LAUFER:

17     Q.   Do you want to take a minute?

18     A.   No, no, no.  I'm fine.  I'm sorry.  I'm fine.

19 I really --

20          MR. FRANK:  You don't have to apologize.

21 BY MR. LAUFER:

22     Q.   You need -- You need not apologize, and we

23 don't even have to stop.  We don't even have to take a

24 long break.  Why don't we just take 30 seconds?  We'll

25 all stay on; you just collect yourself.

Ruby Green
April 16, 2021

Page 212

```
 1      A.    I'm fine.

 2      Q.    Okay.

 3      A.    I'm fine.  I'm -- I'm good.  I am.

 4      Q.    Okay.  All right.  So your -- Your economic

 5   damages in loss regarding lost income were capped

 6   because you were hired by the State Attorney's Office

 7   three months after your termination, correct?

 8      A.    I was hired in October, and then I didn't get

 9   paid because we only get paid once a month.  I didn't

10   get paid until November 1st.  It was the last -- The

11   last workday of the month is when we normally get paid

12   is maybe like October -- the last day -- workday of the

13   month in October.

14      Q.    Okay.  So the three months of lost income, is

15   that the time that you were out of work or is that from

16   the time you were fired until you received your first

17   paycheck?

18      A.    From the time that I was fired and received my

19   first paycheck.

20      Q.    Okay.  All right.  And what is your current

21   position with the State Attorney's Office?

22      A.    I'm a lead felony attorney.

23      Q.    Okay.  As we sit here today, you have no plans

24   to voluntarily give up your current employment,

25   correct?
```

Ruby Green
April 16, 2021

Page 213

1    A.    No.

2    Q.    I'm sorry, ma'am, is that correct, though?

3    A.    No.  Can you hear me?

4    Q.    Yeah, I just -- you -- you -- Let me ask you a
5    different way.  Do you have any intention to
6    voluntarily leave your current employment?

7    A.    No.

8    Q.    Okay.  Did you at some point become aware of
9    an alleged conversation between the current State
10   Attorney and Gordon Weekes regarding your employment at
11   the State Attorney's Office?

12   A.    Yes.

13   Q.    How did you become aware of that statement?

14   A.    Some guy out in the community had told me, and
15   then I called Harold to confirm.

16   Q.    I'm sorry, did you say some guy out in the
17   committee?

18   A.    Community.  It was like --

19   Q.    Oh, community.

20   A.    Yeah, it was -- I received a weird phone call
21   from this guy, Karine Williams or something like that
22   and he told me -- he told me what they were planning.
23   I just freaked out because I had just called for
24   something and then --

25   Q.    Okay.

Ruby Green
April 16, 2021

Page 214

```
 1      A.   -- I had to call him to confirm that, you
 2   know, that he wasn't going to do that to me.
 3      Q.   Okay.  Take your time, ma'am.  I just -- my --
 4   I just want to make sure I understood you correctly.
 5   Did you say he told you what they are planning; is that
 6   what you said?
 7      A.   Yes.  He said it was.
 8      Q.   Who is "they"?
 9      A.   He said it was Gordon, Marsha Ellison, which
10   is with the NAACP, but she was like Gordon's right-hand
11   man, and a former judge named Ilona Holmes.
12      Q.   Okay.  So -- So Karine Williams told you there
13   was some plan between Gordon Weekes, Marsha Ellison of
14   the NAACP and Judge Holmes, and they were planning
15   something; what was it that they were planning?
16      A.   That to fire me, that to tell Harold that he
17   should fire me because I was going to come for his job.
18      Q.   Okay.  Did you ever have any conversations
19   with either Mr. Weeks, Ms. Ellison or Judge Holmes
20   about your employment with the State Attorney's Office?
21      A.   I didn't have it.  I didn't have any --
22      Q.   Okay.
23      A.   -- conversation.  But it was confirmed to me
24   that it happened by Harold.
25      Q.   Okay.  So -- So, in other words, having been
```

Ruby Green
April 16, 2021

Page 215

 1  tipped off by Mr. Williams, you then go to Harold Pryor

 2  to get to the source, so to speak, correct?

 3      A.   Right.

 4      Q.   And what did -- What did Mr. Pryor tell you?

 5      A.   He said that -- that Gordon had approached him

 6  and basically said that, you know, you better watch

 7  out, you better -- I can't remember the specifics; but

 8  she gonna come for you next or something like that.

 9      It was a phone conversation.  I can't remember

10  verbatim about, you know, you might want to get rid of

11  her.

12      Q.   Because somehow his job was in jeopardy

13  because of what you might do?

14      A.   Correct.

15      Q.   Okay.  Did -- Did Mr. Pryor tell you anything

16  about this Ms. Ellison or Judge Holmes?

17      A.   Yeah, there were -- apparently there were --

18  he didn't -- He wasn't a part of that, so this is

19  something that he had got hearsay because it was told

20  to him by another person in the community -- and I'm

21  not sure who it was -- that they had all met up; and

22  that's why Gordon approached him with that because they

23  were all on the same ticket when they were running for

24  office so --

25      Q.   When you say they had all -- I'm sorry, ma'am.

Ruby Green
April 16, 2021

Page 216

1   I didn't -- continue, please.

2       A.   No, I was saying that, you know, they were on

3   the same ticket when they were running, so I guess he

4   felt comfortable enough that he could go and, you know,

5   make exchange but --

6       Q.   Okay.  So, I'm sorry, ma'am, when you say they

7   all met up, you were talking about Mr. Weeks and

8   Mr. Pryor, correct?

9       A.   No, no.  When they all met up, it was Gordon,

10  Ilona Holmes and Marsha Ellison.  Apparently there were

11  other people at the meeting, which is how Mr. Williams

12  found out.

13      Q.   And the purpose of this apparent meeting was

14  to find a way to get you fired from the State

15  Attorney's Office?

16      A.   That -- Listen, I don't know what the entire

17  meeting was about but I -- it -- Allegedly from what

18  Mr. Williams told me, it happened at a meeting that he

19  was there.  I did not ask him anything as to what was

20  this meeting about, why were you all all together or

21  anything like that.

