# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 20-cv-62160-BLOOM/Valle

RUBY GREEN,

      Plaintiff,

v.

HOWARD L. FINKELSTEIN, *et al.*,

      Defendants.

_____/

## OMNIBUS ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Plaintiff's Motion for Partial Summary Judgment as to Liability Against the Defendants, Howard Finkelstein, Individually, and in his Capacity as Public Defender for Broward County, ECF No. [41] (Plaintiff's Motion"), and Defendants' Motion for Final Summary Judgment or in the Alternative, Motion for Partial Summary Judgment, ECF No. [44] ("Defendants' Motion") (collectively, "Motions"). The Court has carefully reviewed the Motions, all opposing and supporting submissions, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Plaintiff's Motion is denied, and Defendants' Motion is granted.

## I.    BACKGROUND

On October 23, 2020, Plaintiff Ruby Green ("Plaintiff") initiated this action against Defendants[1] alleging claims of First Amendment retaliation under 42 U.S.C. § 1983. *See* ECF No. [1]. According to the Complaint, Plaintiff was previously employed as an assistant public defender for Broward County. *Id.* ¶¶ 2, 5. During her employment with the Public Defender's Office for

---

[1] Howard Finkelstein, in both his individual and official capacities, and the Office of the Public Defender for Broward County are collectively referred to as "Defendants".

Broward County (the "Public Defender's Office" or "Office"), Plaintiff campaigned for public office to replace the retiring Public Defender, Defendant Finkelstein. *Id.* ¶¶ 2, 6. Plaintiff contends that during her employment and while campaigning for office, she was actively engaged in speaking about "social justice issues." *Id.* ¶ 7. Specifically, Plaintiff publicly advanced her position on the "equitable treatment of African American participants in the criminal justice system" by engaging the community at large and participating in podcasts. *Id.* ¶¶ 7, 10, 16. The morning after her unsuccessful election, Plaintiff received an e-mail and text message notifying Plaintiff of her termination. *Id.* ¶ 8. That same morning, Defendant Finkelstein participated in an interview with the South Florida Sun Sentinel, during which Defendant Finkelstein "admitted" to the reporter that he personally made the decision to terminate Plaintiff, and that his decision was based on the statements Plaintiff made during her campaign for public office. *Id.* Accordingly, the Complaint asserts two counts for relief: (1) First Amendment Retaliation against Defendant Finkelstein in his individual capacity; and (2) First Amendment Retaliation against Defendant Finkelstein in his official capacity as Public Defender, and the Office of the Public Defender.

Regarding the instant Motions, Plaintiff filed her Motion, ECF No. [41], along with her corresponding Statement of Undisputed Material Facts, ECF No. [41-7] ("Plaintiff's SMF"). Defendants filed their Response in Opposition to Plaintiff's Motion, ECF No. [55] (Defendants' MSJ Response"), and Response to Plaintiff's SMF, ECF No. [54] ("Defendants' SMF Response"). Plaintiff also filed a Reply, ECF No. [58] ("Plaintiff's MSJ Reply").

Defendants filed their Motion, ECF No. [44], along with their corresponding Statement of Undisputed Facts, ECF No. [42] ("Defendants' SMF"). Plaintiff filed her Response/Objection to Defendants' Motion, ECF No. [53] ("Plaintiff's MSJ Response"), together with her Statement of Disputed Facts Responsive to Defendants' SMF, ECF No. [53-1] ("Plaintiff's SMF Response").

Finally, Defendant filed a Reply in Support of their Motion, ECF No. [65] ("Defendants' MSJ Reply"). Both Motions, accordingly, are ripe for consideration.

## II.   MATERIAL FACTS

Based on the parties' statements of material facts in support of and in opposition to the Motions, along with the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.[2]

### A.   The Public Defender's Office

Defendant Finkelstein served as the elected Public Defender for Broward County from 2005 until his retirement in January 2021. ECF No. [43-1] at 1, ¶ 2. As the elected Public Defender, Defendant Finkelstein was charged with the duty of representing any person "without additional compensation, any person determined to be indigent under § 27.52[.]" Fla. Stat. § 27.51(1); *see also* ECF No. [43-1] at 1, ¶ 3. During Defendant Finkelstein's Administration, the Public Defender's Office maintained a Policy Manual ("Manual"), which was made available to all

---

[2] On August 6, 2021, Plaintiff filed a motion seeking leave to file an amended response to Defendants' SMF, ECF No. [62] ("Motion for Leave"). Plaintiff explains that, after timely filing her SMF Response, she reviewed the Local Rules again and "determined that a separate filing of the Statement of Facts is/was required." *Id.* at 1. Plaintiff further states that the Amended SMF Response is longer because she edited the submission "to specifically delineate the paragraphs responsive to the Defendants' Statement of Undisputed Facts which were admitted" and, apart from that change, "the Amended Statement is largely the same" as her SMF Response. *Id.* at 1-2. Defendants oppose the Motion for Leave, ECF No. [64], arguing that the Court already struck Plaintiff's untimely Amended SMF Response, and "Plaintiff's amendment was not to correct a scrivener's error," and instead "seeks to dispute Defendants' statements contained in paragraphs 19[-25], 28, 31, 33[-34], and 38." *Id.* at 3-5; *see also* ECF No. [61]. Upon review of the parties' submissions and the record in this case, the Court does not find good cause to grant the relief sought. First, the Court's Scheduling Order, ECF No. [16], cautioned the parties that "strict compliance with Local Rule 56.1 is mandated" and explicitly set forth the procedures for filing any statements of material fact. *Id.* at 3-5. The Court reminds Counsel for Plaintiff that compliance with the Court's Orders and the Local Rules is not an option but a requirement. Thus, Counsel's resulting failure to read or familiarize himself with the Court's Scheduling Order and Local Rules does not justify amendment. Additionally, contrary to Plaintiff's representation, the Amended SMF Response includes substantive amendments to Plaintiff's SMF Response. *Compare* ECF No. [53-1], *with* ECF No. [56]. Under these circumstances, the Court will not permit amendment. Nonetheless, the Court will set forth the facts insofar as they are supported by evidence in the record.

employees immediately upon being hired by the Public Defender's Office. ECF No. [43-1] at 2, ¶ 5; *see also id.* at 8-38. According to the Manual, the mission of the Public Defender's Office is "to provide zealous and effective representation to persons who cannot afford to hire a lawyer." *Id.* at 11-12.

The Manual also sets forth several policies regarding the Office's expectations of its employees. Specifically, the Manual provides that "[t]he Public Defender expects each member of this office to be professional, diligent and ethical" and that such "standards are necessary to fulfill our constitutional and statutory duties to protect the rights of indigent person charged with violating the law or facing involuntary civil commitment." *Id.* at 11. Employees are also "expected to be courteous, friendly and helpful in dealing with clients, their families, the public and fellow employees." *Id.* at 14. To the extent an employee observes another employee being "rude or disrespectful," the Manual further encourages the observing employee "to address the issue privately with the offending party and if unable to do so or if the behavior continues then to" report the issue "immediately to the employee's supervisor or to the Public Defender." *Id.*

Regarding communications with the media, employees are cautioned that "the Public Defender and he alone, is answerable to the general public regarding the orderly administration of the office and matters relating to office policy. Any inquiry relating to the administration of the office, matters relating to office policy or general law matters should be referred to the Public Defender." *Id.* at 26. Lastly, the Manual instructs that the Public Defender's Office "is committed to the highest standards of moral and ethical behavior" and "[b]reaches of these standards, especially through acts involving fraudulent, unethical, and other dishonest behavior, are not only costly but they erode the public trust and confidence in the integrity of the agency." *Id.* at 18.