22      He just told me --

23      Q.   Right.

24      A.   -- specifically the parts about me, and he

25  told me to watch out and everything.

Ruby Green
April 16, 2021

Page 217

```
 1      Q.    So when you say people were on the same
 2  ticket, who was on the same ticket; what did you mean
 3  by that?
 4      A.    Oh, Gordon and Harold were on the same
 5  ticket --
 6      Q.    Right.  Okay.
 7      A.    -- when they were --
 8      Q.    I think we're --
 9      A.    Yeah, they were being supported by Marsha
10  Ellison of the NAACP.
11      Q.    Had you ever had any prior dealings with
12  Marsha Ellison at the NAACP?
13      A.    Yes.
14      Q.    Okay.  What kind of dealings did you have with
15  her?
16      A.    It was just -- she's just -- wasn't cordial.
17  It was like when I was -- I believe I was becoming the
18  president of the T.J. Reddick Bar Association; and she
19  had an advance; and she was on the stage; and I reached
20  out with my hand to shake her hand to introduce myself;
21  and she did not shake my hand or anything.
22      She just literally looked down on me while she was
23  on the stage, and I'm a pretty short girl; and she
24  asked me what I was doing here, you know.  And it was a
25  public event.  It was like -- It was a school to
```

Ruby Green
April 16, 2021

Page 218

1   prison --

2          THE STENOGRAPHER:   (Interrupted for

3   clarification.)

4       A.   Pipeline event.  And so they had like a panel,

5   and the members of the community were out there.  So I

6   went to her to introduce myself as like a member of the

7   T.J. Reddick Bar Association.  And, you know, I think

8   she had issues with the T.J. Reddick Bar Association

9   because she didn't feel like they did anything in the

10  past.

11      So she probably had some discontent with, you

12  know, the organization as a whole, you know.  But then

13  it was a weird situation because as -- when men were a

14  part of the organization like -- like Harold, he was a

15  president of the organization or George Odom, he was a

16  president of the organization, you know, they got along

17  very well.  She -- The women she just didn't get along

18  so well with.

19  BY MR. LAUFER:

20      **Q.   Okay.  And same thing for Judge Holmes, did**

21  **you have any prior dealings with Judge Holmes?**

22      A.   Yeah, yeah, yeah, yeah, I have --

23      **Q.   Okay.**

24      A.   -- not --

25      **Q.   Do you have any --**

Ruby Green
April 16, 2021

Page 219

1    A.    Say that again.

2    Q.    Sorry.  My question was going to be, did any

3  of your prior dealings with Judge Holmes give you an

4  idea as to why she might be interested in trying to get

5  you fired from the State Attorney's Office?

6    A.    No, absolutely not.  That's why it was such a

7  shock.

8    Q.    Okay.  But you've never spoken to Judge Holmes

9  about it since?

10   A.    No.

11   Q.    Okay.  I mean, other than the fact that Gordon

12 Weekes was your opponent in an election, do you have

13 any reason to -- any reason -- Is there any reason in

14 your mind why he would want to see you fired from the

15 State Attorney's Office?

16   A.    All I can say was that, you know, he was angry

17 about, you know -- I don't know.  He was angry, I

18 guess, that I came so close or some -- I don't know.  I

19 can't speculate really.  I have absolutely no --

20   Q.    Okay.

21   A.    -- idea.

22   Q.    Did Mr. Pryor give you any other firsthand

23 information regarding this conversation with Mr. Weeks?

24   A.    No, that was it.

25   Q.    And this was all just in one conversation?

Ruby Green
April 16, 2021

Page 220

```
 1     A.   Yeah.
 2     Q.   And do you know how long was between
 3  Mr. Pryor's conversation with Mr. Weeks and then
 4  Mr. Pryor's conversation with you?
 5     A.   I had no idea.  I didn't -- I didn't ask.  I
 6  can tell you I didn't ask any of that.
 7     Q.   I'm sorry, didn't ask what?
 8     A.   I didn't -- I didn't ask any of that.  I
 9  didn't ask, like, oh, how long ago.  I didn't ask.
10     Q.   Oh, okay.
11     A.   I just wanted to know if he said it and if he
12  was going to act upon it, you know.  That was my
13  concern whether or not he was going to, you know, do
14  based upon what he said.
15     Q.   Given your current situation, can we assume
16  that he is not going to act upon it?
17     A.   Right, I'm very happy that --
18     Q.   All right.  I want to -- Understood, ma'am.
19     I want to direct your attention back again back to
20  your interrogatory answers; and I want to show you a
21  list of individuals that you have listed in your
22  interrogatory answers; and I understand you have given
23  us an explanation as to what each of these people --
24  what their personal knowledge is.  But what I want to
25  ask you, ma'am, is for numbers five through eleven, to
```

Ruby Green
April 16, 2021

Page 221

1   the best of your knowledge -- can you see it?

2       A.   I can see it.

3       Q.   Let's make it even larger.  Let's do five

4   through nine right now, make it easier for you.  Of the

5   individuals in five through nine, do you know if any of

6   these individuals have firsthand knowledge as to Howard

7   Finkelstein's decision-making process in terminating

8   your employment?

9       A.   No, not -- not, none of those people, no.

10      Q.   Okay.  Now, I'm going to -- Well, we're kind

11  of cut off here; so you're only going to see maybe ten

12  through 12.  Magda Janicke, Ashley Gant, George Rerez,

13  Senior; did any of those individuals have any firsthand

14  knowledge as to Harold Finkelstein's decision-making

15  process in terminating your employment?

16      A.   No.

17      Q.   What about -- Well, we're only left with No.

18  13, Josia James.  Does Mr. Josia James have any

19  firsthand knowledge as to your -- I'm sorry -- as to

20  Mr. Finkelstein's decision-making process as pertains

21  to your termination?

22      A.   No.

23      Q.   Is there anybody that you believe has

24  firsthand knowledge as to Mr. Finkelstein's decision to

25  terminate you other than Mr. Finkelstein?