To carry out its mission, the Office maintained a hierarchy of management, whereby three Executive Chiefs assisted Defendant Finkelstein in overseeing the efficient operation of the Office, and nine Assistant Chiefs oversaw all Assistant Public Defenders employed by the Office. *Id.* at 1, ¶ 4; *see also id.* at 7. Notwithstanding the hierarchy of management, each person employed by the Office ultimately "serve[d] at the discretion of the Public Defender[,]" who could "terminate an employee with or without cause." *Id.* at 22.

### B. The November 2020 Election

During his fourth term as Public Defender, Defendant Finkelstein announced that he was retiring and would not be running for reelection in the November 2020 primary. ECF No. [41-4] at 34:17-36:8. In November 2018, Plaintiff announced her candidacy for Public Defender. ECF No. [43-2] at 64:21-24. Plaintiff began her employment with the Office as an Assistant Public Defender on March 5, 2012. ECF No. [43-2] at 13:19-24; *see also* ECF No. [43-3] at 15-16, ¶ 1. During her employment, Plaintiff received both annual promotions and pay increases. ECF No. [43-3] at 19, ¶ 18. Defendant Finkelstein believed Plaintiff did a "good job" as Assistant Public Defender, but he did not find her qualified to serve as the Public Defender. ECF No. [41-4] at 32:24-33:6, 42:25-43:23.

Before Plaintiff had declared her candidacy, Gordon Weekes ("Weekes"), who served as one of three Executive Chiefs, entered the race and received Defendant Finkelstein's endorsement. ECF No. [43-2] at 64:7-10; *see also* ECF No. [41-4] at 36:10-37:4, 44:2-5. Plaintiff and Weekes, both of whom are persons of color, represented two of the three candidates running to replace Defendant Finkelstein in the November 2020 election. ECF No. [43-2] at 100:24-101:7.

On November 27, 2018, Defendant Finkelstein sent an office-wide email outlining his policy regarding current employees campaigning for public office. ECF No. [43-1] at 40. The email states, in pertinent part:

> When I took office, I felt very strongly that the Law Office of the Public Defender should not be a political machine and the employees should not feel compelled to participate in politics, other than exercising their constitutional right to vote. I allowed several employees to continue working while running for judge. Most elected officials require employees to resign before running for office. My only requirements have always been to follow campaign laws, submit vacation requests for any campaigning during working hours, and refrain from using office computers or supplies for any campaign purpose. My goal was to allow people to run for office without violating any law or losing sight of our important job- to serve our clients.

*Id.* Defendant Finkelstein also sent an individual email to Plaintiff and Weekes, reiterating his campaign policy, and explaining that their campaigns "have the potential of pulling the office apart and distracting our employees from our very important mission." *Id.* at 41. Defendant Finkelstein further stated that he "worked too hard to de-politicize this office to allow it to devolve into chaos before [he] retires" and that he trusts that both Plaintiff and Weekes "will conduct [themselves] professionally. *Id.* at 41.

Both Plaintiff and Weekes were permitted to continue their employment with the Office during their respective campaigns for Public Defender. ECF No. [43-2] at 64:21-65:20; *see also* ECF No. [43-1] at 40-41. Defendant Finkelstein never told Plaintiff that she could not run for Public Defender, ECF No. [43-2] at 76:4-14, 83:10-18, or that she had to support Weekes' campaign, *id.* at 78:17-79:18. Plaintiff, however, contends that Defendant Finkelstein did not want her to run for Public Defender because of his public endorsement, support, and contribution to Weekes' campaign. *Id.* at 76:15-77:9. Plaintiff also explains that she was implicitly told to support Weekes' campaign because she received office-wide emails to attend meetings and to perform tasks associated with her opponent's campaign. *Id.* at 79:17-82:12.

### C.  The *Adams Brothers Podcast*

On August 8, 2020, Plaintiff appeared as a guest on the *Adams Brothers Podcast* (the "Podcast"). *Id.* at 92:23-93:2; *see also* ECF No. [41-1]. Once made aware of the Podcast, Defendant Finkelstein sent Executive Chief Renee Dadowski ("Dadowski") a link to the Podcast for her review and commentary. ECF No. [41-4] at 52:4-54:5. Defendant Finkelstein also watched the Podcast and determined that Plaintiff made a series of statements that were "untruthful, personally and professionally offensive, and which had the ability to undermine and inhibit the Office relations and ability of the Office to accomplish its Mission." ECF No. [43-1] at 4-5, ¶¶ 19, 23; *see also* ECF No. [41-4] at 54:22-66:17, 70:8-76:5, 93:19-95:24. Specifically, Defendant Finkelstein took issue with the following statements:

- "I was told as a supervisor -- as a supervisor and as a chief, not to go to the courtroom, not to train our attorneys." ECF No. [41-1] at 6:23-25.

- "Why would you as an administration not want to hire people who look, you know, like the people that are filling the boxes?" *Id.* at 7:14-18.

- "He maybe comes to work maybe once or twice a week for maybe an hour or two, doesn't know people's names, you know, stuff like that." *Id.* at 9:22-25.

- "But I'm telling you, if you're treated like trash in your own office, you know, you're -- you're wanting someone to fight for you." *Id.* at 12:3-5.

- "That's why I'm saying, like, if you have -- if you see that the community is having issues and, you know, especially with the representation of our clients and how we're being treated, black people are being arrested, disproportionately, you see that, you know that, and you've advocated for that, so you say, and then you go out on a limb and just tell the entire office that we can't march in solidarity with Black Lives Matter, when every single other office in the Brow- -- in state -- Florida, state of Florida, was marching in solidarity with Black Lives Matter? That's a concern. That is a big concern." *Id.* at 15:4-16

- "You tell me, if we were drug addicts and we used to come to court with cocaine on their noses, you know, would we be able to be in a position that he would be able to be in? No. There's completely different sentiments about, you know, how he chose to, you know, do his time as a public defender." *Id.* at 18:17-23.

- "He hasn't had any cases. Hasn't had any – had nothing. Like no jail visits. I don't even think any jail calls, anything like that. It's just you just get to go home and play golf, and, you know, that is your day. And, you know, we don't need that. It's time – it's not time to be complacent. You know, it's – it's really not. And that's what we have had for quite a long time. Quit a long time. Complacency. MR. WAYNE ADAMS: Well, that tells you white privilege is alive and well in Broward County, Florida. MS. GREEN: Uh-huh. Yep." *Id.* at 19:13-20:2.

- "I, you know, asked him to, you know, donate or come to an event that was, you know, of blackness, and he basically said that he wouldn't because he felt that -- or he was mad that some of the people in that organization called him racist of -- you know, for certain things, you know, back in the -- you know, back in the day." *Id.* at 41:10-16.