Ruby Green
April 16, 2021

Page 222

1      A.    Gordon or Renee.

2      Q.    **And what gives you that idea?**

3      A.    Because they were -- he said Gordon -- He said

4    that he consulted Gordon about it and -- and if I'm

5    speaking about some of the things that I've seen that

6    you all have turned over, Renee based upon some

7    conversations that they've had; but he specifically

8    said that he consulted Gordon in the -- in the article

9    that came out.

10     Q.    **Okay.  And there were emails that we turned**

11   **over to your lawyer that pertains to Mr. Finkelstein's**

12   **decision-making process.  Do you have any information**

13   **as to this decision-making process that is outside of**

14   **those emails that we turned over and -- I'm sorry,**

15   **ma'am, or that -- or that's stated in any article for**

16   **the media?**

17     A.    No, I don't know anything otherwise, no.

18     Q.    **Okay.  Have you had any direct communication**

19   **with Mr. Finkelstein since your termination regarding**

20   **the basis -- the rationale for your termination?**

21     A.    No.

22     Q.    **What about as to Mr. Weeks, did you talk to**

23   **Mr. Weeks about any -- since your termination about any**

24   **rationale for your termination?**

25     A.    No.

Ruby Green
April 16, 2021

Page 223

1    Q.   What about Ms. Dadowski, same question?

2    A.   No.

3    Q.   Have you spoken to Ms. Dadowski at all since

4    your termination?

5    A.   I sent her a message saying I heard about what

6    happened because I know she was fired, and that was it.

7    Q.   Did she respond?

8    A.   Yeah, she just said she thinks, you know,

9    hopefully things get better for us or something like

10   that.  Hopefully --

11   Q.   Okay.

12   A.   -- you have a better year or something like

13   that.

14   Q.   Okay.  You said you sent a message, was that

15   text?  Email?  What's the -- How did you send it?

16   A.   I want to say it was a text message.

17   Q.   Okay.  Have you had any -- Have you had any

18   discussions with anyone, any other member -- Strike

19   that.  Sorry.  Same question as to the rationale for

20   your termination; have you had any conversation with

21   any either prior or current member of the Broward

22   County Public Defender's Administration about the

23   rationale for your termination?

24   A.   No.

25   Q.   Have you had any conversation with any

Ruby Green
April 16, 2021

1   employee -- current employee of the Broward Public

2   Defender's Office regarding the rationale for your

3   employment -- your employment termination, rather?

4       A.   You mean, Howard's rationale?

5       Q.   **Yes, ma'am.**

6       A.   Meaning that Howard may have told them what it

7   was for?

8       Q.   **That's -- That's one possibility, just asking**

9   **them if they know the rationale for --**

10      A.   No.

11      Q.   **-- your termination?**

12      A.   No.  People --

13      Q.   **What --**

14      A.   People just --

15      Q.   **I'm sorry, ma'am, "people just"?**

16      A.   Speculate.

17      Q.   **Of course.  Understood.  What about any former**

18  **member of the Public Defender's Office; have you spoken**

19  **with any former employee as to Howard Finkelstein's**

20  **rationale for your termination?**

21      A.   No, people just only mentioned about what he

22  said in the paper.

23      Q.   **Right.  And, obviously, you know that.  You**

24  **don't need someone to tell you that; you read that**

25  **yourself, right?**

Ruby Green
April 16, 2021

Page 225

1    A.    Right.

2    Q.    Okay.  Ms. Green, I think we are almost done.

3  I'm going to look through my notes just to make sure I

4  have covered everything.

5    I want to thank you in advance for your patience

6  and participation here and I -- Just give me about one

7  minute to look through things, and we may be done.

8  Your counsel may have some questions at the conclusion

9  to straighten certain answers out.  But give me one

10 more minute, if you would please, ma'am.

11   A.    Okay.

12   Q.    Do you know Nancy Daniels; does that name ring

13 a bell to you at all?

14   A.    Nancy Daniels, no.

15   Q.    Yes, ma'am.

16   A.    Who -- Nancy -- Was it from maybe the Public

17 Defender's Office, Nancy?

18   Q.    She's -- she's -- I don't think she's an

19 employee of your former office.

20   A.    Oh, then, no, I don't know a Nancy Daniel.  I

21 think -- I remember a secretary a long time ago.  She

22 was hired a while ago.  I believe her name was Nancy.

23   Q.    Understood.  We talked about your two

24 therapists.  Do you have any current plans to see any

25 other medical professional for anything related to the

Ruby Green
April 16, 2021

Page 226

1  loss that we're here on today?

2      A.    I might have to see someone in reference to

3  migraines but that's --

4      Q.    **Hmm-hmm.**

5      A.    That's about it.

6      Q.    **Have you suffered migraines in the past?**

7      A.    No, they're -- They've just come upon me quite

8  recently lately so --

9      Q.    **Did you say quite frequently or recently?**

10     A.    Quite frequently lately.

11     Q.    **Understood.  Okay.  Do you have any other**

12  **current appointment to see any medical professionals**

13  **besides the two therapists that we just spoke of?**

14     A.    No.

15     Q.    **Specific, I mean.**

16     A.    No, I don't.

17     Q.    **Okay.  Do you remember -- We just spoke a**

18  **moment ago about the emails between Mr. Finkelstein,**

19  **Mr. Weeks and Ms. Dadowski that pertain to your**

20  **termination.**

21     **Did you have those emails prior to us turning them**

22  **over to you?  Had you seen them prior to that, ma'am?**

23     A.    No.

24           MR. LAUFER:  Okay.  Ms. Green, I don't have

25  anything further.  I'm just going to reserve to

Ruby Green
April 16, 2021

Page 227

1  possibly come back to get the medical issues expand --

2  if the records expand.  But other than that, I thank

3  you very much.  Your counsel may have some follow-up

4  questions for you.

5          MR. FRANK:  I don't have any follow-up

6  questions.  I think she did well.  We'll read.

7          I do have two follow-up questions.  Are you

8  representing Renee Dadowski?