*Id.* ¶ 23 (emphasis in original) (collectively, "Defendants' Designated Statements").

Plaintiff does not dispute speaking on the above-referenced topics, but takes the position that she could not campaign for Public Defender and advance the need for change without informing the public of what was happening in the criminal justice system under Defendant Finkelstein's Administration. ECF No. [43-2] at 172:175:9, 180:17-182:12. Plaintiff also directs the Court to a "sampling" of other statements made during the Podcast which address: (1) equal protection in the criminal justice system for the minority community; (2) maintaining office morale of public defenders; (3) securing proper job training for public defenders; (4) securing funding for the Office; and (5) effectuating access to mental health and housing resources to the Office's clients. *See* ECF No. [41] at 5-7. The specific statements are as follows:

- We need change at the Broward County Public Defender's Office, because a black face in a high place doesn't always want to advance the race. And I saw that at the Broward County Public Defender's Office. ECF No. [41-1] at 6:18-22.

- Why would you, as an administration, when George Floyd happened, why would you tell the office not to march in solidarity with Black Lives Matters? Why would you as an administration not want to hire people who look, you know, like the people that are filling the boxes? *Id.* at 7:11-16.

- MR. DARREL ADAMS: What are the three biggest challenges facing the Public Defender's Office? MS. GREEN: One is funding; two is keeping our experienced attorneys; and three is the morale. *Id.* at 8:9-14.

- It needs to stop. Like, we need a change. And, you know, it's just a trickle effect. We have attorneys at the office who, you know, once we get our experienced attorneys that are out, then we have to move people up that may have been, you know, in felony for a short time. And some of the attorneys don't even feel comfortable with representing their clients. You tell me, if you get an attorney that has never tried a felony case -- and we have some attorneys, that are lead attorneys, lead felony attorneys, that need to try felony cases, and they've never tried their own felony cases. So if you are arrested for a crime that you could be facing life in prison for, and you have an attorney that has never tried a felony case before, are you going to feel comfortable with them representing you? *Id.* at 10:16-11:8.

- That's why I'm saying, like, if you have -- if you see that the community is having issues and, you know, especially with the representation of our clients and how we're being treated, black people are being arrested, disproportionately, you see that, you know that, and you've advocated for that, so you say, and then you go out on a limb and just tell the entire office that we can't march in solidarity with Black Lives Matter, when every single other office in the Brow -- in state -- Florida, State of Florida, was marching in solidarity with Black Lives Matter? That's a concern. That is a big concern. *Id.* at 15:4-16.

- MR. DARREL ADAMS: --the Public Defender, how would you address the problem of racial disparities in the criminal justice system? MS. GREEN: This -- that's -- that's one thing that we need to do. We need to make sure that we're tracking them. You know, racial disparity is apparent, and it has been that way for many, many, years. We already know that the criminal justice system was a mechanism that was relegated -- you know, that has relegated millions of people of color into a second-class citizenship. You know, we're basically second-class citizens. And it has, you know, basically taken away rights of our clients, you know, voting rights, housing, jobs. And so they're stuck in this revolving door. And that has been an issue. *Id.* at 21:6-22.

- So we need to make sure that we're providing our clients with more access to mental health treatment as well. *Id.* at 27:1-3.

- And I totally understand what the criminal justice system needs when it comes to Broward County Public Defender's Office. We need a holistic approach. And that goes to making sure that our clients, as I stated before, has access to more treatment -- mental health programs and beds, more substance abuse treatment programs and beds, you know. Because a lot of people don't understand that sometimes our -- our clients need inpatient treatment programs. There's not a lot of beds, you know, for our clients. We need to, you know, bridge that gap and build connections with resources that have the ability to treat our clients without trying to charge them astronomical fees. We need -- we need to link our resources with housing. You know, some of our clients get out, and we have situations like, you know, you're in jail for a few days, and then all of a sudden you done lost your housing. You know, it's -- it's crazy. *Id.* at 42:16-43:10.

("Plaintiff's Designated Statements").

### D.  Plaintiff's Termination

On August 10, 2020 at 7:23 a.m., Defendant Finkelstein sent an email to Dadowski and

Weekes, titled "ruby" which stated: "I am firing her today[.]" ECF No. [41-5] at 2. After receiving

no response, Defendant Finkelstein replied to his email stating:

> Unless I hear something from you guys I plan to terminate her today. She attacked
> me professionally and personally, the office and fellow pds. This language has the
> ability to inhibit the ability to do our jobs. She lied and said we wouldn't allow
> people in the office to be involved with marching for blm.

*Id.* (errors in original). Subsequently, on August 15, 2020, Defendant Finkelstein sent another

email to Dadowski and Weekes outlining his plan to terminate Plaintiff:

> I am thinking we send email and text to ruby cell at exactly 7pM and then
> immediately shut off her office email and access card. Here is text and email I
> propose:
>
> Thank you for your service. Your services are no longer requested. Your
> termination is immediate. Please call Chief Investigator mark Forman who will
> facilitate the return of any Personal possessions in your office and receive from you
> your access card. Laptop etc.
>
> We should probably notify chiefs After it's done. We can send them the link of the
> radio show but my guess is they have already heard it. Her disrespect for me
> personally and for the office and its lawyers prevents her from being part of our
> office. It Inhibits us in Our ability to do our job. It brings disrepute down on us and
> our clients. Her lack of truthfulness should prevent her from being a lawyer As well
> but that is another issue for others[.]

ECF No. [41-6] at 2 (errors in original).

On August 19, 2020, the morning after Plaintiff's unsuccessful election, Plaintiff received

a text message from Defendant Finkelstein notifying Plaintiff of her termination. ECF No. [41-3]

at 2. That same day, Defendant Finkelstein participated in an interview with Rafael Olmeda of the

*South Florida Sun Sentinel*, during which Finkelstein discussed his decision to terminate Plaintiff

based on her "unprofessional" and "[un]truthful" statements made during the Podcast. ECF No.

[41-4] at 83:4-25.

During her deposition, Plaintiff testified that she did not know which specific statements led to her termination, ECF No. [43-2] 97:15-98:23, 103:17-104-7, 114:11-115:11, 128:12-129:20, 132:1-25, 156:16-157:2, and explained that she rests her First Amendment retaliation claim on the "main" topics discussed during the Podcast, *id.* at 96:17-97:8; *see also* ECF No. [43-3] at 18, ¶ 14. Plaintiff also testified that she did not watch or read the transcript of the Podcast. ECF No. [43-2] at 89:23-90:8.