9          MR. LAUFER:  Am I representing Renee Dadowski?

10 I'm not sure what the context of that question is, but

11 I don't know if -- Ms. Dadowski is a former, not only

12 an employee, but a manager; so the attorney/client

13 privilege would extend to her.

14         I represent the Broward Public Defender's

15 Office.  Hold on, Counsel.  Sorry, now you're garbled.

16         So if your question is will I -- will I

17 enforce an attorney/client privilege with Renee

18 Dadowski, the answer to that would be yes.

19         Is there -- Was there a second question?  Are

20 you frozen or --

21         MR. FRANK:  I froze.

22         THE STENOGRAPHER:  (Interrupted for

23 clarification.)

24         MR. LAUFER:  Hold on.  The court reporter is

25 frantically waving her hands, is probably her way of

Ruby Green
April 16, 2021

Page 228

1  saying are we still on the record.

2        MR. FRANK:  It's your deposition.  It's up to

3  you.

4        MR. LAUFER:  No, no, no.  I wasn't asking you

5  that question, sir.  I was just trying to call you away

6  for a second.  No, we are no longer on the record.

7        The witness indicated she will read.  I will

8  order.  Sorry, Counsel.  I just wanted to let the court

9  reporter -- I didn't want to stress her out.

10        MR. FRANK:  I'll take a copy.

11        (Proceedings concluded at 6:15 p.m. EST.)

12                    * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

Ruby Green
April 16, 2021

Page 229

```
 1                    CERTIFICATE OF OATH

 2

 3

 4   STATE OF FLORIDA  )

 5   COUNTY OF BROWARD )

 6

 7

 8

 9

10            I, the undersigned authority, certify that

11   RUBY GREEN appeared remotely via web conference before

12   me on the 16th day of April, 2021, and was duly sworn.

13

14            Signed this 22nd day of April, 2021.

15

16

17

18

19

20

21

22   _____

23   FRANCINE O'CLAIRE, RPR
     Notary Public State of Florida
24   Comm# 1654948 Exp. 03/31/2025.

25
```

Ruby Green
April 16, 2021

Page 230

1                     CERTIFICATE OF REPORTER

2

3     STATE OF FLORIDA  )

4     COUNTY OF BROWARD )

5

6              I, FRANCINE O'CLAIRE, RPR, do hereby certify

7     that I was authorized to and did stenographically

8     report the foregoing deposition of RUBY GREEN; that a

9     review of the transcript was requested; and that the

10    foregoing transcript, pages numbered 1 through 174 is a

11    true record of my stenographic notes.

12             I FURTHER CERTIFY that I am not a relative,

13    employee, attorney or counsel of any of the parties' or

14    counsel connected with the action, nor am I financially

15    interested in the action.

16             DATED this 22nd day of April, 2021.

17

18

19

20    _____

      FRANCINE O'CLAIRE

21    Court Reporter, RPR

22

23

24

25

Ruby Green
April 16, 2021

                                                                        Page 231

1   April 22, 2021

2

3   Ruby Green,
    c/o Frank & Rice, P.A.
4   325 West Park Avenue.
    Tallahassee, FL 32301
5
    ATTN:  Mr. Frank
6
    Re:  Ruby Green v. Howard Finkelstein, et al
7   Case No. 20-cv-62160-BLOOM/Valle

8   Please take notice that on the 16th day of April, 2021,
    you gave your deposition in the above cause.  At that
9   time you did not waive your signature.

10
    The above-addressed attorney has ordered a copy of this
11  transcript and will make arrangements with you to read
    their copy.  Please execute the Errata Sheet, which can
12  be found at the back of the transcript, and have it
    returned to us for distribution to all parties.

13

14  If you do not read and sign the deposition within a
    reasonable amount of time, the original, which has
15  already been forwarded to the ordering attorney, may be
    filed with the Clerk of the Court.

16

17  If you wish to now waive signature, please sign your
    name in the blank at the bottom of this letter and
18  return to the email address listed below.
    Very truly yours,
19
    Francine O'Claire, RPR
20  Phipps Reporting, Inc.
    Production@phippsreporting.com
21
    I do hereby waive my signature.
22
    _____
23  Ruby Green

24  Job No.:  182495

25

Ruby Green
April 16, 2021

Page 232

```
 1                         ERRATA SHEET

 2                 DO NOT WRITE ON THE TRANSCRIPT
                   ENTER CHANGES ON THIS SHEET
 3

 4    RUBY GREEN vs. HOWARD FINKELSTEIN, et al

 5    Deponent:   RUBY GREEN

 6    Date Taken: April 16, 2021

 7    Case No.:   20-cv-62160-BLOOM/Valle

 8    PAGE   LINE         REMARKS

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    Under penalties of perjury, I declare that I have read
      the foregoing document and that the facts stated in it
22    are true.

23    Signature of Witness: _____

24    Dated this _____ day of _____, _____.

25    Job No.:  182495
```

Ruby Green
April 16, 2021

1

---

**Exhibits**

Exhibit 007 Green
  190:17 195:24
  196:11

---

**$**

$120
  203:24
$2.5
  211:11
$20
  203:23 207:1,
  2
$22,000
  203:3
$5
  210:2
$80
  205:6

---

**1**

100
  207:2
12
  221:12
120
  204:14
13
  221:18
17
  196:18,20
  209:11
1st
  212:10

---

**2**

2
  191:1
20
  193:20 204:14
2017
  196:18,20
  198:18 199:2
  205:13
2021
  204:24

---

**3**

30
  211:24

---

**4**

47,000
  203:10

---

**5**

5
  203:1
5:23
  191:1

---

**6**

6
  203:11
6,000
  203:12,14
6:15
  228:11

---

**7**

7
  194:2 195:24
  196:11
72,000
  202:2

---

**9**

9th
  204:24

---

**A**

absolutely
  219:6,19
accurate
  198:20
act
  220:12,16
Adams
  193:18 194:18
  195:18 200:22
Adams-meredith
  206:13
Administration
  223:22
advance
  217:19 225:5
afford
  207:2
afterward
  196:17
agree
  192:19 195:1
allegations
  207:25