### III.  LEGAL STANDARD

The standard of review on cross-motions for summary judgment does not differ from the standard applied when only one party files such a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including, among other things, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations, which 'are jury functions, not those of a judge.'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019) (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)); *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *see also Crocker*

*v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-movant's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant."). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

Initially, the moving party bears the "responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 322). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *See*

*Shiver*, 549 F.3d at 1343. Yet, even where a non-movant neglects to submit any alleged material facts in dispute, a court must still be satisfied that the evidence in the record supports the uncontroverted material facts proposed by the movant before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004) ("*One Piece of Real Prop.*"). Indeed, even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

Additionally, "cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1345-46 (11th Cir. 2015). Indeed, even where the issues presented on motions for summary judgment overlap, a court must consider each motion on its own merits, "resolving all reasonable inferences against the party whose motion is under consideration." *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1243 (N.D. Ga. 2014) (citing *Am. Bankers Ins. Grp.*, 408 F.3d at 1331). In particular, where "the parties respond[] to each respective summary judgment motion with disputes as to the 'undisputed' facts, add[] 'material facts' of their own, and then repl[y] with subsequent objections to the other party's additional facts," the mere filing of cross motions for summary judgment is not conclusive. *Id.* Thus, where the parties disagree as to the facts, summary judgment cannot be entered unless one of the parties meets its burden of demonstrating that "there is no dispute as to any material facts with the evidence and all inferences drawn therefrom viewed in the light most favorable" to the

non-moving party. *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983) (citing *M/V Nan Fung*, 695 F.2d at 1296-97).

## IV.   DISCUSSION

As the instant action concerns a claim for First Amendment retaliation, the Court first sets forth the relevant framework for addressing this claim. The Court will then turn to the respective Motions.

### A.   First Amendment Retaliation

"A government employer may not demote or discharge a public employee in retaliation for speech protected by the First Amendment." *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1159 (11th Cir. 2015) (citing *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989)). While it is true that a citizen who enters public service "must accept certain limitations on his or her freedom[,] . . . [t]he First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Garcetti v. Ceballos*, 547 U.S. 410, 418-19 (2006) (citing *Waters v. Churchill*, 511 U.S. 661, 671 (1994); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)); *see also Lane v. Franks*, 573 U.S. 228, 236 (2014) ("public employees do not renounce their citizenship when they accept employment, and [the Supreme Court] has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights" (citations omitted)). Thus, in the First Amendment context, courts must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist.*, 391 U.S. 563, 568 (1968).

The Court of Appeals for the Eleventh Circuit has set forth a four-part inquiry to determine whether an employer's actions constitute retaliation for protected speech in violation of the First Amendment: (1) whether the employee's speech involves a matter of public concern; (2) whether the employee's interest in commenting upon matters of public concern outweighs the employer's legitimate interest in promoting the efficiency of public service it performs through its employees; (3) whether the employee's speech played a substantial or motivating factor in the employer's decision to demote or discharge the employee; and (4) whether the employer would have taken the same action against the employee even in the absence of the protected speech. *See Bryson*, 888 F.2d at 1565-66 (citations omitted) ("*Bryson* test").

"The first two factors are questions of law designed to determine whether the First Amendment protects the employee's speech." *Anderson v. Burke Cnty., Ga.*, 239 F.3d 1216, 1219 (11th Cir. 2001) (citations omitted); *see also Morales v. Stierheim*, 848 F.2d 1145, 1148 (11th Cir. 1988) (citations omitted). "The second two factors are questions of fact designed to determine whether the alleged adverse employment action was in retaliation for the protected speech." *Anderson*, 239 F.3d at 1219-20 (citations omitted). "If an employee satisfies her burden on the first three steps, the burden then shifts to the employer to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech." *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005) (citing *Bryson*, 888 F.2d at 1565-66).

### B.  Plaintiff's Motion

Plaintiff moves for partial summary judgment on the issue of liability for her retaliatory discharge claim because, according to Plaintiff, she has demonstrated the absence of any genuine issues of material fact that she was terminated for engaging in constitutionally protected speech.

*See generally* ECF No. [41]. In particular, Plaintiff argues that her statements made during the Podcast are constitutionally protected because they were given in the context of a campaign-related event and addressed matters of public concern, including: (1) "equal protection in the criminal justice system for the minority community," (2) "maintaining office morale of public defenders," (3) "securing proper job training for public defenders," (4) "securing funding for the public defender's office," and (5) "effectuating access to mental health and housing resources to clients of the public defender's office." *See* ECF No. [41] at 6-7 (citing ECF No. [41-1] at 6:18-22, 8:8-14, 7:11-16, 10:16-11:8, 15:4-16, 21:6-22, 27:1-3, 42:16-43:10); Plaintiff's Designated Statements, *supra*. Plaintiff further explains that there is no dispute of fact that she suffered an adverse employment action by virtue of her termination or that she was terminated for statements made during the Podcast. ECF No. [41] at 8-10.

Defendants respond that the Motion fails primarily because Plaintiff: (1) relies on inapplicable case law in an attempt to establish that *any* statements made during a campaign for public office are afforded "impervious constitutional protection[;]" (2) fails to carry her burden of demonstrating that she engaged in speech that is constitutionally protected; and (3) ignores the undisputed facts as to the statements which actually led to her termination, and therefore cannot demonstrate a causal connection between her Designated Statements and Defendants' employment decision. *See generally* ECF No. [55].

Upon review of the record, the Court determines that Plaintiff is not entitled to judgment as a matter of law. As Defendants correctly argue, there are several procedural and substantive defects with Plaintiff's Motion, which demonstrate that Plaintiff has failed to meet her burden at this stage of the proceedings.

### i.    Constitutionally Protected Speech

To prevail on a claim for First Amendment retaliation, Plaintiff must first demonstrate that her speech is constitutionally protected. *See Bryson*, 888 F.2d at 1565-66; *see also Morales*, 848 F.2d at 1148. There are two inquiries that guide the interpretation of constitutional protections accorded to public employees. First, the public employee's speech must be "fairly characterized as constituting speech on a matter of public concern." *Bryson*, 888 F.2d at 1565 (citations omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Meyers*, 461 U.S. 138, 147-48 (1983) ("*Connick* framework"). "In evaluating whether speech may be fairly characterized as speech on a matter of public concern, 'it is relevant to examine whether the public interest is asserted on the basis of a vague and general assumption that the public would be interested, versus an articulable, specific public interest.'" *Natale v. Broward Cnty.*, 987 F. Supp. 926, 933-34 (S.D. Fla. 1997) (quoting *Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904, 916 (11th Cir. 1993)).

If the public employee did not speak as a citizen on a matter of public concern, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418 (citing *Connick*, 461 U.S. at 147). However, "[i]f the answer is yes, then the possibility of a First Amendment claim arises. The [next] question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* (citing *Pickering*, 391 U.S. at 568) ("*Pickering* balance"); *see also Maggio v. Sipple*, 211 F.3d 1346, 1351-52 (11th Cir. 2000) ("[T]o establish a constitutional violation, [a public employee's] speech must satisfy both elements of the *Pickering-Connick* test."). The *Pickering* balancing test "reflects the importance of the relationship between

the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Garcetti*, 547 U.S. at 418.