---

alleged
  208:20 213:9
Allegedly
  216:17
amazing
  197:3,17
angry
  219:16,17
anonymous
  199:25 200:3
anonymously
  200:6,11
answers
  203:1,2
  206:12
  220:20,22
  225:9
anxiety
  209:14,16
apologize
  211:20,22
apparent
  216:13
apparently
  207:11 215:17
  216:10
appears
  194:18 195:13
appointment
  226:12
appointments
  203:23,25
  204:7,13,15,
  21 205:1
approached
  215:5,22
approximately
  201:24 203:3

---

Ruby Green
April 16, 2021

article
  222:8,15
Ashley
  221:12
assigned
  199:16
assistant
  193:16 199:13
assistants
  193:15
Association
  217:18 218:7,
  8
assume
  220:15
attempt
  193:21
attention
  196:4 220:19
attorney
  197:17 199:16
  209:25 212:22
  213:10
Attorney's
  192:14 212:6,
  21 213:11
  214:20 216:15
  219:5,15
attorney/client
  227:12,17
attorneys
  193:3
award
  210:16
aware
  209:8 213:8,
  13

—————————
B
—————————

back
  191:24 194:14
  196:19 201:2
  203:1 209:10,
  11 220:19
  227:1
ballpark
  204:17
Bar
  217:18 218:7,
  8
based
  198:4 220:14
  222:6
basically
  198:6 215:6
basis
  222:20
Bear
  206:11
behalf
  193:11,12
  194:14 199:15
bell
  225:13
benefit
  202:4,15
bigger
  196:7
bit
  201:22 207:9
blog
  199:25 200:1,
  7,12,19,20
body
  209:21,22

book
  197:3,23,24
  198:22,25
break
  211:24
breakdown
  210:25
bring
  209:9
Brothers
  193:18 194:18
  195:18 200:23
Broward
  205:25 223:21
  224:1 227:14

—————————
C
—————————

calculated
  211:13
calendar
  204:2
call
  193:7 213:20
  214:1 228:5
called
  213:15,23
campaign
  198:2 201:1,
  8,9
candidate
  193:19
capped
  212:5
case
  193:20 194:12
  201:23
cell
  201:5

Center
  209:23
cetera
  202:4,7
  207:17
chance
  197:7,16
change
  192:12
changed
  198:8,13
chief
  196:24
chosen
  208:2
citizens
  193:6
claim
  210:2 211:10
clarification
  218:3 227:23
clerks
  193:7
client
  199:9,10
clients
  193:5 197:6,
  12 198:16
  199:3,8,18,22
  207:4
clippings
  200:17
close
  203:12 219:18
closed
  201:12
co-pay
  207:1

Ruby Green
April 16, 2021

3

collect
  211:25
color
  194:10,11
comfortable
  216:4
commenced
  191:1
committee
  213:17
communication
  222:18
community
  213:14,18,19
  215:20 218:5
compensation
  202:4
complaint
  208:1,20
composite
  196:1
concern
  220:13
concluded
  228:11
conclusion
  225:8
confident
  207:22
confirm
  213:15 214:1
confirmed
  214:23
consulted
  222:4,8
contact
  201:5

contacting
  207:6
contemplate
  201:18
context
  227:10
continue
  200:15 210:18
  216:1
contrast
  191:6
conversation
  213:9 214:23
  215:9 219:23,
  25 220:3,4
  223:20,25
conversations
  214:18 222:7
copy
  228:10
cordial
  217:16
correct
  191:14,16
  193:15 199:5
  200:7 203:10,
  15 204:14,16
  206:9 207:17
  212:7,25
  213:2 215:2,
  14 216:8
correctly
  214:4
counsel
  191:20 195:7
  210:3 225:8
  227:3,15
  228:8

County
  205:25 223:22
court
  192:1,2 211:1
  227:24 228:8
covered
  225:4
COVID
  207:5
crazy
  210:20
cross
  201:19
current
  212:20,24
  213:6,9
  220:15 223:21
  224:1 225:24
  226:12
cut
  200:15 221:11

———————————

D

Dadowski
  223:1,3
  226:19 227:8,
  9,11,18
damage
  211:10
damages
  201:23 203:2
  210:2,10,16
  212:5
Daniel
  225:20
Daniels
  225:12,14
date

204:22
daughter
  205:13,16
  206:4
Dawn
  206:21,23
  208:12
day
  193:8 201:2,
  12 211:3,5
  212:12
dealings
  217:11,14
  218:21 219:3
decision
  221:24
decision-making
  221:7,14,20
  222:12,13
declined
  202:21
Defender
  191:6,15,17
  192:4,25
  193:10 197:11
  199:13,21
Defender's
  192:8,11,13,
  22 193:1
  196:16 198:1
  199:10,17
  201:25 205:8,
  25 223:22
  224:2,18
  225:17 227:14
defenders
  193:16 199:14
deposition
  194:2 195:25