Plaintiff has designated eight statements which she believed formed the basis of her termination. ECF No. [41] at 5-7; *see* Plaintiff's Designated Statements, *supra*. Yet, Plaintiff has remarkably failed to analyze any of her statements under the framework set forth in *Connick* to determine the threshold inquiry of whether they implicate matters of public concern and warrant constitutional protection. *See* ECF No. [41] at 4-8; *see also Connick*, 461 U.S. 138 at 147-48; *Boyce*, 510 F.3d at 1343. Plaintiff instead suggests that she is *automatically* afforded constitutional protections for her Designated Statements because they were made within the context of her campaign event for public office. *See, e.g.*, ECF No. [41] at 5 ("[T]he incontrovertible fact that the speech at issue occurred within the context of a political campaign event—taken alone—gives rise to the presumption that said speech was constitutionally protected."). While it is certainly true that political speech lies "at the core of the First Amendment[,]" the Court is unaware of, and Plaintiff has failed to cite to, any authority to support Plaintiff's position that *any and all* statements advanced during a campaign for public office are afforded constitutional protection. *See Carter v. City of Melbourne, Fla.*, 731 F.3d 1161, 1169 (11th Cir. 2013) (citation omitted) (internal quotation marks omitted) (analyzing the "public concern" framework set forth in *Connick* to an employee's political speech).

In support of Plaintiff's position that her speech "triggers First Amendment protection[,]" ECF No. [41] at 4, Plaintiff relies on a body of case law that is materially distinguishable and has no application to the instant case.[3] For example, in *Randall*, 610 F.3d at 710, the Eleventh Circuit

---

[3] *See* ECF No. [41] at 4 (citing *Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010); *Terry v. Cook*, 866 F.2d 373 (11th Cir. 1989); *Epps v. Watson*, 492 F.3d 1240 (11th Cir. 2007) (order of authority in original)).

addressed the degree of First Amendment protection for *candidacy*. The Eleventh Circuit explained that "[p]recedent in the area of constitutional protection for candidacy can be described as a legal morass[,]" but ultimately determined that the "decision to run for office enjoys *some* First Amendment protection." *Id.* 710, 715 (emphasis in original). Additionally, in *Terry*, 866 F.2d at 376-377, the Eleventh Circuit addressed the First Amendment rights of employees discharged due to their *political patronage* and stressed the importance of recognizing "the distinction between actions that assert employees' right of expression and actions that challenge discharge based on political patronage." *Id.*; *see also Epps*, 492 F.3d (political patronage). Critically, the issue before this Court is whether Defendants' decision to terminate Plaintiff following her participation in the Podcast violated her First Amendment right to free speech. As such, this is the quintessential employee speech case where the threshold public concern framework set forth in *Connick* controls. At no point has Plaintiff alleged that she was terminated for her political patronage, candidate support, or restrictions on candidacy and therefore Plaintiff's reliance on *Randall*, *Terry*, and *Epps*, is misplaced. Moreover, even if Plaintiff did, neither of the cited cases would afford Plaintiff absolute protection for her speech. Instead, it would trigger a different constitutional analysis.

Typically, when a party fails to cite legal authority in support of its position, that "suggests either that there is no authority to sustain its position or that it expects the court to do its research." *Goldberg for Jay Peak, Inc. v. Raymond James Fin., Inc.*, No. 16-21831-CIV, 2017 WL 7791564, at *7 (S.D. Fla. Mar. 27, 2017) (*Rapid Transit Lines, Inc. v. Wichita Developers, Inc.*, 435 F.2d 850, 852 (10th Cir. 1970)). The Court, however, declines the invitation to do Plaintiff's research, as there is certainly "no burden upon the district court to distill every potential argument that could

be made based upon the materials before it[.]" *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

Based on the foregoing, Plaintiff has failed to satisfy her burden of demonstrating that her Designated Statements warrant constitutional protection. Nonetheless, in order to fully address Plaintiff's Motion, the Court assumes that Plaintiff's Designated Statements are constitutionally protected.

### ii.   "Substantial" or "Motivating" Factor

To succeed on a First Amendment retaliation claim, Plaintiff must *also* demonstrate "that [her] speech was a 'substantial' or 'motivating' factor in the allegedly retaliatory decision." *Gattis v. Brice*, 136 F.3d 724, 726 (11th Cir. 1998) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). At the summary judgment stage, Plaintiff must "make a showing sufficient to permit a reasonable jury to find that [her] protected speech was a substantial or motivating factor behind [her] [termination]." *Gattis*, 136 F.3d at 726.[4]

In her Motion, Plaintiff maintains that "there is absolutely no dispute of fact whatsoever" that Defendant Finkelstein terminated Plaintiff for statements given during the Podcast. ECF No. [41] at 9. In support of her position, Plaintiff relies on the following excerpt from Defendant Finkelstein's deposition, in which he explains that after watching the Podcast he had "already decided what [he] was going to do. She was going to be terminated because the way and what she said about [him] as a person was outrageous, wrong, it was untruthful, and [he] was really hurt. [He] was really hurt professionally." *Id.* (citing ECF No. [41-4] at 65:4-16); *see also* ECF No. [41-

---

[4] The Court emphasizes that "[a]t the summary judgment stage, the district court [is] not required to accept as true the allegations in [Plaintiff's] complaint regarding the reason why [s]he was terminated." *Cox v. Clayton Cnty. Sch. Dist.*, 763 F. App'x 817, 819 (11th Cir. 2019). Thus, while Plaintiff has alleged that she was terminated for speaking on social justice issues, such as the "equitable treatment of African American participants in the criminal justice system," ECF No. [1] ¶¶ 7, 10, those allegations must be supported by evidence in the record.

4] at 83:4-17 (testifying that he gave an interview about Plaintiff's termination and made it "clear" that he terminated her because "she was unprofessional" and "not truthful").

Defendants do not dispute that Plaintiff was terminated for certain statements made during the Podcast, but aver that she was terminated only for the "personally and professionally" offensive statements made against Defendant Finkelstein.[5] Defendants further explain that Plaintiff has failed to set forth any evidence to establish that Plaintiff's "non-offensive" Designated Statements played a substantial or motivating factor in Defendants' employment decision, or that Defendant Finkelstein took issue with any of her Designated Statements. ECF No. [55] at 12.

As set forth in *Waters*, Plaintiff must come forward with evidence demonstrating that her Designated Statements played a substantial or motivating factor in her termination. *See Waters*, 511 U.S. at 681 (explaining that "[a]n employee who makes an unprotected statement is not immunized from discipline by the fact that this statement is surrounded by protected statements."); *see also Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287 (The burden is placed "upon [the employee] to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor' or to put it in other words, that it was a 'motivating' factor in the [employer's] decision"). If the record contains no direct evidence that Plaintiff suffered an adverse employment action on account of her statements, "the question then becomes whether the record permits the inference that the speech [at issue] played a role in [Defendants'] decision." *Gattis*, 136 F.3d at 726.

Upon review of the record, Court agrees that Plaintiff has failed to make a showing sufficient to permit a reasonable jury to conclude that her Designated Statements played a "substantial" or "motivating" factor behind her termination. Indeed, during her deposition,

---

[5] *See* Defendants' Designated Statements, *supra*; *see also* ECF No. [43-1] ¶¶ 19, 23; *see also* ECF No. [41-4] at 54:22-66:17, 70:8-76:5, 93:19-95:24; ECF No. [41-5] at 2; ECF No. [41-6] at 2.