Ruby Green
April 16, 2021

4

228:2

**depression**
208:15,17,19
209:12

**diagnose**
208:24

**diagnosed**
209:13

**diagnosis**
208:10,13,19

**differentiate**
193:21

**direct**
191:2 196:4
220:19 222:18

**discontent**
218:11

**discussed**
209:25

**discussions**
223:18

**dispute**
194:24,25

**distress**
210:2,10

**docket**
193:7

**drug**
197:18

---

E

**earlier**
193:18

**earning**
201:24 202:2

**easier**
221:4

**easy**
194:17

**economic**
212:4

**effect**
208:3

**election**
219:12

**eleven**
220:25

**Ellison**
214:9,13,19
215:16 216:10
217:10,12

**email**
198:4 223:15

**emails**
222:10,14
226:18,21

**emotional**
210:2,10

**employed**
206:23

**employee**
224:1,19
225:19 227:12

**employment**
212:24 213:6,
10 214:20
221:8,15
224:3

**encompassed**
192:7 193:2

**enforce**
227:17

**entire**
197:11,14
216:16

**era**
198:2,12

**ERU**
193:5

**EST**
191:1 228:11

**estimate**
204:20

**event**
217:25 218:4

**events**
208:19

**evidence**
195:4

**EXAMINATION**
191:2

**examples**
192:9

**exchange**
216:5

**exhibit**
193:25 195:24
196:1,11
203:1

**expand**
227:1,2

**explanation**
220:23

**extend**
227:13

**extra**
205:6

---

F

**fact**
198:6 219:11

**fair**

**feel**
207:22 208:6
218:9

**felonies**
202:6

**felony**
212:22

**felt**
216:4

**fights**
199:15

**file**
194:14

**filed**
204:12,23

**filled**
204:13

**find**
207:5 216:14

**fine**
195:9 208:8
211:18 212:1,
3

**finished**
197:3

**Finkelstein**
191:7,9
192:21 193:11
197:10 199:2
200:22 201:5
221:25 222:19
226:18

**Finkelstein's**
199:10 221:7,
14,20,24
222:11 224:19

**fire**

Ruby Green
April 16, 2021

5

214:16,17

**fired**
201:3 212:16,
18 216:14
219:5,14
223:6

**firsthand**
219:22 221:6,
13,19,24

**focused**
201:8

**follow-up**
227:3,5,7

**forum**
194:5

**found**
206:23 216:12

**FRANK**
191:22 195:3,
8 210:6,9
211:15,20
227:5,21
228:2,10

**frantically**
227:25

**freaked**
213:23

**free**
204:9 205:13
206:19,20
207:18

**frequently**
226:9,10

**froze**
227:21

**frozen**
227:20

**fulfill**

206:15,18

**fulfilling**
197:4

**full**
209:21,22

---

**G**

**Gant**
221:12

**garbled**
227:15

**gave**
208:12

**general**
195:20

**George**
218:15 221:12

**get along**
218:17

**girl**
210:20 217:23

**give**
204:19 212:24
219:3,22
225:6,9

**glad**
197:4,7

**God's**
197:8

**good**
197:2,22
198:7,11
212:3

**goodness**
205:19

**Gordon**
193:22 194:11
195:18 213:10

214:9,13
215:5,22
216:9 217:4
219:11 222:1,
3,4,8

**Gordon's**
214:10

**greatest**
199:20

**Green**
191:19,20,25
192:3 225:2
226:24

**gross**
203:15,19

**guess**
193:7 211:4
216:3 219:18

**guy**
194:13
213:14,16,21

---

**H**

**hand**
217:20,21

**hands**
227:25

**Hang**
191:25

**happened**
206:19 214:24
216:18 223:6

**happening**
211:1

**happy**
220:17

**Harold**
213:15

214:16,24
215:1 217:4
218:14 221:14

**hear**
191:20 202:24
213:3

**heard**
192:3 223:5

**hearsay**
215:19

**hired**
212:6,8
225:22

**Hmm-hmm**
226:4

**hold**
196:5 204:19
227:15,24

**Holmes**
214:11,14,19
215:16 216:10
218:20,21
219:3,8

**hope**
207:18

**Howard**
192:8,20
193:11 197:14
198:4,14
221:6 224:6,
19

**Howard's**
224:4

---

**I**

**idea**
219:4,21
220:5 222:2

Ruby Green
April 16, 2021

6

**Ilona**
  214:11 216:10
**imagine**
  196:19 206:7
**income**
  203:3 212:5,
  14
**incredible**
  197:25
**independent**
  210:5
**individually**
  210:1
**individuals**
  220:21 221:5,
  6,13
**information**
  219:23 222:12
**initially**
  202:5
**insurance**
  202:8,9,12,
  17,19 204:8
  206:22,24
  207:1,3,6,8
**intention**
  213:5
**intents**
  192:21
**interested**
  219:4
**interrogatories**
  204:12
**interrogatory**
  203:2 206:12
  209:10,13
  220:20,22
**interrupted**

  218:2 227:22
**interview**
  193:4
**introduce**
  217:20 218:6
**investigators**
  193:4
**issue**
  194:8 197:25
  201:7 207:7
**issues**
  218:8 227:1

---

**J**

**J-A-A-B**
  199:25
**JAAB**
  199:25
  200:12,19,20
**jail**
  193:5
**James**
  221:18
**Janicke**
  221:12
**jeopardy**
  215:12
**job**
  214:17 215:12
**Josia**
  221:18
**journal**
  194:9
**judge**
  193:22 194:8
  214:11,14,19
  215:16
  218:20,21

  219:3,8
**jury**
  210:15

---

**K**

**Karine**
  213:21 214:12
**kind**
  209:21 217:14
  221:10
**knowledge**
  207:15 210:5
  220:24 221:1,
  6,14,19,24

---

**L**

**lapsed**
  204:8
**larger**
  221:3
**LAUFER**
  191:3,19,25
  192:18 195:6,
  9,11 196:12
  210:8,11
  211:16,21
  218:19 226:24
  227:9,24
  228:4
**lawyer**
  222:11
**lead**
  212:22
**learn**
  197:6,12
  198:16
**learning**
  199:4

**leave**
  210:23 213:6
**left**
  191:23 221:17
**level**
  199:3
**life**
  194:13
**link**
  209:7
**linked**
  208:19,21
**list**
  220:21
**listed**
  220:21
**Listen**
  216:16
**literally**
  201:10 217:22
**live**
  197:8
**long**
  211:24 220:2,
  9 225:21
**longer**
  197:10 228:6
**looked**
  217:22
**loss**
  212:5 226:1
**lost**
  191:19 192:1
  203:3 205:12,
  16 206:3
  212:5,14
**lot**
  198:12

Ruby Green
April 16, 2021

7

Lynch
  193:22 194:8,
  17

_____

**M**

_____

Madam
  192:2
made
  191:5 198:5
  208:1
Magda
  221:12
maintaining
  199:3
make
  196:7 199:7
  210:19 214:4
  216:5 221:3,4
  225:3
making
  192:9 193:20
  203:11
man
  214:11
manager
  227:12
mandatories
  192:15
March
  204:24 207:14
mark
  193:25 195:24
marked
  196:11
Marsha
  214:9,13
  216:10 217:9,
  12