Plaintiff repeatedly testified that she did not know which particular statements gave rise to her termination, ECF No. [43-2] 97:15-98:23, 103:17-104-7, 114:11-115:11, 128:12-129:20, 132:1-25, 156:16-157:2, and explained that she rests her First Amendment retaliation claim on the "main" statements made during the Podcast, *id.* at 96:17-97:8; ECF No. [43-3] at 18, ¶ 14. Yet, the evidence in the record demonstrates that Plaintiff was terminated only for those statements made during the Podcast that offended Defendant Finkelstein "personally and professionally." ECF No. [43-1] ¶¶ 19, 23; *see also* ECF No. [41-4] at 54:22-66:17, 70:8-76:5, 93:19-95:24; ECF No. [41-5] at 2; ECF No. [41-6] at 2. Plaintiff has not offered any evidence demonstrating that was not the case, and the record does not permit the inference that Defendant Finkelstein took issue with any of her Designated Statements.[6] Notably, Defendant Finkelstein testified that he agreed with Plaintiff that the Office needed more funding, ECF No. [41-1] at 72:17-20, 81:5-82:24, that attorneys within the Office needed more training, *id.*, and that the Office's clients needed access to mental health treatments, *id.* at 63:13-64:5. Additionally, the record is entirely devoid of any evidence that Defendant Finkelstein opposed Plaintiff's desire to change how people of color are treated within the criminal justice system.

Simply put, even if Plaintiff may be entitled to some degree of First Amendment protection for her Designated Statements, there is no evidence in the record from which a reasonable jury could conclude that Plaintiff's Designated Statements played a "substantial" or "motivating" factor in Defendants' employment decision. Accordingly, Plaintiff's Motion is denied.[7]

---

[6] Defendants do not dispute that one of the eight statements that Plaintiff has designated played a factor in Defendant Finkelstein's decision to terminate Plaintiff—to wit, Plaintiff's speech regarding Defendant Finkelstein's position as it relates to the Office marching in solidarity with the Black Lives Matter movement. As explained more fully below in addressing Defendants' Motion, this statement is not constitutionally protected.

[7] Although there is no evidence in the record to support Plaintiff's theory that her Designated Statements played a substantial or motivating factor in Defendants' employment decision, Defendants concede that

### C.  Defendants' Motion

In their Motion, Defendants maintain that Plaintiff's First Amendment retaliation claim fails as a matter of law because the record evidence demonstrates that the statements which formed the basis of Plaintiff's termination are not constitutionally protected. *See generally* ECF No. [44]. Specifically, Defendants contend that Plaintiff was terminated "for the disparaging statements she made [during the Podcast] regarding her employer, her supervisors and fellow employees" which are not issues of public concern and therefore do not call for First Amendment protection. *Id.* at 9-12. Defendants further maintain that even if the Court were to find that some of these statements relate to matters of public concern, Defendants' interest in promoting the efficiency of the Office outweighs Plaintiff's interest in commenting upon matters of alleged public concern. *Id.* at 12-14. Alternatively, Defendant Finkelstein seeks partial summary judgment on qualified immunity grounds, arguing that there is no evidence in the record demonstrating that Defendant Finkelstein violated any clearly established law in terminating Plaintiff's employment. *Id.* at 15-19.

Plaintiff responds that summary judgment in favor of Defendants is inappropriate because Defendants improperly seek to recharacterize Plaintiff's statements as mere employee grievances rather than matters of public concern. As in her Motion, Plaintiff maintains that "there can be no question as to the constitutionally-protected status of [Plaintiff's] statements/speech" because they were given in the context of a campaign event. ECF No. [53] at 4. Additionally, regarding the *Pickering* balancing test, Plaintiff contends that Defendants have failed to provide evidence of actual problems or disruptions caused by her statements and, therefore, Defendants' interests in

---

Plaintiff was terminated as a result of certain statements made during the Podcast that offended Defendant Finkelstein "personally and professionally." *See* Defendants' Designated Statements, *supra*. Thus, in addressing Defendants' Motion, the Court will analyze those remaining statements at issue.

promoting the efficiency of the public services it performs cannot possibly outweigh Plaintiff's interest in engaging in free speech. *Id.* at 12-14.

###### i.   Statements at Issue

Before addressing Defendants' Motion, the Court sets forth the specific statements at issue. As explained above, while Plaintiff takes the position that she was terminated for her Designated Statements, there is no evidence in the record from which a reasonable jury could conclude that Plaintiff's Designated Statements played a substantial or motivating factor in Defendants' employment decision. The record before this Court conclusively demonstrates that Plaintiff was terminated only for those statements made during the Podcast that offended Defendant Finkelstein personally and professionally. *See* ECF No. [43-1] 4-5, ¶¶ 19, 23; *see also* ECF No. [41-4] at 54:22-66:17, 70:8-76:5, 93:19-95:24; ECF No. [41-5] at 2; ECF No. [41-6] at 2. The statements at issue are as follows:

- "I was told as a supervisor -- as a supervisor and as a chief, not to go to the courtroom, not to train our attorneys." ECF No. [41-1] at 6:23-25.

- "Why would you as an administration not want to hire people who look, you know, like the people that are filling the boxes?" *Id.* at 7:14-18.

- "He maybe comes to work maybe once or twice a week for maybe an hour or two, doesn't know people's names, you know, stuff like that." *Id.* at 9:22-25.

- "But I'm telling you, if you're treated like trash in your own office, you know, you're -- you're wanting someone to fight for you." *Id.* at 12:3-5.

- "That's why I'm saying, like, if you have -- if you see that the community is having issues and, you know, especially with the representation of our clients and how we're being treated, black people are being arrested, disproportionately, you see that, you know that, and you've advocated for that, so you say, and then you go out on a limb and just tell the entire office that we can't march in solidarity with Black Lives Matter, when every single other office in the Brow- -- in state -- Florida, state of Florida, was marching in solidarity with Black Lives Matter? That's a concern. That is a big concern." *Id.* at 15:4-16

- "You tell me, if we were drug addicts and we used to come to court with cocaine on their noses, you know, would we be able to be in a position that he would be

able to be in? No. There's completely different sentiments about, you know, how he chose to, you know, do his time as a public defender." *Id.* at 18:17-23.

- "He hasn't had any cases. Hasn't had any – had nothing. Like no jail visits. I don't even think any jail calls, anything like that. It's just you just get to go home and play golf, and, you know, that is your day. And, you know, we don't need that. It's time – it's not time to be complacent. You know, it's – it's really not. And that's what we have had for quite a long time. Quit a long time. Complacency. MR. WAYNE ADAMS: Well, that tells you white privilege is alive and well in Broward County, Florida. MS. GREEN: Uh-huh. Yep." *Id.* at 19:13-20:2.

- "I, you know, asked him to, you know, donate or come to an event that was, you know, of blackness, and he basically said that he wouldn't because he felt that -- or he was mad that some of the people in that organization called him racist of -- you know, for certain things, you know, back in the -- you know, back in the day." *Id.* at 41:10-16.