Meaning
  224:6
media
  222:16
medical
  207:17 208:9
  209:22 225:25
  226:12 227:1
medicated
  208:5
medication
  207:25 208:4,
  6
meeting
  191:23
  216:11,13,17,
  18,20
member
  218:6 223:18,
  21 224:18
members
  218:5
memory
  195:17
men
  218:13
mentioned
  192:12
  194:11,15
  199:24 209:11
  224:21
merit
  202:16
message
  196:13 223:5,
  14,16
messages
  196:2,6

met
  215:21 216:7,
  9
methodology
  210:7
middle
  196:18
migraines
  226:3,6
million
  210:2 211:11
mind
  199:20 201:20
  209:4 219:14
minimum
  192:15
minute
  211:17 225:7,
  10
misdemeanor
  202:6,11
mistaken
  205:4
moment
  196:3 209:10
  226:18
momentarily
  201:20
money
  201:25
month
  203:10,12
  212:9,11,13
months
  202:5,6,10,11
  203:3 212:7,
  14
morning

197:2
motions
  194:14
moving
  193:2

_____

**N**

_____

NAACP
  214:10,14
  217:10,12
named
  214:11
Nancy
  225:12,14,16,
  17,20,22
needed
  192:11 198:12
net
  203:15,17
network
  207:7,13
networks
  207:8
notes
  207:16 209:4
  225:3
November
  196:18,20,23
  198:17 212:10
number
  204:20,21
  210:12,15
numbers
  220:25

_____

**O**

_____

obtain

Ruby Green
April 16, 2021

8

202:4

**October**
212:8,12,13

**Odom**
218:15

**office**
191:10,14
192:8,11,14,
22 193:1,2
196:16 198:1,
3 199:10,17
201:25 205:9
206:1 212:6,
21 213:11
214:20 215:24
216:15 219:5,
15 224:2,18
225:17,19
227:15

**ongoing**
206:9

**opponent**
219:12

**opponents**
195:21

**opportunity**
197:5,12
198:15

**opposed**
207:2

**order**
200:25 202:11
228:8

**organization**
218:12,14,15,
16

---
**P**
---

**p.m.**
191:1 228:11

**pages**
196:1

**paid**
212:9,10,11

**panel**
218:4

**paper**
224:22

**part**
196:25 215:18
218:14

**participation**
225:6

**parts**
193:2 216:24

**pass**
197:7 205:17

**past**
193:20 198:17
218:10 226:6

**patience**
225:5

**pay**
203:14 204:7
206:21,25

**paycheck**
212:17,19

**people**
193:4,5
194:10 197:19
200:4,6,16
202:24 207:4
210:23 211:2
216:11 217:1

220:23 221:9
224:12,14,15,
21

**person**
197:21 211:5
215:20

**personal**
220:24

**pertain**
226:19

**pertains**
203:2 208:10
221:20 222:11

**phone**
201:5 213:20
215:9

**Pipeline**
218:4

**plan**
214:13

**planning**
213:22 214:5,
14,15

**plans**
212:23 225:24

**pleading**
193:10

**pleasure**
192:23

**podcast**
193:19 194:4,
6,7,19 195:18
200:23

**point**
196:17 197:22
202:22 205:24
213:8

**polls**

201:10

**pompous**
192:20

**position**
212:21

**possibility**
224:8

**possibly**
227:1

**post**
200:6 205:11

**posted**
200:11,14,19,
20

**posting**
199:25 200:3

**posttraumatic**
206:6

**practicing**
197:17

**praised**
198:6,9

**preparing**
201:13

**president**
217:18
218:15,16

**pretty**
217:23

**previously**
208:4

**prior**
197:15 202:10
205:7 217:11
218:21 219:3
223:21
226:21,22

Ruby Green
April 16, 2021

9

prison
  194:13 218:1
privilege
  227:13,17
problem
  195:10
problems
  197:18
proceedings
  191:1 228:11
process
  221:7,15,20
  222:12,13
profession
  208:9
professional
  208:9 209:22
  225:25
professionals
  226:12
promoted
  202:3
provided
  195:6,7
Pryor
  215:1,4,15
  216:8 219:22
Pryor's
  220:3,4
psychiatrist
  206:3,4
  208:25 209:2
psychologist
  206:2 208:25
  209:2
PTSD
  208:4

public
  191:6,15,17
  192:4,8,11,
  13,22,25
  193:1,10,16
  196:15 197:11
  198:1 199:9,
  13,17,20
  201:25 205:8,
  25 217:25
  223:22 224:1,
  18 225:16
  227:14
punitive
  211:10
purpose
  197:4 216:13
purposes
  192:21 204:11

_____

Q

question
  193:17 197:9
  201:18 204:1
  211:10 219:2
  223:1,19
  227:10,16,19
  228:5
questionnaire
  198:5
questions
  225:8 227:4,
  6,7
quick
  194:16

_____

R

raises
  202:16

rash
  209:21,22
rationale
  222:20,24
  223:19,23
  224:2,4,9,20
re-enter
  191:23
reached
  217:19
read
  196:25 197:1,
  23,24 200:16
  203:22 224:24
  227:6 228:7
reading
  197:3 204:13
real
  200:9
reality
  199:14
reason
  194:23,25
  197:19 206:14
  219:13
recall
  193:20,23
receive
  195:15
received
  202:15
  212:16,18
  213:20
recently
  226:8,9
recognize
  196:6
record

228:1,6
records
  203:20 207:17
  227:2
Reddick
  217:18 218:7,
  8
reference
  210:19 226:2
reflect
  206:13
regular
  193:6
rehab
  197:18,20
relate
  197:6,12
  198:16
related
  208:10 225:25
relating
  199:3
remember
  191:8 208:17
  215:7,9
  225:21 226:17
Renee
  222:1,6
  227:8,9,17
reporter
  192:1,2
  227:24 228:9
represent
  199:21 227:14
representing
  194:12 227:8,
  9
Rerez