### ii.     Constitutionally Protected Speech

The threshold inquiry before the Court is whether the statements which formed the basis of Plaintiff's termination touched upon matters of public concern. "To fall within the realm of the 'public concern' an employee's speech must relate to a matter of political, social, or other concern to the community." *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993) (alterations omitted) (quoting *Connick*, 461 U.S. at 146). In making this determination, the court must consider "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48; *see also Boyce*, 510 F.3d at 1343. Additionally, the Eleventh Circuit has instructed that "an employee's *motive* for speech, while not dispositive, is a factor that must be considered in determining whether speech is a matter of public concern." *Morris v. Crow*, 117 F.3d 449, 457 (11th Cir. 1997) (emphasis in original) (citation omitted). Ultimately, "[i]f the government employee speaks 'not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency

allegedly in reaction to the employee's behavior.'" *Maggio v. Sipple*, 211 F.3d 1346, 1351-52 (11th Cir. 2000) (quoting *Connick*, 461 U.S. at 147).

### a. Matter of Public Concern

Viewing the content, form, and context of the statements that formed the basis of Plaintiff's termination, the Court cannot conclude that each of the statements implicate matters of public concern warranting constitutional protection. As an initial matter, the Court recognizes that the content and form of Plaintiff's speech weighs in favor of the conclusion that Plaintiff spoke as a citizen on matters of public concern. *See Carter v. City of Melbourne, Fla.*, 731 F.3d 1161, 1169 (11th Cir. 2013) (finding that the content and form of the plaintiff's political speech activities "strongly favor the conclusion that he was speaking as a citizen addressing a matter of public concern."). Indeed, there is no dispute that Plaintiff participated in the Podcast while off duty and for the purpose of advancing her campaign for public office. *See* ECF No. [41-1]; ECF No. [43-2] at 100:1-23; Yet, while Plaintiff's efforts to communicate to the public are certainly relevant to the Court's inquiry, "focusing solely on such behavior . . . does not fully reflect the Supreme Court's directive that the content, form, and context of the speech must all be considered."); *see also Alves*, 804 F.3d at 1162 ("[W]hether the speech at issue was communicated to the public or privately to an individual is relevant—but not dispositive."). Here, upon a close review of the content of Plaintiff's statements at issue, it is apparent that not all of Plaintiff's statements relate to matters of public concern.

In reaching this determination, the Court agrees with Defendants that the Supreme Court's decision in *Connick*, 461 U.S. 138 is instructive. In *Connick*, an assistant district attorney was terminated for circulating a questionnaire seeking her co-worker's views on an office transfer policy, office morale, the need for a grievance committee, the level of confidence in superiors, and

whether employees felt pressured to work in political campaigns on behalf of office-supported candidates. *Id.* at 141, 155. The Court determined, with the exception of the final question, that the questionnaire was primarily an employee grievance that "if released to the public, would convey no information at all other than the fact that a single employee was upset with the status quo." *Id.* The Court further explained that "[t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Id.* at 149. Additionally, "while public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Id.*

Here, Plaintiff's statements (1) regarding her inability to "go to the courtroom" and "train [ ] attorneys" in her chief capacity, ECF No. [41-1] at 6:23-25; and (2) that employees were treated like "trash" by the Administration, *id.* at 12:3-5, do not implicate matters of public concern. Rather, these statements are "most accurately characterized as an employee grievance concerning internal office policy." *Connick*, 461 U.S. at 154. While Plaintiff may have been displeased with the working environment at the Public Defender's Office, as well as internal management training policies, these statements hinge upon Plaintiff's personal grievance regarding Defendant Finkelstein's management of the Office and assignment of duties according to hierarchy. ECF No. [43-2] at 104:8-113:22.

The Court certainly recognizes that issues of proper training and office morale are worthy of a public forum. However, upon careful reading, these statements did not alert the public to any wrongdoing or breach of public trust on the part of Defendant Finkelstein or his Administration. *See Connick*, 461 U.S. at 148; *see also Alves*, 804 F.3d at 1167 ("*Connick* 'requires us to look at

the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern because they are of public concern? Or was the point to further some purely private interest?" (emphasis in original) (quoting *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir. 1985))). Rather, the speech at issue pertained to Plaintiff's personal concerns of her own employment and it was only incident to these concerns that her remarks touched on conditions that might potentially affect the Broward County community as a whole. *See Pearson v. Macon-Bibb Cnty. Hosp. Auth.*, 952 F.2d 1274, 1278 (11th Cir. 1992). The Eleventh Circuit has made clear that "a public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run." *Ferrara v. Mills*, 781 F.2d 1508, 1516 (11th Cir. 1986).

Additionally, the Court cannot conclude that Plaintiff's statements (1) critical of Defendant Finkelstein's work schedule—i.e., that he goes to "work maybe once or twice a week for maybe an hour or two, [and] doesn't know people's names[,]" ECF No. [41-1] at 9:22-25; and (2) exemplifying Defendant Finkelstein's prior drug abuse and workload as an anecdote for white privilege in the Public Defender's Office, *id.* at 18:17-23, 19:13-20:2, "are of public import in evaluating the performance of [Defendant Finkelstein] as an elected official." *Connick*, 461 U.S. at 148. Similarly, the record indicates that these statements implicate Plaintiff's personal frustrations in her workplace—namely, that Defendant Finkelstein was not "in the trenches," and did not convey any actionable information to the public that Defendant Finkelstein was not discharging his duties as Public Defender. ECF No. [43-2] at 54:6-58:10. Notably, Plaintiff testified that she did not know what Defendant Finkelstein actually did while he was not physically in the workplace, and explained that she formed her statements based on her personal observations of "[b]eing able to watch [Defendant Finkelstein] leave after he comes in late and leaves early" or

"not seeing his car . . . or him just not being there." *Id.* at 52:14-53:23, 138:7-140:18. Moreover, Plaintiff further clarified that her statements regarding Defendant Finkelstein's prior drug abuse was not a criticism of him, but rather an example of the "black tax" and that racial minorities "have to work ten times as hard[.]" *Id.* at 159:22-160:12.

Lastly, Plaintiff's statements concerning Defendant Finkelstein's (1) discriminatory hiring practices, ECF No. [41-1] at 7:14-18; (2) decision not to permit the Office to march in solidarity with the Black Lives Matter movement during the George Floyd protests, *id.* at 15:4-16; (3) lack of support for organizations that support racial minorities, *id.* at 41:10-16, warrant closer scrutiny. Examination of these statements, taken together, necessarily touch upon matters of public concern. Although Defendant Finkelstein contests the accuracy and truthfulness of these statements, Plaintiff's campaign platform centered around the need for change in the Office, as well as the advancement of the African American community within the criminal justice system as a whole. Thus, these specific statements did not address matters of interest only to Plaintiff, but "sought to bring about changes that would lead, at least in [her] eyes, to the more effective operation of the [Office]" and the Broward County community at large. *Carter*, 731 F.3d at 1169. The Court is also mindful that these statements could be viewed as an *ad hominem* attack insinuating that Defendant Finkelstein is a racist. However, at the very least, "there is a sufficient quantum of content touching a matter of public concern mixed in with the attack." *Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276, 1285 n.22 (11th Cir. 2006).

### b. *Pickering* Balancing Test

Having determined that Plaintiff's statements concerning Defendant Finkelstein's purportedly discriminatory practices touched upon matters of public concern, the Court must engage in the subsequent balancing of interests under *Pickering*. *See Pickering*, 391 U.S. at 568.