Ruby Green
April 16, 2021

10

221:12

**reserve**
226:25

**respond**
223:7

**response**
204:12

**result**
207:25

**rid**
215:10

**right-hand**
214:10

**ring**
225:12

**roles**
206:15,18

**rough**
204:20

**roughly**
203:9 204:15
205:5

**rounded**
203:8

**route**
208:2

**Ruby**
211:15

**run**
191:6 193:7
200:25

**running**
198:1,3
215:23 216:3

——————

**S**

**salary**

203:6

**school**
217:25

**screen**
196:3

**seconds**
211:24

**secretary**
225:21

**send**
223:15

**Senior**
221:13

**sense**
191:5

**sentencing**
194:9

**services**
206:25

**session**
207:20

**sessions**
204:10
205:13,15,23
206:8 207:10
208:11 209:1

**set**
192:24

**shade**
203:9

**shake**
217:20,21

**share**
196:3

**shock**
219:7

**short**
217:23

**show**
193:24 195:4,
24 202:25
220:20

**shown**
200:17

**shows**
194:23 201:13

**shut**
210:23

**sick**
204:5

**side**
208:3 210:21
211:7

**sign**
193:9

**signing**
193:10,12

**similar**
205:10

**sir**
210:8 228:5

**sit**
197:9 212:23

**situation**
218:13 220:15

**Skin**
209:23

**slick**
211:7

**smart**
211:7

**sought**
206:20 207:4

**sound**
192:20

**source**
215:2

**speak**
215:2

**speaking**
198:17 200:21
222:5

**specific**
200:3 209:20
226:15

**specifically**
191:13 209:8
216:24 222:7

**specifics**
215:7

**speculate**
219:19 224:16

**speculated**
197:19

**spoke**
226:13,17

**spoken**
219:8 223:3
224:18

**staff**
193:3

**stage**
217:19,23

**started**
205:8

**State**
192:14 212:6,
21 213:9,11
214:20 216:14
219:5,15

**stated**
222:15

**statement**

193:18 197:1
198:5 199:7
203:16 213:13

**statements**
191:18 192:5
193:21 194:3,
4 195:20

**statute's**
192:24

**stay**
211:25

**STENOGRAPHER**
192:4 218:2
227:22

**stillborn**
205:18

**stop**
211:23

**story**
197:3,24

**straighten**
225:9

**stress**
206:6 228:9

**Strike**
208:8 223:18

**struggling**
196:8

**stuff**
192:12,17
197:15 201:9

**style**
191:7

**subsequent**
200:23

**substantial**
210:16

**suffered**
226:6

**Sun-sentinel**
198:5

**supervision**
192:23

**supervisor**
196:15 197:24

**supported**
217:9

**supposed**
201:2 207:16

**Swanson**
206:14 207:5,
9,11

**switched**
207:8,11

---

**T**

**T.J.**
217:18 218:7,
8

**take-home**
203:14

**taking**
207:4,24

**talk**
201:22 209:1,
6 210:24
222:22

**talked**
192:15 193:17
194:7 209:15
225:23

**talking**
198:21,22
210:6 216:7

**taxes**
203:6,7

**Technically**
199:12

**telling**
198:14 206:8

**ten**
205:5 221:11

**term**
209:14

**terminate**
221:25

**terminated**
201:24 202:1
205:9

**terminating**
221:7,15

**termination**
205:11 212:7
221:21
222:19,20,23,
24 223:4,20,
23 224:3,11,
20 226:20

**terms**
197:22

**Test:to**
197:8

**text**
196:1,6,13
223:15,16

**therapist**
204:5 208:18
209:15

**therapists**
206:13,15
207:16 225:24
226:13

**therapy**
203:23,25
204:3,6
205:10,12,23,
24 206:8
208:6,11
209:1

**thereabouts**
198:18

**thing**
197:2 202:14,
23 218:20

**things**
198:7,8,11,12
222:5 223:9
225:7

**thinks**
223:8

**third-degree**
202:6

**thought**
197:24 201:19

**thousands**
199:18,21

**ticket**
215:23 216:3
217:2,5

**time**
196:21,23
197:11,14
198:7,11
200:24
201:12,17,23
202:1 204:12
205:8,9,25
210:19 211:3
212:15,16,18
214:3 225:21

**times**

Ruby Green
April 16, 2021                                                                                    12

194:10,17
195:12,17
203:23 204:14

**tipped**
215:1

**today**
197:10 212:23
226:1

**today's**
194:2 195:25

**told**
197:23 208:21
213:14,22
214:5,12
215:19
216:18,22,25
224:6

**transcript**
194:18,21,23
195:2,3,5,13,
15

**treatment**
206:21

**treatments**
206:19,20,22

**true**
199:7

**trust**
202:24

**turned**
222:6,10,14

**turning**
226:21

**type**
205:10

———————
**U**
———————

Uh-huh

196:10

**unable**
204:9 206:21
207:11

**understand**
192:19 193:9
201:11,15
209:20 211:9
220:22

**understanding**
210:1

**understood**
194:22 195:9,
23 205:7
207:24 209:5,
9 214:4
220:18 224:17
225:23 226:11

———————
**V**
———————

**verbatim**
215:10

**virus**
211:4

**volume**
191:1

**voluntarily**
212:24 213:6

———————
**W**
———————

**wait**
207:3

**waive**
192:16

**wanted**
220:11 228:8

**wanting**
208:5

**watch**
215:6 216:25

**waving**
227:25

**ways**
199:11

**week**
204:4,6 205:2

**Weekes**
193:22 213:10
214:13 219:12

**weeks**
195:13 200:25
204:25 214:19
216:7 219:23
220:3 222:22,
23 226:19

**weird**
213:20 218:13

**Williams**
213:21 214:12
215:1 216:11,
18

**women**
218:17

**word**
195:17

**words**
214:25

**work**
197:20 200:25
201:2 202:10
210:25 212:15

**workday**
212:11,12

**working**
205:8

**works**

**192:22**

**world**
199:21

**worry**
203:18,21

———————
**Y**
———————

**year**
223:12

**years**
193:20