*Pickering* requires balancing "between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* This balance reflects the "common sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick*, 461 U.S. at 143.

In resolving the *Pickering* balance, the Eleventh Circuit has instructed courts to consider the following factors in determining the government-employer's interest in efficient provision of public services: "(1) whether the *speech at issue* impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Bryson*, 888 F.2d at 1567 (emphasis in original) (citation omitted). The government's interests "weigh heavily where an employee's speech thwarts the mission of the agency or impedes the performance of the speaker's duties." *Morales*, 848 F.2d at 1149. Additionally, "where an employee's speech has a detrimental impact on close working relationships or destroys harmony among coworkers, 'a wide degree of deference to the employer's judgment is appropriate.'" *Id.* (quoting *Connick*, 461 U.S. at 151-52); *see also Morris*, 117 F.3d at 457-58.

Even viewing the facts in the light most favorable to Plaintiff, the record reveals that the speech at issue had the ability to impair the efficient functioning of the Office. During his deposition, Defendant Finkelstein testified that Plaintiff's statements negatively affected the respect he earned in the community, thereby impeding his ability to carry out his constitutional duties as Public Defender. ECF No. [41-4] at 75:75:8-21. Defendant Finkelstein also explained that there was "no way [he] could have [Plaintiff] be on [his] staff working for [him] because of the contempt, hatred, and basically calling [him] an old racist that doesn't care." *Id.* at 94:19-22.

According to Defendant Finkelstein, the manner in which Plaintiff's message was expressed was disrespectful and insulting, and it amounted to a breach of his trust. *See Morris*, 117 F.3d at 458 ("The First Amendment does not require a public employer to tolerate an embarrassing, vulgar, vituperative, ad hominem attack, simply because the employee recently has waved a political sign, or was waiving the sign while conducting the attack.").

From within the Office, Defendant Finkelstein also believed that Plaintiff's statements "created a split in the office" based upon race and caused lawyers in the Office to avoid those in Administration. ECF No. [41-4] at 70:8-71:18, 74:3-75:7. Defendant Finkelstein further deemed Plaintiff's statements regarding the prevalence of racial inequities in the Office as untrue and particularly shocking because both Defendant Finkelstein and those he "served with have dedicated [their] entire [lives] to fighting for racial equality in the criminal justice system." *Id.* at 71:3-25; *see also* ECF No. [43-1] at 39. Ultimately, Defendant Finkelstein exercised his discretionary authority to terminate Plaintiff's employment because keeping her on board would be akin to "a disease in the office" and he "would have to spend the next four months finding out what [Plaintiff] said to counter it." ECF No. [41-4] at 94:25-95:2; *see also Shahar v. Bowers*, 114 F.3d 1097, 1103-04 (11th Cir. 1997) ("[T]he government employer's interest in staffing its offices with persons the employer fully trusts is given great weight when the pertinent employee helps make policy, handles confidential information or must speak or act—for others to see—on the employer's behalf.").

In her Response, Plaintiff maintains that Defendants' interest in maintaining orderly and efficient operation of the Office could not reasonably outweigh Plaintiff's interest in engaging in free speech because "Defendants have provided no evidence of any problems and/or disruption of their office" due to Plaintiff's speech. ECF No. [53] at 14. However, "[i]t is well-settled that a

'government's legitimate interest in avoiding disruption does not require proof of actual disruption.'" *McCullars v. Maloy*, 369 F. Supp. 3d 1230, 1240 (M.D. Fla. 2019) (citing *Snipes v. Volusia Cnty.*, 704 F. App'x 848, 852 (11th Cir. 2017) (explaining that a reasonable possibility of adverse harm is all that is required)). Courts "have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern." *Waters*, 511 U.S. at 673; *see also Connick*, 461 U.S. at 152 (explaining it is not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action."). In further support of her position, Plaintiff also points to the deposition testimony of Dadowski that she "didn't believe" Plaintiff's statements had any impact on the operation of the Office and "didn't think" Plaintiff's statements undermined or hurt Defendant Finkelstein's relationships with any attorneys in the Office. ECF No. [41-2] at 104:6-22. However, Dadowski's testimony does not rise above mere speculation, which is insufficient to demonstrate a genuine issue of material fact. *See Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015) ("Conclusory allegations and speculation are insufficient to create a genuine issue of material fact." (citations omitted)). Defendants have demonstrated that their interests in the orderly administration of the Office were threatened by Plaintiff's statements, and Plaintiff has not produced the type of evidence required by Rule 56(c) to contradict Defendants' conclusions.[8]

The time, place, and manner in which Plaintiff's statements were made also had the ability to impair the efficient functioning of the Office and disrupt its important mission of protecting the

---

[8] Plaintiff also seems to suggest that the Office's purported "interests as to avoiding an alleged imminent upheaval" necessarily fails because, at the time of Plaintiff's termination, the Office "had been shut down due to Covid-19 and the work for the office was done remotely." ECF No. [53] at 13. This argument is without merit. The mere fact that the Office was operating remotely has no bearing on whether Plaintiff's speech could have reasonably impaired its daily functions and affect employee working relationships.

constitutional rights of any indigent person charged with violating the law. Specifically, Plaintiff's statements insinuating that Defendant Finkelstein was a "racist" or that his Administration employed racially discriminatory practices could certainly discredit the respect Defendant Finkelstein earned in the Broward County community, as well as impair the community's trust and confidence in the integrity of the Office. ECF No. [41-4] at 75:75:8-21. Lastly, the Court acknowledges that the context of Plaintiff's statements—i.e., made pursuant to her campaign for public office—weighs in favor of Plaintiff. However, the considerations discussed above tilt the *Pickering* balance in favor of Defendants.

Under all of the circumstances and construing the facts in the light most favorable to Plaintiff, the *Pickering* balance tilts strongly in favor of Defendants' interest in the effective operation of the Office, superseding Plaintiff's First Amendment interest in this case. In sum, Defendant Finkelstein, relying on his own experiences as Public Defender, acknowledged the adverse effect Plaintiff's statements could have on the operation of the Office, as well as the public at large, and did not have to wait until tensions ensued before taking action. Plaintiff had not produced evidence to contradict Defendant Finkelstein's conclusions, or otherwise demonstrate that Defendants are not entitled to judgment as a matter of law. Therefore, the Court finds that Plaintiff is not entitled to First Amendment protection for the speech at issue.[9]

**V.     CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion, **ECF No. [41]**, is **DENIED**.

2. Defendants' Motion, **ECF No. [44]**, is **GRANTED**.

---

[9] Because the Court finds that Plaintiff's termination did not run afoul her First Amendment right to free speech, the Court does not address the remaining two prongs under the *Bryson* test or whether Defendant Finkelstein is entitled to qualified immunity.

Case No. 20-cv-62160-BLOOM/Valle

3. Pursuant to Federal Rule of Civil Procedure 58, Final Judgment will be entered by separate order.

4. To the extent not otherwise disposed of, all pending motions are **DENIED AS MOOT**, any scheduled hearings are **CANCELED**, and all deadlines are **TERMINATED**.

5. The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers at Miami, Florida, on October 10, 2021.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**